1  Elizabeth L. Deeley (SBN 230798)
   Michael P. Esser (SBN 268634)
2  KIRKLAND & ELLIS LLP
   555 California Street
3  San Francisco, CA 94104
   Telephone: (415) 439-1400
4  Facsimile: (415) 439-1500
   Email:  elizabeth.deeley@kirkland.com
5  Email:  michael.esser@kirkland.com

6  Jeffrey L. Willian, P.C. (*pro hac vice*)
   Donna M. Welch, P.C. (*pro hac vice*)
7  KIRKLAND & ELLIS LLP
   300 North LaSalle
8  Chicago, IL 60654
   Telephone: (312) 862-2000
9  Facsimile: (312) 862-2200
   Email:  jwillian@kirkland.com
10 Email:  dwelch@kirkland.com

11 Attorneys for Plaintiffs

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14                    SAN JOSE DIVISION

15 MONTEREY BAY MILITARY HOUSING, LLC,        Case No. 5:17-cv-04992
   MONTEREY BAY LAND, LLC, MEADE
16 COMMUNITIES LLC, FORT BLISS/WHITE SANDS    FIRST AMENDED COMPLAINT
   MISSILE RANGE HOUSING LP, RILEY
17 COMMUNITIES LLC, FORT LEAVENWORTH          JURY TRIAL DEMANDED
   FRONTIER HERITAGE COMMUNITIES, I, LLC,
18 FORT LEAVENWORTH FRONTIER HERITAGE
   COMMUNITIES, II, LLC, CARLISLE/ PICATINNY
19 FAMILY HOUSING LP, BRAGG COMMUNITIES
   LLC, FORT DETRICK/WALTER REED ARMY
20 MEDICAL CENTER LLC, PICERNE-FORT POLK
   FUNDING, LLC, RUCKER COMMUNITIES LLC,
21 STEWART HUNTER HOUSING LLC, SILL
   HOUSING, LLC, AETC HOUSING LP, AMC WEST
22 HOUSING LP, LACKLAND FAMILY HOUSING,
   LLC, and VANDENBERG HOUSING LP,
23
              Plaintiffs,
24        vs.

25 AMBAC ASSURANCE CORPORATION,
   JEFFERIES MORTGAGE FINANCE, INC.,
26 JEFFERIES & COMPANY, INC., JEFFERIES LLC,
   JEFFERIES GROUP LLC, DANNY RAY,
27 ANNANDALE PLANTATION, LLC, ANNANDALE
   PLANTATION, LLC, and CHETAN MARFATIA
28
              Defendants.

FIRST AMENDED COMPLAINT                          CASE NO. 5:17-cv-04992

1.      In the mid-1990s, pursuant to the Military Housing Privatization Initiative of 1996 ("MHPI"), Congress authorized the Department of Defense (including the United States Army and Air Force) to enter into agreements with private sector developers to finance, develop, construct and operate modernized housing for military families on bases around the country.  These MHPI Projects collectively needed billions of dollars of long-term financing to accomplish this objective, as the military bases largely were comprised of aging homes in need of renovation or demolition.  The purpose of these projects was to develop long-term, safe, economical, and comfortable housing for the men, women and families of the Armed Forces.  Plaintiffs are MHPI project entities (referred to herein as the "Projects"), each dedicated to one or more of the specified military bases.

2.      In the Army MHPI Projects, the Army and a private developer are partners, with the private developer partner managing the Project on a day-to-day basis.  The Army contributed the land and additional equity, and in return receives significant equity participation.  In addition, the Army has consent rights to major decisions regarding the Projects, including the terms of the initial financing at issue in this Complaint and whether to initiate litigation such as this Complaint.

3.      In the Air Force MHPI Projects, the Air Force contracted with the private developer, contributed the land and provided a Government Direct Loan to the Project (except at the Vandenberg Project), and has the right to cash flows after certain returns are paid to the private developer.  The Air Force is consulted on significant issues, including on whether to initiate litigation such as this Complaint.

4.      Defendant Danny Ray ("Ray"), a former Managing Director of GMAC Commercial Mortgage Corporation ("GMAC")[1] and its successors, and Defendant Chetan Marfatia ("Marfatia"), a former Managing Director of Defendant Ambac Assurance Corporation ("Ambac"), viewed the housing needs of the MHPI Projects as an opportunity to enrich themselves by committing repeated frauds and breaches of fiduciary duty.  By no later than 2002, GMAC and Defendant Ambac, through

---

[1]    In 2006, GMAC was sold in a leveraged buyout and later formed into Capmark.  In late 2009, Capmark went into bankruptcy and its military housing servicing business was sold to Defendant Jefferies Mortgage Finance, Inc.  Key personnel, including Ray, who along with Ambac devised the financing structures at issue herein, moved from GMAC to each of these successor entities.  GMAC and Capmark are collectively referred to as "GMAC" herein.

their respective managing partners Ray and Marfatia, formed a RICO enterprise to illegally profit on the financing of such transactions. GMAC and Ray acted as self-described "financial advisors" to the Projects in connection with the transactions, and GMAC also served as the eventual lender. Ray used GMAC's role as lender and financial advisor to mislead the Projects and reap various and substantial undisclosed and inflated fees and profits.

5. For its part, Ambac used its then AAA credit rating to insure the loan (or on occasion the bonds or certificates syndicated by GMAC), which allowed GMAC to syndicate the loan provided to the Projects by selling bonds (also known as certificates) as AAA-rated. Such bond insurance is commonly referred to as "credit enhancement." While GMAC and Ambac represented to the Projects that they operated at arm's length, in reality they operated as a self-described joint venture, where GMAC provided Ambac with an undisclosed exclusive right to provide bond insurance and guaranteed investment contracts. GMAC and Ambac built on this exclusive and undisclosed relationship to aid and abet the other for years in charging the Monterey Plaintiffs and other Plaintiff Projects hundreds of millions of dollars in inflated and undisclosed fees and profits.

6. In carrying out this pattern of racketeering, Ray and Marfatia (and through them, GMAC, Jefferies in the post-2009 time period, and Ambac) made numerous written (via interstate wires and the U.S. mails) and verbal misrepresentations and omissions to the Projects. All of the Projects and their representatives trusted that Ray and Marfatia (and their employers) would tell them the truth, disclose all material facts regarding the financing transactions, not make any secret profits or fees, and operate in the Projects' best interests. As detailed herein, as the risk of detection increased, Defendants employed variations to the scheme to not only mask it, but to increase their secret profits over time. However, the scheme essentially had the following elements, all of which constituted a long-running pattern of racketeering.

7. **Ray, GMAC, and later Jefferies charged the Projects an inflated interest rate on the Project loans.** GMAC and Ray represented to each of the Projects that it would serve as financial advisor and help originate a long-term loan, often in the hundreds of millions of dollars, to fund the necessary housing renovation and construction on the individual bases. In return, GMAC received a

disclosed "origination fee" for these services.  GMAC represented that it would act as a fiduciary and in essence use its "best efforts" to provide the most competitive market rate possible.

8.      In 2009, when Ray moved to and became employed by Jefferies & Company, Inc., and in subsequent years when he became employed by Jefferies LLC (all under the umbrella of parent company Jefferies Group LLC), Ray continued to act as a financial advisor and the Projects continued to view Ray, and these Jefferies entities, as trusted financial advisors as Ray had been for the prior eight years.  Defendant Jefferies Mortgage Finance Inc. ("Jefferies Mortgage"), as lender, did purport to disclaim a financial advisor or fiduciary relationship role to Plaintiffs Sill Housing LLC in 2010 and Fort Bliss/White Sands Missile Range Housing LP in 2012, but this disclaimer is unenforceable as it was obtained through fraud.  Further, at no time did this disclaimer apply according to its express terms to Ray or the other Jefferies Defendants.  Thus, after Ray moved to Jefferies in 2009, Ray and all Jefferies Defendants owed the Projects a fiduciary duty.

9.      Beginning with the Meade Project, which closed in 2002, and the Bragg Project, which closed in August 2003, Ray and GMAC began to use their position of trust and confidence to defraud, taking significant secret fees and profits.  Then, beginning with the Monterey Project, which closed several months later in October 2003, Ray and GMAC first set the interest rate to include undisclosed profits in the form of an inflated "credit spread" (the difference between a bond's coupon rate or yield and an underlying benchmark rate).  They continued this new element of the fraud, through a variety of changing artifices and misrepresentations, at subsequent Plaintiff Projects (and in additional financing provided to the Bragg Project in 2007).  A minor and undetected inflation in the interest rate above market, given the long-term nature of the loan, reaped substantial excess and immediate profits for GMAC and Ray when it syndicated the loan by selling bonds.

10.     While Ray represented the credit spread was set based on the "risk premium required by investors," in reality, beginning with the Monterey Project, he inflated the spread to allow GMAC to make tens of millions of dollars of undisclosed profits on the sale of the underlying bonds prior to the close of the Projects' loan transactions.  Through the sale of these bonds, Ray was able to monetize the inflated credit spread for GMAC and his own personal profit.  Ray has admitted, even though a fiduciary to the Projects, that none of these bond profits of which Ray personally received

approximately 40%, were ever disclosed to the Projects. To this day, the Monterey Project and subsequent Projects continue to suffer substantial harm in paying inflated interest rates on these long-term loans.

11.   Ambac aided and abetted Ray and GMAC in charging this inflated interest rate to the Projects. Among other acts described herein, Ambac began to directly participate in the GMAC scheme to profit on the sale of the bonds, by buying some of the MHPI bonds (either directly or indirectly) at a premium to par. Indeed, Ambac first did so at the Monterey Project, and, in return for aiding GMAC's scheme by putting money directly in Ray's pocket, Ray and GMAC used Ambac exclusively in subsequent Projects, allowing Ambac to avoid competition and charge inflated credit enhancement fees as well.

12.   **Ambac, GMAC, Marfatia and Ray manipulated the "shadow" ratings from the rating agencies to the detriment of the Projects.** Prior to the July 2005 Fort Bliss transaction, Ray and Marfatia represented to the Projects that they needed a rating from the rating agencies on the underlying proposed transaction before credit enhancement from Ambac. Unlike other competitors, Ray and Marfatia insisted that the Projects only pay to obtain "shadow ratings" rather than the more common public rating that would have been subject to public scrutiny. GMAC and Ambac used the resulting shadow rating as a basis to justify in part setting the inflated interest rates and the need for, and amount of, credit enhancement.

13.   Ambac and GMAC represented to the Projects that they would attempt to obtain the highest or most favorable rating from the rating agencies based on the transaction pro forma—which would have been in the Projects' best interests. Instead, Ambac and GMAC, through Ray and Marfatia, rigged the rating system. In or around October 2003, in a face-to-face meeting with S&P, Ambac instructed that none of the MHPI Projects involving Ambac credit enhancement should receive a shadow rating higher than an "A." This artificial ratings cap, which S&P accepted, allowed GMAC and Ambac to ensure the rating justified their inflated charges and the overall supposed need to credit enhance the GMAC loan and/or bonds. Notably, many MHPI Projects not involving GMAC/Ambac received public ratings above an "A" and therefore did not require credit enhancement. In contrast, consistent with the above instruction by Ambac and GMAC to S&P, after 2003 and at least before

S&P's ratings criteria changed in August 2006, no joint GMAC/Ambac Project received a rating above an "A."

14. **GMAC and Ambac conspired to charge the Projects for unnecessary and inflated surety and bond insurance fees and premiums.**  To maximize the ill-gotten fees that it received from the Projects, GMAC and Ambac falsely represented to the Projects that in addition to bond insurance on the full amount of the loan, the rating agencies required the Projects to purchase a surety bond or cash fund a debt service reserve account in the amount of one year's principal and interest in order to receive a AAA rating.  In truth, in or about 2002, at least S&P had made clear to Marfatia and Ray that it did not require a surety or cash funding of the debt service reserve on a credit enhanced transaction in order to rate the loan or bonds as AAA.

15. Ambac and GMAC did not disclose this rating agency instruction to the Projects, and actively concealed that, in fact, S&P only required 12 months total of any type of bond insurance (or cash funded liquidity).  Thus, Ambac and GMAC falsely insisted that the rating agencies require that the Projects buy not only bond insurance for the full amount of the loan (or at times, the bonds), but also buy insurance on insurance—a surety bond representing one year's worth of liquidity protection—for a hefty fee.  Internally, Ambac recognized that, in fact, the sureties it sold to the Projects were effectively unnecessary and not required by the rating agencies as they were subordinated to the actual bond insurance that it provided and would never be triggered.

16. **GMAC and Ambac rigged the Guaranteed Investment Contracts ("GIC") bidding process.**  Not content with the secret and inflated profits described above, GMAC and Ray also rigged the GIC auction process to favor their RICO enterprise.  At the time of the loan transactions, a significant amount of the initial loan proceeds were not needed by the Projects until months and years later and hence needed to be invested.  Ray recommended that unused proceeds be invested in GICs.  Ray, as financial advisor, claimed he would run a "blind bid" auction for nearly all of the Projects to identify a willing GIC provider(s) with the highest return and best terms.

