Michael Esser (SBN 268634)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439 1500
Email: michael.esser@kirkland.com

Jeffrey L. Willian, P.C. (*pro hac vice*)
Donna M. Welch, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862 2000
Facsimile: (312) 862 2200
Email: jwillian@kirkland.com
Email: dwelch@kirkland.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| MONTEREY BAY MILITARY HOUSING, LLC, MONTEREY BAY LAND, LLC, MEADE COMMUNITIES LLC, FORT BLISS/WHITE SANDS MISSILE RANGE HOUSING LP, RILEY COMMUNITIES LLC, FORT LEAVENWORTH FRONTIER HERITAGE COMMUNITIES, I, LLC, FORT LEAVENWORTH FRONTIER HERITAGE COMMUNITIES, II, LLC, CARLISLE/PICATINNY FAMILY HOUSING LP, BRAGG COMMUNITIES LLC, FORT DETRICK/WALTER REED ARMY MEDICAL CENTER LLC, PICERNE FORT POLK FUNDING, LLC, RUCKER COMMUNITIES LLC, STEWART HUNTER HOUSING LLC, SILL HOUSING, LLC, AETC HOUSING LP, AMC WEST HOUSING LP, LACKLAND FAMILY HOUSING, LLC, and VANDENBERG HOUSING LP, <br><br> Plaintiffs, <br> vs. <br><br> AMBAC ASSURANCE CORPORATION, JEFFERIES MORTGAGE FINANCE, INC., JEFFERIES & COMPANY, INC., JEFFERIES LLC, JEFFERIES GROUP LLC, DANNY RAY, ANNANDALE PLANTATION, LLC, ANNANDALE PLANTATION, LLC, and CHETAN MARFATIA, <br><br> Defendants. | Case No. 5:17-cv-04992-BLF (NC) <br><br> Judge: Honorable Beth Labson Freeman <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT AMBAC'S MOTION TO DISMISS** <br><br> Date: April 12, 2018 <br> Time: 9:00 a.m. <br> Dept:  Courtroom 3 <br> The Hon. Beth Labson Freeman <br><br> Complaint Filed: August 28, 2017 |

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND FACTS ................................................................................................... 2

I.    Ambac's Conduct Pre-2005 ................................................................................... 2

II.    Beginning In 2005, Ambac And GMAC Develop The "Stealth Structure" ...................... 3

III.    Ambac And GMAC Rig The GIC Bidding Process .......................................... 3

LEGAL STANDARD ....................................................................................................... 4

ARGUMENT ..................................................................................................................... 4

I.    The Complaint Pleads All Necessary Elements For A RICO Claim .................................. 4

    A.    The Complaint Properly Pleads A RICO Enterprise ................................... 4

    B.    The Plaintiffs Have More Than Sufficiently Alleged Mail And Wire Fraud ............. 7

    C.    Plaintiffs Have Sufficiently Alleged Ambac's Role In The Enterprise ..................... 10

    D.    Plaintiffs Sufficiently Allege A Pattern Of Racketeering Activity ........................... 12

    E.    Ambac Conspired To Further The Criminal Endeavor ............................................ 14

    F.    Plaintiffs' RICO Claims Are Not Time Barred ...................................................... 15

    G.    Plaintiffs' RICO Claims Are Not Barred By The PSLRA ....................................... 16

II.    Plaintiffs' State Law Claims Are Adequately Pled ................................................ 19

    A.    Plaintiffs State A Claim For Breach Of Fiduciary Duty Against Ambac ................ 19

    B.    The Plaintiffs State A Claim For Aiding And Abetting A Breach Of Fiduciary Duty By Ambac ............................................................. 20

    C.    Plaintiffs State A Timely Claim For Fraud ............................................................. 21

III.    This Court Has Personal Jurisdiction Over All Defendants ........................................ 23

CONCLUSION ................................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abada v. Charles Schwab & Co.*,
    127 F. Supp. 2d 1101 (S.D. Cal. 2000) ............................................................................17

*Abels v. Farmers Commodities Corp.*,
    259 F.3d 910 (8th Cir. 2001) ..........................................................................................10

*In re Animation Workers Antitrust Litig.*,
    123 F. Supp. 3d 1175 (N.D. Cal. 2015) ...........................................................................22

*Barantsevich v. VTB Bank*,
    954 F. Supp. 2d 972 (C.D. Cal. 2013) .............................................................................24

*Bixler v. Foster*,
    596 F.3d 751 (10th Cir. 2010) ........................................................................................18

*Boyle v. United States*,
    556 U.S. 938 (2009) ..........................................................................................................5

*Brady v. Dairy Fresh Products*,
    974 F.2d 1149 (9th Cir. 1992) ........................................................................................11

*Bristol Myers Squibb Co. v. Superior Court of Ca., San Francisco Cnty.*,
    137 S. Ct. 1773 (2017) ....................................................................................................23

*Cervantes v. City of San Diego*,
    5 F.3d 1273 (9th Cir. 1993) ............................................................................................22

*Comm. On Children's Television, Inc. v. Gen. Foods Corp.*,
    35 Cal. 3d 197 (1983) .....................................................................................................19

*Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*,
    235 F. Supp. 3d 1132 (E.D. Cal. 2017) ..........................................................................12

*Cortina v. Bristol-Myers Squibb*,
    2017 WL 2793808 (N.D. Cal. June 27, 2017) ...........................................................23, 24

*Crocker Nat. Bank v. Rockwell Int'l Corp.*,
    555 F. Supp. 47 (N.D. Cal. 1982) .....................................................................................1

*Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*,
    557 F.2d 1280 (9th Cir. 1977) ........................................................................................24

*Deutsch v. Flannery*,
    823 F.2d 1361 (9th Cir. 1987) ..........................................................................................7

*E-Fab, Inc. v. Accountants, Inc. Servs.*,
    153 Cal. App. 4th 1308 (2007) ...........................................................................21

*Eisenbaum v. W. Energy Res., Inc.*,
    218 Cal. App. 3d 314 (1990) .............................................................................22

*Fox v. Ethicon Endo-Surgery, Inc.*,
    35 Cal. 4th 797 (2005) ......................................................................................21

*Gold v. Lumber Liquidators, Inc.*,
    No. 14-cv-05373-TEH, 2015 WL 7888906 ........................................................4

*Grauberger v. St. Francis Hosp.*
    169 F. Supp. 2d 1172 (N.D. Cal. 2001) ...........................................................14

*Hamilton Materials, Inc. v. Dow Chem. Corp.*,
    494 F.3d 1203 (9th Cir. 2007) ..........................................................................21

*Hemi Grp., LLC v. City of New York, N.Y.*,
    559 U.S. 1 (2009) ................................................................................................9

*I.T.C. Int'l, LLC v. Am. Voyage Corp., Inc.*,
    No. SACV 08-844, 2008 WL 11342745 (C.D. Cal. Sept. 26, 2008)................14

*Jablon v. Dean Witter & Co.*,
    614 F.2d 677 (9th Cir. 1980) ............................................................................15

*Jolly v. Eli Lilly & Co.*,
    44 Cal. 3d 1103 (1988) .....................................................................................21

*Kabushiki Kaishi Megahouse v. Anjar Co. LLC*,
    No. 14-cv-00598, 2014 WL 5456523 (C.D. Cal. Oct. 20, 2014) ............19, 20

*Kayne v. Ho*,
    No. LA CV09-06816, 2012 WL 12878753 (C.D. Cal. Sept. 6, 2012) ...........16, 17, 18

*Lomita Land & Water Co. v. Robinson*,
    154 Cal. 36 (1908) ............................................................................................20

*Mackell v. Wells Fargo Home Mortg.*,
    2017 WL 373077 (N.D. Cal. Jan 26, 2017)......................................................21

*Mazur v. eBay Inc.*,
    2008 WL 2951351 (N.D. Cal. July 25, 2008)...................................................14

*U.S. ex rel. McCoy v. Cal. Med. Review, Inc.*,
    723 F. Supp. 1363 (N.D. Cal. 1989) ..................................................................8

*Mohebbi v. Khazen*,
    50 F. Supp. 3d. 1234 (N.D. Cal. 2014) ..............................................................6

iii

*Monterey Bay Military Housing, LLC v. Pinnacle Monterey LLC*,
   116 F. Supp. 3d 1010 (N.D. Cal. 2015) ....................................................5, 13

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
   635 F. Supp. 2d 1170 (S.D. Cal. 2009) ...........................................................5

*Neubronner v. Milken*,
   6 F.3d 666 (9th Cir. 1993) .............................................................................7

*Novitaz, Inc. v. inMarket Media, LLC*,
   No. 16-cv-06795-EJD, 2017 WL 2311407 (N.D. Cal. May 26, 2017) ...........4

*Odom v. Microsoft Corp.*,
   486 F.3d 541 (9th Cir. 2007) ........................................................................4

*Oki Semiconductor Co. v. Wells Fargo Bank, Nat'l Ass'n*,
   298 F.3d 768 (9th Cir. 2002) ...................................................................5, 11

*Pedrina v. Chun*,
   97 F.3d 1296 (9th Cir. 1996) ......................................................................11