17. In reality, Ray and GMAC had rigged the GIC auction in at least the following respects. As parties of the undisclosed GMAC/Ambac joint venture, Ray gave Ambac a "last look" at all GIC bids.  This practice severely undermined the efficiency and integrity of the results of the blind auction

process.  Ray and GMAC further demanded, without disclosure to certain of the Projects and omitted from the bidding instructions shared and approved by the Projects, that the bidder GMAC selected pay separate fees to GMAC.  These practices, among other potential undisclosed GIC bid practices, led to lower returns on the Projects' investments than could have been obtained if Ray, GMAC and Ambac acted in the best interest of the Projects.

18.     **GMAC and Ambac charged the Projects for inflated deal expenses.**  GMAC and Ambac also charged the Projects inflated deal expenses in connection with the financings.  The Projects agreed to pay the actual deal expenses of GMAC and Ambac (sometimes subject to a cap), but rather than charge actual expenses, GMAC and Ambac charged the Projects inflated expenses that exceeded their actual expenses, often by as much as hundreds of thousands of dollars.  To ensure that Ray received his approximately 40% cut of all GMAC profits on the MHPI Projects, he calculated the profits received by GMAC in charging "expenses" to the Projects.  Ambac knew that GMAC was charging inflated expenses and likewise did the same, sometimes using the proceeds to fund client entertainment that Ambac claimed to the Projects it was funding.

19.     **Ambac and GMAC concealed their exclusive relationship, allowing them to perpetuate the fraud and charge above market rates to the Projects.**  GMAC and Ray recognized that Ambac was crucial to receiving their out-sized and illicit profits in connection with the interest rate charged to the Projects, including taking undisclosed profits on the sale of Project bonds as they had first begun to do at the Monterey Project.  As a result, Ray went to extraordinary lengths to maximize the credit enhancement fees that Ambac could charge the Projects and through direct misrepresentations to the Projects protected Ambac from competition from other mono-line bond insurers, including MBIA.  Such misrepresentations included reporting to the Projects that competitor MBIA would charge the same fees and terms as Ambac, despite the fact that MBIA had specifically told Ray that it could provide substantially better pricing and terms than Ambac.

20.     Prior to the 2005 Bliss Project, Ray promised the Projects that he would use good faith and best efforts to negotiate credit enhancement fees with Ambac.  In truth, he engaged in no meaningful negotiation with Ambac.  The relationship between Ray and Marfatia was so close that Marfatia even gave Ray authority to charge the Projects Ambac's credit enhancement fee within a

range of discretion.  In return, Ray gave Ambac an exclusive right to provide this unnecessary and/or overpriced financial product, thereby insulating Ambac from competition.  This exclusive relationship between GMAC and Ambac allowed Ambac to charge the Projects above market and unnecessary credit enhancement and surety fees.

21.     **Defendants modified the RICO scheme over time to avoid detection.**  By early 2005, when the private developers and the Army's real estate consultant, Jones Lang LaSalle ("JLL"), began to observe that GMAC seemed partial to using Ambac for credit enhancement on its MHPI deals, the Fort Bliss Project insisted that GMAC competitively bid out credit enhancement.   In response to a demand for competition, GMAC and Ambac developed what they termed a "stealth structure" to help further perpetuate and enlarge the fraud schemes.

22.     This stealth structure had several integrated deceptive components.  First, as part of the stealth structure, Ray represented to the Projects that GMAC would close the loan and then later attempt to syndicate the loan post-closing thereby taking market risk.  In reality, Ray and GMAC, as Ambac knew, intended to and did set the Projects' loan interest rate above market and sell the bonds prior to close at a premium to par, reaping millions in undisclosed profits.  Second, the stealth structure allowed Ray, Marfatia, and Ambac to secretly build a monthly fee for Ambac credit enhancement into the loan interest rate.  Yet, Ray and Ambac failed to disclose the involvement of Ambac prior to close and failed to disclose that the Ambac fee was a result of a collusive relationship between GMAC and Ambac.  Third, through written responses to requests for proposals, GMAC convinced the Projects to purchase a Liquidity Facility from GMAC in lieu of a surety bond representing it was substantially cheaper.  In truth, without disclosure to the Projects, at a separate simultaneous closing that excluded the Projects, GMAC immediately assigned the Liquidity Facility to Ambac who issued a surety bond in lieu of the Liquidity Facility at approximately half the price of the Liquidity Facility. GMAC and Ambac then secretly negotiated on how to split the Liquidity Facility fee between the two companies even though GMAC took no market risk.

23.     **In late 2009, Defendant Jefferies hired Ray and joined the conspiracy.**   In December 2009, after GMAC became Capmark and it filed for bankruptcy, Defendant Jefferies Mortgage purchased Capmark's MHPI servicing business out of bankruptcy in a Section 363 asset

sale.  As part of that transaction and after substantial due diligence, Jefferies hired Ray, as a Managing Director and Head of Global Finance, and Ray's team from GMAC/Capmark, in order to continue their MHPI-related business.  With the consent of those at Jefferies to whom Ray reported and needed approval, Ray almost immediately began using Jefferies to perpetuate and continue the pattern of racketeering that he had directed previously.  For example, in early 2010, with respect to providing financing to Fort Sill (an Army installation in Oklahoma), Ray and now Jefferies made over $5 million in secret profits on the pre-sale of the underlying bonds, through the use of an Original Issue Discount ("OID") on the loan.

24.     As explained more fully herein, the OID (theoretically) allowed Ray to sell  underlying MHPI bonds at a discount to par, yet still reap millions in undisclosed profits and convince the Project that Jefferies had sold the bonds after closing thereby purportedly taking post-closing market and interest rate risk.  In reality, without disclosure to the Project, Ray and Jefferies had presold the Sill bonds at a $5 million profit prior to closing based on the inflated credit spread that was masked in part by the OID.

25.     As the scheme to profit on the sale of bonds (which had begun at the Monterey Project) evolved, Ray and GMAC began to use this same OID scheme to make secret profits on the bonds sold to many other MHPI Projects, including Plaintiff Army Projects Carlisle/Picatinny, Leavenworth, and Rucker, and on additional financing in 2007 at Bragg, and the Air Force Projects, including AETC I, Vandenberg (located in California), AMC West (which provides housing for three Air Force bases, including Travis Air Force Base in California), and Lackland II.  At Ray's direction, in 2006 and thereafter, including in connection with the 2010 Sill transaction, Ray sent (via interstate wires) emails with false representations about the purpose and effect of the OIDs.

26.     **By 2012, Ray and Jefferies had not only perfected their fraud scheme, but knew that opportunities to commit such MHPI transactional frauds were diminishing.**  By then, most of the housing in the Armed Forces bases had been privatized and so what remained for Ray and Jefferies were additional financings at bases where Ray had initially committed fraud.  Thus, in 2011 and 2012, when the Bliss Project determined it needed an additional $140 million (approximately) in debt to further increase the Armed Forces housing scope at Bliss—as approved by the Army—Ray

and Jefferies saw this as one of the last opportunities to make outsized secret profits. Thus, pursuant to the 2012 Bliss $140 million financing, Ray and Jefferies reaped greater secret profits (on a percentage basis)—all locked in prior to closing—than on any other of the referenced MHPI Project transactions.

27.     As part of the 2005 fraudulent Bliss transaction, Ray secured for GMAC a right of first refusal (a right now owned by Jefferies) to issue any additional debt needed by the Bliss Project. As such, Ray and Jefferies assured the Bliss Project that the loan from Jefferies Mortgage was at market rate. In truth, Ray and Jefferies had secret pre-commitments from investors to buy the debt at a staggering 8% above par—reflecting a highly inflated interest rate on the loan. In fact, the excess interest rate that Jefferies Mortgage charged the Bliss Project was so significant that Ray and Jefferies Mortgage carved out a separate Interest Only strip at 0.576% and securitized it in the form of a bond.

28.     As Ambac's consent was required for this transaction, in November 2012, Ray communicated to Ambac (specifically, Gary Greendale) that again he had pre-sold the bonds prior to closing and needed prompt Ambac consent for the transaction. Ambac, as a co-conspirator who had received an inflated credit enhancement fee on the 2005 Bliss transaction and also had approval rights over the issuance of additional debt, readily consented to the fraudulent transaction. Thus, on the last fraudulent MHPI transaction, not only did Ray and Jefferies reap extraordinary undisclosed profits on the sale of the bonds, but Ambac consented to the transaction in its long-held role as co-conspirator.

29.     **Defendants conspired to conceal their fraudulent scheme from the Projects.** Defendants have gone to extraordinary lengths to fraudulently conceal the above scheme and pattern of racketeering from the Projects. As detailed herein, Defendants directly misled some of the Projects verbally and in writing (using interstate wires) when the Projects and/or JLL questioned Ray and Marfatia about the transactional issues discussed herein, including whether GMAC/Jefferies were making a profit on the sale of bonds. Defendants further had a duty to disclose all such secret profits and fees. It was not until late 2016, and in particular, early 2017, that the Projects began to learn that

they had been severely misled and harmed by Defendants based on facts unearthed during ongoing, related litigation ("Debt Service Reserve Litigation") between Ambac and the Projects.[2]

30.     In 2016 and 2017, after they received subpoenas in the Debt Service Reserve Litigation, Jefferies and Ray misled a California state court about the existence of documents.  Worse, Jefferies and Ray attempted to cover up through direct misrepresentations and false testimony that Ray had attempted to destroy over 9,100 MHPI documents in the custody of Jefferies that bear on these issues within days and even hours after receiving a subpoena from the Monterey Plaintiffs.  Other evidence indicates further potential massive deletions of relevant documents by Jefferies and Ray.  When it learned of this destruction after the court was forced to issue five discovery orders against Jefferies, the California State Court observed this conduct was "highly disturbing" and issued an order (the "Forensic Order") for further and detailed forensic investigation and document and data review of Jefferies' systems and documents.  As of this filing, Jefferies has failed to comply with the California State Court's Forensic Order due to Ambac's sudden concession of judgment in Monterey by waiving defenses it had stood by throughout the case, and Jefferies and Ray have subsequently refused to confirm that they have preserved—and continue to preserve—documents subject to the Forensic Order.

31.     **Defendants' actions constitute classic racketeering.**  The above fraudulent and long-running scheme, implemented through the use of the U.S. mails and interstate wires including emails, constituted a classic, long-running RICO enterprise that accomplished its fraudulent goals through a continuous pattern of racketeering activity.  The RICO enterprise included at least Ambac, Jefferies, GMAC (not sued in this action given their bankruptcy), Ray (and his Annandale Plantation LLCs as alleged herein), and Marfatia.  As co-conspirators, Jefferies, Ambac, Ray, the Annandale LLCs and Marfatia, are all jointly and severally liable for the acts of each other.  The damage that their

---

[2]   In late 2015, litigation ensued between various MHPI Projects and Ambac.  The central dispute in these related and currently pending cases was whether Ambac could force the various MHPI Projects to "cash fund" a debt service reserve in a collective amount of $220 million after Ambac's 2008 credit rating downgrade.  As a result of this downgrade, the surety bonds that Ambac had sold on false pretenses to the MHPI Projects no longer met the contractually required credit rating requirements, but Ambac argued that the MHPI Projects should be forced to effectively set aside hundreds of millions of dollars in total to make up for Ambac's now-worthless surety bond.  Equitable defenses in those cases bear on some of the same conduct at issue here.

RICO enterprise has caused the Projects is in the hundreds of millions of dollars and, as noted herein, the damage is ongoing and continues to this day. Such damage is subject to trebling under RICO, and Defendants are liable for all reasonable attorney fees and subject to punitive damages. In addition, as dishonest fiduciaries, Defendants must disgorge all profits and fees received in these transactions, both disclosed and undisclosed, including the fees that Jefferies received from the Projects for acting as Servicer.

32.     The Army and Air Force have authorized the prosecution of these claims.

## Parties

**Plaintiffs**

33.     Plaintiff Monterey Bay Military Housing, LLC is a Delaware limited liability company with an address at 4401 Wilson Boulevard, Suite 600, Arlington, VA 22203. Monterey Bay Military Housing, LLC's principal place of business is at 328 Hatten Road, Seaside, CA 93955.

34.     Plaintiff Monterey Bay Land, LLC is a Delaware limited liability company with an address at 4401 Wilson Boulevard, Suite 600, Arlington, VA 22203. This entity, along with Plaintiff Monterey Bay Military Housing, LLC, operates the privatized military housing project located at the Presidio of Monterey and Naval Post-Graduate School located in Monterey, California.

35.     Plaintiff Fort Bliss/White Sands Missile Range Housing LP is a Delaware limited partnership with an address at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern, PA 19355. This entity operates the private military housing project located at Fort Bliss, Texas and the White Sands Missile Range in New Mexico.

36.     Plaintiff Carlisle/Picatinny Family Housing LP is a Delaware limited partnership with an address at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern, PA 19355. This entity operates the privatized military housing project located at the Carlisle Barracks in Pennsylvania and the Picatinny Arsenal in New Jersey.