*Perkumpulan Inv'r Crisis Ctr. Dressel-WBG v. Wong*,
   No. C09-1786-JCC, 2014 WL 1047946 (W.D. Wash. March 14, 2014) .......18

*Pincay v. Andrews*,
   238 F.3d 1106 (9th Cir. 2001) ....................................................................15

*Pinney Dock & Transp. Co. v. Penn Cent. Corp.*,
   No. C80-1733, 1983 WL 21364 (N.D. Ohio June 21, 1983)........................15

*PT United Can Co. v. Crown Cork & Seal Co.*,
   138 F.3d 65 (2d Cir. 1998)...........................................................................24

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993).....................................................................................10

*Rezner v. Bayerische Hypo-Und Vereinsbank AG*,
   No. C 06-02064 JW, 2008 WL 11346211 (N.D. Cal. Aug. 13, 2008), *aff'd* 630
   F.3d 866 (9th Cir. 2010) .................................................................16, 17, 18

*Roberts v. Gainsforth*,
   No. CV 14-07595-AB, 2015 WL 12765021 (C.D. Cal. Apr. 28, 2015).........9

*Rupert v. Bond*,
   68 F. Supp. 3d 1142 (N.D. Cal. 2014) ...........................................................8

*S.E.C. v. Zandford*,
   535 U.S. 813 (2002).....................................................................................17

iv

*Semegen v. Weidner*,
  780 F.2d 727 (9th Cir. 1985) ..............................................................................4

*Swartz v. KPMG LLP*,
  476 F.3d 756 (9th Cir. 2007) .........................................................................17, 18

*Todaro v. Orbit Int'l Travel, Ltd.*,
  755 F. Supp. 1229 (S.D.N.Y. 1991)...................................................................13

*In re Toyota Motor Corp.*,
  785 F. Supp. 2d 883 (C.D. Cal. 2011) .................................................................9

*Trachsel v. Buchholz*,
  No. C-08-02248 RMW, 2009 WL 86698 (N.D. Cal. Jan. 9, 2009)...............................18

*United Energy Trading, LLC v. Pac. Gas & Elec. Co.*,
  177 F. Supp. 3d 1183 (N.D. Cal. 2016) ..............................................................11

*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*,
  1 Cal. 3d 586 (1970) .......................................................................................22

*United States v. Fernandez*,
  388 F.3d 1199 (9th Cir. 2004), *modified*, 425 F.3d 1248 (9th Cir. 2005) .....................14

*United States v. Garlick*,
  240 F.3d 789 (9th Cir. 2001) ..............................................................................7

*United States v. Lothian*,
  976 F.2d 1257 (9th Cir. 1992) ...........................................................................13

*United States v. Oreto*,
  37 F.3d 739 (1st Cir. 1994) ...............................................................................10

*United States v. Persico*,
  832 F.2d 705 (2d Cir. 1987).............................................................................12

*United States v. Stapleton*,
  293 F.3d 1111 (9th Cir. 2002) ......................................................................12, 13

*United States v. Turkette*,
  452 U.S. 576 (1981)......................................................................................4, 5

*Volk v. D.A. Davidson & Co.*,
  816 F.2d 1406 (9th Cir. 1987) ..........................................................................16

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
  MDL No. 2672 CRB (JSC), 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017)................6, 12, 13

*W. Am. Fin. Co. v. Pac. Indem. Co.*,
  17 Cal. App. 2d 225 (1936) ..............................................................................20

*Walden v. Fiore*,
   134 S. Ct. 1115 .................................................................................................23

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*,
   865 F. Supp. 2d 1002 (C.D. Cal. 2011) ..........................................................12

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*,
   903 F. Supp. 2d 880 (C.D. Cal. 2012) .........................................................7, 12

*Wolf v. Superior Court*,
   106 Cal. App. 4th 625 (2003) ..........................................................................19

**Statutes**

18 U.S.C. 1962(c) ......................................................................................................13

18 U.S.C. 1965(b) ......................................................................................................24

18 U.S.C. § 1964(c) ...................................................................................................16

18 U.S.C. § 1965(a) ...................................................................................................24

Cal. Civ. Proc. Code § 338 ........................................................................................21

**Rules**

Rule 9(b) ............................................................................................................4, 7, 8, 9

Rule 12(b)(6) ...............................................................................................................4

**Other Authorities**

Wright & Miller, FED. PRAC. & PROC. § 1351 (3d ed.) ...........................................24

**INTRODUCTION**

Ambac claims that the Plaintiff Projects have misused RICO, as it was intended only to "combat organized crime."  (Dkt. #71 at 1.)   Courts long ago have rejected such a contention, especially where, as here, Plaintiffs have alleged in detail a long-running conspiracy, involving related predicate acts, many false statements and omissions and multiple, and related victims.  *Crocker Nat. Bank v. Rockwell Int'l Corp.*, 555 F. Supp. 47, 49 (N.D. Cal. 1982) ("Congress did not, however, limit the scope of RICO to persons connected with organized crime, or even to those activities that are commonly thought of as racketeering.") (citations omitted).

Ambac's lack of particularity arguments depend on ignoring controlling case law and the 48 pages of detailed, non-repetitive complaint allegations.  As taken largely from Ambac and GMAC's own documents and the testimony of Ambac's executive Marfatia, and Defendant Ray, the complaint alleges that Marfatia and Ray, a self-touted financial advisor and fiduciary, formed a silent "joint venture" on behalf of the respective companies to secretly profit through fraud at the expense of the Projects.  (Dkt. #60, First Am. Compl. ("FAC") ¶ 5.)  The RICO scheme crystalized at the Monterey Project and included allowing Ambac to charge inflated credit enhancement fees and surety fees through false claims of negotiation and competition, and, if that were not enough, providing  Ambac with "exclusives" and "'last looks'" for credit enhancement and the GIC auctions, which were supposedly "blind auctions" run by Ray and GMAC. (FAC ¶¶ 14-17, 19.)  Ambac rigged the credit ratings, and bought GMAC MHPI bonds above par pre-close of the Project loan, allowing Ray to charge the Projects' inflated interest on the Project loans.  (*Id.* at ¶ 18-19.)  Plaintiffs detailed numerous misrepresentations and omissions transmitted via interstate wires in connection with these activities, all of which allowed scheme perpetuation and greater secret profits for all Defendants.

Ambac's remaining arguments regarding the statute of limitations, the Private Securities Litigation Reform Act and personal jurisdiction are easily turned aside.  Well-pled allegations of fiduciary duty limit inquiry notice; in any event, the active efforts to fraudulently conceal have been alleged in detail.  This scheme is much broader than the purchase or sale of any alleged security, and no party claims that there were any misrepresentations to investors that could form the basis for a

colorable claim for securities fraud.  Thus the PSLRA has no application.  Finally, Ambac has consented to personal jurisdiction, so its personal jurisdiction argument is not well-taken.

## BACKGROUND FACTS

### I.   AMBAC'S CONDUCT PRE-2005.

The complaint alleges in detail that Ambac (and its employees) were at the center of the fraudulent scheme from the earliest days, including taking steps to both hide the scheme from Plaintiffs and to further enrich themselves and their co-conspirators Ray and GMAC/Jefferies.  Specifically, as alleged, as early as 2001, "Ray and Marfatia, on behalf of their respective organizations, had agreed to act in each other's best interest, at the expense of the Projects, in order to reap inflated and undisclosed profits."  (FAC ¶ 90.)  Until 2005, Ambac, like GMAC, held itself out as a fiduciary that would act in the best interests of the Projects, at least with respect to interactions with third party rating companies.  (*Id.* at ¶ 78.)

Despite these representations, Ambac acted in numerous ways to benefit itself and its co-conspirators to the detriment of the Projects. ***First***, Ambac and GMAC formed a *de facto* joint venture, where Ambac got an "exclusive" right to provide insurance and a surety bond, allowing Ambac to charge above market prices.  (*Id.* at ¶ 20.)  Ambac (and its former managing director Marfatia) conspired with GMAC/Jefferies and Ray to fix the ratings process to the Plaintiffs' detriment by instructing the ratings agencies to artificially cap the ratings that the Projects could receive.  (*Id.* ¶¶ 96–97.)  Ambac knew the Projects, like any loan recipient, would benefit from the highest rating possible as a higher rating could, among other things, have led to less expensive credit enhancement if needed at all and potentially greater loan proceeds.  (*Id*. at ¶ 97.)  But by artificially capping the ratings at an "A," Ambac was able to justify its overpriced credit enhancement insurance.  (*Id*. at ¶¶ 97–98.)  Furthering this scheme, Ambac concealed from the Projects that at least S&P no longer required full credit enhancement in addition to a 12-month funded debt service reserve or surety bond in order to justify its own products.  (*Id*. at ¶ 99-100.)