37.     Plaintiff Stewart Hunter Housing LLC is a Delaware limited liability company with an address at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern, PA 19355. This entity operates the privatized military housing project located at Fort Stewart and Hunt Army Airfield in Georgia.

38.     Plaintiff Fort Leavenworth Frontier Heritage Communities, I, LLC is a Kansas limited liability company with an address at 222 Hancock Avenue, Fort Leavenworth, KS 66027.

39.     Plaintiff Fort Leavenworth Frontier Communities, II, LLC is a Kansas limited liability company with an address at 222 Hancock Avenue, Fort Leavenworth, KS 66027.  This entity, along with Plaintiff Fort Leavenworth Frontier Heritage Communities, I, LLC operates the private military housing project located at Fort Leavenworth, Kansas.

40.     Plaintiff Meade Communities LLC is a Delaware limited liability company with its principal place of business at 3080 Ernie Pyle Street, Fort Meade, Maryland 20755.

41.     Plaintiff Riley Communities LLC is a Kansas limited liability company with an address at 45 Barry Avenue, Fort Riley, KS 66442.  This entity operates the private military housing project located at Fort Riley, Kansas.

42.     Plaintiff Bragg Communities LLC is a Delaware limited liability company with an address at 160 Mine Lake Court, Suite 200, Raleigh, NC 27615.  This entity operates the private military housing project located at Fort Bragg, North Carolina.

43.     Plaintiff Fort Detrick/Walter Reed Army Medical Center LLC is a Delaware limited liability company with an address at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern, PA 19355.  This entity operates the privatized military housing project located at Fort Detrick, Maryland and the Walter Reed Army Medical Center in Maryland.

44.     Plaintiff Picerne Fort Polk Funding LLC is a Delaware limited liability company with an address at 1405 South County Trail, Suite 530, East Greenwich, RI 02818.  This entity operates the private military housing project located at Fort Polk, Louisiana pursuant to a sublease from Plaintiff Polk Communities LLC.

45.     Plaintiff Rucker Communities LLC is a Delaware limited liability company with an address at 2908 Andrews Avenue, Fort Rucker, AL 36362.  This entity operates the private military housing project located at Fort Rucker, Alabama.

46.     Plaintiff Sill Housing, LLC is a Delaware limited liability company with an address at 6949 Post Road, Suite 300, North Kingstown, RI 02852.  This entity operates the private military housing project located at Fort Sill, Oklahoma.

47.     Plaintiff AETC Housing LP is a Delaware limited partnership with an address at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern, PA 19355.  This entity operates as one privatized military housing project at four Air Force bases located at:  Altus Air Force Base in Altus, Oklahoma; Luke Air Force Base in Glendale, Arizona; Sheppard Air Force Base in Wichita Falls, Texas; and Tyndall Air Force Base in Panama City, Florida.

48.     Plaintiff AMC West Housing LP is a Delaware limited partnership with an address at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern, PA 19355.  This entity operates as one privatized military housing project at three Air Force bases located at: Fairchild Air Force Base, Spokane County, Washington, Tinker Air Force Base, Oklahoma County, Oklahoma, and Travis Air Force Base, Solano County, California.

49.     Plaintiff Lackland Family Housing, LLC is a Delaware limited liability company with an address at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern, PA 19355.  This entity operates the privatized military housing project located at Lackland Air Force Base, in Bexar County, Texas.

50.     Plaintiff Vandenberg Housing LP is a Delaware limited partnership with an address at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern, PA 19355.  This entity operates the privatized military housing project located at Vandenberg Air Force Base, in Santa Barbara County, California.

**Defendants**

51.     Defendant Ambac Assurance Corporation is an insurance company formed under the laws of the state of Wisconsin, with its principal place of business at One State Street Plaza, New York, New York 10004.

52.     Defendant Jefferies Mortgage Finance, Inc. was a Delaware corporation with its principal place of business at 520 Madison Avenue, 16th Floor, New York, New York 10022.  Two days after a California state court issued an order granting the Monterey Plaintiffs' motion to compel Jefferies Mortgage to produce evidence that revealed its involvement with Ray in attempting to destroy the 9,100 documents, the Jefferies Defendants attempted to dissolve Jefferies Mortgage on

1  February 8, 2017.   Jefferies Mortgage served as the lender for the 2010 Sill and 2012 Bliss
2  transactions.

3          53.     Defendant Jefferies & Co., Inc. was a Delaware corporation with its principal place of
4  business at 520 Madison Ave, 16th Floor, New York, New York 10022.   Jefferies & Co., Inc. merged
5  and became Jefferies LLC in 2013.   Prior to its merger with Jefferies LLC, Jefferies & Co. Inc.
6  employed Ray and his team and served as placement agent and financial advisor on the 2010 Sill and
7  2012 Bliss transactions.

8          54.     Defendant Jefferies Group LLC is a Delaware limited liability company with its
9  principal place of business at 520 Madison Avenue, 16th Floor, New York, New York 10022.   It was
10  Jefferies Mortgage's ultimate parent company at the time of Jefferies Mortgage's dissolution and
11  Jefferies Group LLC received a distribution of Jefferies Mortgage's assets following Jefferies
12  Mortgage's dissolution.

13          55.     Defendant Jefferies LLC is a Delaware limited liability company with its principal
14  place of business at 520 Madison Avenue, 16th Floor, New York, New York 10022.   After its merger
15  with Jefferies & Co. Inc., Jefferies LLC employed Ray and his team.

16          56.     Defendant Danny Ray is a natural person and resident of South Carolina residing at
17  732 Prince Street, Georgetown, South Carolina 29585.

18          57.     Defendant Chetan Marfatia is a natural person and resident of New York residing at 13
19  Horton Court, West Harrison, New York 10604.

20          58.     Defendant Annandale Plantation, LLC ("Annandale Plantation - CO") is a Colorado
21  limited liability company with its principal place of business and registered agent at 22415 Sunset
22  Drive, Golden, Colorado 80401.   Since July 1, 2007, Annandale Plantation - CO has been listed as a
23  delinquent company by the Colorado Secretary of State.   Prior to February 18, 2004, Annandale
24  Plantation - CO was known as Millbrook Plantation, LLC.

25          59.     Defendant Annandale Plantation, LLC ("Annandale Plantation - SC") is a South
26  Carolina limited liability company with a principal place of business and registered agent at 241
27  Annandale Road, Georgetown, SC 29440.

28

**Jurisdiction and Venue**

60.   This Court has subject matter jurisdiction over the civil RICO claims asserted herein pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a) because the claims relate to the same case or controversy under Article III of the United States Constitution.

61.   This Court has personal jurisdiction over Defendant Ambac because it regularly conducts business in the state of California, has a registered agent within the state of California, transacts its affairs within the state of California, and has availed itself of the benefits of doing business in the state of California.   These facts are sufficient to establish personal jurisdiction over Ambac pursuant to 18 U.S.C. § 1965(a).   Furthermore, the subject matter of this dispute arises in part out of Ambac's contacts within the state of California.   Ambac committed intentional torts, including numerous instances of breach of fiduciary duty, fraud and violations of RICO, purposefully directed at and causing harm to the Monterey and Vandenberg Projects in California and to the AMC West Project, which provides housing to three Air Force bases, including Travis Air Force Base in California.

62.   As detailed above, while Defendants engaged in multiple misrepresentations and took hidden fees and profits with respect to the Meade and Bragg Projects, they added a major (and perhaps most damaging) component of the fraud—beginning to take hidden profits on the pre-sale of the bonds—with the Monterey Project in 2003.   This was the basic fraud model used thereafter.   Without the trust gained through the financing of early projects including the Monterey Project, Defendants would not have been able to carry out their fraudulent scheme against other Projects located outside of California.   Jurisdiction is therefore appropriate over Ambac pursuant to 18 U.S.C. § 1965(a), California Code of Civil Procedure section 410.10, and the Fifth and Fourteenth Amendments of the United States Constitution.

63.   This Court has personal jurisdiction over Defendants Jefferies Mortgage, Jefferies & Company, Inc., Jefferies LLC, and Jefferies Group LLC (collectively "Jefferies") because the subject matter of this dispute arises in part out of Jefferies' contacts within the state of California.   Additionally, each of the Jefferies entities regularly conducted business and transacted their affairs in the state of California and had a registered agent in the state of California during all

relevant time periods.  These facts are sufficient to establish personal jurisdiction over each of the Jefferies entities pursuant to 18 U.S.C. § 1965(a).  Jefferies LLC and Jefferies Group LLC continue to conduct business and transact their affairs in the state of California and have a registered agent within the state of California.  And once Ray became Managing Director of the Jefferies entities, continuing to hold himself out as the Projects' financial advisor, Defendants continued the same pattern of racketeering activity and continued to act, as alleged herein.  Jurisdiction is therefore appropriate over Jefferies pursuant to 18 U.S.C. § 1965(a), California Code of Civil Procedure section 410.10, and the Fifth and Fourteenth Amendments of the United States Constitution.

64.   This Court has personal jurisdiction over Defendant Ray because the subject matter of this dispute arises in part out of Ray's contacts within the state of California.  Ray committed intentional torts, including numerous instances of breach of fiduciary duty, fraud and violations of RICO, purposefully directed at and causing harm to the Monterey, Vandenberg, and AMC West Project (which includes Travis Air Force Base) in California.  Additionally, in 2003, Ray traveled to California in connection with the schemes to defraud the Projects.   As detailed above, while Defendants engaged in multiple misrepresentations and took hidden fees and profits with respect to the Meade and Bragg Projects, they added a major (and perhaps most damaging) component of the fraud—beginning to take hidden profits on the pre-sale of the bonds—with the Monterey Project in 2003.  The Monterey fraud model was the basic model used thereafter to engage in the subsequent pattern of racketeering alleged herein.  Without the trust gained through the financing of early projects including the Monterey Project, Defendants would not have been able to carry out their fraudulent scheme against other Projects located outside of California. Jurisdiction is therefore appropriate over Defendant Ray pursuant to 18 U.S.C. § 1965(a), California Code of Civil Procedure section 410.10, and the Fifth and Fourteenth Amendments of the United States Constitution.

65.   This Court has personal jurisdiction over Defendant Marfatia because the subject matter of this dispute arises in part out of this party's contacts with the state of California.  Marfatia committed intentional torts, including numerous instances of breach of fiduciary duty, fraud and violations of RICO, purposefully directed at and causing harm to the Monterey, Vandenberg and AMC West Projects (which includes Travis Air Force Base) in California.  Additionally, in 2003, Marfatia

traveled to California in connection with the schemes to defraud the Projects.  As detailed above, while Defendants engaged in multiple misrepresentations and took hidden fees and profits with respect to the Meade and Bragg Projects, they added a major (and perhaps most damaging) component of the fraud—beginning to take hidden profits on the pre-sale of the bonds—with the Monterey Project in 2003.  The Monterey fraud model was the basic pre-fraud model used thereafter.  Without the trust gained through the financing of early projects including the Monterey Project, Defendants would not have been able to carry out their fraudulent scheme against other Projects located outside of California. Jurisdiction is therefore appropriate over Defendant Marfatia pursuant to 18 U.S.C. § 1965(a), California Code of Civil Procedure section 410.10, and the Fifth and Fourteenth Amendments of the United States Constitution.

66.    This Court has jurisdiction over Defendants Annandale Plantation - CO and Annandale Plantation - SC (together the "Annandale Plantation Defendants") because they are limited liability companies, organized under the laws of Colorado and South Carolina and operating exclusively in South Carolina, which Ray used in connection with the RICO enterprise and the pattern of racketeering alleged throughout this complaint.  The Annandale Plantation Defendants have been used by Ray to shelter and hide Ray's ill-gotten gains as well as conduct business related to the MHPI Projects and the RICO enterprise.  Because the Annandale Plantation Defendants were part of the national RICO enterprise and pattern of racketeering committed against Plaintiffs, this Court has personal jurisdiction over the Annandale Plantation Defendants pursuant to 18 U.S.C. § 1965(b).  The Annandale Plantation Defendants do not have sufficient contacts to create personal jurisdiction in the states of New York or California.

67.    In addition, this Court further has personal jurisdiction over all Defendants pursuant to 18 U.S.C. § 1965(b) because all Defendants participated in an enterprise engaged in a pattern of racketeering activity, and the Court has personal jurisdiction over at least one Defendant.  There is no other federal district in which a federal court will have personal jurisdiction over all Defendants because while the Southern District of New York would have jurisdiction over Defendants Ambac, Jefferies and Marfatia because they are residents of or have their principal place of business within the Southern District of New York, Defendant Ray resides and is domiciled in South Carolina and he is

not subject to personal jurisdiction in the state of New York with regard to the allegations of this lawsuit as no torts or fraud were directed at or felt by any Plaintiff in New York.  Likewise, the Annandale Plantation Defendants are limited liability companies, organized under the laws of the states of Colorado and South Carolina, respectively.  Both Annandale Plantation - CO and Annandale Plantation - SC own real estate solely in South Carolina and are thus subject to personal jurisdiction in the District of Colorado and District of South Carolina.  Thus, the ends of justice require national service of process and personal jurisdiction over all Defendants pursuant to 18 U.S.C. § 1965(b).