***Second***, beginning with the Monterey Project, Ambac assisted Ray and GMAC in locking in their ill-gotten proceeds on the pre-sales of bonds by itself purchasing MHPI Project bonds at a premium prior to closing of the transaction.  (*Id.* at ¶ 91.)  The sale of the bonds prior to the closing of

the Projects' loans did not harm investors and was not unlawful, but they allowed Ray and GMAC to lock in the secret and outsized profits.  (*Id*.)  As alleged, "[t]hese Ambac bond purchases helped cement Ray and GMAC's loyalty," and, in return for these bond purchases, Ray and GMAC agreed to "protect Ambac from competition and provide[] it [with] an exclusive on all Project transactions with credit enhancement."  (*Id*. at ¶¶ 91-92.)

## II.   BEGINNING IN 2005, AMBAC AND GMAC DEVELOP THE "STEALTH STRUCTURE".

In approximately 2005, the Army's advisor, Jones Lang LaSalle ("JLL"), observed GMAC's preference for using Ambac as credit enhancer and GMAC was informed that it would be required to bid out Ambac's role.  (FAC ¶ 21.)  To avoid this, and continue to provide Ambac with an undisclosed "exclusive," Ambac and GMAC developed what they termed the "stealth structure" in order to conceal Ambac's role before close.  (*Id*. at ¶ 20-22)  Thus, for Fort Bliss and subsequent Projects, where Ambac's role was concealed (*id*. at ¶ 111 (listing "stealth structure" Projects)), Ambac was able to rely on GMAC's and Ray's direct misrepresentations to the Projects, which allowed Ambac to continue to receive its outsized fees without the threat of any competition.  (*Id*. at ¶¶ 108–09.)

## III.   AMBAC AND GMAC RIG THE GIC BIDDING PROCESS.

To further enrich themselves at the expense of the Projects, Ambac and GMAC rigged the auction process for the guaranteed investment contracts ("GIC") utilized by many of the Plaintiff Projects.  (FAC ¶¶ 124–28.)  These GICs provided a safe investment for the Projects to invest the loan proceeds, as they would not need the entirety of the loan proceeds at the outset.  (*Id*. at ¶ 124.)  Through this scheme, despite representing to the Projects that the GIC fees and rates would be established via a blind auction, GMAC in fact granted special treatment to Ambac, giving Ambac at least a "last look." (*Id*. at ¶ 125; ¶ 127.)  Ambac provided the GICs at several Projects.  (*Id*. at ¶¶ 125-26.)  Given Ambac's knowledge that Ray and GMAC held themselves out as financial advisors (*i.e.*, fiduciaries) to the Projects (*id*. at ¶ 78), Ambac was certainly aware that its access to these last looks was not in keeping with the Defendants' duties and representations to the Projects.

1

## LEGAL STANDARD

2

On a motion to dismiss under Rule 12(b)(6), "the complaint must be construed in the light most

3

favorable to the non-moving party, and all material allegations in the complaint are taken as true."

4

*Novitaz, Inc. v. inMarket Media, LLC*, No. 16-cv-06795-EJD, 2017 WL 2311407, at *1 (N.D. Cal.

5

May 26, 2017).  The complaint "does not need to have detailed factual allegations to survive a 12(b)(6)

6

motion," but must only "provide grounds demonstrating [the plaintiff's] entitlement to relief."  *Id.*  As

7

discussed below, the allegations contained in the complaint state plausible claims against Ambac.  In

8

addition, claims based on fraud are subject to the heightened pleading standards of Rule 9(b).   Under

9

Rule 9(b), "[t]he allegations must be 'specific enough to give the defendants notice of the particular

10

misconduct which is alleged to constitute the fraud charged so that they can defendant against the

11

charge and not just deny that they have done anything wrong.'"  *Gold v. Lumber Liquidators, Inc.*,

12

No. 14-cv-05373-TEH, 2015 WL 7888906, at *2 (quoting *Semegen v. Weidner,* 780 F.2d 727, 731

13

(9th Cir. 1985).  As discussed further below, the complaint sufficiently alleges fraud claims against

14

Ambac, as well as the other Defendants.

## ARGUMENT

15

## I.    THE COMPLAINT PLEADS ALL NECESSARY ELEMENTS FOR A RICO CLAIM.

16

### A.    The Complaint Properly Pleads A RICO Enterprise.

17

18

In arguing that Plaintiffs fail to sufficiently plead a RICO enterprise, Ambac ignores well-

19

established case law.  Ambac asserts that Plaintiffs fail to allege "a RICO enterprise with an

20

*ascertainable structure.*"  (Dkt. #71 at 10 (emphasis in original).)  In making the argument, Ambac

21

ignores United States Supreme Court precedent, which has intentionally set a low threshold for

22

pleading the organizational structure of an association-in-fact RICO enterprise.  *United States v.*

23

*Turkette*, 452 U.S. 576, 580 (1981) ("[t]here is no restriction upon the associations embraced by the

24

definition: an enterprise includes any union or group of individuals associated in fact.").  As even the

25

cases cited by Ambac recognized, "[a]n association-in-fact enterprise under RICO ***does not*** require

26

any particular organizational structure, separate or otherwise," and thus the argument that Plaintiffs

27

must plead some specific hierarchy misses the mark.  *Odom v. Microsoft Corp.*, 486 F.3d 541, 551

28

(9th Cir. 2007) (emphasis added).  Stated differently, "[t]o require that an associated-in-fact enterprise

have a structure beyond that necessary to carry out its racketeering activities would be to require precisely what the Court in *Turkette* held that RICO does *not* require." *Id.* (italics in original).

Plaintiffs satisfy this standard. The complaint details how Ambac, Jefferies, Ray, and Marfatia acted in concert to engage in a pattern of racketeering activity. (*E.g.*, FAC ¶¶ 95–101 (allegations concerning Ambac and GMAC/Jefferies conspiring to artificially limit shadow ratings and keep this information from Plaintiffs); *id. at* ¶¶ 108–09 (allegations concerning Ambac and GMAC/Jefferies conspiring through the stealth structure to reap illicit profits); *id. at* ¶¶ 124–28 (allegations concerning Ambac and GMAC conspiring to rig GIC auction process).) Further, the complaint contains factual allegations concerning the role each Defendant played in the enterprise. Ray and GMAC originated the loans, set the fraudulent interest rates, and led the sale of the bonds to outside investors (reaping illicit profits from the Projects but not the purchasers of the bonds). (*Id.* at ¶¶ 102–07.) In contrast, Ambac took the lead in directing the fraud with respect to the shadow ratings and ratings agency requirements. (*Id.* at ¶ 95.)

These allegations provide a detailed schematic of the various frauds perpetrated by the Defendants and the roles that each Defendant filled within the enterprise. This is more than sufficient to establish the structure of a RICO enterprise. *Monterey Bay Military Housing, LLC v. Pinnacle Monterey LLC*, 116 F. Supp. 3d 1010, 1044 (N.D. Cal. 2015) ("[I]t is well established that the breadth of the enterprise concept in RICO encompasses *any* union or group of individuals associated in fact for a common purpose of engaging in a course of conduct.") (italics in original). Although Ambac's involvement in the enterprise changed over time, this does not change the outcome as RICO does not require that every defendant be involved in every aspect of the enterprise. *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 635 F. Supp. 2d 1170, 1174 (S.D. Cal. 2009) ("[A]ll members of the enterprise need not be directly working with all other members of that enterprise."); *Oki Semiconductor Co. v. Wells Fargo Bank, Nat'l Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002) ("All conspirators are liable for the acts of their coconspirators.").

Through these allegations, the alleged enterprise meets all three requirements found in *Boyle v. United States*: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. 556 U.S. 938,

946 (2009). The purpose of the enterprise was to enrich the Defendants at the expense of the Projects in connection with financing improvement of the housing for the men and women of the armed forces. (FAC ¶ 4.) The relationships among the individual Defendants (and non-Defendants) associated with the enterprise is also well-pled. For instance, as alleged, Ambac and GMAC (through their employees Ray and Marfatia) had relationships arising out of their scheme to defraud the Plaintiff Projects. Through these relationships, GMAC reaped illicit profits through its goosing of interest rates and the pre-sale of bonds (assisted by Ambac's purchase of the bonds), *id.* at ¶¶ 102–07, while Ambac was permitted by GMAC to provide the credit enhancement for these Projects as an undisclosed "exclusive" right. (*Id.* at ¶ 92.) Finally, the enterprise, as alleged, operated over the course of more than a decade, clearly providing the requisite "longevity." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 4890594, at *16 (N.D. Cal. Oct. 30, 2017) ("[T]he Franchise Dealers allege that Bosch and Volkswagen's emissions scheme extended over the course of a decade . . . . The enterprise, then, had a longevity necessary to accomplish its purpose."). Thus, the complaint pleads an enterprise that satisfies the requirements of RICO.