68.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred and were felt in the Northern District of California.

69.     Additionally, all Defendants have engaged in a multidistrict pattern of racketeering activities and a conspiracy to engage in these racketeering activities.  Thus, venue also is proper pursuant to 18 U.S.C. § 1965(a).

70.     Joinder of all Plaintiffs is proper under Federal Rule of Civil Procedure 20(a)(1).  As alleged throughout, Defendants' fraud and pattern of racketeering activity arose out of the same series of privatized Army and Air Force housing transactions that have a similar factual background and a definite, logical relationship to one another.  Likewise, numerous issues of law and fact common to all Plaintiffs will arise in this action.  A significant waste of judicial and client resources would result, including a risk of inconsistent verdicts, if the Projects were forced to try each of their claims separately in differing forums.

## I.     MHPI Structure and Relationship of the Parties

71.     Congress established the MHPI in 1996 to help the military improve the conditions of the housing provided to members of the Armed Forces.  According to the United States Department of Defense's website, MHPI "was designed and developed to attract private sector financing, expertise and innovation to provide necessary housing faster and more efficiently than traditional Military Construction processes would allow."  The Office of the Secretary of Defense delegated implementation of MHPI to the Military Services and authorized them "to enter into agreements with private developers selected in a competitive process to own, maintain and operate family housing via

a fifty-year lease." At the end of the 50-year Ground Lease, the program contemplates that the housing will be returned to the Armed Services—thus any decrease in the Projects' value and scope as a result of Defendants' actions both harm the Projects and, at the end of the Projects' terms, directly decreases the bargain received by the armed services.

72.     Each of the Army Project Plaintiffs is a participant in a public-private partnership between the United States Army and a private developer, established to operate, construct, develop and maintain privatized housing on one of several Army bases located around the country. The Army is an equity member/partner in each Army Project, is entitled to significant equity returns, and holds consent and approval rights over all significant aspects of the Project. The managing member of each Army Plaintiff is a private development partner, which manages Plaintiff's operations pursuant to its respective operating agreements or partnership agreements with the Army. Each of the Air Force Project Plaintiffs has contracted with the Air Force, and the Air Force contributed the land and provided a Government Direct Loan to the Projects (except at the Vandenberg Project), and has the right to cash flows after certain returns are paid to the private developer.

73.     Clark Realty Capital, L.L.C. (headquartered in Virginia), through its affiliates, partnered with the Army in connection with the Monterey Project Plaintiff, located in, and with its principal place of business, in California. Balfour Beatty Communities, LLC (f/k/a as GMH Military Housing headquartered in Pennsylvania), through its affiliates, is the private partner with the Army in connection with the Fort Stewart/Hunter Army Airfield (Georgia), Fort Bliss/White Sands Missile Range (Texas), Carlisle Barracks/Picatinny Arsenal (Pennsylvania), and Fort Detrick/Walter Reed Army Medical Center Project (Maryland) Plaintiffs. Balfour Beatty, through its affiliates, also contracted with the Air Force in connection with the AETC I (Oklahoma, Arizona, Texas and Florida), Vandenberg (California), AMC West (Washington, Oklahoma, and California), and Lackland II Air Force (Texas) Plaintiffs. Corvias Group, LLC (f/k/a Picerne Military Housing headquartered in Rhode Island), through its affiliates, is the private partner with the Army in connection with the Fort Meade (Maryland), Fort Bragg (North Carolina), Fort Polk (Louisiana), Fort Riley (Kansas), Fort Rucker (Alabama), and Fort Sill (Oklahoma) Plaintiffs. Michaels Management (headquartered in New Jersey), through its affiliates, is the private partner with the Army in connection with the Fort

Leavenworth (Kansas) Project Plaintiff.  California is thus the location of three of the military bases at issue:  the Presidio of Monterey, Vandenberg Air Force Base, and Travis Air Force Base (a part of the AMC West Project).  No other state is home to more military bases harmed by Defendants' long-running fraud scheme.

74.    In order to construct and develop high quality housing for military families at each of the respective bases, each Project took out a large loan (often in the amount of hundreds of millions of dollars) from a division of GMAC or its successor Capmark (collectively referred to herein as GMAC) or Jefferies.  A division of GMAC (and later Jefferies) also served as the loan servicer, the entity responsible for disbursing the Projects' revenue pursuant to the waterfall levels specified in the Servicing and Lockbox Agreement.

75.    In nearly all of the deals involving GMAC prior to 2009, Ambac provided both the credit enhancement insurance and the surety bond (though, as described, in some deals GMAC and Ambac conspired to hide the extent and nature of Ambac's involvement prior to closing from the Projects).  Ambac received millions of dollars in up-front surety fees from the Projects, and continues even today to receive tens of millions of dollars in credit enhancement insurance premiums each year. The Projects, all financially healthy, have never drawn on their credit enhancement insurance with Ambac.  Although Ambac's credit rating was downgraded in 2008 and it remains unrated today, GMAC and Ambac negotiated the Project deals to allow Ambac to stay in place as credit enhancer despite such ratings downgrades.

**A.    To win the MHPI Projects, Ray and His Employers and Ambac held themselves out as fiduciaries that would act in the Projects' best interests.**

76.    Over the course of many years, GMAC, Ray, Marfatia, and Ambac gained the trust and confidence of the private developers and the Army/Air Force and their respective advisors including JLL with whom they worked on multiple MHPI deals.  Through written material sent to the Army Projects (much of which was sent via interstate wires and/or U.S. mails) and in verbal discussions, GMAC and Ray assured the Projects that they were serving as "financial advisors" to the Projects and, in that role, that they were working in the Projects' best interests.  Under the law, financial advisors

owe their client an unmitigated fiduciary duty, must use best efforts, and must place their client's interest ahead of their own and not make any secret fees or profits, among other well-recognized duties.

77.    Beginning with the earliest Projects, including the Monterey Project, the Projects selected GMAC to serve as their financial advisor and lender as a direct result of these representations, and thereafter GMAC and Ray were treated as trusted members of the Project teams to whom the Projects turned for advice and trusted with confidential information.  Over time, Ray and GMAC highlighted verbally and in writing their success in closing the Monterey Project transaction and other early transactions, in order to secure other MHPI Project business, and then perpetrated essentially the same fraud on each successive Project.  In and after late 2009, when Ray joined Jefferies, Ray continued to act as financial advisor to the Projects and Jefferies also assumed the duties of financial advisor to the Projects, and advised the Projects on several occasions, including in connection with the 2010 Sill and 2012 Bliss transactions.

78.    Ambac likewise participated in calls and meetings where financial advice was given to the Projects by both Ambac and GMAC as confirmed by Marfatia.  Ambac further represented that it would act on the Projects' behalf, and in their best interests, in working with rating agencies to obtain the highest ratings, among other things.

79.    While the wording of the various written and verbal representations changed somewhat over time, the representations all were designed to, and did, lead the Projects to rely on GMAC, Jefferies and Ray as trusted financial advisors who always worked in the Projects' best interests.  By way of example, GMAC and Ray represented verbally and in writing to the Monterey Project, which closed in October 2003, that they would act as financial advisor and use their best efforts to negotiate the most favorable rates.  They likewise represented verbally and in writing to the Stewart/Hunter Project, which closed in November 2003, that they would act as financial advisor in connection with a variety of roles, including developing the financing structure, coordinating with rating agencies, negotiating the surety bond requirements (thus with Ambac), analyzing capital structures and GIC bidding.  Ray and his employers continued to build on these representations, making similarly specific written and verbal representations to the other Plaintiff Army Projects, including Meade (which closed in May 2002), Monterey (which closed in October 2003), Bragg (which closed in August 2003),

Stewart (which closed in November 2003), Detrick/Walter Reed (which closed in July 2004), Polk (which closed in September 2004), Bliss/White Sands (which closed in July 2005), Leavenworth (which closed in March 2006), Rucker (which closed in April 2006), Carlisle/Picatinny (which closed in July 2006), Riley (which closed in July 2006), and Sill (which closed in June 2010).

80.     GMAC and Ray made similar verbal representations to the Projects and to BBC that they would serve, and did serve, as financial advisor, to the Air Force Projects.  Thus Ray and GMAC served as financial advisor to those Projects, including AETC (which closed in November 2007), Vandenberg (which closed in November 2007), AMC West (which closed in July 2008), and Lackland (which closed in December 2008).

81.     After Ambac's ratings downgrade in 2008 (reduced from AAA to eventually having no rating at all), the Army Projects, the Army, and JLL continued to turn to Ray, GMAC and Jefferies for consultation and advice regarding the impact of Ambac's ratings downgrade on the Projects.  For example, in 2009 and 2010, the Projects, the Army and JLL had several conference calls with Ray, seeking his input as their financial advisor on the impact of Ambac's downgrades and on related strategies to minimize any harm to the Projects.

82.     In or around the fall of 2009, as part of due diligence Jefferies performed leading up to its acquisition of Capmark's MHPI servicing business and its hiring of Ray and Ray's team from GMAC/Capmark to continue their MHPI-related business, Jefferies communicated with Ray and learned of the manner in which Ray had manipulated the financings of past MHPI Projects to reap substantial, undisclosed profits from the Projects.  With knowledge of the scheme that had been perpetrated, Jefferies elected to go forward with the acquisition and hiring of Ray and his team, in part, so Jefferies could benefit from this past misconduct through servicing fees that these Projects are required to pay.

83.     Jefferies determined, however, that because Ray could continue his manipulation of MHPI Project financings while at Jefferies, Jefferies would try to insulate itself from liability by including a disclaimer that disavowed a fiduciary duty from Jefferies Mortgage, the lender, to the Projects on future transactions.  In connection with the 2010 Sill and 2012 Bliss transactions, Jefferies Mortgage enlisted Ray, the MHPI Projects' trusted financial advisor (whose fiduciary obligations to

the Corvias managed MHPI Projects dated back to May 2002 (Meade), and whose fiduciary obligations to the Fort Bliss Project dated back to the July 2005 closing), to induce the Sill and Fort Bliss Projects to sign letters of intent in which Jefferies Mortgage, the actual lender on these Projects, claimed to disavow a fiduciary duty to the Projects.

84.     To obtain this disclaimer for Jefferies Mortgage, Ray held himself out as having always acted in the Projects' best interests; however, both Jefferies and Ray continued to conceal the truth of his, and now Jefferies' role, in the ongoing fraudulent scheme to manipulate these financings to the detriment of the Sill and Fort Bliss Projects.  The Projects viewed Ray's and other Jefferies' employees previous experience and role as financial advisors with the Projects as selling points; but the Projects had no way of knowing that Jefferies Mortgage and Ray were concealing their past scheme as alleged herein.  The Projects would never have agreed to a disclaimer of duties or entered into the agreements had they known such information.  Thus, through material omissions and misrepresentations, Jefferies Mortgage used Ray's and other Jefferies employees' relationships with the Projects—who still held themselves out as financial advisors to the Projects, actively advised the Projects and made no disclaimer of a fiduciary duty—to fraudulently obtain this limited disclaimer.   Based on the confidential and trusted relationship with Plaintiffs, Ray and Jefferies both had a duty to disclose the prior fraud and breach of fiduciary in obtaining such waivers, but failed to do so.  As such, the 2010 Sill and 2012 Bliss disclaimers by Jefferies Mortgage of a fiduciary duty and any financial advisor role are void as having been procured through Ray's and now Jefferies Mortgage's ongoing fraudulent conduct.

85.     In sum, Ray and GMAC and later Ray and Jefferies (as alleged) together held themselves out as, and acted as financial advisors to the Projects over many years—misleading the Projects to believe that they were acting in the Projects' best interests.  While Ray, GMAC, and Jefferies caused the Projects to rely on them as fiduciaries, Defendants regularly ignored such a sacrosanct duty in order to enrich themselves without disclosure at the long-term expense of these military housing Projects.

**B.      Ambac represented that it would act in the Army Projects' best interests in connection with the rating agencies.**

86.     As part of the initial financing structure devised by Ray, Marfatia, Ambac and GMAC, they required that the Projects pay often $100,000 or more to obtain underlying ratings from the rating agencies in connection with the planned financing.  In imposing this requirement on the Projects, Ambac and GMAC, through Marfatia (as he confirmed) and Ray, represented that they would operate in the Projects' best interest and obtain the highest rating possible from the rating agencies for the transaction, based on the Projects' pro forma financials.

87.     The Projects' best interests included receiving the highest rating possible in order to minimize the interest rate charged for the underlying loan and to minimize the need for, and cost of, any credit enhancement.  However, in their dealings with rating agencies, Ambac and GMAC operated as a RICO enterprise, tightly controlling the flow of communication to address any rating agency questions or concerns and then manipulated the rating process.