Ambac's reliance on *Mohebbi v. Khazen* is misplaced. 50 F. Supp. 3d 1234 (N.D. Cal. 2014). As this Court recognized in *Mohebbi*, in pleading an organization structure, "that structure need not exist beyond that necessary to carry out its racketeering activities." *Id.* at 1254. "A Plaintiff must plead only that there exists an ongoing organization, either formal or informal, which acts through the coordinate nature of defendants' activity and functions as a continuing unit." *Id.* (internal quotation marks and citations omitted). The *Mohebbi* complaint faced dismissal because the plaintiff "merely allege[d] that the Defendants and their corporations form an enterprise" and the plaintiff "d[id] not cite ***any*** facts about the alleged enterprise whatsoever–only that every Defendant sued in this matter is a part of the enterprise." *Id.* at 1254 ("[p]laintiff does not allege ***how*** each individual Defendant is engaged in the enterprise, only making a cursory allegation that all 'Individual Defendants and their numerous related corporations' constitute the structure of the enterprise."). As demonstrated above, the complaint here contains detailed allegations concerning the relationship between the Defendants and the roles they played in the enterprise that satisfy the pleading requirements.

**B.**     **The Plaintiffs Have More Than Sufficiently Alleged Mail And Wire Fraud**.

Rule 9(b) requires information in pleadings "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993).  A pleading satisfies Rule 9(b) if it "identifies 'the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations.'"  *Deutsch v. Flannery*, 823 F.2d 1361, 1365 (9th Cir. 1987).  Here, the allegations meet this standard.

Ambac's claim that the Plaintiffs have not alleged in sufficient detail the acts of mail and wire fraud that occurred is without merit.  Plaintiffs have numerous, specific allegations of representations made by Ambac and Ambac's co-conspirators via the mails and wires that furthered the improper goals of the enterprise.  (*E.g.*, FAC ¶ 88 (alleging that Ambac "chastised" ratings agency that communicated directly with Projects and instructed ratings agency to cease such communications); *id.* at ¶ 92 (alleging that GMAC's agreement to protect Ambac from competition and provide it exclusives on MHPI Projects was reflected through "[n]umerous emails sent via interstate wires"); *id.* at ¶ 113 (Ray's false claims that original issue discount was financially neutral was sent "by email via interstate wires") *see also id.* at ¶¶ 115-17, 157.)  The many wire transactions and emails that consummated these fraudulent transaction serve as colorable wire fraud.  *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001) ("[E]ach use of the wires under the wire fraud statute constitutes a separate offense."); *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, 903 F. Supp. 2d 880, 913 (C.D. Cal. 2012) (recognizing that even "'innocent' mailings—ones that contain no false information—may supply the mailing element" because "[t]he predicate transmissions do not have to be alleged as false or contain misrepresentations; they need only be in furtherance of a scheme to defraud").

What's more, the complaint contains a substantial number of detailed allegations concerning the Ambac's role in various aspects of the scheme.  (FAC ¶¶ 86–89 (describing Ambac's role in misleading Projects with respect to ratings and rating agency requirements); *id.* at ¶¶ 108–111 (describing Ambac's role in creating stealth structure); *id.* at ¶¶ 124–28 (describing Ambac's role in rigging GIC auction process).)  These specific allegations about Ambac's fraud participation refute Ambac's argument under Rule 9(b), as these allegations contain sufficient detail to put Ambac (and

the other Defendants) on notice of the fraudulent schemes alleged.  *U.S. ex rel. McCoy v. Cal. Med. Review, Inc.*, 723 F. Supp. 1363, 1372 (N.D. Cal. 1989) (denying motion to dismiss based on Rule 9(b) where complaint contained a description of "the plan allegedly created by defendant Snodgrass and approved and implemented by defendants Ross, Magna and Shea for falsely certifying that discharges from the last quarter of fiscal 1986 had been reviewed").

Ambac's citation to *Rupert v. Bond* is misplaced.  68 F. Supp. 3d 1142 (N.D. Cal. 2014).  In *Rupert*, this Court dismissed the complaint for failure to satisfy Rule 9(b) because the plaintiff's "single allegation in paragraph 79 fails to state the time, place, or specific content of the purported 'scheme,'" and this lone allegation related to the alleged wire fraud was that "a series of emails were exchanged, sometime after March 15, 2010, 'to wrongfully use . . . both extrinsic and intrinsic fraud to obtain corrupt'" declaratory judgments.  *Id*. at 1160.  Here, in contrast, Plaintiffs have alleged specific communications (including the contents to whom the representations were made) that furthered the fraudulent scheme.  (*E.g.*, FAC ¶¶ 157(b), 88, 115.)

Ambac's claim that Plaintiffs fail to satisfy the requirements with respect to each individual Plaintiff also fails.  (Dkt. #71 at 13-14.)  Plaintiffs allege Ambac's role as it relates to each Plaintiff, but because that role is often the same (*e.g.*, Ambac's role for Projects prior to 2005 and Ambac's separate role for "stealth structure" Projects), that is appropriate.  (*E.g.*, FAC ¶ 77 (alleging that "Ray and GMAC . . . perpetrated essentially the same fraud on each successive Project"); *id*. at ¶ 25 (identifying Projects where Defendants perpetrated OID scheme); *id*. at ¶ 104 (alleging that Ray represented "in writing via interstate wires that interest would be set by an 'open book' process" to "nearly all of the early Projects (Meade, Bragg, Stewart, Detrick, and Polk)"); *id*. at ¶ 110–11 (identifying Projects where stealth structure was used).)

Likewise, Ambac's claim that the complaint fails to adequately distinguish between the acts of the various Defendants cannot be squared with the allegations.  (Dkt. #71 at 13.)  To be sure, there are parts of the complaint where the Plaintiffs allege that more than one Defendant was involved in an aspect of the fraud.  (*E.g.*, FAC ¶ 123 (alleging that "Defendants instead colluded to mislead and to keep the [] material information from the Projects, contrary to their representations that they were acting in the Projects' best interests.").)  But this is only the case where more than one Defendant was

involved in that specific aspect of the fraud.  For the remaining allegations, Plaintiffs specifically identify which Defendant played which specific role.  (*E.g.*, *id.* at ¶ 18 ("GMAC and Ambac also charged the Projects inflated deal expenses in connection with the financings"); *id.* at ¶ 14 (alleging GMAC and Ambac misrepresented rating agency requirements for surety bonds to Projects).)  Thus, this case presents facts far different than those found in *In re Toyota Motor Corp.*, upon which Ambac relies.  785 F. Supp. 2d 883, 919 (C.D. Cal. 2011).  In that case, it appears that the plaintiffs did not attempt to allege ***any acts*** that any ***specific defendant*** performed.  *Id*. ("Plaintiffs lump all of the Defendants together instead of 'attributing specific conduct to individual defendants.") (internal citations and quotation marks omitted).  Here, the substantial detail in the complaint concerning the allegations against each specific Defendant, including Ambac, put Ambac on notice of the allegations against it.

In short, the complaint contains both general allegations about how all the Projects were harmed, as well as specific allegations about how these schemes impacted each of the specific Projects.  (*E.g.*, FAC ¶¶ 98–99 (alleging scheme with ratings agencies damaged, and continue to damage, Projects through increased and unnecessary fees and premiums for Ambac credit enhancement and surety bond); *id*. at ¶¶ 106–07 (alleging that pre-sale of bonds at above par price, including sale to Ambac, harmed Projects by leading to increased interest rates).  Ambac's claim that the complaint fails to allege that the Projects "suffered damage as the proximate result of a pattern of racketeering activity" is belied by these allegations, which are in line with what *Hemi Grp., LLC v. City of New York, N.Y.* requires.  559 U.S. 1, 9 (2009).

Ambac's argument also ignores that part of Ambac's scheme in the conspiracy was the ***failure*** to disclose things to the Projects that Ambac had a duty to disclose as a fiduciary.  With respect to such claims, courts recognize that because the claim is based on a failure to act, as opposed to a specific act, the Rule 9(b) standards are somewhat relaxed.  *Roberts v. Gainsforth*, No. CV 14-07595-AB (VBKx), 2015 WL 12765021, at *8 (C.D. Cal. Apr. 28, 2015) ("[A] plaintiff in a fraudulent concealment suit will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim.  For that reason, a fraud by concealment

1    claim can succeed without the same level of specificity required by a normal fraud claim." (internal

2    citations and quotation marks omitted)).

3         **C.    Plaintiffs Have Sufficiently Alleged Ambac's Role In The Enterprise**.

4         Ambac suggests others were more involved in the RICO enterprise and thus it should not be

5    held liable under the "operation or management test."  (Dkt. #71 at 15 ("Ambac merely provided

6    insurance against default for the benefit of bondholders").)  But, as alleged, Ambac was a central figure

7    instrumental to the enterprise's success in defrauding Plaintiffs.  (*E.g.* FAC ¶¶ 12–20 (recounting

8    Ambac's role in charging inflated expenses to the Projects, rigging the GIC bidding process, and

9    rigging the ratings provided to the Projects).)  Only "*some* part in directing the enterprise's affairs is

10   required."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (italics in original).  "[T]he word

11   'participate' makes clear that RICO liability is not limited to those with primary responsibility for the

12   enterprise's affairs."  *Id.*  Ambac cannot be characterized as an "outsider" such as an attorney or an

13   accountant who only plays a peripheral role in the enterprise, which is the policy underlying the

14   Supreme Court's decision in *Reves*.  *See, e.g., United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994)

15   ("*Reves* is a case about the liability of *outsiders* who may assist the enterprise's affairs"); *Abels v.*

16   *Farmers Commodities Corp.*, 259 F.3d 910, 918 (8th Cir. 2001).