88.     For example, Ambac and GMAC instructed the rating agencies that they could not directly communicate with the Projects' representatives without the presence of Ambac or GMAC, and demanded that any questions be funneled directly through Ambac or GMAC, as the case may be.  On several occasions, including on the 2003 Monterey Project, when the rating agencies inadvertently communicated directly to the Projects, they were chastised, and instructed by Ambac (Marfatia in particular) or GMAC (Ray and those acting at his direction) to cease such communications.  Likewise, Ambac and/or GMAC instructed the rating agencies where possible not to share shadow ratings directly with the Projects, but to provide those ratings only to Ambac and GMAC.  None of these information limiting instructions—designed to perpetuate the pattern of racketeering—were disclosed to the Projects.

89.     Thus, Ambac joined the scheme and conspiracy with GMAC by, among other acts, convincing the Projects that it too would operate as a fiduciary in their best interests with at least the rating agencies.

II.   **In a Pattern of Racketeering, GMAC and Ambac Systematically Misrepresented and Omitted Critical Facts to the Financial Detriment of the Projects.**

A.   **Ambac and GMAC misrepresented and omitted that they had formed a collusive relationship in order to benefit each other at the Projects' expense.**

90.   As detailed above, as early as 2001, Ray and Marfatia, on behalf of their respective organizations, had agreed to act in each other's best interest, at the expense of the Projects, in order to reap inflated and undisclosed profits.  GMAC and Ray led the Projects to believe that they operated at arm's length with Ambac, for example, agreeing in substance to use their best efforts to negotiate credit enhancement premiums and surety bond fees with Ambac.  In truth, Ambac, GMAC, Ray, and Marfatia had formed an intertwined and collusive enterprise that was specifically designed to benefit their respective companies and themselves at the expense of the Projects.

91.   This collusive enterprise was deep and took many forms.  For example, in 2003, both GMAC and Ambac agreed to attempt to cap the ratings that the MHPI Projects could receive from at least S&P, in order to inflate the interest rates and credit enhancement premiums charged to the Projects.  This directly benefitted both GMAC and Ambac, to the detriment of the Projects.  And, while Ray and GMAC (and later Jefferies) told the Projects that they were taking significant market risk by making a loan and then, later, selling bonds—in several deals Ambac itself agreed (directly or indirectly) to buy MHPI Project bonds (Monterey and Stewart, among others) at a premium prior to closing, in order to provide immediate and outsized profits to GMAC and Ray.  These Ambac bond purchases helped cement Ray and GMAC's loyalty and perpetuated the fraud scheme.

92.   In return, GMAC agreed to protect Ambac from competition and provided it an exclusive on all Project transactions with credit enhancement.  Thus, while misleading the Projects into believing that the two were operating at arm's length with respect to each other, GMAC and Ambac operated collusively as a joint venture.  Numerous emails sent via interstate wires reflect such collusive behavior.

93.   In early 2005, GMAC and Ambac jointly developed a stealth MHPI financing structure, designed to conceal Ambac's role and avoid competition, and thus continue to charge inflated and secret fees to the Projects.  At one point, in or around 2005, JLL requested that Ray/GMAC use MBIA for credit enhancement.  Ray misled in response and declared that MBIA charged the same rates and

terms as Ambac, despite the fact that MBIA had specifically told Ray that it could provide better pricing and better terms than Ambac. Despite his fiduciary role, Ray concealed this information from the Projects and never attempted to negotiate with both Ambac and MBIA in order to secure the best pricing for the Projects.

94.    In carrying out their scheme, co-conspirators Ray and Marfatia often traveled and socialized together. They also repeatedly took business discussions off-line to avoid a paper trail and, in later years, communicated and sent materials to each other via Blackberry Pins, which allowed them to communicate regarding their conspiracy in an untraceable manner. If Ray and Marfatia had been operating in a forthright and arm's-length manner, consistent with their duties and as represented to the Projects, there would have been no need to engage in these extensive efforts to conceal their communications. To this day, these untraceable business communications between Ray and Marfatia, by design, are unrecoverable.

**B.    Ambac and GMAC conspired with respect to the rating agencies.**

95.    By mid-2003, Ambac and GMAC had rigged the rating system by capping at least the S&P rating for nearly all, if not all, of the MHPI Projects insured by Ambac at an "A." They further ensured that the ratings were not public and instructed the agencies to communicate only with Ambac or GMAC to minimize the risk of detection. In the fall of 2003, after learning that S&P had issued a public rating for the Camp Pendleton MHPI Project (in which Ambac was not involved) of an "A+," Marfatia and his boss, Robert Shoback, invited S&P to Ambac's New York office where they specifically instructed S&P representatives that any MHPI project credit-enhanced by Ambac should not receive a rating higher than an "A." Ambac and GMAC did not disclose to the Projects this unusual and harmful instruction to S&P.

96.    In general, S&P complied with this demand from Ambac. S&P followed the practice that if the transaction representatives did not seek a higher shadow rating than it would otherwise consider, then it would not provide that rating. Thus, without disclosure to the Projects, as of October 2003 Ambac and GMAC had pre-rigged the rating process to cap the rating the Projects could receive at no higher than an "A." Indeed, in contrast to other MHPI projects, the GMAC/Ambac projects consistently received an "A" from S&P, while other non-GMAC/Ambac MHPI projects often

received a higher rating.  By capping the S&P shadow rating at an "A," Ambac and GMAC had created a ready but false justification for Ambac's role as credit enhancer.

97.     A capped shadow rating of an "A" was not in the Projects' best interests, but, as Marfatia has confirmed, it was in the economic "sweet spot" for Ambac (and GMAC).  An "A" rating allowed Ambac to minimize the capital it needed to set aside for insuring the Projects; a "BBB" rating required a far higher capital charge than an "A" rating.  While the capital charge was smaller for an "AA" rating, the difference was not nearly as significant as between a "BBB" and an "A."

98.     If a Project had received an "AA" rating, it would have caused the Project (and the Army or Air Force) to question not only the premium being charged for Ambac's insurance, but the actual need for such credit enhancement insurance.  Many MHPI projects rated an "AA" by S&P did not use credit enhancement in order to syndicate the selling of its loan through the sale of bonds or certificates.  Likewise, it would have caused the Projects to question whether a surety bond or debt service reserve was needed at all, let alone to cover a full 12 months of debt service.

99.     Contrary to what GMAC and Ambac told the Projects, by at least 2002, S&P had specifically told Marfatia of Ambac and GMAC that a surety or partial funding of a debt service reserve was not needed when a MHPI Project had sufficient liquidity in the form of credit enhancement/bond insurance.  In fact, S&P informed Marfatia and Ray and others at GMAC that only a surety or bond insurance was required to cover 12-months premium and interest on the loan for the MHPI Projects—and S&P later lowered that requirement to six months.  S&P explained that they had concluded that the MHPI deals were low risk compared to other housing deals because the MHPI Projects' revenue consisted almost exclusively of soldiers' rent (known as a Basic Allowance for Housing or "BAH"), which the federal government directly funds.

100.     Despite this, in 2002 and beyond, both Marfatia and Ray falsely represented to the Projects (as well as to the Army and JLL) that all of the rating agencies, including S&P, required full credit enhancement in addition to a 12-month funded debt service reserve or a surety bond (or other financial instrument) in that amount, for liquidity purposes.  Ambac and Marfatia knew a surety bond was unnecessary for the MHPI Projects.  This was particularly true from Ambac's perspective because the surety bond it provided for the MHPI Projects was structured differently from other traditional

sureties by Ambac, in that Ambac's bond insurance would be drawn on first in the event a Project was unable to pay its debt service. Thus, as Marfatia discussed internally with his superiors in 2010, there was no risk that the Projects' surety bonds would ever be drawn as they were subordinated to the larger credit enhancement policy.

101.    As a result of Marfatia's and Ray's false representations, Ambac obtained a provision in the loan documents for the Plaintiff Army Projects that according to Ambac required a replacement surety or full funding of a debt service reserve for a year's worth of principal and interest if Ambac's credit rating dropped below a certain level—as it did in 2008. In 2015, Ambac threatened and sued to wrongfully enforce this contractual right, which was procured through the fraudulent scheme as alleged herein. The Army Plaintiffs' costs incurred in defending and pursuing the Debt Service Reserve Litigation is a recoverable damage from this scheme. Absent the fraud, Ambac would not have obtained such a contractual provision.

### C.    GMAC ensured that the Projects paid inflated interest rates on their loans in order to make profits on the sale of the Project bonds before close of the loan.

102.    Beginning with the Monterey Project (which closed in October 2003), a central part of Defendants' scheme allowed GMAC, and later Jefferies, to make undisclosed and outsized profits on the sale of the bonds or certificates that were syndicated from the Projects' loans. In general, GMAC and later Jefferies would originate a Project loan, claim to have set the credit spread (the interest rate spread above the then applicable 30-year swap rate) and therefore the coupon interest rate on the loan at market as required by investors or the market, and then would sell bonds or certificates based on the purported market rate of the loan. The Projects paid the interest and principal on the loan on a monthly basis from the soldiers' rent payments, which, in turn, was used to meet the required bond payments.

103.    In reality, Ray and GMAC had pre-sold the bonds in nearly all cases at a profit prior to closing of the transaction, necessarily meaning that Ray and GMAC had set the Projects' interest rate above investor demand and therefore the market and in contravention of their direct representations. By syndicating the loans through the sale of bonds prior to close, GMAC and Jefferies immediately monetized the interest rate spread above market to reap and make outsized profits. As a result of their

1   fraud, GMAC and Jefferies saddled the Projects with inflated fixed interest rates on their loans that

2   they continue to pay and will have to pay for years to come.

3        104.    Defendants' scheme to profit from the sale of the bonds morphed over the years in

4   response to changing market conditions, the desire to maximize secret profits and to ensure the scheme

5   would continue undetected.  In nearly all of the early Projects (Meade, Bragg, Stewart, Detrick, and

6   Polk), Ray stated in writing via interstate wires the interest would be set by an "open book" process

7   where the loan in the form of bonds would be auctioned to investors prior to loan close.  With the bids

8   from the bond investors in hand, GMAC and Ray claimed they would then set the market interest rate

9   based on what the investors were willing to pay for the bonds.  Ray represented to the Projects and

10  JLL that this process would make certain that a true market credit spread was determined and that the

11  Projects would receive the full benefit of competition.  Thus, in reasonable reliance on Ray and

12  GMAC, JLL reported in 2008 to the General Accounting Office (the non-partisan agency that acts as

13  the investigative arm of Congress), that this credit spread represented the "risk premium required by

14  investors."  In truth, the credit spread set by Ray included not only the risk premium required by

15  investors—but also a percentage to generate undisclosed and substantial profits for Ray and GMAC

16  when it syndicated the loan as of the close.

17       105.    On the first Plaintiff Projects, namely the 2002 Meade Project and the 2003 Bragg

18  Project, Ray and GMAC apparently followed this outlined process and it was used to generate a market

19  interest rate for the Project.  Thus, subject to further confirmation, it appears that the Meade bonds

20  sold at par, and that the Bragg 2003 bonds sold at or below par, reflecting a market credit spread on

21  the loan.  However, Ray and GMAC took undisclosed profits from these Projects in other ways, and

22  used these Projects to begin to build the trust and confidence of the Projects, the Army and JLL.

23       106.    Within weeks of the Bragg Project closing in August 2003, and having obtained the

24  trust of the Army and JLL, at the Monterey Project (which closed in October 2003), Ray and GMAC

25  began to manipulate the interest rate setting process for subsequent Projects to generate millions of

26  dollars in secret profits.  This new element of the fraud continued thereafter.  Ray represented that he

27  would employ this auction process to ensure the Projects received the full benefit of the bond sales in

28  the form of a true market rate interest.  In reality, he misrepresented the market risk and/or the credit

spread generated by the sale of bonds allowing GMAC to sell the bonds prior to loan closing at a premium to par and, at times, to justify unnecessary and inflated rate lock fees and thus to reap millions in undisclosed profits.

107.    At times directly and through their fiduciary duties, Ray and GMAC represented to the Projects, JLL and the Army that they would use their best efforts to obtain the most favorable rates for the interest rate, including specifically for the interest rate components of the investor credit spread and credit enhancement.  These representations were false.  For example, Ray and GMAC represented to the Monterey Project, the Project on which this bond fraud scheme started, that to the extent "the actual" Loan Credit Spread "is lower than the above stated not-to-exceed rates, the lower actual rates will be provided to Borrower."   In reality, GMAC, without disclosure to the Project, pre-sold the Monterey bonds prior to loan closing at a substantial profit and never engaged in such best efforts. Thus, the "actual" credit spread was never provided as represented, as Ray and GMAC built into the spread an undisclosed profit prior to the loan closing.  Ray and GMAC capitalized on these early Projects to secure new business, continuing to build in undisclosed profits in successive Project transactions.