17        Ambac's claim that it did not "have some part in directing" the affairs of the enterprise is belied

18   by the factual allegations in the complaint.  (Dkt. #71 at 14.)  Rather, Ambac was involved in the fraud

19   from its inception and was integrally involved in the development of the "stealth" structure that was

20   used to insulate Ambac from competition in order both to conceal and continue the fraud.  (FAC ¶¶ 95–

21   96 (detailing Ambac's role in specifically directing S&P representatives to artificially cap ratings for

22   MHPI Projects); *id.* at ¶¶ 91–92 (describing Ambac's purchase of bonds from GMAC at above-par

23   prices in return for GMAC protecting Ambac from competition for credit enhancement); *id.* at ¶ 108

24   ("GMAC, Ray, Ambac, and Marfatia altered the secret profits scheme by developing a new

25   transactional structure that they termed amongst themselves the 'stealth structure.'").)  Plaintiffs

26   specifically allege that ***Ambac*** "invited S&P to Ambac's New York office where they specifically

27   instructed S&P representatives that any MHPI Project credit-enhanced by Ambac should not receive

28   a rating higher than an 'A.'"  (*Id.* at ¶ 95.)  Similarly, it is alleged that Ambac employees "falsely

represented to the Projects (as well as to the Army and JLL) that all of the rating agencies, including S&P, required full credit enhancement in addition to a 12-month funded debt service reserve or a surety bond[.]"  (*Id.* at ¶ 100.)  Thus, Ambac's reliance on *Pedrina v. Chun* is misplaced.  97 F.3d 1296 (9th Cir. 1996).  In that case, the individual defendant's only involvement in the enterprise was receiving bribes; the court recognized that under these facts, the defendant did not control the enterprise, but rather was "controlled by [the enterprise]."  *Id.* at 1300–01.  Here, the allegations demonstrate that Ambac specifically conceived of and directed critical portions of the enterprise and its pattern of racketeering.  (*E.g.*, FAC ¶¶ 95-96, 108.)

Likewise, Ambac's claim that it "is not alleged to have had any role in the operation and management of the alleged GIC auction-rigging" is belied by the complaint. (Dkt. #71 at 15.)  Ambac and GMAC rigged the auction process for the GICs by allowing Ambac special treatment in the bidding, despite representing to the Projects that the GIC fees and rates would be established via a blind auction.  (FAC ¶ 125.)  When Ambac was expressly offered the "last look" opportunity; it knew that this would necessarily skew the auction process and effectively chill the bidding.  (*Id.* at ¶ 127.)  And given Ambac's knowledge that Ray and GMAC held themselves out as financial advisors (*i.e.*, fiduciaries) to the Projects (*id.* at ¶ 78), Ambac was certainly aware that its access to these last looks was not in keeping with the Defendants' duties to the Projects.  And there should be no doubt that Ambac may be held liable for the acts of its co-conspirators.  *See Oki Semiconductor*, 298 F.3d at 775.

Furthermore, Ambac is liable under RICO for the actions of its agents and employees (*i.e.*, Marfatia).  (*See* FAC ¶¶ 99-110; 131–34 (acts of Marfatia Ambac is liable for).)  "An employer may be liable for an employee's violation of section 1962(c) under the doctrine of *respondeat superior* where: (1) the employer is distinct from the enterprise, (2) the employer benefitted from its employee's RICO violation, and (3) the employee's acts were committed within the course and scope of her employment, meaning the conduct occurred substantially within the time and space limits authorized by the employment, the employee was motivated, at least in part, by a purpose to serve the employer, and the act was of a kind that the employee was hired to perform." *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 177 F. Supp. 3d 1183, 1190 (N.D. Cal. 2016) (denying motion to dismiss RICO claim against company based upon *respondeat superior*) (citations and quotation marks omitted);

*Brady v. Dairy Fresh Products*, 974 F.2d 1149, 1154 (9th Cir. 1992) ("[W]hen the corporation or other employer is not the enterprise . . . the application of the doctrine of *respondeat superior* would not upset the enterprise/person distinction in section 1962(c)").  Marfatia was working in his role as an Ambac employee in reaching these agreements with Ray and GMAC/Jefferies to benefit both himself individually and Ambac generally, and thus further supports a finding that Ambac operated the RICO enterprise.

> **D.      Plaintiffs Sufficiently Allege A Pattern Of Racketeering Activity**.

Ambac argues that in pleading a pattern of racketeering activity, "a plaintiff must allege at least two predicate acts *by each defendant*."  (Dkt. #71 at 16, *citing Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1177 (E.D. Cal. 2017) (emphasis original in Ambac's brief).)  With respect to the court in *Occidental Oil*, this is an incorrect statement of what RICO requires in a multi-defendant case and inconsistent with established Ninth Circuit law.  In support of this position, *Occidental Oil* (not controlling) relies on *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, 903 F. Supp. 2d 880, 914 (C.D. Cal. 2012), which supported this supposed proposition with a citation to its own earlier decision in *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, 865 F. Supp. 2d 1002, 1035 (C.D. Cal. 2011), as well as the Second Circuit's decision in *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987).  *Persico* concerned the criminal statute of limitations under RICO.  832 F.2d at 714.  It did not hold that a plaintiff must allege two predicate acts of mail or wire fraud committed by each individual Defendant.

The recent case of *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, analyzed and confronted this very issue.  MDL No. 2672 CRB (JSC), 2017 WL 4890594, at *13 (N.D. Cal. Oct. 30, 2017) ("*Volkswagen*").  In *Volkswagen*, the court rejected the precise argument being made by Ambac in this litigation because it is contrary to the Ninth Circuit's opinion in *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002):

> In arguing against co-schemer liability for mail and wire fraud, Bosch also relies on *WellPoint*… The *WellPoint* court went on to note, though, that "the complaint need not identify false statements made by each and every individual," but rather the plaintiff need only "identify the role of each defendant in the alleged fraudulent scheme." *Id.* at 1036 (citation omitted).  **WellPoint, then, is not necessarily inconsistent with Stapleton.  And to the extent WellPoint is inconsistent, the Ninth Circuit's Stapleton decision controls.**

*Volkswagen*, 2017 WL 4890594, at *13 (emphasis added).  This is because, to prove a violation of the mail or wire fraud statutes, "the misrepresentation does not need to be made through the mails or wires; rather, the use of the mails or wires only needs to be 'a step in the plot.'  The misrepresentation also does not need to be made to the RICO plaintiff, but instead may be made to a third-party."  *Id.* at *11 (citations omitted). "Like co-conspirators, 'knowing participants in the scheme are legally liable' for their co-schemers' use of the mails or wires." *Stapleton*, 293 F.3d at 1117 (quoting *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992)); *see also Monterey Bay Military Hous., LLC v. Pinnacle Monterey LLC*, 116 F. Supp. 3d 1010, 1051 (N.D. Cal. 2015) (Freeman, J.) ("With respect to predicate acts, Plaintiffs need only identify transmissions using the mail or wire that furthered the scheme to defraud.")  This makes sense, as RICO's statutory language makes clear, it punishes those who "conduct or participate" in an enterprise through a pattern of racketeering activity, not simply those who commit wire or mail fraud twice.  18 U.S.C. 1962(c) ("It shall be unlawful for any person employed or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through pattern of racketeering activity . . . ."); *Volkswagen*, 2017 WL 4890594, at *12.  Like the Bosch-defendants in *Volkswagen*, Ambac misconstrues the RICO statute, this Court should not.

Plaintiffs have further alleged a pattern of racketeering activities that shared a common purpose and characteristic.  *Monterey Bay Military Hous., LLC*, 116 F. Supp. 3d at 1047 ("The relatedness requirement to establish a 'pattern' of racketeering activity is not a high threshold.  Indeed, 'whether the predicate acts alleged or proven are sufficiently related is seldom at issue.'").  Here, the allegations encapsulate a similar fraudulent scheme carried out by Ambac and the other Defendants at various military Projects.  At each Project, Ambac and the other Defendants conspired to line their own pockets—through, among other things, hidden fees and profits and increased interest rates—to the detriment of the Projects.  Although the precise way in which Ambac and GMAC reaped secret fees and profits varied slightly at different Projects, the purpose and characteristics of the scheme remained constant.  (*See, e.g.* FAC ¶¶ 7–20.)  Namely, to enrich the Defendants at the expense of the Plaintiffs through preying on a relationship of trust and making numerous misrepresentations and omissions.  *Todaro v. Orbit Int'l Travel, Ltd.*, 755 F. Supp. 1229, 1236 (S.D.N.Y. 1991) (relatedness requirement

was satisfied based upon similar purposes "to carry out a scheme to defraud plaintiffs of certain funds and thereafter protect those funds from judgment" and similar participants).