**The Stealth Structure**

108.    By early 2005 in the Bliss and later Projects, GMAC, Ray, Ambac, and Marfatia altered the secret profits scheme by developing a new transactional structure that they termed amongst themselves the "stealth structure."  Ray and Marfatia employed this fraudulent stealth structure to help perpetuate, mask and enhance the proceeds from their pattern of racketeering.  Specifically, to minimize risk of detection that Ray had been pre-selling bonds, but setting the interest rate above the investor purchase bids, in the stealth structure transactions Ray represented to the Projects that GMAC would take the Projects' loans on his balance sheet and securitize the loan after close, thus taking market risk.  The stealth structure further allowed Ray to aid his co-conspirator Ambac and to insulate them from competition and charge above-market rates by obscuring Ambac's role prior to closing, and by secretly building into the loan interest rate stack a monthly fee that would be paid to Ambac for providing credit enhancement.  Finally, the stealth structure allowed GMAC to mislead the Projects

on the cost and need to purchase a Liquidity Facility when in fact no such facility was required by the rating agencies.

109.    Thus, for example, in the 2005 Bliss transaction where the stealth transaction was first employed by Defendants, Ray and Marfatia instructed those who worked for them to not disclose the "stealth" structure to the Project or the rating agencies.  With secrecy assured, Ray then pre-sold the bonds for the securitized loan at a substantial profit, and baked into the already inflated interest rate stack a monthly fee to pay Ambac.  Ray also sold the Project an unnecessary and/or inflated Liquidity Facility for 2%, then off-loaded it to Ambac at a secret closing, in exchange for a surety bond that cost 1%.  In fact, the stealth structure was so successful in misleading the Bliss Project that Ray carved out an interest only ("IO") strip bond to avoid selling the Bliss bonds at too high a premium.  In later deals, Ray and Ambac continued to use the stealth structure to hide Ambac's role pre-close, despite the fact that by 2007, the Wisconsin Insurance Commissioner had significant concerns about Ambac's financial health.

110.    Ray and Jefferies used the same convention of an IO Strip to make substantial undisclosed profits in connection with a follow on financing for the Fort Bliss Project in 2012.

111.    Ray and Ambac used this above-described stealth structure on the following Projects: Fort Bliss, Fort Leavenworth, Fort Rucker, Fort Riley, Carlisle/Picatinny, AETC I and Vandenberg.

**The Original Issue Discount (OID)**

112.    In a further effort to mask their undisclosed profits, in or around 2006 and in the context of the stealth structure, Ray and GMAC began to request that the Projects accept what Ray termed an Original Issue Discount ("OID") on the loan.  In general, an OID occurs when a financial instrument sells for a price less than its stated redemption price at maturity.  For Plaintiff Projects AETC I, Vandenberg, AMC West and Lackland II Air Force Projects and for the Leavenworth, Rucker, Carlisle/Picatinny and Sill Army Projects (including additional financings at Bragg and Stewart/Hunter in 2007 and 2008, respectively), Ray insisted on the use of an OID.

113.    In practice, GMAC and Ray purported to generate the loan interest rate at par pre-closing (which should be market), then took an OID to reduce the interest rate, but also decrease the actual loan proceeds received by the Project by an equivalent amount.  Ray, and those who worked

for him, represented verbally and by email sent via interstate wires that the OID was financially neutral to the Projects, but that it helped GMAC/Jefferies sell the bonds post-closing at a discount to par. Ray claimed prospective bond buyers were increasingly unwilling to pay fair value above par, which would occur if interest rates moved lower after the closing of the transaction. Thus, through interstate wires, Ray and those who reported to him represented the "only" purpose of the OID was to ensure GMAC/Jefferies could sell the bonds post-closing at a discount to par and that the Projects would not suffer any financial harm.

114. These representations were false. Ray used the OID as a masking tool to help ensure that he sold the bonds prior to closing at a substantial and secret profit. By suggesting that he sought to sell the bonds after close at a discount to premium by using the OID, Ray caused the Projects to believe that GMAC was taking genuine market risk. In reality, before setting the OID, Ray knowingly set the credit spread at an above market level as before, having pre-sold the bonds prior to the loan closing, therefore taking no real market risk post close. At times, Ray's scheme was so successful that he made undisclosed profits pre-close both by selling the bonds at a premium above par and in taking an OID profit.

115. As an example of the fraudulent scheme, in September 2006, the Balfour Beatty project management team had discussions with GMAC and Ray regarding an OID taken on the Carlisle/Picatinny Project near the time of the Project's closing and an OID that GMAC requested on the pending AETC I Project. One of Ray's chief lieutenants, with Ray's knowledge, misrepresented in writing using interstate wires that in using the OID "all GMAC was doing" was swapping out interest and replacing it with principal. That was not accurate in that GMAC was using the OID to lock in secret profits prior to close of the loan transaction. GMAC also represented in writing that the Carlisle/Picatinny interest rate was at "market rate," when it knew this was false—GMAC again sold the bonds prior to close at a significant profit, meaning the loan interest rate was by definition above market and par.

116. As another example, in July/August 2010, in connection with the Fort Sill transaction, both the Corvias project management team and the Army's advisor, JLL, inquired specifically about how Ray, now on behalf of his new firm Jefferies, was pricing and marketing the bonds and whether

Jefferies was making a profit on the bonds at the expense of the Sill Project.  Ray denied to Corvias that Jefferies was making hidden profits on the sale of the Fort Sill bonds.  Ray reiterated these misrepresentations to Corvias, claiming that Jefferies was taking significant market risk in connection with selling the bonds after the closing of the Project's loan.  Ray's statement was false, because as in other prior deals as alleged herein, Ray, and this time Jefferies, had sold the bonds prior to the loan closing at an out-sized and undisclosed profit.  Ray confirmed a pattern and practice of racketeering by further stating in this email sent via interstate wires that the financing of the Sill Project had been handled just like all of the prior Corvias MHPI Projects (Meade, Bragg, Polk, Rucker, Riley)—in other words conceding that all such Projects had been similarly misled.

117.    Jefferies and Ray further led the Sill Project and JLL to believe that the OID it took on in the Fort Sill transaction, which resulted in nearly $5 million in lower loan proceeds to the Project, did not represent a profit to Jefferies.  To the contrary and prior to loan closing, Ray and Jefferies had already calculated the profit they would make on the Sill transaction, including over $5 million in profit in connection with the OID.  In an effort to further mislead the Sill Project and JLL, in written communications transmitted via interstate wires in August 2010, Ray specifically represented that Jefferies was passing on the benefit of the OID "dollar for dollar"—and that Jefferies received no benefit from an OID—when he knew in fact (and had calculated internally) that Jefferies would take over $5 million in profit on the OID.  These facts were known to Jefferies management, which approved of the Fort Sill transaction, and thus Jefferies knowingly bought into the conspiracy, continued to profit from the servicing fees on prior deals, and reaped over $5 million in profit on the Sill transaction alone.

**Ray's and Jefferies' 2012 Bliss Fraud**

118.    By 2012, Ray and Jefferies had not only fine-tuned their fraud scheme, but knew that opportunities to commit such MHPI transactional frauds were diminishing.  By then, most of the housing in the Armed Forces bases had been privatized and so what largely remained for Ray and Jefferies were additional financings at bases where Ray had initially committed fraud.  Thus, in 2011 and 2012, when the Bliss Project determined it needed an additional $140 million (approximately) in debt to further increase the Armed Forces housing scope at Bliss—as approved by the Army—Ray

and Jefferies saw this as one of the last opportunities to make secret profits.  Thus, as planned and executed, on the 2012 Bliss financing, Ray and Jefferies reaped greater secret profits (on a percentage basis)—secured prior to closing—than on any other of the referenced MHPI Project transactions.

119.    As part of the 2005 fraudulent Bliss transaction, Ray secured for GMAC a right of first refusal (a right now owned by Jefferies) to issue any additional debt needed by the Bliss Project.  In exercising their fraudulently obtained right, Ray and Jefferies assured the Bliss Project that the loan from Jefferies Mortgage was at market rate.  In truth, Ray and Jefferies had secret pre-commitments from investors to buy the debt at a staggering 8% above par—reflecting a highly inflated interest rate on the loan.  In fact, the excess interest rate that Jefferies Mortgage charged the Bliss Project was so significant that Ray and Jefferies Mortgage carved out a separate Interest Only strip at 0.576% and securitized it in the form of a bond.

120.    As Ambac's consent was required for this transaction, in November 2012, Ray communicated to Ambac (specifically, Gary Greendale) that again he had pre-sold the bonds prior to closing and needed prompt Ambac consent for the transaction.  Ambac, as a co-conspirator who had received an inflated credit enhancement fee on the 2005 Bliss transaction and also had approval rights over the issuance of additional debt, readily consented to the fraudulent transaction.  Thus, on the last fraudulent MHPI transaction, not only did Ray and Jefferies reap extraordinary undisclosed profits on the pre-sale of the bonds, but Ambac consented to the transaction in its long-held role as co-conspirator.

121.    Thus, as alleged herein and as a result of Defendants' misrepresentations and omissions, GMAC and, later, Jefferies saddled the Projects with an interest rate that was above market for the long life of these loans and also were required to pay excess amounts in insurance premiums on the underlying loan amounts.  Had the Projects known that GMAC and Jefferies were making these undisclosed profits from securitizing the loans pre-closing, they would have had the option either to demand a lower interest rate or to seek more competitive rates from these or other lenders.  Likewise, the Projects in which Ambac is involved (including all but the Fort Sill Army Project and the Lackland II Air Force Project) would have used this information to negotiate better insurance premiums, and either better surety fees or a deal where no surety or bond insurance was required.

**Rate Lock Fees**

122.     Ray and GMAC also charged the Projects for unnecessary rate lock fees.  At times, Ray and GMAC offered Plaintiffs rate locks knowing the rate had been effectively locked by virtue of the undisclosed pre-sale of the bonds.  For example, in 2003, at Fort Stewart on September 24, 2003, Ray sold a rate lock to the Project for $1 million yet already had received an undisclosed commitment of purchase from bondholders.  Further, Plaintiffs paid to lock a market rate, not the inflated above market rate that Ray and GMAC intended to and did charge to nearly all of the Plaintiff Projects.

123.     Defendants instead colluded to mislead and to keep the above material information from the Projects, contrary to their representations that they were acting in the Projects' best interests.

### D.     GMAC and Ambac rigged the GIC auction process to benefit themselves.

124.     As described above, the Projects could not use all of the hundreds of millions of dollars in loan proceeds from GMAC at the outset—rather, much of the proceeds were needed for development and construction over a several year initial development period ("IDP").  The Projects therefore needed a safe investment vehicle for the remaining loan proceeds, which provided an attractive return.  Ray and GMAC recommended the GICs as the most appropriate investment vehicle without disclosing the process for selecting the GIC providers.

125.     In fact, GMAC and Ray in their financial advisor role purported to conduct a blind auction to obtain the best GIC products for the Projects with the highest interest rates.  GMAC and Ray promised to competitively bid the GICs in a "blind bid process," and to negotiate the terms of the GIC contracts on behalf of, and in the best interest of, the Projects.

126.     In connection with that duty, GMAC prepared a detailed "Request For Bids" for all or nearly all of the Projects.  As shared with the Projects, the Request For Bids for the GICs detailed the specifics of the transaction and the requirement for each GIC bid.  Despite such specifications, GMAC sought to conceal that it required the GIC bidders to pay a separate fee to GMAC.  GMAC then separately communicated to the GIC bidders (via interstate wires) that a payment of a fee was required by GMAC to be considered an eligible bidder.

127.     Contrary to the Request For Bids shared with the Projects, GMAC ran a rigged auction process to benefit itself, Ray, and Ambac at the expense of the Projects.  First, GMAC gave Ambac

preferential treatment in the auction process including providing it with a "last look" that necessarily skewed the auction process.  This last look had the effect of chilling the auction process and allowing Ambac to bid in an unfair manner.  Second, GMAC's demand of an undisclosed fee from the GIC providers likely caused some if not all of the GIC providers to further lower their GIC interest bids. This means the Projects necessarily have received less in interest rate returns than if no fee had been demanded.

128.    This rigged auction process was not disclosed to the Projects.  In total, GMAC and Ray reaped undisclosed profits from certain of the GIC providers and caused lasting damage to the Projects' returns.

### E.    GMAC and Ambac conspired to charge the Projects inflated expenses.

129.    GMAC and Jefferies also charged the Projects other unjustified and undisclosed fees, which were disguised and misrepresented in the closing instructions.  For example, GMAC charged several of the Projects a $75,000 fee for undescribed "expenses."  After closing, GMAC then secretly wired this money to Ambac as part of their scheme.

130.    GMAC and Jefferies also negotiated a cap on their expenses with the Projects, representing that they would not charge more than a certain amount for expenses actually incurred. Instead, they charged the amount of the negotiated cap, and then made an undisclosed profit, by charging these Projects hundreds of thousands of dollars more than it had actually incurred in expenses.  Ray earned 40% of all profits on the expense charges.  Collectively, GMAC and Ambac charged several million dollars more in transactional expenses than actually incurred.

### F.    Ray and Marfatia acted within the scope of their employment for the benefit of Ambac, GMAC, and Jefferies in carrying out the scheme.

131.    During all relevant time periods, Ray was a senior employee and Managing Director of GMAC and later of the Jefferies entities as alleged herein.

132.    Marfatia was acting in the scope of his employment and, in part, for the benefit of his employer Ambac when he worked to arrange the financing for the Projects and in the process executed the aforementioned schemes to defraud.