Ambac's passing claim that the Plaintiffs have failed to show "any threat of continued criminal activity" is based on a misreading of the law.  (Dkt. #71 at 17.)   Plaintiffs are not required to demonstrate a continued threat of criminal activity to satisfy the "pattern" requirements; instead, this requirement can be shown by a "closed period of repeated conduct" (*i.e.*, "closed-ended continuity). *I.T.C. Int'l, LLC v. Am. Voyage Corp., Inc.*, No. SACV 08-844 CJC (CWx), 2008 WL 11342745, at *3 (C.D. Cal. Sept. 26, 2008).  Given the allegations referenced above, which show a pattern of related activity over a number of years, Plaintiffs' allegations satisfy the requirement pattern by demonstrating closed-ended continuity.  *Id.*

### E.     Ambac Conspired To Further The Criminal Endeavor.

Ambac argues that Plaintiffs have not alleged that Ambac conspired to further the criminal endeavor.  (Dkt. #71 at 17.)  To the extent Ambac's argument applies to RICO 1962(d) conspiracy liability, Plaintiffs need not allege actual operation or management for conspiracy liability.  *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004), *modified*, 425 F.3d 1248 (9th Cir. 2005). Regardless, as described in Sections A–D above, there is substantial evidence that Ambac conspired with the other Defendants to advance the common goal of lining their own pockets at the expense of the Projects.   (*E.g.*, FAC ¶¶ 6–28 (summarizing various fraudulent schemes carried out by Defendants).)

Ambac's citations to *Grauberger v. St. Francis Hosp.* 169 F. Supp. 2d 1172 (N.D. Cal. 2001) and *Mazur v. eBay Inc.*, 2008 WL 2951351 (N.D. Cal. July 25, 2008) are not to the contrary.  In *Grauberger*, the court dismissed the plaintiff's RICO claims as being made up of "summary pleading" that simply pleaded verbatim the legal requirements of a RICO claim.  *Grauberger*, 169 F. Supp. 2d at 1179.  Likewise, the pleadings in *Mazur* were found insufficient because they did not contain "specific allegations of knowledge," but instead contained "purely conclusory" allegations that certain individuals had knowledge of the wrongdoing. 2008 WL 2951351, *7.  The allegations in this case, both of knowledge and of express agreement between the Defendants, are far more robust.  The

complaint contains allegations of how the Defendants acted in coordination with one another (*e.g.*, FAC ¶ 19 (alleging that Ray and GMAC made illicit profits on sale of bonds to Ambac at above-market prices and, in return, Ray and GMAC protected Ambac from competition for credit enhancement) and why.  (*Id*. at ¶ 90 (alleging that agreement was designed to "benefit [the Defendants'] respective companies and themselves at the expense of the Projects").).)

**F.    Plaintiffs' RICO Claims Are Not Time Barred**.

Plaintiffs' claims are not barred by the four-year statute of limitations for civil RICO actions. *Pincay v. Andrews*, 238 F.3d 1106, 1008 (9th Cir. 2001).  Ambac claims that Plaintiffs became aware of their injury in at least 2009, and thus these claims have been brought outside the applicable statute of limitations.  (Dkt. #71 at 18.)  As an initial matter, it is rarely appropriate to grant a motion to dismiss on statute of limitations grounds.  *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980) ("When a motion to dismiss is based on the running of the statute of limitations, it can be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled.").  Ambac's arguments that Plaintiffs became aware of their injury in at least 2009 and thus are barred by the statute of limitations fail for two additional reasons.

*First*, Ambac claims that because Plaintiffs became aware in 2005 that GMAC "seemed partial to using Ambac," Plaintiffs "knew enough to investigate their now-claimed injury based upon Ambac's allegedly 'exclusive' relationship with GMAC."  (Dkt. #71 at 18.)  Ambac's argument ignores that, in that same set of allegations, Plaintiffs allege that GMAC and Ambac took steps to actively conceal the fraud, including by developing a "stealth structure" to avoid detection.  (FAC ¶¶ 21–22.)  Indeed, after Plaintiffs demanded, and GMAC agreed, to competitively bid out the credit enhancement, they would have no reason to further investigate the exclusive relationship between GMAC and Ambac based on the representations that were made in response.  (*Id.* at ¶ 21 ("In response to a demand for competition, GMAC and Ambac developed what they termed a 'stealth structure' to help further perpetuate and enlarge the fraud schemes.").  Given this fraudulent response by Ambac and GMAC, the allegations in the complaint are far from sufficient to establish that the Projects were on inquiry notice in 2005 as a matter of law.  *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, No. C80-1733, 1983 WL 21364, at *22 (N.D. Ohio June 21, 1983) (denying motion for summary judgment

on statute of limitations ground because plaintiff "made several inquiries as to why it was placed in the CEICO district" and "[]nothing in the responses to [plaintiff] . . . revealed the existence of a conspiracy"). The misrepresentations from Ambac and GMAC that the credit enhancement would be bid out is sufficient to establish a claim that the statute of limitations should be tolled. *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir. 1987).

**Second**, Ambac's unsupported claim that the Plaintiffs became aware of the fraud after 2009, when Ambac's credit ratings were downgraded, is also contrary to the well-pled allegations of the complaint. Even after the Plaintiffs became aware in 2008 that Ambac was playing *some* role on these Projects, there is no allegation supporting that Plaintiffs became aware of the fraudulent ways that Ambac had been involved in those Projects prior to the loan closings (and that its role had not been bid out), or that Ambac was conspiring with Ray and GMAC related to the placement of the credit enhancement at these Projects. And there are likewise no allegations from which Ambac can argue that Plaintiffs had any way of discovering the full extent of the fraud, given their pattern of documented misrepresentations.

**G.**     **Plaintiffs' RICO Claims Are Not Barred By The PSLRA**.

Ambac's argument that Plaintiffs' RICO claims are barred by the Private Securities Litigation Reform Act ("PSLRA") is refuted by the case law. Section 107 of the PSLRA provides that "no person may rely upon any conduct ***that would have been actionable as fraud in the purchase or sale of securities*** to establish a violation of section 1962." 18 U.S.C. § 1964(c) (emphasis added). Thus, courts have properly held that the PSLRA only "bars private cause of action under RICO for predicate acts that describe conduct that would ***otherwise be actionable as securities fraud.***" *Kayne v. Ho*, No. LA CV09-06816 JAK (CWx), 2012 WL 12878753, at *10 (C.D. Cal. Sept. 6, 2012) (emphasis added) (denying motion to dismiss based on PSLRA). The securities laws are designed to protect investors, and thus to be actionable as securities fraud, "a misrepresentation must be made concerning the securities themselves, or their value." *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, No. C 06-02064 JW, 2008 WL 11346211, at *3 (N.D. Cal. Aug. 13, 2008) (citations omitted) (denying motion for summary judgment based upon PSLRA), *aff'd* 630 F.3d 866, 871-72 (9th Cir. 2010).

1    Here, although Plaintiffs allege a long-running scheme to defraud Plaintiffs in connection with

2    the loans and credit enhancement provided by GMAC (and later Jefferies) and Ambac, Plaintiffs allege

3    ***no conduct actionable under the securities laws.***  Specifically, Plaintiffs do not allege that there were

4    any misrepresentations made in connection with the sale of the securities to investors, either regarding

5    the securities or their value; indeed there are no allegations of any misrepresentations made to

6    purchasers of the securities at all.  As a result, there is no claim based on Plaintiffs' allegations that

7    could be actionable under the Securities Act or the Securities Exchange Act—and Ambac has not

8    claimed to the contrary.  *Abada v. Charles Schwab & Co.*, 127 F. Supp. 2d 1101, 1103 (S.D. Cal.

9    2000) ("The purpose of the Securities Act of 1933 and the Securities Exchange Act of 1934, and

10   specifically Rule 10b–5, was and remains to protect investors against manipulation of stock prices, to

11   promote fair, equitable trading practices, and to insure fairness in securities transactions.").  It is thus

12   unsurprising that, as Ambac itself makes clear, no purchaser has alleged that there was fraud in

13   connection with the sale of the bonds.  (Dkt. #71 at n.4.)

14      Ambac is wrong that a defendant is immunized from RICO liability just because a security

15   touches the RICO scheme.  (*See id.* at 19-20.)  The law is clear that "mere involvement of securities

16   is not sufficient." *Rezner*, 2008 WL 11346211, at *3; *Kayne*, 2012 WL 12878753, at *10 (claim not

17   barred under PSLRA despite allegations involving SEC filings, as "Plaintiffs do not allege that the

18   enterprise was wrongful because of its fraud on the market, or any other theory that would be

19   actionable as securities fraud").  Plaintiffs allege that the Projects' interest rates (and not any security

20   sold to anyone) were inflated above market.  (FAC ¶¶ 102-03.)  Consistent with this, the only

21   misrepresentations made were to the Projects.  (*Id.*)  With respect to the sale of securities themselves,

22   there is no actionable conduct under the securities laws, Plaintiffs simply allege that GMAC and

23   Jefferies "immediately monetized the interest rate spread above market to reap and make outsized

24   profits."  (*Id.* at ¶ 103.)  Such conduct, while harmful to the Project because they were saddled with

25   higher interest rates on their loan, does not constitute securities fraud.  *S.E.C. v. Zandford*, 535 U.S.

26   813, 819 (2002).