133.    Ray's and Marfatia's superiors, including the various credit committees of their employers, approved of Ray's and Marfatia's acts and conduct as alleged herein that generate the revenue and profits for their respective companies.

134.    GMAC, Jefferies and Ambac benefited from the aforementioned schemes to defraud through receipt of hundreds of millions of dollars in fees and profits taken from the Projects.  Jefferies and Ambac are thus liable for the tortious and fraudulent conduct of Ray and Marfatia.

### G.    Ray used the Annandale Plantation Defendants to further the fraudulent scheme and Conceal RICO proceeds and evidence.

135.    In December 2003, two months after the close of the Monterey Project, in which both GMAC and Ray personally and illicitly earned millions of dollars, Ray began to invest millions of dollars of his ill-gotten proceeds in certain real estate holdings.  Ray began to put such funds into Annandale Plantation, LLC, a Colorado limited liability company, wholly owned and controlled by Ray and his wife (at the time known as Millbrook Plantation, LLC before its February 2004 name change to Annandale Plantation, LLC).  At all relevant times, Ray operated and acted as agent for the Annandale Plantation Defendants.  The Annandale Plantation Defendants had no other agents or employees other than Ray.  Ray used Annandale Plantation - CO to shelter his RICO proceeds.  On December 30, 2003, Ray and Annandale Plantation - CO purchased over three thousand acres of land near Georgetown, South Carolina known as the Annandale Plantation for $9 million.

136.    In July 2007, Ray allowed Annandale Plantation- CO to slip into delinquent status, but soon after, in October 2007, Ray created Annandale Plantation - SC.  Ray not only transferred ownership of certain structures, including a historic house, within the Annandale Plantation to Annandale Plantation - SC, but he also began using the Annandale Plantation Defendants to transact business relating to the MHPI Projects and to shelter documents related to the same.  The primary email account for the Annandale Plantation Defendants, annandale.plantation@gmail.com, created and controlled by Ray, was used to communicate regarding the MHPI Projects involved in the fraudulent scheme, including, for example, about the follow on financing for the Fort Bliss Project in 2012.  Ray instructed his subordinates to send such email communications through the Annandale Plantation Defendants' email account, Annandale.plantation@gmail.com, to further insulate the

fraudulent scheme from later detection.  Additionally, over a several year period, Ray used the Annandale Plantation Defendants, and their annandale.plantation@gmail.com email account, to receive and store documents relating to the MHPI Projects and the RICO enterprise, including, for example, documents relating to Ambac's 2015 purchase of MHPI bonds owned by Freddie Mac.  Ray regularly emailed such documents, including those related to the allegations contained in this action, from his Jefferies email account to the annandale.plantation@gmail.com email address.  As discovery has proven, Ray's practice of emailing MHPI Project related documents to the Annandale Plantation Defendants continued even after Ray was personally served with a subpoena for documents in the Debt Service Reserve Litigation.  Ray's practice of deleting documents in response to receiving lawful subpoenas has continued as well.  Despite multiple requests, Ray has refused to confirm that after receiving the Monterey Plaintiffs' subpoena he did not subsequently delete transmittal emails documenting his transfer of MHPI Project related documents to the annandale.plantation@gmail.com email address.

### III.  In Late 2016, as the Projects Began to Piece Together the Scheme, Jefferies and Ray Further Conspire, including with Ambac, to Avoid Detection, Spoliate Evidence, and Conceal the RICO Proceeds through a Fraudulent Transfer.

137.    The above-described long-running scheme only began to come to light in late 2016 and early 2017 in the context of the Debt Service Reserve Litigation that Ambac had threatened and initiated against several MHPI Projects.  In connection with their fraudulent scheme described above, Ambac and GMAC demanded a provision in the Projects' loan documents that purportedly provided that, if Ambac's credit rating fell below a certain credit rating, which it did in the fall of 2008, the Projects had a contractual obligation to provide a replacement surety or cash fund a debt service reserve.  But for the fraud described above, this contractual provision would not have existed between the parties.  From 2008 until 2015, Ambac took no steps to legally enforce the ill-gotten provision, but instead looked for other ways to create leverage with the Projects (for example, by attempting to negotiate additional rights, including enhanced consent rights) based on the purported obligation to cash fund or replace the surety.

138.    In 2015, Ray and his new employer Jefferies, agreed to help Freddie Mac, a large investor in MHPI bonds, to divest some of their MHPI bond holdings, by securitizing the bonds and

selling a "D tranche" to outside investors, while Freddie Mac retained the other tranches.  Jefferies and Ray took this opportunity to benefit Ray's co-conspirator Ambac, by offering it the opportunity to purchase the D tranche of bonds (the most risky of the tranches) for MHPI Projects where it served as credit enhancer, all the while making substantial fees in connection with the transaction.  Ambac would stand to make a huge profit on the D tranche purchase if it could force the MHPI Projects to cash fund the debt service reserves as such cash funding would serve as the first barrier of insurance.

139.     In the fall of 2015, Ambac executive Gary Greendale convinced Ambac senior management and the Rehabilitator overseeing Ambac's Segregated Account to take the unusual step of using Ambac's limited and highly restricted capital to make a $72 million purchase of a portion of the D tranche of the securitization of MHPI bonds owned by Freddie Mac.  The D tranche purchased by Ambac included only deals in which Ambac had provided credit enhancement (and included bonds relating to the Projects).

140.     This investment was highly unusual and, in fact, unprecedented at Ambac, since it had been subject to rehabilitation in 2010.  Since 2010, Ambac's troubled assets have been in a "segregated account" and overseen by a Rehabilitator in Wisconsin.  In particular, pursuant to the terms of the Wisconsin Rehabilitation Proceedings, Ambac is forbidden from engaging in non-ordinary course transactions with a value over $5 million or to pay dividends absent the consent of the Rehabilitator.  Yet, despite these restrictions, Ambac senior management determined that if it bought the D tranche that contained its credit-enhanced deals, and then was able to successfully force the Projects to cash fund or obtain replacement sureties from other companies (unlike the Ambac surety bonds that served no economic function), its D tranche investment would greatly increase in value.  In essence, Ambac bet, without telling the Projects, that it could leverage its fraudulently obtained contract provision to increase the value of its new investment in MHPI bonds.

141.     On or around September 30, 2015, literally within a few days of making the D tranche purchase brokered by Jefferies and Ray, Ambac threatened the Army Projects with litigation if they failed to immediately cash fund their debt service reserve or replace their surety bonds as a result of Ambac's 2008 ratings downgrade.  It then almost immediately began to implement the Debt Service Reserve Litigation, filing suit first against the Meade Project on October 14, 2015.

142.    But for the underlying litigation that ensued as a result of Ambac's desire to force cash funding to increase the value of its own holdings, the long-running scheme by Ambac and GMAC likely would never have come to light.  After the Debt Service Reserve Litigation was filed, Ambac fought discovery relating to its MHPI Projects' bond purchases, including the 2015 purchase of the Freddie Mac D tranche, but it was forced by court orders to provide such discovery.  As a result, in late 2016 and early 2017, the above multi-faceted scheme began to surface.

143.    Ray and Jefferies, who were no doubt aware that Ambac had ultimately filed suit against the Meade Project in October 2015, and who had gone to great lengths to conceal their hidden profits from the Projects as detailed above, were subpoenaed for documents.  However, recognizing that Jefferies had purchased the GMAC MHPI assets, including its books and records and documentation of the above schemes, Jefferies and Ray went to extraordinary lengths to avoid discovery.  In response to motions brought by the Monterey Plaintiffs in California state court, Jefferies and Ray made numerous false representations to the Court and to Plaintiffs—including claiming "they had no responsive documents."  Nonetheless, the California State Court granted five discovery orders compelling discovery from Jefferies, including producing Ray's early GMAC documents and emails.

144.    Within hours after Ray and Jefferies had received subpoenas for the transactional documents in the underlying litigation, Ray, while a Managing Director of Jefferies and with Jefferies' knowledge, began to delete thousands of responsive MHPI documents on the Jefferies document system—including files related to the subject matter of the above described schemes.  In a matter of a few days, Ray attempted to delete over 9,100 electronic documents from the Jefferies' electronic data system server after he and Jefferies were subpoenaed.  Jefferies and Ray subsequently misled Plaintiffs and the California Court in attempting to hide this massive act of intentional document spoliation by claiming they personally investigated and ensured through a viewing of Jefferies access logs that no such deletions had occurred.  These statements by Jefferies were knowingly false.  Two days after the California Court issued its February 6, 2017 order granting the Monterey Plaintiffs' motion to compel Jefferies to produce the access logs, which detailed Ray's minute-by-minute deletion of records from

Jefferies' document system, on February 8, 2017, the Jefferies Defendants attempted to dissolve Jefferies Mortgage—the Jefferies party before the California state court.

145.    As part of discovery during the Debt Service Reserve Litigation, Ray also was personally served with a subpoena for documents within his personal possession and control.  As stated above, for years, including after Ray was served with the subpoena, Ray sent MHPI Project related documents, some of which were responsive to the subpoena requests, to the email address he used on behalf of the Annandale Plantation Defendants.  Despite this, Ray's outside counsel, who at the same time represented Jefferies, represented in writing that Ray had no documents responsive to the subpoena served upon him in that litigation.  Ray further confirmed the same in a sworn declaration sent via interstate wires later served in connection with a motion to compel discovery from Jefferies.  Such statements were demonstrably false at the time they were made.

146.    In April 2016, while Ray was in the process of deleting documents responsive to the subpoena from his Jefferies email account, he began sending and securing MHPI-related documents pertaining to the RICO scheme to the Annandale Plantation Defendants' email account.  For example, on April 8, 2016, he transferred evidence relating to the MHPI Projects using interstate wires to conceal evidence.  This was part of an effort to destroy evidence saved on the Jefferies email servers and computers (where it was still possible for Jefferies employees to recover it) and conceal it in the Annandale Plantation Defendants' email account where it was only accessible to Ray.

147.    Days after being confronted with evidence regarding his attempts to delete thousands of electronic documents and basic facts regarding the RICO enterprise described herein, Ray engaged in further efforts to conceal his ill-gotten RICO proceeds.  On March 10, 2017 (eight days after he was deposed, and the day after Jefferies outside counsel stated in writing that they they no longer represented Ray), Ray executed four deed transfers of real estate from his name to his wife's, including the transfer of Ray's Pawleys Island, South Carolina beach house.  These real estate interests were worth millions of dollars and Ray transferred them all to his wife in consideration of "Five ($5.00) Dollars and Love and Affection."

148.    The March 10, 2017 deed transfers were attempts by Ray to conceal assets obtained via the RICO enterprise and an attempt to judgment-proof himself against a lawsuit, after he had been

1    confronted with evidence of his intentional destruction of documents.   In recording and executing

2    these deed transfers, Ray utilized interstate wires and/or the U.S. mail.

3    **Count I:  Violation of 18 U.S.C. §§ 1962(c) and 1962(d)**

4    **(Civil RICO and Conspiracy to Commit Civil RICO)**

5    **(Against All Defendants)**

6    149.    Plaintiffs reallege, as if fully set forth herein, the allegations set forth in the preceding

7    paragraphs.

8    150.    Plaintiffs are all "persons," who have sustained injury to their business or property by

9    reason of Defendants' conduct within the meaning of 18 U.S.C. § 1964(c).

10   151.    Defendants Ambac, Ray, Marfatia, and Annandale Plantation Defendants, Jefferies are

11   "persons" within the meaning of 18 U.S.C. § 1961.

12   152.    Defendants are "culpable persons" within the meaning of 18 U.S.C. § 1962(c).

13   153.    Defendants, along with GMAC, associated together as an "enterprise" within the

14   meaning of 18 U.S.C. § 1961(4).  Each of the Defendants participated in this enterprise in its various

15   permutations in order to engage in a pattern of racketeering activity designed to mislead Plaintiffs and

16   to thereby ensure that Plaintiffs would continue to pay Ambac's and GMAC's premiums, profits and

17   fees (both disclosed, inflated and undisclosed) in connection with the financing at each of the military

18   housing Projects.  This enterprise consisted originally of Ambac, Marfatia, GMAC, and Ray (and over

19   time the Annandale Plantation Defendants and Jefferies).

20   154.    As Ray and other individuals moved to and worked at other organizations, including

21   Jefferies, Ambac and Marfatia worked with Ray and thus associated in fact with Ray, GMAC, and

22   Jefferies to continue to conceal and effectuate this pattern of racketeering activity.

23   155.    Defendants engaged and participated in a pattern of racketeering activity as set forth in

24   18 U.S.C. § 1961(1).  Specifically, as alleged herein, each of the Defendants engaged in at least two

25   incidents of mail fraud in violation of 18 U.S.C. § 1341 and/or wire fraud in violation of 18 U.S.C.

26   § 1343.  More specifically, various elements of the RICO scheme were carried out, recorded, and

27   communicated through the use of interstate wires and the U.S. mails.

28

156.   Defendants, along with other members of the enterprise, intentionally devised and participated in a scheme to defraud Plaintiffs out of money.  Defendants did so with the intent to defraud Plaintiffs.