27      In ***every case*** cited by Ambac, the plaintiffs directly allege an underlying violation of the

28   securities laws, making them inapplicable here.  In *Swartz v. KPMG LLP*, 476 F.3d 756, 761 (9th Cir.

2007), the scheme involved the purchase and later sale of Microsoft stock by a purchaser who had been told that "that 'the sale of 364 share of Microsoft stock would trigger a purported 1999 capital loss of [approximately $18 million].'" *Id.* at 759–60. Plaintiff specifically alleged that his was a misrepresentation, made in connection with the purchase/sale of the security, which significantly affected the value of the security at issue. Indeed, the plaintiff had sought to amend his complaint to add a cause of action for securities fraud. *Id.* at 760.

In *Perkumpulan Inv'r Crisis Ctr. Dressel-WBG v. Wong*, the plaintiffs' allegations included "'material misrepresentations' to investors" through various brochures and in-person discussions. No. C09-1786-JCC, 2014 WL 1047946, at *9 (W.D. Wash. March 14, 2014). These misrepresentations went directly towards the value and performance of the securities. *Id.* ("The misrepresentations included statements regarding the false qualifications of the Dressel managers, the expected returns on the funds, the types of investments that were to be made with investors' money, and the fact that the investment schemes were legitimate."). The Court found the alleged conduct "is of the type generally actionable under the United States securities laws" and thus Plaintiffs' RICO claim was barred by the PSLRA. *Id.* at *9. Similarly, in both *Bixler v. Foster* and *Taschel v. Bucholz*, the underlying allegations of the RICO claim dealt directly with the "purchase" and "sale" of securities. *Bixler v. Foster*, 596 F.3d 751, 759–60 (10th Cir. 2010) (allegations were that defendant "defrauded [plaintiffs] from receiving UKL stock as provided in the transaction"); *Trachsel v. Buchholz*, No. C-08-02248 RMW, 2009 WL 86698, at *4 (N.D. Cal. Jan. 9, 2009) (allegations that the defendant issued "misleading statements and omissions and kick-backs during the plaintiffs' purchase of interest in Solomon Tower, LLC" (emphasis added).)

*Rezner* and *Kayne* are on point and instructive. In *Kayne*, the plaintiffs made allegations supporting their RICO claim relating to "filings with the Securities and Exchange Commission." 2012 WL 12878753, at *10. But the court recognized that despite these references to the filings, "Plaintiffs have not alleged that such filings artificially inflated stock value, or affected the purchase or sale of securities." *Id.* The same is true here; there are no allegations that any of the Defendants' fraud impacted the value or sale of securities. Likewise, in *Rezner*, the plaintiff asserted claims related to an alleged account fraud. 2008 WL 11346211, at *2. As part of the collateral for a loan, the plaintiff

put up bonds. *Id.* at *3. But the *Rezner* court held, as equally applicable here, that "[s]ince the alleged conduct is not actionable as securities fraud, it is not barred by the PSLRA and may form the basis of Plaintiff's RICO claims." *Id.* Thus, as there is no actionable securities fraud that anyone could assert, the RICO claims are not barred.

## II.   PLAINTIFFS' STATE LAW CLAIMS ARE ADEQUATELY PLED.

### A.   Plaintiffs State A Claim For Breach Of Fiduciary Duty Against Ambac.

Ambac's claim that the Plaintiffs "fail to sufficiently allege that Ambac or any Defendant owed a fiduciary duty to any one of them" ignores the various ways that a fiduciary duty can arise. (Dkt. #71 at 21.) Indeed, "[a] 'fiduciary relationship' is any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party." *Wolf v. Superior Court*, 106 Cal. App. 4th 625, 629 (2003), *as modified on denial of rehr'g* (Mar. 20, 2003) (citation and quotation marks omitted). Said another way, a fiduciary relationship is formed when a party "knowingly undertake[s] to act on behalf and for the benefit of another[.]" *Comm. On Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 221 (1983).

Here, Plaintiffs do not contend that Ambac owed fiduciary duties to the Plaintiff Projects on which Ambac was operating the stealth structure, as no duty could have been established given that the Plaintiffs were unaware of Ambac's role.[1] For pre-stealth Projects, however, there are sufficient allegations to establish a fiduciary duty owed by Ambac to these Projects. Specifically, Plaintiffs allege that Ambac "represented to the Projects that they would attempt to obtain the highest or most favorable rating from the rating agencies." (FAC ¶ 13.) Ambac's representation that it would work on the Projects' behalf to obtain the benefit of the highest or most favorable rating possible satisfies that requirement. (*Id.* at ¶ 78 ("Ambac further represented that it would act on the Projects' behalf, and in their best interests, in working with rating agencies to obtain the highest ratings, among other things.").) *Kabushiki Kaishi Megahouse v. Anjar Co. LLC*, No. 14-cv-00598, 2014 WL 5456523, at *8 (C.D. Cal. Oct. 20, 2014) ("[A] fiduciary relationship is ***any relation*** between parties to a

---

[1]   For these later Projects, Ambac is still subject to liability for aiding and abetting the breach of fiduciary duty of Ray and GMAC/Jefferies. (*See* Section V.)

transaction wherein one of the parties is duty bound to act with the utmost good faith for the benefit of the other party." (emphasis added)).

Ambac's claim that this is merely an "arm's length" transaction that could not lead to the creation of fiduciary duties completely ignores these express representations, which are sufficient under California law. Thus, all of Ambac's citations to cases concerning standard "arm's-length" transactions (Dkt. #71 at 22–23) are irrelevant, as none of these cases involve express representations that the defendant would work in the best interests of the plaintiff. At the very least, the direct representations by Ambac that it would work in the best interest of the pre-2005 Projects are sufficient to create an issue of fact as to whether there was a fiduciary relationship, rendering this issue inappropriate to be decided on a motion to dismiss. *Kabushiki*, 2014 WL 5456523, at *8 ("[T]he existence of a fiduciary relationship is a question of fact which properly should be resolved by looking to the particular facts and circumstances of the relationship at issue.").

### B. The Plaintiffs State A Claim For Aiding And Abetting A Breach Of Fiduciary Duty By Ambac.

Ambac claims it cannot be liable for aiding and abetting the breach of fiduciary duty by any of its co-defendants because it was unaware of any of their fiduciary obligations. (Dkt. #71 at 23.) This is certainly untrue as to Marfatia, whose knowledge is imputed to Ambac. *W. Am. Fin. Co. v. Pac. Indem. Co.*, 17 Cal. App. 2d 225, 236 (1936) (recognizing rule that "knowledge of an officer acquired in the course of his duties is presumed to have been communicated to the corporation.") Further, the complaint alleges that Ambac had knowledge of the fiduciary duties owed by Ray and Jefferies. Marfatia confirmed that he was involved in calls and meetings "where financial advice was given to the Projects by both Ambac and GMAC." (FAC ¶ 78.) Despite knowing of this duty to the Projects, Ambac nonetheless assisted GMAC and Ray in secretly profiting at the expense of the Projects. (*Id.* at ¶ 92 (alleging that Ambac purchased bond at above-par prices to line GMAC and Ray's pockets in return for GMAC "protect[ing] Ambac from competition and provid[ing] it with an exclusive on all Project transactions with credit enhancement.").) Because Ambac had knowledge of GMAC and Ray's fiduciary duties, and assisted these other Defendants in breaching those duties to the detriment of the Projects, Ambac is liable for aiding and abetting the breach of fiduciary duty. *See Lomita Land*

*& Water Co. v. Robinson*, 154 Cal. 36, 48 (1908) (holding liability for aiding-and-abetting established where defendant had "actual knowledge of all the facts relative to [scheme]" and "knowingly" assisted in the scheme's "consummation").

*Mackell v. Wells Fargo Home Mortg.*, which Ambac relies upon, is not on point.  2017 WL 373077 (N.D. Cal. Jan 26, 2017).  In *Mackell*, there were no allegations that the lender owed a fiduciary duty or had aided or abetted the breach of a fiduciary duty.  *Id.* at *8.  The case dealt with allegations concerning the breach of the duty of good faith and fair dealing, and held that the claim should be dismissed because the plaintiff did not allege any duty to disclose under the contract.  *Id.*  In contrast here, as recounted above, Plaintiffs have alleged that GMAC and Ray owed a fiduciary duty to Plaintiffs that required disclosure of the underlying facts.  (FAC ¶ 78.)

**C.     Plaintiffs State A Timely Claim For Fraud**.

Under California law, claims arising from fraud must be brought within three years of when the claim accrues.  Cal. Civ. Proc. Code § 338.  California follows the discovery rule, which "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action."  *E-Fab, Inc. v. Accountants, Inc. Servs.*, 153 Cal. App. 4th 1308, 1318 (2007).  Under the discovery rule, the limitations period begins when the plaintiff has inquiry notice of the cause of action. *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005). Inquiry notice is triggered by the plaintiff's suspicion of wrongdoing: "Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights."  *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1111 (1988); *see also Hamilton Materials, Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1206 (9th Cir. 2007) ("A plaintiff is on inquiry notice of its fraud claims when he learns, or at least is put on notice, that a representation is false."  (citation and quotation marks omitted).