157.   Each mailing and/or use of interstate wires by any one of the Defendants in connection with the scheme to defraud represents a separate violation of 18 U.S.C. § 1341 and § 1343 and includes at least the following:

a)     Using the U.S. mails and/or interstate wires to deceive the Plaintiff Projects and Army/Air Force into believing that Ray and GMAC would act as a financial advisor and Agent on behalf of the Projects and negotiate with Ambac on behalf of the Projects;

b)     Using the U.S. mails and/or interstate wires to deceive the Projects and Army/Air Force into believing that GMAC and Ambac would act in the interests of the Projects to ensure that the Projects received the highest possible ratings;

c)     Using the U.S. mails and/or interstate wires to deceive the Projects and Army/Air Force into believing that the insurance portion of any financing transaction was competitively bid out;

d)     Using the U.S. mails and/or interstate wires (including for the transmission of email) to deceive the Projects and Army/Air Force into believing that the rating agencies required a surety bond and that the fee for the surety bond was the product of arm's-length negotiations;

e)     Using interstate wires to communicate with S&P and potentially other ratings agencies, including about the "shadow ratings" for the military housing projects;

f)     Using interstate wires to communicate among themselves regarding the scope and later concealment of their scheme to defraud;

g)     Using the U.S. mails and/or interstate wires to charge and receive inflated fees from the Projects and from the bond investors;

h)     Using the interstate wires to mislead regarding the destruction of documents;

i)     Using the U.S. mails and/or interstate wires to conceal, and later fraudulently transfer ill-gotten proceeds from the RICO enterprise; and

j)     Using the U.S. mails and/or interstate wires to mislead regarding the matters alleged herein.

158.   These predicate acts were committed over a number of years, beginning in at least 2002, and continuing at least through 2017, but were not discovered by Plaintiffs until late 2016 and early 2017.

159.    The acts set forth above constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

160.    Defendants further conspired and agreed to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d) by knowingly agreeing to adopt the goal of further facilitating the operation of the aforementioned enterprise through a pattern of racketeering and by agreeing to the commission of multiple predicate acts.

161.    Plaintiffs suffered injury to their business and property by reason of Defendants' conspiracy and pattern of racketeering activity.

<u>**Count II:  Breach of Fiduciary Duty (Against Defendants Ambac,**</u>

<u>**Jefferies, Ray and Marfatia)**</u>

162.    Plaintiffs reallege, as if fully set forth herein, the allegations set forth in the preceding paragraphs.

163.    As alleged herein and for the purposes stated, Ambac, GMAC, Jefferies, Ray, and Marfatia held themselves out as fiduciaries to Plaintiffs and committed to working in Plaintiffs' best interests in connection with the financing of the Projects.  Ambac and Marfatia, however, did not hold themselves out as fiduciaries in connection with the Bliss Project in 2005 or later Projects because Ambac and Marfatia, along with GMAC and Ray sought to hide Ambac's involvement in those transactions from the Projects.

164.    Based upon the representations of Ambac, GMAC, Ray, and Marfatia, and later Jefferies, Plaintiffs placed confidence, trust, and reasonable reliance in Defendants to secure the most advantageous financing terms on behalf of each of the Plaintiffs.

165.    Each of these Defendants breached their fiduciary duties to Plaintiffs by, among other things, concealing and misrepresenting the relationship between Ambac, GMAC, Ray, and Marfatia in connection with the financing of the Projects; charging undisclosed fees in connection with the financing of the Projects; making undisclosed profits in connection with the financing of the Projects; not operating in the best interests of the Projects; and, other harms as more fully alleged herein.

166.    Defendants' breaches of their respective fiduciary duties proximately caused damage to Plaintiffs in the form of higher interest rates, payment of unnecessary and inflated fees, and payment

of undisclosed fees in connection with the financing of the Projects, and additional damages as alleged herein and subject to discovery.

## Count III:  Aiding and Abetting Breach of Fiduciary Duty

### (Against All Defendants)

167.   Plaintiffs reallege, as if fully set forth herein, the allegations set forth in the preceding paragraphs.

168.   Defendants each knew that one another's conduct, as alleged above, constituted breaches of their respective fiduciary duties by concealing and misrepresenting the relationship between Ambac, GMAC, Ray, the Annandale Plantation Defendants and Marfatia in connection with the financing of the Projects; charging undisclosed and excessive fees in connection with the financing of the Projects; making undisclosed profits in connection with the financing of the Projects; not operating in the best interest of the Projects; and other harms as more fully alleged herein.

169.   Defendants each had knowledge that one another's conduct breached their respective fiduciary duties to Plaintiffs.

170.   Defendants each provided substantial assistance and encouragement to one another so as to breach their respective fiduciary duties to Plaintiffs.

171.   Such substantive assistance and encouragement caused substantial damage to the Projects.

## Count IV:  Fraud by Intentional Misrepresentation

### (Against Defendants Ambac, Jefferies, Ray and Marfatia)

172.   Plaintiffs reallege, as if fully set forth herein, the allegations set forth in the preceding paragraphs.

173.   As alleged above, Ambac, GMAC, Ray, and Marfatia intentionally misrepresented to Plaintiffs and the Army/JLL that financial guarantee insurance and a fully funded 12-month debt service reserve or surety bond were required by the rating agencies.

174.   Ambac, GMAC, Ray, and Marfatia each intentionally concealed, among other things, that they were working to obtain shadow ratings from third party rating agencies that justified the need

for insurance and 12-month surety bonds, and that justified the excessive premiums and fees being charged by Ambac.

175.    Ambac, GMAC, Ray, and Marfatia each intentionally concealed, among other things, that they were splitting fees paid by the Projects, including fees for a debt service reserve or surety bond.  They further concealed that GMAC was splitting other fees (including fees misrepresented to be for reimbursement of expenses to GMAC) with Ambac.

176.    Beginning in approximately 2005, Ambac, GMAC, Ray, and Marfatia intentionally misrepresented to the Projects that GMAC was providing a Liquidity Facility to the Projects, when in fact, GMAC was immediately assigning the Liquidity Facility to Ambac and receiving a full release and taking no real market risk.  Ambac, GMAC, Ray, and Marfatia each intentionally concealed this immediate assignment from the MHPI Projects and the Army/JLL in order to charge excessive fees to the Projects and to hide Ambac's involvement prior to closing.

177.    GMAC, Jefferies, and Ray also misrepresented, among other things as alleged more fully herein, to the Projects and the Army/JLL that the interest rates they charged to the Projects on the underlying loans were "market" and were "the best rates," that the credit spread represented what the investors required to purchase the bonds, and that the only purpose for the OIDs was to ensure the sale of bonds post-closing at a below-par-amount.  GMAC and Ray further misrepresented that they were negotiating with and selecting GIC providers in the Projects' interests when they had rigged the auction with Ambac and received under the table GIC fees.  Ambac was aware of these misrepresentations and of the outsized profits GMAC was making on the securitization of the loans and the sale of bonds (including to Ambac), which were concealed from Plaintiffs and the Army/JLL.

178.    Plaintiffs reasonably relied on Defendants' intentional misrepresentations and intentional concealment and, as a result, were damaged as a result of this fraud, including by paying inflated and undisclosed premiums, fees and expenses.

### Count V:  Fraud by Fraudulent Concealment

### (Against Defendants Ambac, Jefferies, Ray and Marfatia)

179.    Plaintiffs reallege, as if fully set forth herein, the allegations set forth in the preceding paragraphs.

180.    As alleged above, Ambac, GMAC, Jefferies, Ray, and Marfatia served as fiduciaries to Plaintiffs and committed to work in the best interests of Plaintiffs.  This fiduciary relationship required a duty of full disclosure by Ambac, GMAC, Ray, Jefferies, and Marfatia.

181.    Ambac, GMAC, Ray, and Marfatia failed to disclose, among other things, to Plaintiffs and the Army that financial guarantee insurance and a fully funded 12-month debt service reserve or surety bond were not required by the rating agencies.

182.    Ambac, GMAC, Ray and Marfatia likewise failed to disclose that they were splitting fees, including fees for a debt service reserve/surety.  They further failed to disclose that GMAC was splitting other fees (including fees misrepresented to be for reimbursement of expenses to GMAC) with Ambac.

183.    Beginning in approximately 2005, Ambac, GMAC, Ray, and Marfatia also failed to disclose to Plaintiffs that, among other things, GMAC was providing a Liquidity Facility to the Projects, when in fact, GMAC was immediately assigning the Liquidity Facility to Ambac and receiving a full release.  Ambac, GMAC, Ray, and Marfatia failed to disclose this immediate assignment in order to charge excessive fees to the Projects and to hide Ambac's involvement prior to closing.

184.    GMAC, Jefferies, and Ray also failed to disclose to Plaintiffs that, among other things as alleged more fully herein, the interest rates they charged to the Projects on the underlying loans were not "market," were not "the best rates" that its trading desk could offer, were not what was required by investors, that the OIDs were merely to allow GMAC to sell the bonds post-closing at a discount to par, that they were not negotiating Plaintiffs' credit enhancement premiums in the Projects' best interests, that they were not bidding out and selecting GIC providers in the Projects' best interests, and that they were not charging only legitimate deal expenses to the Projects.  Ambac was aware of these misrepresentations and of the outsized and undisclosed profits GMAC was making on the securitization of the loans and the sale of bonds (including to Ambac), which were concealed from Plaintiffs.

185.    Plaintiffs were not aware of these concealed facts at the time of the transactions.

186.     Plaintiffs reasonably relied on Defendants to provide full disclosure of all material facts and, as a result, were damaged as a result of these frauds, including by paying inflated premiums, fees and expenses.

### Count VI:  Conspiracy to Commit Fraud

### (Against All Defendants)

187.     Plaintiffs reallege, as if fully set forth herein, the allegations set forth in the preceding paragraphs.

188.     Ambac and Marfatia, and their co-conspirators GMAC, Jefferies, Ray and the Annandale Plantation Defendants arrived at a mutual understanding of how they would cooperate to accomplish carrying out and concealing the above-described frauds.

189.     Ambac and its co-conspirators acted in concert and made these representations and failed to disclose material facts with knowledge of their falsity.

190.     Plaintiffs were damaged as a result of the wrongful acts and conspiracy.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendants and seek the following relief:

a)     Relieving Plaintiffs, in whole or in part, from a continuing obligation to make payments to Ambac or its bond insurance;

b)     Declaring any purported disclaimer by Jefferies Mortgage of its fiduciary duty to the Sill and Fort Bliss Projects null and void;

c)     Disgorgement of all profits and fees, both disclosed and undisclosed;

d)     An award of compensatory damages, the amount of which is to be determined at trial;

e)     Punitive damages;

f)     Trebled damages pursuant to 18 U.S.C. § 1964(c);

g)     Attorney's fees pursuant to 18 U.S.C. § 1964(c);

h)     Prejudgment interest at the legal rate on the foregoing sums; and

i)     Such other relief deemed appropriate and just by the Court.

1

DATED:  October 27, 2017

Respectfully submitted,

2

KIRKLAND & ELLIS LLP

3

By:  */s/ Donna M. Welch*

4

Elizabeth L. Deeley (SBN 230798)
Michael P. Esser (SBN 268634)

5

KIRKLAND & ELLIS LLP
555 California Street

6

San Francisco, CA 94104
Telephone: (415) 439-1400

7

Facsimile: (415) 439-1500
Email: elizabeth.deeley@kirkland.com

8

Email: michael.esser@kirkland.com

9

Jeffrey L. Willian, P.C. (*pro hac vice*)
Donna M. Welch, P.C. (*pro hac vice*)

10

KIRKLAND & ELLIS LLP
300 North LaSalle

11

Chicago, IL 60654
Telephone: (312) 862-2000

12

Facsimile: (312) 862-2200
Email: jwillian@kirkland.com

13

Email: dwelch@kirkland.com

14

Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2    I HEREBY CERTIFY that on October 27, 2017 that a copy of the foregoing document is

3 being electronically filed with the Clerk of the United States District Court for the Northern District

4 of California by using the CM/ECF system which will send notice of such filing to all counsel of

5 record.

6    KIRKLAND & ELLIS LLP

7

8    By:    /s/ Donna M. Welch
    Elizabeth L. Deeley (SBN 230798)
9    Michael P. Esser (SBN 268634)
    KIRKLAND & ELLIS LLP
10    555 California Street
    San Francisco, CA 94104
11    Telephone: (415) 439-1400
    Facsimile: (415) 439-1500
12    Email: elizabeth.deeley@kirkland.com
    Email: michael.esser@kirkland.com
13
    Jeffrey L. Willian, P.C. (*pro hac vice*)
14    Donna M. Welch, P.C. (*pro hac vice*)
    KIRKLAND & ELLIS LLP
15    300 North LaSalle
    Chicago, IL 60654
16    Telephone: (312) 862-2000
    Facsimile: (312) 862-2200
17    Email: jwillian@kirkland.com
    Email: dwelch@kirkland.com
18
    Attorneys for Plaintiffs

19

20

21

22

23

24

25

26

27

28