Ambac argues the Projects' state law claims are time-barred because the Projects were aware of Ambac's role in the Projects by 2009 or earlier.  (Dkt. #71 at 24.)  But Ambac conflates knowledge of its involvement with knowledge of facts that would trigger inquiry notice.  Defendants made misrepresentations about, among other things, ratings-agency requirements, the purpose of certain fees charged, the splitting of fees, and whether certain rates charged to the Projects were the best rates. (FAC ¶¶ 173-77.)  Ambac does not suggest how the mere knowledge of Ambac's providing a surety

or credit enhancement would indicate to the Projects that prior representations by Ambac or other Defendants were false.

That is especially true in the context alleged here, where Defendants avoided scrutiny for years by fostering a fiduciary relationship with the Projects.  GMAC, Ray, and Jefferies (after it joined the fraud) owed fiduciary duties to each of the Projects.  (*Id.* at ¶ 76 (alleging that Ray and GMAC "assured the Projects that they were serving as 'financial advisors' to the Projects and, in that role, they were working in the Projects' best interests"); *id.* at ¶ 77 ("In and after late 2009, when Ray joined Jefferies . . . Jefferies also assumed the duties of financial advisor.").)  "[W]here a fiduciary obligation is involved the courts have recognized a postponement of the accrual until the beneficiary has knowledge or notice of the act constituting a breach of fidelity."  *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal. 3d 586, 596 (1970); *Eisenbaum v. W. Energy Res., Inc.*, 218 Cal. App. 3d 314, 325 (1990) ("Where a fiduciary relationship exists, facts which ordinarily require investigation may not incite suspicion and do not give rise to a duty of inquiry. Where there is a fiduciary relationship, the usual duty of diligence to discover facts does not exist.") (citation omitted).  And Ambac cannot avoid the impact of the failure to disclose by its co-conspirators who did owe such a duty.  As the court in *Animation Workers* explained, "if two members of a conspiracy are responsible for misleading potential plaintiffs from the existence, scope, or effects of an anticompetitive conspiracy, and other members are responsible for implementing other integral functions of the conspiracy, a plaintiff seeking to toll the statute of limitations may only bring claims against the first two members of the conspiracy.  Such an outcome cannot be reconciled" with Ninth Circuit law.  *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1207-1208 (N.D. Cal. 2015).  Thus, even if it was Ambac's co-conspirators that committed the fraudulent concealment, the statute of limitations would still be tolled with respect to the allegations against Ambac.[2]

---

[2] Generally, a court will not dismiss claims on statute of limitations grounds because it is a fact-intensive inquiry.  *Cervantes v. City of San Diego*, 5 F.3d 1273, 1277 (9th Cir. 1993) (stating equitable tolling requires a fact-intensive inquiry that generally precludes dismissal on statute of limitations ground).  Given the facts alleged, this is certainly not the rare case where dismissal based on a statute of limitations defense is appropriate.

1

### III.   THIS COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS.

2

Ambac contends that the Plaintiffs have not established personal jurisdiction over the

3  Defendants "with respect to claims by each Plaintiff." (Dkt. #71 at 24.)  Ambac's reliance on *Bristol*

4  *Myers Squibb Co. v. Superior Court of Ca., San Francisco Cnty*. is misplaced. 137 S. Ct. 1773, 1781

5  (2017).  As courts interpreting *Bristol Myers* have recognized, if the out-of-state Plaintiffs can

6  demonstrate that "but for" the Defendants' actions in California, their harm would not have occurred,

7  the California Court may properly exercise jurisdiction over the claims of these out-of-state Plaintiffs.

8  *Cortina v. Bristol-Myers Squibb*, 2017 WL 2793808, at *3 (N.D. Cal. June 27, 2017) ("The question

9  is, but for [Ambac's] conduct in California, would [the Plaintiffs'] injury have occurred?").

10

Here, that test is easily satisfied given the centrality of Ambac's (and the other Defendants')

11  fraud towards the Monterey Project.  It was through that transaction that Ambac established its *bona*

12  *fides*—gaining the trust of the United States military and its advisors—and thus Ambac was able to

13  perpetuate their scheme against the other, non-California Projects.  (FAC ¶ 62 ("Without the trust

14  gained through the financing of early projects including the Monterey Project, Defendants would not

15  have been able to carry out their fraudulent scheme against other Projects located outside of

16  California.").)  Indeed, it was in California, in connection with the Monterey Project, that Ambac and

17  GMAC first carried out what would become their blueprint for fraud going forward. (*Id*. at ¶¶ 10–11.)

18  This satisfies the "but for" test utilized in the Ninth Circuit and therefore does not run afoul of *Bristol-*

19  *Myers*.  The focus in this inquiry is not on the various plaintiffs, but instead on the defendant. *Walden*

20  *v. Fiore*, 134 S. Ct. 1115, 1125-1126 ("[I]t is the defendant, not the plaintiff or third parties, who must

21  create contacts with the forum state.").  Where, as here, Plaintiffs' claims against Ambac have the

22  requisite contacts with California, it is irrelevant that the out-of-state Plaintiffs do not have a

23  connection with California.

24

Recognizing this distinction, in *Cortina v. Bristol-Myers Squibb Co.*, the court considered the

25  application of *Bristol-Myers* to a suit of a New York plaintiff against Bristol-Myers in California,

26  alleging a number of claims based on problems with a prescription drug.  2017 WL 2793808, at *1.

27  Relying on *Bristol-Myers*, the defendant argued that it was not subject to specific jurisdiction in

28

California because it had not sold the product to the plaintiff in California and the relationship between the plaintiff and defendant was not centered in California. *Id.* at *2. The court rejected this argument, recognizing that the defendant's work in developing and testing the drug at issue in California was "sufficient to satisfy the Ninth Circuit's 'but' test." *Id.* at *4. That is, but for Bristol-Myers' development in California, the plaintiffs would never have been damaged. The same is true here; but-for Ambac's actions at the outset of its fraud within the state of California, the subsequent, out-of-state Plaintiffs would not have suffered the alleged injuries.

Ambac's claim in passing that Plaintiffs have not properly alleged that jurisdiction exists under 18 U.S.C. § 1965(b) is not accurate. (Dkt. #71 at 25.) Ambac's brief assertion is based on *Butcher's Union* regarding the elements for establishing jurisdiction under 18 U.S.C. § 1965(b), and a simple conclusory statement that the elements have not been satisfied. (*Id.*) To the contrary, Plaintiffs have established jurisdiction under § 1965(b). This Court has personal jurisdiction under the California long-arm statute against all Defendants other than the Annandale Plantation Defendants, and, as argued at length in response to Ambac's co-Defendants' motions to dismiss, this Court may exercise jurisdiction under 1965(b) as neither Ray nor the Annandale Plantation Defendants would be subject to jurisdiction in the Southern District of New York.

Finally, Ambac completely ignores Plaintiffs' third basis for personal jurisdiction over Ambac: 18 U.S.C. § 1965(a). "1965(a) grants personal jurisdiction over an initial defendant in a civil RICO case to the district court for the district in which that person resides, has an agent, or transacts his or her affairs." *Barantsevich v. VTB Bank*, 954 F. Supp. 2d 972, 989 (C.D. Cal. 2013) (citation omitted); *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998) (same). As alleged in Plaintiffs' complaint (left wholly unchallenged by Ambac), Ambac "regularly conducts business in the state of California" (including with Plaintiffs based here), "has a registered agent within the state of California," and "transacts its affairs within the state of California." (FAC ¶ 61.) Ambac has offered no argument, let alone an affidavit or evidence, to rebut these specific allegations of jurisdiction. Ambac's failure to contest Plaintiffs' allegations is fatal to its attempts to thwart having to defend its conduct before this Court. Wright & Miller, FED. PRAC. & PROC. § 1351 (3d ed.); *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1284 (9th Cir. 1977).

## CONCLUSION

For these reasons, the Court should deny Ambac's Motion to Dismiss, as all Plaintiffs have adequately asserted personal jurisdiction over all Defendants and Plaintiffs have stated valid claims against Ambac.

DATED:  December 15, 2017

Respectfully submitted,

KIRKLAND & ELLIS LLP

By: ___/s/ Donna M. Welch, P.C._____

Michael P. Esser (SBN 268634)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: michael.esser@kirkland.com

Jeffrey L. Willian, P.C. (*pro hac vice*)
Donna M. Welch, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: jwillian@kirkland.com
Email: dwelch@kirkland.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 15, 2017 a copy of the foregoing document is being electronically filed with the Clerk of the United States District Court of the Northern District of California by using the CM/ECF system, which will send notice of such filing to all counsel of record.

DATED:  December 15, 2017

Respectfully submitted,

KIRKLAND & ELLIS LLP

By:   */s/ Donna M. Welch, P.C.*
Michael P. Esser (SBN 268634)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: michael.esser@kirkland.com

Jeffrey L. Willian, P.C. (*pro hac vice*)
Donna M. Welch, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: jwillian@kirkland.com
Email: dwelch@kirkland.com

Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

Case No.  5:17-cv-04992-BLF