1  Michael P. Esser (SBN 268634)
   KIRKLAND & ELLIS LLP
2  555 California Street
   San Francisco, CA 94104
3  Telephone: (415) 439-1400
   Facsimile: (415) 439 1500
4  Email:  michael.esser@kirkland.com

5  Jeffrey L. Willian, P.C. (*pro hac vice*)
   Donna M. Welch, P.C. (*pro hac vice*)
6  KIRKLAND & ELLIS LLP
   300 North LaSalle
7  Chicago, IL 60654
   Telephone: (312) 862-2000
8  Facsimile: (312) 862-2200
   Email:  jwillian@kirkland.com
9  Email:  dwelch@kirkland.com

10  Attorneys for Plaintiffs

11              **UNITED STATES DISTRICT COURT**

12             **NORTHERN DISTRICT OF CALIFORNIA**

13                  **SAN JOSE DIVISION**

| | |
|---|---|
| 14  MONTEREY BAY MILITARY HOUSING, LLC, MONTEREY BAY LAND, LLC, MEADE COMMUNITIES LLC, FORT BLISS/WHITE SANDS MISSILE RANGE HOUSING LP, RILEY COMMUNITIES LLC, FORT LEAVENWORTH FRONTIER HERITAGE COMMUNITIES, I, LLC, FORT LEAVENWORTH FRONTIER HERITAGE COMMUNITIES, II, LLC, CARLISLE/ PICATINNY FAMILY HOUSING LP, BRAGG COMMUNITIES LLC, FORT DETRICK/WALTER REED ARMY MEDICAL CENTER LLC, PICERNE-FORT POLK FUNDING, LLC, RUCKER COMMUNITIES LLC, STEWART HUNTER HOUSING LLC, SILL HOUSING, LLC, AETC HOUSING LP, AMC WEST HOUSING LP, LACKLAND FAMILY HOUSING, LLC, and VANDENBERG HOUSING LP, | Case No. 5:17-cv-04992-BLF (NC) **PLAINTIFFS' OPPOSITION TO DEFENDANT DANNY RAY'S MOTION TO DISMISS** Date: April 12, 2018 Time: 9:00 a.m. Dept:  Courtroom 3 The Hon. Beth Labson Freeman Complaint Filed: August 28, 2017 |
|                  Plaintiffs, vs. | |
| AMBAC ASSURANCE CORPORATION, JEFFERIES MORTGAGE FINANCE, INC., JEFFERIES & COMPANY, INC., JEFFERIES LLC, JEFFERIES GROUP LLC, DANNY RAY, ANNANDALE PLANTATION, LLC, ANNANDALE PLANTATION, LLC,  and CHETAN MARFATIA, Defendants. | |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION................................................................................................1

BACKGROUND FACTS ....................................................................................1

LEGAL STANDARD ..........................................................................................3

ARGUMENT .......................................................................................................3

I.      Plaintiffs Have Alleged Personal Jurisdiction Over Ray. ......................3

        A.      This Court Has Personal Jurisdiction Under 18 U.S.C. § 1965(b)...........3

                1.      The Complaint Properly Alleges A Single, Multi-District Conspiracy. ...............................................................4

                2.      This Court Has Jurisdiction Over At Least One Defendant And No Other District Court Can Exercise Personal Jurisdiction Over All Defendants. .......................................5

        B.      This Court Has Jurisdiction Over Ray Under California's Long-Arm Statute. ......................................................................6

II.     Plaintiffs Allege Breach of Fiduciary Duty Against Ray. ....................10

III.    Plaintiffs' Claims Are Not Barred By the Statute of Limitations. ......................13

IV.     The PSLRA Does Not Bar The Projects' RICO Claims. .....................17

V.      The First Amended Complaint Satisfies Rule 9(B). ............................21

CONCLUSION..................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abada v. Charles Schwab & Co.*,
   127 F. Supp. 2d 1101 (S.D. Cal. 2000)............................................................18

*Akkerman v. Mecta Corp.*,
   72 F. App'x 652 (9th Cir. 2003) ....................................................................15

*Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*,
   94 F.3d 586 (9th Cir.) .....................................................................................6

*In re Animation Workers Antitrust Litig.*,
   123 F. Supp. 3d 1175 (N.D. Cal. 2015) ........................................................17

*Applied Underwriters, Inc. v. Combined Mgmt., Inc.*,
   No. C07-5129 BZ, 2007 WL 4287322 (N.D. Cal. Dec. 5, 2007)...................7

*Aversano v. Greenberg Traurig*,
   753 F. Supp. 2d 1063 (2010) .........................................................................19

*BHC Interim Funding, L.P. v. Finantra Capital, Inc.*,
   283 F. Supp. 2d 968 (S.D.N.Y. 2003)...........................................................11

*Bristol-Myers Squibb Co. v. Superior Court of Cal., S.F. Cty.*,
   137 S. Ct. 1773 (2017)...................................................................................10

*Bulletin Displays, LLC v. Regency Outdoor Advert.*,
   518 F. Supp. 2d 1182 (C.D. Cal. 2007) ...................................................15, 16

*Butcher's Union Local No. 498, United Food & Commercial Workers v. SDC Inv., Inc.*,
   788 F.2d 535 (9th Cir. 1986) ......................................................................3, 5

*Cal. Prop. Owners Ass'n v. Pedotti*,
   206 Cal. App. 4th 384 (2012) .......................................................................12

*Cervantes v. City of San Diego*,
   5 F.3d 1273 (9th Cir. 1993) ...........................................................................15

*Chiron Corp. v. Abbott Labs.*,
   156 F.R.D. 219 (N.D. Cal. 1994)...................................................................23

*Connor v. Great W. Sav. & Loan Ass'n*,
   69 Cal. 2d 850 (1968) ...................................................................................11

*Cooper v. Pickett*,
  137 F.3d 616 (9th Cir. 1997) ...............................................................................23

*Core-Vent Corp. v. Nobel Indus. AB*,
  11 F.3d 1482 (9th Cir. 1993) .................................................................................9

*Cortina v. Bristol-Myers Squibb*,
  No. 17-cv-00247-JST, 2017 WL 2793808 (N.D. Cal. June 27, 2017) .................8, 9, 10

*In re Daisy Sys. Corp.*,
  No. C–92–1845–DLJ, 1993 WL 491309 (N.D. Cal. Feb. 3, 1993).......................12, 13

*De Wit v. Firstar Corp.*,
  879 F. Supp. 947 (N.D. Iowa 1995)......................................................................20

*Delman v. J. Crew Grp., Inc.*,
  No. CV 16–9219–MWF, 2017 WL 3048657 (C.D. Cal. May 15, 2017) .........................7

*Doe v. Unocal Corp.*,
  248 F.3d 915 (9th Cir. 2001) ..................................................................................8

*Dole Food Co. v. Watts*,
  303 F.3d 1104 (9th Cir. 2002) ............................................................................6, 8

*E-Fab, Inc. v. Accountants, Inc. Servs.*,
  153 Cal. App. 4th 1308 (2007) .............................................................................13

*EBC I, Inc. v. Goldman Sachs & Co.*,
  91 A.D.3d 211 (2011) ..........................................................................................12

*Evans v. Arizona Cardinals Football Club, LLC*,
  231 F. Supp. 3d 342 (N.D. Cal. 2017) ...................................................................13

*Ewing v. McCarthy*,
  No. 3:17-CV-01554-GPC-RBB, 2017 WL 4810098 (S.D. Cal. Oct. 25, 2017).........................7, 8

*First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Tr. Co.*,
  919 F.2d 510 (9th Cir. 1990) ...........................................................................12, 21

*Fox v. Ethicon Endo-Surgery, Inc.*,
  35 Cal. 4th 797 (2005) ........................................................................................13

*GEC US 1 LLC v. Frontier Renewables, LLC*,
  No.: 16-cv-1276 YGR, 2017 WL 605070 (N.D. Cal. Feb. 15, 2017) ..........................8

*Gold v. Lumber Liquidators, Inc.*,
  No. 14-CV-05373-TEH, 2015 WL 7888906 (N.D. Cal. Nov. 30, 2015) .......................3

*Graham-Sult v. Clainos*,
  756 F.3d 724 (9th Cir. 2014) ................................................................................15

*Grimmett v. Brown*,
   75 F.3d 506 (9th Cir. 1996) ........................................................................13

*Groth-Hill Land Co., LLC v. Gen. Motors LLC*,
   No. C13–1362 TEH, 2013 WL 3853160 (N.D. Cal. July 23, 2013) ...........................15

*Heller v. Deutsche Bank*,
   No. Civ.A. 04-CV-3571, 2005 WL 525401 (E.D. Pa. March 3, 2005) ........................20

*Hirsch v. Blue Cross, Blue Shield of Kansas City*,
   800 F.2d 1474 (9th Cir. 1986) ......................................................................9

*Jablon v. Dean Witter & Co.*,
   614 F.2d 677 (9th Cir. 1980) .......................................................................15

*Jolly v. Eli Lilly & Co.*,
   44 Cal. 3d 1103 (1988) .............................................................................14

*Kayne v. Ho*,
   No. LA CV-09-06816, 2012 WL 12878753 (C.D. Cal. Sept. 6, 2012) .................17, 18, 19

*Lennard, et al. v. Yeung, et al.*,
   No. CV 10–09322 MMM, 2012 WL 13006214 (C.D. Cal. Feb. 23, 2012) .......................4

*Ling v. Deutsche Bank*,
   No. 04 CV 4566(HB), 2005 WL 1244689 (S.D.N.Y. May 26, 2005) ..........................20

*Luna v. Shac, LLC*,
   No. C14-00607 HRL, 2014 WL 3421514 (N.D. Cal. July 14, 2014) ..........................8

*Marine Bank v. Weaver*,
   455 U.S. 551 (1982) ................................................................................20

*U.S. ex rel. McCoy v. California Med. Review, Inc.*,
   723 F. Supp. 1363 (N.D. Cal. 1989) ...............................................................23

*In re Mid-Island Hosp., Inc.*,
   276 F.3d 123 (2d Cir. 2002)........................................................................12

*Moore v. Kayport Package Exp., Inc.*,
   885 F.2d 531 (9th Cir. 1989) ......................................................................22

*In re Nat. W. Life Ins. Deferred Annuities Litig.*,
   635 F.Supp. 2d 1170 (S.D. Cal. 2009)...........................................................4, 5

*Neubronner v. Milken*,
   6 F.3d 666 (9th Cir. 1993) .........................................................................21

*Newmyer v. Philatelic Leasing, Ltd.*,
   888 F.2d 385 (6th Cir. 1989) ......................................................................21

*Nisselson v. Lernout*,
    469 F.3d 143 (1st Cir. 2006)...........................................................................................4

*Novitaz, Inc. v. in Market Media, LLC*,
    No. 16-CV-06795-EJD, 2017 WL 2311407 (N.D. Cal. May 26, 2017)...........................3

*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*,
    133 Cal. App. 4th 658 (2005) .........................................................................................4

*Perkumpulan Inv'r Crisis Ctr. Dressel-WBG v. Wong*,
    No. C09–1786–JCC, 2014 WL 1047946 (W.D. Wash., Mar. 14, 2014)......................19

*PetEdge, Inc. v. Garg*,
    234 F. Supp. 3d 477 (S.D.N.Y. 2017)..........................................................................12

*Petrus v. New York Life Ins. Co.*,
    No. 14-CV-2268-BAS-JMA, 2016 WL 1255812 (S.D. Cal. Mar. 31, 2016)...............22

*Picot v. Weston*,
    780 F.3d 1206 (9th Cir. 2015) .................................................................................1, 2, 7

*Pinney Dock & Transp. Co. v. Penn Cent. Corp.*,
    No. C 80-1733, 1983 WL 21364 (N.D. Ohio June 21, 1983)......................................14

*Precision Orthopedic Implants, Inc. v. Limacorporate S.P.A.*,
    No. 2:16-cv-02945-ODW (PLA), 2016 WL 7187299 (C.D. Cal. Dec. 9, 2016)............8

*Resnick v. Hyundai Motor Am.*,
    2017 WL 1531192 (C.D. Cal. Apr. 13, 2017) ........................................................21, 22

*Rezner v. Bayerische Hypo-Und Vereinsbank AG*,
    No. C 06-02064 JW, 2008 WL 11346211 (N.D. Cal. Aug. 13, 2008), *aff'd* 630
    F.3d 866 (9th Cir. 2010) ...............................................................................17, 18, 19, 20

*Roberts v. Gainsforth*,
    No. CV 14-07595-AB, 2015 WL 12765021 (C.D. Cal. Apr. 28, 2015)........................24

*S. Pac. Petrol Corp. v. MB Guam, Inc.*,
    NO. 15-00042, 2017 WL 1393040 ................................................................................19

*S.E.C. v. W.J. Howey Co.*,
    328 U.S. 293 (1946)......................................................................................................21

*S.E.C. v. Zandford*,
    535 U.S. 813 (2002)......................................................................................................18

*San Francisco Bay Area Rapid Transit Dist. v. Spencer*,
    No. C 04-04632 SI, 2005 WL 2171906 (N.D. Cal. Sept. 6, 2005)................................5

*Semegen v. Weidner,*
    780 F.2d 727 (9th Cir. 1985) ..................................................................3

*Sipe v. Countrywide Bank,*
    690 F. Supp. 2d 1141 (E.D. Cal. 2010)..................................................11

*Stechler v. Sidley Austin Brown & Wood LLP,*
    382 F.Supp.2d 580 (S.D.N.Y 2005)........................................................20

*Swartz v. KPMG LLP,*
    476 F.3d 756 (9th Cir. 2007) ............................................................18, 19

*Tab P'ship v. Grantland Fin. Corp.,*
    866 F. Supp. 807 (S.D.N.Y. 1994)..........................................................20

*Thorman v. Am. Seafoods Co.,*
    421 F.3d 1090 (9th Cir. 2005) ................................................................16

*In re Toyota Motor Corp.,*
    785 F. Supp. 2d 883 (C.D. Cal. 2011) ...................................................22

*United States v. United Healthcare Ins. Co.,*
    848 F.3d 1161 (9th Cir. 2016) ................................................................21

*Vachani v. Yakovlev,*
    No.15-cv-04296-LB, 2016 WL1598668 (N.D. Cal. Apr. 21, 2016) ............6

*Walden v. Fiore,*
    134 S. Ct. 1115 (2014)............................................................................10

*Warshaw v. Xoma Corp.,*
    74 F.3d 955 (9th Cir. 1996) ....................................................................21

*Wolf v. Superior Court,*
    106 Cal. App. 4th 625 (2003) .................................................................11

*World Surveillance Grp. Inc. v. La Jolla Cove Inv'rs, Inc.,*
    66 F. Supp. 3d 1233 (N.D. Cal. 2014) ...................................................13

*Wyatt v. Union Mortg.,*
    24 Cal. 3d 773 (1979) (*En Banc*) ...........................................................15

**Statutes**

18 U.S.C. § 1964(c) ..........................................................................................17

18 U.S.C. § 1965(b) ...................................................................................3, 4, 5

Cal. Civ. Proc. Code § 338 ..............................................................................13

1

**Rules**

2

N.Y. C.P.L.R. 302...................................................................................................................6

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

From the outset, Defendant Ray's motion decries Plaintiffs' supposed "outlandish theory that Ray and the other Defendants owed them an unwritten fiduciary duty" in part because these were "well-advised sophisticated" Plaintiffs. (Dkt. #64 at 1.) But, as the complaint makes clear, Ray tried to set himself apart from the competition and Plaintiffs hired Ray because in part he touted repeatedly *in writing* that he and GMAC would serve as "financial advisor" and always act in the best interest of the Projects. (Dkt. #60, First Amended Complaint ("FAC") ¶ 76.) Plaintiffs specify in detail that Ray made this written representation to the clear majority of the Projects. (FAC ¶ 79-80.) While Ray disputes that this Court has jurisdiction over him, he again ignores critical allegations and facts of his own-making. For example, Ray's affidavit purposely fails to establish that New York would have personal jurisdiction over Ray. (Dkt #64–1 ¶¶ 2-3 (stating merely that he worked in New York "on occasion").) As such, this Court has 1965(b) jurisdiction over Ray, given that the Southern District of New York does not have jurisdiction over all the Defendants. As detailed, Ray also orchestrated and crystalized the formative conspiracy at the Monterey Project, causing that Project substantial harm, from where Ray and the other Defendants grew the RICO enterprise for years to come. (FAC ¶¶ 102-104.) Directing such fraud and harm into California triggers long-arm jurisdiction. *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015). Ray's remaining arguments, that the PSLRA bars the RICO claims and that Plaintiffs' allegations to not satisfy Rule 9(b), do not withstand scrutiny.

**BACKGROUND FACTS**

As alleged in detail in the complaint, Defendants' scheme turned on Ray's ability to induce the Projects to enter into financing with secretly inflated interest rates and credit enhancement fees for its "joint venture" partner Ambac. At the outset, and repeatedly, GMAC and Ray represented *in writing* that they would would serve as "financial advisors" to assist with loan origination, using "best efforts" to provide "the most competitive market rate possible." (FAC ¶ 7; *id*. at ¶ 20 ("Ray promised the Projects that he would use good faith and best efforts to negotiate credit enhancement fees with Ambac"); *id*. at ¶¶ 79-80.) Ray obtained "undisclosed profits" by including an "inflated 'credit spread'" in the interest rate, though representing to the Projects that it was a market rate. (*Id*. at ¶ 9.) Ray then monetized the inflated interest rate by selling bonds to third party investors prior to loan

closing at a premium to par given the inflated interest rate, with Ray personally receiving 40% of all profits.  Through this scheme, Ray personally reaped tens of millions of dollars from the Projects for his personal gain.  (*Id*. at ¶ 10.)

Ray and Marfatia represented to the Projects that they would work on their behalf to secure the most favorable agency credit rating for their loans, which was purportedly necessary for the Projects to obtain credit enhancement from Ambac.  (FAC ¶¶ 12-13.)  In fact, Ray and Marfatia instructed the agencies to cap the Projects' ratings artificially, which Ray and Marfatia then used to justify GMAC's and Ambac's inflated charges.  (*Id*. at ¶ 13.)  Starting in 2005 with the Bliss transaction, Ray and Marfatia employed a self-described "stealth structure" to obscure Ambac's involvement in the transactions while building Ambac fees into the already inflated interest rate stack.  (*Id*. at ¶¶ 108-109.).  The stealth structure's many undisclosed features and Ray's misleading statements include, "that GMAC would close the loan and then later attempt to syndicate the loan post-closing thereby taking market risk," "secretly build a monthly fee for Ambac credit enhancement into the loan interest rate," and "convince[ing] the Projects to purchase a Liquidity Facility from GMAC in lieu of a surety bond representing that it was substantially cheaper." (*Id.* at ¶ 22.)

Ray's scheme also involved the Projects' purchase of guaranteed investment contracts ("GICs") to contain unused loan proceeds.  (*Id*. at ¶ 16.)  GMAC and Ray, acting as financial advisors, advised the Projects to negotiate and place money in custom-made GICs. GMAC and Ray then purported to set up a blind bidding process for GIC providers.  (*Id*. at ¶ 124.)  Though Ray contends GMAC negotiated with "large insurance companies, such as Aegon-Trans America and AIG" (Dkt. #64 at 4)—a fact not even alleged by Plaintiffs—in fact, GMAC and Ambac rigged the process by giving Ambac a "last look" to allow Ambac to manipulate its bid thus undermining the auction process. (FAC ¶ 127.)  GMAC, without proper disclosure to certain Projects, also charged bidders a fee simply to participate in the auction, likely affecting their bids.  (*Id*.)

Having developed relationships of trust and confidence with the Projects, Ray was able to operate his scheme and to work with his conspirators to extract secret profits and fees from the Projects for more than a decade.  (*Id*. at ¶¶ 9, 76-77.)  The scheme only came to light in 2016 in the course of litigation between the Projects and Ambac.  In addition to attempts to offer perjured testimony, Ray

attempted to delete over 9,000 relevant documents after he and Jefferies were subpoenaed.  (*Id.* at ¶ 144.)  Contrary to Ray's assertion, the Projects' theory of the case is not that a commercial lender must always place a financing counterparty's interest ahead of its own.  (Dkt. #64 at 5.)  Rather, the Projects' theory, as plainly alleged, is that Ray must live up to the fiduciary duties he touted to get hired on which the Projects relied and answer for his fraud.  (*E.g.*, FAC ¶¶ 77, 84.)

## LEGAL STANDARD

On a motion to dismiss, "the complaint must be construed in the light most favorable to the non-moving party, and all material allegations in the complaint are taken as true." *Novitaz, Inc. v. in Market Media, LLC*, No. 16-CV-06795-EJD, 2017 WL 2311407, at *1 (N.D. Cal. May 26, 2017). In determining whether a complaint states a claim for relief, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Gold v. Lumber Liquidators, Inc.*, No. 14-CV-05373-TEH, 2015 WL 7888906, at *2 (N.D. Cal. Nov. 30, 2015).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In addition, claims based on fraud are subject to the heightened pleading standards of Rule 9(b):  "[t]he allegations must be 'specific enough to give the defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'" *Id.* (quoting *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985)).

## ARGUMENT

## I.   PLAINTIFFS HAVE ALLEGED PERSONAL JURISDICTION OVER RAY.

### A.   This Court Has Personal Jurisdiction Under 18 U.S.C. § 1965(b).

A Court may exercise jurisdiction under § 1965(b) where the Court has personal jurisdiction over at least one Defendant, and there is no other district court in the United States that could exercise personal jurisdiction over all of the Defendants. *Butcher's Union Local No. 498, United Food & Commercial Workers v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986) ("For nationwide service to be imposed under section 1965(b), the court must have personal jurisdiction over at least one of the

1    participants in the alleged multidistrict conspiracy and the plaintiff must show that there is no other

2    district in which a court will have personal jurisdiction over all of the alleged co-conspirators.").

3           1.    **The Complaint Properly Alleges A Single, Multi-District Conspiracy.**

4           Ray first argues that the complaint does not establish a single multi-district conspiracy, as

5    required for nationwide jurisdiction under § 1965(b).  Ray admits the complaint alleges a conspiracy

6    among Ray, Jefferies, Ambac, and Marfatia, but claims the Annandale Defendants' only involvement

7    could be through a separate conspiracy with Ray from 2016 to 2017.  (Dkt. #64 at 10.)  This argument

8    ignores the unambiguous allegations that the Annandale Defendants were involved in the conspiracy

9    dating back to 2003.  The Projects specifically allege that in December 2003 Ray "began to put [funds

10   from the Monterey Project deal] into Annandale Plantation, LLC."  (FAC ¶ 135.)  The Projects further

11   allege that Ray created Annandale Plantation - SC in October 2007, and that he not only transferred

12   assets to the new entity but also used it to "transact business relating to the MHPI Projects and to

13   shelter documents related to the same."  (*Id*. at ¶ 136.)

14          Based on these facts, Ray's attempt to cabin his use of the Annandale Defendants as a separate

15   conspiracy from the larger fraud scheme fails.  Ray acted as the sole controlling member for the

16   Annandale Defendants and his knowledge is imputed to them.  *See Peregrine Funding, Inc. v.*

17   *Sheppard Mullin Richter & Hampton LLP*, 133 Cal. App. 4th 658, 679 (2005) (holding fraud properly

18   imputed to corporation owned entirely by defendant and his wife and controlled by defendant); *see*

19   *also Lennard, et al. v. Yeung, et al.*, No. CV 10–09322 MMM, 2012 WL 13006214, at *16 (C.D. Cal.

20   Feb. 23, 2012); *Nisselson v. Lernout*, 469 F.3d 143, 154-55 (1st Cir. 2006).  The Projects have alleged

21   Ray used the Annandale entities not only for his own benefit, but also in service of the larger

22   conspiracy—by concealing the ill-gotten proceeds, by using the Annandale email address for Projects-

23   related communications, including in connection with the 2012 follow on financing at the Bliss

24   Project, the orchestration of Ambac's purchase of MHPI bonds in 2015, and by saving Project-related

25   information to his Annandale files. (FAC ¶¶ 135-136.)

26          The law does not allow a RICO defendant to slice up a RICO enterprise in order to escape

27   liability, as Ray seeks to do here. *In re Nat. W. Life Ins. Deferred Annuities Litig.*, 635 F.Supp. 2d

28   1170, 1174 (S.D. Cal. 2009) ("[A]ll members of the enterprise need not be directly working with all

1   other members of that enterprise."); *id*. ("[t]he common purpose element, however, does not require

2   the enterprise participants to share all of their purposes in common.").  Plaintiffs have alleged a single

3   nationwide enterprise and the Court must, at the motion to dismiss stage, take those allegations as true.

4   *San Francisco Bay Area Rapid Transit Dist. v. Spencer*, No. C 04-04632 SI, 2005 WL 2171906, at *2

5   (N.D. Cal. Sept. 6, 2005).

> 2.   **This Court Has Jurisdiction Over At Least One Defendant And No Other District Court Can Exercise Personal Jurisdiction Over All Defendants.**

7           Ray also argues this Court lacks personal jurisdiction over any of the Defendants and, in the

8   alternative, that all of the Defendants would be subject to jurisdiction in the Southern District of New

9   York.  (Dkt. # 64 at 13.)  Both arguments are incorrect.  Ambac has ***conceded*** that it is subject to

10  personal jurisdiction in California.  (*See* Dkt. #86 11/30/17 Hr'g Tr. at 9:11–12 ("[Counsel for Ambac]:

11  Well, certainly for our client, we believe -- we concede there would be jurisdiction.").)  Therefore, the

12  Court may exercise personal jurisdiction over all Defendants pursuant to 1965(b), ***unless*** there is

13  another court that could exercise jurisdiction over all Defendants.  18 U.S.C. § 1965(b); *Butcher's*

14  *Union*, 788 F.2d  at 539.

15          Section 1965(b) supplies jurisdiction here because neither Ray nor the Annandale Defendants

16  are subject to personal jurisdiction in New York.  The Projects have alleged that neither Ray nor the

17  Annandale Defendants are subject to personal jurisdiction in New York because "with regard to the

18  allegations of this lawsuit . . . no torts or fraud were directed at or felt by any Plaintiff in New York."

19  (FAC ¶ 67.)  Although several of the other Defendants argue that Ray is subject to jurisdiction in New

20  York (*e.g.*, Dkt. #63 at 8 ("Ray would be subject to personal jurisdiction under New York's long arm

21  statute)), Ray's own position on his amenability to suit in New York is to the contrary.  For his part,

22  Ray, a resident of South Carolina, ***does not offer any evidence (or argument) for why he would be***

23  ***subject to personal jurisdiction in New York***.  His declaration states only that during his time working

24  for GMAC and Capmark, he worked in New York "on occasion", Dkt #64–1 ¶¶ 2-3, and that he

25  maintained a New York office while working for Jefferies, though he resided in South Carolina and

26  his "work location" was in Colorado.  (*Id*. ¶ 4.)   Ray ***does not*** assert that he would be subject to

27  jurisdiction in New York including the basis for such jurisdiction (*e.g.*, that he directed the alleged

28  frauds from New York, committed a tortious act felt in New York, or even that he performed any work

related to the Projects while in New York), and no other Defendants provides contrary evidence.  *See* N.Y. C.P.L.R. 302 (McKinney).

Additionally, the Annandale Defendants are not subject to personal jurisdiction in New York. Those entities are Colorado and South Carolina limited liability companies that operate exclusively in South Carolina.  (FAC ¶ 66.)  There is no allegation in the complaint or evidence provided by the Annandale Defendants to suggest that these Defendants would be subject to personal jurisdiction in New York.  Indeed, , both Jefferies and the Annandale Defendants (the only Defendants that present substantive argument on this point) simply assert that the Annandale Defendants were not part of the underlying conspiracy, and therefore they should not be considered for jurisdictional purposes because their claims should be dismissed.  (*E.g.*, Dkt. #66 at 8-9.)  The Annandale Defendants have been part of the alleged conspiracy dating back to 2003, FAC ¶¶ 135-136, and because neither is subject to personal jurisdiction in the Southern District of New York, this Court may exercise jurisdiction over all Defendants under 1965(b).

## B.    This Court Has Jurisdiction Over Ray Under California's Long-Arm Statute.

Ray is also subject to specific personal jurisdiction in this Court  under California's long-arm statute. *Vachani v. Yakovlev*, No.15-cv-04296-LB, 2016 WL1598668, at *3 (N.D. Cal. Apr. 21, 2016) ("A federal court sitting in diversity borrows the long-arm jurisdictional statute of the forum state."); *Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 589 (9th Cir.) ("When subject matter jurisdiction is premised on a federal question, a court may exercise specific jurisdiction over a defendant if a rule or statute authorizes it to do so and the exercise of such jurisdiction comports with the constitutional requirements of due process.").   "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1110 (9th Cir. 2002).

Specific personal jurisdiction is proper under the Constitution when the following circumstances are present: "1) the nonresident defendant must have purposefully availed himself of the privilege of conducting activities in the forum by some affirmative act or conduct; 2) plaintiff's claim must arise out of or result from the defendant's forum-related activities; and 3) exercise of

1  jurisdiction must be reasonable." *Applied Underwriters, Inc. v. Combined Mgmt., Inc.*, No. C07-5129

2  BZ, 2007 WL 4287322, at *1 (N.D. Cal. Dec. 5, 2007) (citation omitted).  When those elements are

3  satisfied, Ray then has the burden to demonstrate that the exercise of jurisdiction over him is not

4  reasonable. *Ewing v. McCarthy*, No. 3:17-CV-01554-GPC-RBB, 2017 WL 4810098, at *2 (S.D. Cal.

5  Oct. 25, 2017).

6      In establishing whether a defendant purposefully directed actions at the forum, the court

7  considers whether the defendant "(1) committed an intentional act, (2) expressly aimed at the forum

8  state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Picot v.*

9  *Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015); *Delman v. J. Crew Grp., Inc.*, No. CV 16–9219–MWF,

10  2017 WL 3048657, at *3 (C.D. Cal. May 15, 2017).  Here the *Picot* standard is easily met.  Ray

11  "purposefully directed [] and caus[ed] harm to the Monterey, Vandenberg, and AMC West Project

12  (which includes Travis Air Force Base) in California."  (FAC ¶ 64.)  The Monterey Project was the

13  first where Ray managed to manipulate the interest rate so that it included "undisclosed profits in the

14  form of an inflated 'credit spread.'" (FAC ¶ 9.)  This fraud at the Monterey Project served as the

15  blueprint for the subsequent frauds carried out on other Projects.  (*Id.* at ¶¶ 10–11.)  Ray further

16  directed this fraud, along with other aspects of the fraud such as the stealth structure and the Original

17  Issue Discount" instrument to "mask [his and GMAC's] undisclosed profits," at the other California

18  Projects: Vandenberg and AMC West. (*Id.* at ¶¶ 108, 111 (Vandenberg); *id.* at ¶ 112 (Vandenberg and

19  AMC West).)  Additionally, Ray traveled to California for the purpose of perpetrating this fraudulent

20  scheme against the MHPI Projects.  (*Id.* at ¶ 64; Dkt. 64-1 at ¶ 13 (Ray declaration admitting he

21  traveled to California).  These California Projects further continue to suffer harm to this very day on

22  a monthly basis based on the inflated interest rate and credit enhancement fees. (FAC ¶ 103.) Thus,

23  there is substantial evidence that Ray purposely directed his fraudulent actions at California and is

24  thus subject to personal jurisdiction here.

25      Ray attempts to avoid this conclusion by drawing a distinction between the California Projects'

26  financial stakeholders (who he claims were not located in California) and the Projects themselves.

27  (Dkt. #64 at 11-13.)  But Ray's argument ignores Plaintiffs' allegations (and the common sense point)

28  that his conduct harmed the Projects themselves (*i.e.*, the military bases) due to the resulting "decrease

1    in the Projects' [] scope," *i.e.*, having less funds available to develop and maintain the military housing

2    (FAC ¶ 71.)  Ray cannot casually dismiss that he spearheaded transactions for California housing

3    developments worth hundreds of millions of dollars, knowing he would impact those developments in

4    California.  Thus, Ray's actions were "performed for the very purpose of having their consequences

5    felt" in California.  *Dole Food Co. v. Watts*, 303 F.3d 1104, 1112 (9th Cir. 2002).

6         Ray's attempts to write off his contacts with California as only "fleeting" fails as a matter of

7    law.  (Dkt. #64 at 12.)  Federal courts have found specific jurisdiction appropriate in circumstances

8    where the connections with California were much less substantial.  In *Ewing v. McCarthy*, the court

9    held that it possessed specific jurisdiction over the defendants where the defendants "intentionally

10   called and texted a number with a California area code" because this action reflected an intent "to

11   reach someone in California."  2017 WL 4810098, at *3.  *See also*, *Luna v. Shac, LLC*, No. C14-00607

12   HRL, 2014 WL 3421514, at *4 (N.D. Cal. July 14, 2014) (similar); *GEC US 1 LLC v. Frontier

13   Renewables, LLC*, No.: 16-cv-1276 YGR, 2017 WL 605070, at *5 (N.D. Cal. Feb. 15, 2017); *Precision

14   Orthopedic Implants, Inc. v. Limacorporate S.P.A.*, No. 2:16-cv-02945-ODW (PLA), 2016 WL

15   7187299, at *6 (C.D. Cal. Dec. 9, 2016).

16        Ray likewise contends that the Projects cannot establish that their claims would not have arisen

17   but for Ray's contacts with California, and thus jurisdiction is improper.  (Dkt. #64 at 12.)  Ray's

18   argument unilaterally focuses on his visit to Monterey while ignoring the allegations that the Monterey

19   Project acted as the incubator for all of Ray's subsequent and expansive fraud:  "[t]he Monterey fraud

20   model was the basic model used thereafter" and "[w]ithout the trust gained through the financing of

21   early projects including the Monterey Project, Defendants would not have been able to carry out their

22   fraudulent scheme against other Projects located outside of California."  (FAC  ¶ 64.)  This case is

23   plainly different from *Doe v. Unocal Corp.*, 248 F.3d 915, 924 (9th Cir. 2001), cited by Ray, in which

24   the Ninth Circuit found it would be impossible for plaintiffs to establish the Southeast Asian oil

25   pipeline project in dispute would not have gone forward without negotiations having taken place in

26   California.  Instead, this case is far more akin to *Cortina v. Bristol-Myers Squibb*, No. 17-cv-00247-

27   JST, 2017 WL 2793808 (N.D. Cal. June 27, 2017).  In *Cortina*, a New York plaintiff brought suit

28   against Bristol-Myers in California, alleging a number of claims based on problems with a prescription

drug. 2017 WL 2793808, at *1. The defendant argued that it was not subject to specific jurisdiction in California because it had not sold the product to the plaintiff in California and the relationship between the plaintiff and defendant was not centered in California. *Id.* at *2. The court rejected this argument, recognizing that the defendant's work in developing and testing the drug at issue in California was "sufficient to satisfy the Ninth Circuit's 'but for' test." *Id.* at *4. That is, but for Bristol-Myers' development in California, the plaintiffs would never have been injured. The same is true here; but for Ray's actions at the outset of its fraud within the state of California, the subsequent, out-of-state Plaintiffs would not have suffered the alleged injuries. (*Id.* at ¶ 64 ("Without the trust gained through the financing of early projects including the Monterey Project, Defendants would not have been able to carry out their fraudulent scheme against other Projects located outside of California").) Ray subsequently sought to cover up the fraud, including through his substantial deletion of documents in response to a subpoena issued by a California state court. (*Id.* at ¶ 143–44.)

Because these first two requirements of personal jurisdiction are satisfied, the burden shifts to Ray to demonstrate that the exercise of jurisdiction would be unreasonable. Ray cannot carry this burden. In making this determination, courts consider the following factors: "(1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum." *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1487–88 (9th Cir. 1993). Here, Ray intentionally involved himself in loan transactions for the development of hundreds of millions of dollars' worth of California property, to be used for housing thousands of California residents. (FAC ¶ 74.) Though Ray claims California has a "weak interest" in the case, Dkt. #64 at 13, "[n]o other state is home to more military bases harmed" by his conduct, and thus there is no other state with a greater interest. (FAC ¶ 73.) Ray claims litigating this dispute in California will be less efficient and less convenient for him, but suggests no advantages to alternative forums or burdens in California such that litigation here would deprive him of substantial justice. *See Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1481 (9th Cir. 1986).

1    Finally, Ray argues that the non-California Projects cannot invoke this Court's personal

2    jurisdiction to bring their claims, citing the United States Supreme Court decision in *Bristol-Myers*

3    *Squibb Co. v. Superior Court of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1781–82 (2017).  But *Bristol-Myers*

4    does not speak to the facts of this case.  In *Bristol-Myers*, a number of plaintiffs (some from California,

5    some from other states) sued Bristol-Myers in California.  137 S. Ct. at 1781.  The Supreme Court

6    held that the California court could not exercise specific jurisdiction over the out-of-state plaintiffs'

7    claims against Bristol-Myers because there was no tie between the non-California plaintiffs' claims

8    and the state of California.  *Id.* ("What is needed—and what is missing here—is a connection between

9    the forum and the specific claims at issue.").  Here, the Monterey Project was among the earliest

10   Projects to rely on Ray's assurances that he and GMAC were serving as "financial advisors" to the

11   Projects and "working in the Projects' best interests."  (FAC ¶¶ 76-77.)  Ray "then perpetrated

12   essentially the same fraud on each successive Project."  (*Id.* at ¶ 77.)  And the Monterey Project was

13   the first where Ray charged an inflated interest rate to the Monterey Project, despite his written

14   representations that he would work on their behalf to secure the most favorable rates.  (*Id.* at ¶ 102.)

15   It was also shortly after the Monterey Project's closing, which generated millions in ill-gotten profits

16   for Ray and GMAC, that Ray began to utilize the Annandale Defendants to shelter the proceeds of the

17   fraud.  (*Id.* at ¶135.)  That the non-California Projects did not experience injury in California does not

18   change this conclusion.  Indeed, "[t]he proper question [in determining specific jurisdiction] is not

19   where the plaintiff experienced a particular injury or effect but whether the defendant's conduct

20   connects him to the forum in a meaningful way."  *Walden v. Fiore*, 134 S. Ct. 1115, 1125 (2014).  The

21   focus is on the connections of the defendant, here Ray, more so than the Plaintiff.  *Id.* at 1126 ("[I]t is

22   the defendant, not the plaintiff or third parties, who must create contacts with the forum state.").

23   ## II.   PLAINTIFFS ALLEGE BREACH OF FIDUCIARY DUTY AGAINST RAY.

24   Ray contends the Projects fiduciary-duty claims must be dismissed because he and other

25   Defendants did not undertake a fiduciary duty to the Projects.  At this point, Ray's unsupported

26   assertions cannot overcome well-pled allegations.  As alleged in the complaint, Ray undertook a

27   fiduciary duty to all of the Projects by representing himself as a "financial advisor" acting their best

28   interests.  (FAC ¶ 76 ("Through written material sent to the Army Projects . . . and in verbal

1    discussions, GMAC and Ray assured the Projects that they were serving as 'financial advisors' to the

2    Projects, and, in that role, that they were working in the Projects' best interests.").)   Yet Ray argues

3    the Projects' fiduciary duty claims fail because "commercial lenders do not voluntarily become

4    fiduciaries of commercial real estate developers who are counterparties to hundred-million dollar loan

5    negotiations." (Dkt. #64 at 15.)

6           This argument does not square with the allegations in the complaint because the complaint

7    expressly alleges that Ray (and GMAC and Jefferies) held themselves out as fiduciaries in order to get

8    the MHPI Project business.  (FAC ¶¶ 7–8 (describing fiduciary relationship).)  A fiduciary relationship

9    "ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such

10   a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept

11   the confidence, can take no advantage from his acts relating to the interest of the other party without

12   the latter's knowledge or consent." *Wolf v. Superior Court*, 106 Cal. App. 4th 625, 629 (2003) (citation

13   and quotation marks omitted).  Here, the Projects have alleged just such a relationship of confidence

14   with Ray, GMAC, and Jefferies.  Ray and his employers spent years cultivating relationships with the

15   Projects, and made numerous representations to them that they were acting as "financial advisors"

16   acting in the Projects' best interests, then exploiting those relationships of trust.  (FAC ¶ 76.)

17          Ray relies on *BHC Interim Funding, L.P. v. Finantra Capital, Inc.*, 283 F. Supp. 2d 968, 989

18   (S.D.N.Y. 2003), which states that "the relationship between a lender and borrower is not fiduciary in

19   nature."  But Ray ignores *BHC*'s ultimate holding that "[n]othing in [defendant's] *status* as lender

20   created a fiduciary duty." 283 F. Supp. 2d at 989 (emphasis added).  The Projects do not dispute the

21   generic proposition that lenders are not always fiduciaries; Plaintiffs are not arguing as much.  Instead,

22   the fiduciary duties stem from Ray's and his employers' statements that they would act as financial

23   advisors who would act on the Projects' behalf and in their best interests.  (FAC ¶ 76.)

24          California courts recognize that a lender can undertake a fiduciary duty where, like here, the

25   lender undertakes additional services, including advisory functions.  *See Connor v. Great W. Sav. &*

26   *Loan Ass'n*, 69 Cal. 2d 850, 864 (1968) (finding duty of care where "financing, which made the

27   enterprise possible, took on ramifications beyond the domain of the usual money lender"); *Sipe v.*

28   *Countrywide Bank*, 690 F. Supp. 2d 1141, 1153 (E.D. Cal. 2010) (holding special circumstances giving

1  rise to a fiduciary duty by a lender exist when it "actively participates in the financed enterprise beyond

2  the domain of the usual money lender") (citation omitted).

3           These numerous additional services thus render inapposite Ray's cited authority regarding the

4  typically non-fiduciary relationships involving arm's-length commercial lending transactions.  In *First*

5  *Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Tr. Co.*, 919 F.2d 510, 514 (9th Cir. 1990), the

6  court held, in the context of a motion for summary judgment, that a fiduciary relationship did not exist,

7  but only because plaintiffs based their claim solely on a servicing contract which obligated a loan

8  servicer to exercise the same degree of care it would exercise on its own account.  In *In re Mid-Island*

9  *Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002), the Second Circuit noted that "[a] debtor-creditor

10 relationship is not **by itself** a fiduciary relationship although **the addition** of a relationship of

11 confidence, trust, or superior knowledge or control may indicate that such a relationship exists"

12 (emphasis added) (citation and quotation marks omitted).  In contrast, here, the duty arose from the

13 numerous pre- and post-contractual representations made by Ray and his co-Defendants.

14          Ray's cited authority regarding fiduciary duties owed by financial advisors likewise ignores

15 the facts of this case.  In *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 499 (S.D.N.Y. 2017), the court

16 dismissed fiduciary duty claims where plaintiff alleged only that it had relied on defendant's superior

17 experience, as such allegations, "standing by themselves," do not establish a claim.  Ray's other cited

18 cases likewise turn on plaintiffs' unreasonable unilateral perception of confidence.  *See EBC I, Inc. v.*

19 *Goldman Sachs & Co.*, 91 A.D.3d 211, 216 (2011) ("This evidence amounts to a mere expression of

20 confidence in Goldman Sachs' expertise[.]"); *In re Daisy Sys. Corp.*, No. C–92–1845–DLJ, 1993 WL

21 491309, at *5 (N.D. Cal. Feb. 3, 1993) ("Daisy's 'complete' dependence on Bear Stearns, even if it is

22 true, is unjustified[.]").  Here, the understanding of the fiduciary relationship was not unilateral;

23 instead, it was **Ray and GMAC/Jefferies** that held themselves out as financial advisors in writing.

24 (FAC ¶¶ 76–77.)  Similarly, Ray's claim that "a promise to use best efforts" does not create a fiduciary

25 relationship is a clever mischaracterization.  (Dkt. 64 at 16, *citing Cal. Prop. Owners Ass'n v. Pedotti*,

26 206 Cal. App. 4th 384 (2012).  Plaintiffs allege that Ray represented he would act in the Project's **best**

27 **interests**, *i.e.*, putting the interest of the Projects ahead of his own; this is far different from simply

28 representing that Ray would put forth his best efforts.

1    Ray and his employers developed relationships that went beyond the confines of a commercial

2    lending relationship.  Ray argues that Defendants never "knowingly undertook" a fiduciary duty.  (Dkt.

3    #64 at 13 (citing *World Surveillance Grp. Inc. v. La Jolla Cove Inv'rs, Inc.*, 66 F. Supp. 3d 1233, 1236

4    (N.D. Cal. 2014).)  But unlike *World Surveillance*, where plaintiff's claims were based on a unilateral

5    understanding of the relationship and its "hopes and dreams," *id.*, Ray and GMAC affirmatively took

6    on fiduciary duties by expressly representing that he would act as a financial advisor and in the

7    Project's best interest by, among other things, "developing the financing structure, coordinating with

8    rating agencies, negotiating the surety bond requirements (thus with Ambac), analyzing capital

9    structures and GIC bidding"; and selling bonds using an "'open book' process" that would ensure the

10   Projects received "the full benefit of competition." (FAC ¶¶ 79, 104.)  Ray and his employers touted

11   and knowingly undertook fiduciary duties to the Projects—indeed, doing so was a necessary element

12   of the scheme and a material basis for hiring Ray and GMAC in the first place.

13   **III.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS.**

14          Notwithstanding Ray's attempts to delete thousands of MHPI documents in response to a 2016

15   subpoena, Ray urges that the Projects' claims are time-barred because the Projects were aware of

16   certain facts related to the scheme no later than 2012 and as early as 2005.  (Dkt #64 at 21-23.)  Civil

17   RICO claims must be brought within four years of a plaintiff's discovery of the underlying injury.

18   *Evans v. Arizona Cardinals Football Club, LLC*, 231 F. Supp. 3d 342, 346 (N.D. Cal. 2017) (citation

19   omitted).  Courts in the Ninth Circuit follow the injury discovery rule for civil RICO claims, starting

20   the limitations period when a plaintiff knows or should reasonably know of the injury that is the basis

21   for the action.  *Grimmett v. Brown*, 75 F.3d 506, 511 (9th Cir. 1996).  Under California law, claims

22   arising from fraud must be brought within three years of when the claim accrues.  Cal. Civ. Proc. Code

23   § 338.  California follows the discovery rule, which "postpones accrual of a cause of action until the

24   plaintiff discovers, or has reason to discover, the cause of action."  *E-Fab, Inc. v. Accountants, Inc.*

25   *Servs.*, 153 Cal. App. 4th 1308, 1318 (2007).  Under the discovery rule, the limitations period begins

26   when the plaintiff has inquiry notice of the cause of action.  *Fox v. Ethicon Endo-Surgery, Inc.*, 35

27   Cal. 4th 797, 807 (2005). Inquiry notice is triggered by the plaintiff's suspicion of wrongdoing: "Once

28

1   the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether

2   to file suit or sit on her rights."  *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1111 (1988).

3       Ray argues there is "no question" the Projects' claims accrued by 2012 at the latest.  (Dkt #64

4   at 22.)  In support of that proposition, Ray exercises predictably perfect hindsight, citing a number of

5   disparate facts over the course of more than a decade that purportedly placed the Projects on notice of

6   the complex financial scheme executed by Defendants.  (*Id.*)  Ray notes, for example, that in 2005 the

7   Army's real estate consultant had observed GMAC was partial to using Ambac for credit enhancement

8   on Project deals and that in 2009 the Projects had discussed the impact of Ambac's credit downgrade.

9   (*Id.* at 23.)  But Ray conflates knowledge of isolated facts with knowledge of facts that would trigger

10  inquiry notice.  Specifically, in response and to deflect the Projects' inquiries in 2005, Ray and the

11  other Defendants modified their fraudulent scheme to put to rest any of the Projects' concerns leading

12  the Projects to believe that their concerns had been resolved and they had no reason to investigate

13  further.  *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, No. C 80-1733, 1983 WL 21364, at *22

14  (N.D. Ohio June 21, 1983) (denying motion for summary judgment on statute of limitations ground

15  because plaintiff "made several inquiries as to why it was placed in the CEICO district" and "[n]othing

16  in the responses to [plaintiff] . . . revealed the existence of a conspiracy).

17      Ray's reference to the facts the Projects discovered in 2009 is even further from the mark.

18  Even after the Plaintiffs became aware in 2008 that Ambac was playing ***some*** role on these Projects,

19  there is no allegations supporting that Plaintiffs became aware of the ways that Ray was conspiring

20  with the other Defendants related to the placement of the credit enhancement at these Projects.  As

21  alleged, under the stealth structure, GMAC and Ambac concealed the above-market cost of Ambac's

22  credit enhancement by "secretly building into the loan interest rate stack a monthly fee that would be

23  paid to Ambac for providing credit enhancement."  (FAC ¶ 108.)  Nothing about this cost being borne

24  by the Projects, or the way that the above-market rate was established, was disclosed as a result of

25  Ambac's financial problems in 2008 and 2009.  And there are likewise ***no allegations*** from which Ray

26  can argue that the other aspects of the fraud were disclosed to Plaintiffs at that time–such as that the

27  interest rate being charged was above-market or that the ratings provided to the Projects were based

28  on fraudulent instructions that Ambac and GMAC gave to the rating agencies. The Projects allege

Defendants made misrepresentations about, among other things, ratings-agency requirements, the purpose of certain fees charged, the splitting of fees, and whether certain rates charged to the Projects were the best rates.  (FAC ¶¶ 173-177.)

That the Projects were not on inquiry notice is especially true in the context alleged here, where Defendants avoided scrutiny for years, both by relying on their status as trusted advisors and developing increasingly complex and difficult-to-trace fraud.  For example, Ray notes that the Projects "could have investigated" whether they were being charged above-market premiums after JLL observed GMAC's preference for Ambac.  (Dkt #64 at 23.)  But Ray ignores that he and his employers were fiduciaries to the Projects.  As a matter of fundamental California law, a party is entitled to rely on their fiduciary's representations and expect the "fullest disclosure of all material facts . . . that might affect the principal[.]" *Wyatt v. Union Mortg.* Co., 24 Cal. 3d 773, 782 (1979) (*En Banc*). The duty of "inquiry notice" is limited and reduced by the existence of a fiduciary or confidential relationship. *Graham-Sult v. Clainos*, 756 F.3d 724, 743 (9th Cir. 2014) ("[E]ven though Plaintiffs had some duty to investigate the facts surrounding the distribution of assets from their father's estate, that duty was limited, because they were 'entitled to rely on the statements and advice provided by the fiduciary.'"). After violating this fiduciary duty, Ray cannot now use his own silence as a means for claiming that Plaintiffs' claims are time-barred, particularly at the motion to dismiss stage.  *Cervantes v. City of San Diego*, 5 F.3d 1273, 1277 (9th Cir. 1993) (stating equitable tolling requires a fact-intensive inquiry that generally precludes dismissal on statute of limitations ground); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980) ("When a motion to dismiss is based on the running of the statute of limitations, it can be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled."); *Akkerman v. Mecta Corp.*, 72 F. App'x 652, 654 (9th Cir. 2003) (same).

Ray's cited authority does not address these facts.  In *Groth-Hill Land Co., LLC v. Gen. Motors LLC*, NO. C13–1362 TEH, 2013 WL 3853160, at *7 (N.D. Cal. July 23, 2013), the court found plaintiff's RICO injury occurred at the time it sold its dealerships at a monetary loss.  However, "[t]he injury was not hidden; Crown was aware that it sold its dealerships and that it sold them at below-market prices at the time it actually sold them."  *Id.*  Ray similarly misapplies the holding of *Bulletin*

1    *Displays, LLC v. Regency Outdoor Advert.*, Inc., 518 F. Supp. 2d 1182, 1186 (C.D. Cal. 2007).  There,

2    plaintiff alleged its civil RICO claim related to the illicit awarding of city permits accrued when the

3    contracts were awarded to a competitor and plaintiff lost a profit opportunity, while defendant argued

4    the claim accrued earlier when plaintiff became aware of a side deal that would threaten its ability to

5    win the contracts.  *Id.*  Defendant pointed to certain pre-award evidence, including a letter written by

6    plaintiff to a government investigator inquiring whether the competitor's conduct constituted

7    extortion.  *Id.* at 1187.  The court nonetheless held the claim did not accrue because plaintiff technically

8    had an opportunity to win the contracts until they were awarded to someone else.  *Id.*

9            *Bulletin Displays* does not stand for the proposition that the Projects' claims necessarily

10   accrued when their deals were closed and unlike the *Bulletin Displays* plaintiff, the Projects did not

11   suspect wrongdoing by Defendants before closing.  For example, with the 2012 Bliss financing, the

12   Bliss Project did not suspect wrongdoing by Ray and Jefferies prior to closing; meanwhile, Ray and

13   Jefferies represented that the Jefferies loan was at a market rate when in fact they had secret pre-

14   commitments which reflected a highly inflated interest rate on the loan.  (FAC ¶ 27.)  Despite the Bliss

15   Project's awareness of the interest rate, it did not have awareness of the secret pre-commitments.

16   Similarly, the Monterey Project was aware its loan was being syndicated, but was unaware of the bond

17   pre-sales which reflected an above-market interest rate on the loan.  (FAC ¶¶ 102-103.)

18           Ray argues equitable tolling cannot apply in this case and that the Projects have failed to allege

19   fraudulent concealment sufficiently because they rely on a theory of omission.  (Dkt. #64 at 24-25.)

20   Ray's argument ignores the Projects' allegations that he and other Defendants owed the Projects a

21   fiduciary duty.  "The principle that passive concealment is insufficient for a court to grant equitable

22   tolling under the doctrine of fraudulent concealment bears one caveat—'unless the defendant had a

23   fiduciary duty to disclose information to the plaintiff.'"  *Thorman v. Am. Seafoods Co.*, 421 F.3d 1090,

24   1096 (9th Cir. 2005) (citation omitted).  Thus, while an omission or failure to disclose might normally

25   be written off as merely "passive conduct," it becomes something different when a fiduciary duty

26   exists.  Here, while a fiduciary, Ray repeatedly failed to disclose his prior misconduct, allowing him

27   to avoid discovery.  Under such circumstances, justice requires the limitations period be tolled.  Even

28   without reference to Ray's fiduciary duty, the complaint alleges specific affirmative steps that Ray

1    took to mislead the Projects and avoid detection, namely, the use of the stealth structure.  This alone

2    is sufficient to state a claim for fraudulent concealment.  *In re Animation Workers Antitrust Litig.*, 123

3    F. Supp. 3d 1175, 1197 (N.D. Cal. 2015) (holding that fraudulent concealment test could be established

4    by affirmative acts even if those acts are also "in furtherance of" the underlying conspiracy).

5    **IV.    THE PSLRA DOES NOT BAR THE PROJECTS' RICO CLAIMS.**

6            Ray's argument that Plaintiffs' RICO claims are barred by the Private Securities Litigation

7    Reform Act ("PSLRA") does not square with the case law.  Section 107 of the PSLRA provides that

8    "no person may rely upon any conduct ***that would have been actionable as fraud in the purchase or***

9    ***sale of securities*** to establish a violation of section 1962."  18 U.S.C. § 1964(c).  Thus, courts have

10   properly held—and Ray concedes—that the PSLRA only "bars private cause of action under RICO

11   for predicate acts that describe conduct that would ***otherwise be actionable as securities fraud.***"

12   *Kayne v. Ho*, No. LA CV09-06816 JAK (CWx), 2012 WL 12878753, at *10 (C.D. Cal. Sept. 6, 2012)

13   (emphasis added) (denying motion to dismiss based on PSLRA).  The securities laws are designed to

14   protect investors, and thus to be actionable as securities fraud, "a misrepresentation must be made

15   concerning the securities themselves, or their value." *Rezner v. Bayerische Hypo-Und Vereinsbank*

16   *AG*, No. C 06-02064 JW, 2008 WL 11346211, at *3 (N.D. Cal. Aug. 13, 2008) (citations omitted)

17   (denying motion for summary judgment based upon PSLRA), *aff'd* 630 F.3d 866, 871-72 (9th Cir.

18   2010).

19           The distinction Ray attempts to draw between whether Plaintiffs have the ability to bring a

20   securities claim under these facts, versus whether some other party could bring such a claim, is

21   irrelevant.  (Dkt. #64 at 17.)  There are no allegations in the complaint that would allow anyone

22   (including an investor) to bring a claim under the securities laws and thus the PSLRA is no bar to

23   Plaintiffs' RICO claims.  Here, although Plaintiffs allege a long-running scheme to defraud Plaintiffs

24   in connection with the loans provided by GMAC (and later Jefferies), Plaintiffs allege ***no conduct***

25   ***actionable under the securities laws.***  Specifically, Plaintiffs do not allege any misrepresentations

26   made in connection with the sale of the securities, or their value; indeed there are no allegations of any

27   misrepresentations made to purchasers of the securities (bonds or certificates sold as part of

28   GMAC/Jefferies' efforts to securitize the loans) at all.  As a result, there is no claim based on Plaintiffs'

1   allegations that could be brought under the Securities Act or the Securities Exchange Act—and no

2   Defendant has argued otherwise.  *Abada v. Charles Schwab & Co.*, 127 F. Supp. 2d 1101, 1103 (S.D.

3   Cal. 2000) ("The purpose of the Securities Act of 1933 and the Securities Exchange Act of 1934, and

4   specifically Rule 10b–5, was and remains to protect investors against manipulation of stock prices, to

5   promote fair, equitable trading practices, and to insure fairness in securities transactions.").

6          Ray is not exempt from liability under RICO just because a security was involved in a

7   transaction.  The law is clear that "mere involvement of securities is not sufficient." *Rezner* , 2008 WL

8   11346211, at \*3; *Kayne*, 2012 WL 12878753, at \*10 (claim not barred under PSLRA despite

9   allegations involving SEC filings, as "[p]laintiffs do not allege that the enterprise was wrongful

10  because of its fraud on the market or any other theory that would be actionable as securities fraud.").

11  Plaintiffs' allege that the Projects' interest rates were inflated above market.  (FAC ¶¶ 102-103.)

12  Consistent with this, the only misrepresentations made were made to the Projects (and not to investors,

13  purchasers or prospective purchasers).  (*Id.*)  With respect to the sale of securities themselves, Plaintiffs

14  allege that GMAC and Jefferies "immediately monetized the interest rate spread above market to reap

15  and make outsized profits."  (*Id*. at ¶ 103).  Such conduct, while harmful to the Project because they

16  were saddled with higher interest rates on their loan, does not constitute securities fraud.  *S.E.C. v.*

17  *Zandford*, 535 U.S. 813, 819-21 (2002) (collecting cases where "in connection with" standard satisfied

18  for securities fraud and recognizing that the securities statutes "must not be construed so broadly as to

19  convert every common-law fraud that happens to involve securities into a violation of § 10(b)" and

20  that fraud in that case was "in connection with" securities because ***investors*** were "duped" as to how

21  defendant would invest their assets).

22          In ***every case*** cited by Ray, the plaintiffs directly alleged an underlying violation of the

23  securities laws, making them inapplicable here.  In *Swartz v. KPMG LLP*, 476 F.3d 756, 761 (9th Cir.

24  2007), the scheme involved the purchase and later sale of Microsoft stock by a purchaser who had

25  been told that that "the sale of 364 shares of Microsoft stock would trigger a purported 1999 capital

26  loss of [approximately $18 million]."  *Id*. at 759–60.  The plaintiff specifically alleged that his was a

27  misrepresentation, made in connection with the purchase/sale of the security, which significantly

28  affected the value of the security at issue.  Indeed, the plaintiff had sought to amend his complaint to

1    add a cause of action for securities fraud.  *Id.* at 760.  Thus, unlike here, the plaintiff's allegations

2    included conduct that was actionable as securities fraud.

3         In *Perkumpulan Inv'r Crisis Ctr. Dressel-WBG v. Wong*, the plaintiffs' allegations included

4    "material misrepresentations to investors" through various brochures and in-person discussions.  No.

5    C09–1786–JCC, 2014 WL 1047946, at *9 (W.D. Wash., Mar. 14, 2014).  These misrepresentations

6    went directly towards the value and performance of the securities.  *Id.*  ("The misrepresentations

7    included statements regarding the false qualifications of the Dressel managers, the expected returns

8    on the funds, the types of investments that were to be made with investors' money, and the fact that

9    the investment schemes were legitimate.").  The court found the alleged conduct "is of the type

10   generally actionable under the United States securities laws" and thus the plaintiffs' RICO claim was

11   barred by the PSLRA.  *Id.*  Similarly, in *Aversano v. Greenberg Traurig,* 753 F. Supp. 2d 1063 (2010),

12   the plaintiffs specifically alleged that Greenberg's lawyers "induced Aversano to invest in two

13   projects", which the Court held were securities under the securities laws.  *Id.* at 1068.  Thus, because

14   the alleged conduct was actionable under the securities laws, the PSLRA barred the claims.  *Id.*

15   Finally, *S. Pac. Petrol Corp. v. MB Guam, Inc.*, NO. 15-00042, 2017 WL 1393040, makes the same

16   point.  2017 WL 1393040, at *11 (D. Guam Apr. 15, 2017).  There, the allegation was that the

17   defendants had sold bonds to the plaintiff, representing that the proceeds from the bonds would be

18   used to operate a business.  *Id.* at *4.  Instead, the defendants effectively embezzled the proceeds from

19   the bond sale to the benefit of other entities. *Id.* at *4.  The court recognized that this scheme, in which

20   the misrepresentations went to the very nature of the securities, was subject to the PSLRA bar.  *Id.* at

21   *11-12.

22        *Rezner* and *Kayne* are on point and instructive.  In *Kayne*, the plaintiffs made allegations

23   supporting their RICO claim relating to "filings with the Securities and Exchange Commission."  2012

24   WL 12878753, at *10.  But the court recognized that despite these references to the filings, "Plaintiffs

25   have not alleged that such filings artificially inflated stock value, or affected the purchase or sale of

26   securities."  *Id.*  The same is true here; there are no allegations that any of the Defendants' fraud

27   impacted the value or sale of securities.  Likewise, in *Rezner*, the plaintiff asserted claims related to

28   an alleged accounting fraud.  2008 WL 11346211, at *2.  As part of the collateral for a loan, the

1    plaintiff put up bonds.  *Id.* at *3.  The court recognized that this involvement of bonds as collateral did

2    not implicate the PSLRA bar because the Defendants did not "use[] fraud in connection with the

3    security at issue" *Id*.  Rather, "the fraud alleged in this case involves Defendants' representations

4    regarding the proper accounting of a series of transactions."  *Id*.  The *Rezner* court thus held that

5    "[s]ince the alleged conduct is not actionable as securities fraud, it is not barred by the PSLRA and

6    may form the basis of Plaintiff's RICO claims." *Id*. at *4. Here, as in both *Kayne* and *Resner*, the

7    conduct alleged by Plaintiffs is not actionable as securities fraud and thus is not barred by the PSLRA

8           Ray also points to the use of GICs in the fraud scheme as implicating the PSLRA.  However,

9    a GIC under these circumstances is not a "security" under the securities law.  In this case, the GICs

10   were individually negotiated and never intended to be transferred, and thus are not subject to securities

11   claims.  *See Marine Bank v. Weaver*, 455 U.S. 551, 560 (1982) ("[A]n agreement is not a security if

12   the defendants distributed no prospectus to the plaintiffs. . . the agreement they negotiated was not

13   designed to be traded publicly, and the agreement was negotiated one-on-one between the parties.");

14   *see also Tab P'ship v. Grantland Fin. Corp.*, 866 F. Supp. 807, 809 (S.D.N.Y. 1994) ("Federal

15   securities laws are not properly invoked where a loan results from direct negotiations between the

16   parties.").  Ray disagrees, but at a minimum whether a GIC is a security is an extremely fact intensive

17   test, covering many issues that cannot be determined based on the pleadings at this stage.   *E.g.*, *De

18   Wit v. Firstar Corp.*, 879 F. Supp. 947, 979 (N.D. Iowa 1995) (discussing tests for determining whether

19   instrument satisfies "common enterprise" prong of securities test and recognizing outcome depends

20   on how money collected is pooled among investors); *Heller v. Deutsche Bank,* No. Civ.A. 04-CV-

21   3571, 2005 WL 525401, at *4-5 (E.D. Pa. March 3, 2005) (denying motion to dismiss RICO tax shelter

22   claim based on PSLRA bar, even where COBRA tax shelter required plaintiff to "form and purchase

23   shares in S Corporations," because whether the S Corporation's "stocks" constituted "securities"

24   within the meaning of the federal securities laws was an issue of fact appropriate for a motion for

25   summary judgment); *Ling v. Deutsche Bank,* No. 04 CV 4566(HB), 2005 WL 1244689, at *5

26   (S.D.N.Y. May 26, 2005) (declining to determine for purposes of a motion to dismiss whether

27   plaintiffs' equity stakes in LLCs or S corporations were "securities" for purposes of the PSLRA bar to

28   RICO); *Stechler v. Sidley Austin Brown & Wood LLP,* 382 F.Supp.2d 580, 597 (S.D.N.Y 2005) (digital

options that could fluctuate in value were not a "security," because whether the options were securities turned on issues of fact and was an issue "not appropriately resolved on a motion to dismiss"); *Newmyer v. Philatelic Leasing, Ltd.,* 888 F.2d 385, 395-96 (6th Cir. 1989) (finding material issues of fact as to whether certain leases were investment contracts constituting "securities" for purposes of federal securities laws; *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 297-99 (1946) (determining whether complicated financial instruments are securities requires a multi-tiered, fact-intensive inquiry which cannot be performed on a motion to dismiss before discovery has even begun).

## V.    THE FIRST AMENDED COMPLAINT SATISFIES RULE 9(B).

Notwithstanding the extensive and detailed allegations against him, Ray challenges the particularity of the fraud-related allegations in the complaint under Rule 9(b), both with respect to Plaintiffs' state law and RICO claims.  (Dkt. #64 at 19-20.)  The complaint documents a complex financial fraud that played out among five defendants and 18 plaintiffs over the span of more than a decade.  Ray cites the familiar refrain that a fraud complaint must allege the "who, what, where, when, and how" of the fraud and argues the Projects fail to do so.  (*Id.* at 19.)  Here, the complaint alleges numerous specific allegations that provide Ray with information "specific enough to give [Ray] notice of the particular misconduct which is alleged to constitute the fraud charged  so that [he] can defend against the charge and not just deny that [he has] done anything wrong."  *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993).  A complaint "is sufficient under Rule 9(b) if it identifies the circumstances of the alleged fraud so that the defendant can prepare an adequate answer."  *Warshaw v. Xoma Corp.*, 74 F.3d 955, 960 (9th Cir. 1996).

***First***, Ray suggests the Projects improperly use "group pleading" to deprive him notice of the allegations against him.  It is not a pleading deficiency that more than one defendant is alleged to have engaged in the same conduct.  If anything, that is part-and-parcel of a conspiracy.  *See United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016) ("There is no flaw in a pleading, however, where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct."); *Resnick v. Hyundai Motor Am.*, Inc., No. CV 16-00593-BRO (PJWx) 2017 WL 1531192, at *13 n.8 (C.D. Cal. Apr. 13, 2017) (holding no need to differentiate where two defendants are alleged to have committed the same operative acts).

1    Plaintiffs make clear the manner in which Ray acted individually and on behalf of his various

2    employers and with his co-conspirators.  (*See, e.g.*, FAC ¶ 4 (emphasis added) ("GMAC and Ray acted

3    as self-described 'financial advisors' . . . ***Ray*** used GMAC's role as lender and financial advisor to

4    mislead the Projects and reap various and substantial undisclosed and inflated fees and profits.")

5    (emphasis added); *id*. at ¶ 6 (emphasis added) ("Ray and Marfatia (and ***through them***, GMAC,

6    Jefferies [], and Ambac) made numerous written [] and verbal misrepresentations and omissions to the

7    Projects.").)  Ray cannot now feign confusion as to the role he is alleged to have played in the

8    conspiracy and the conduct he is alleged to have engaged in.  Ray's cited authority does not hold to

9    the contrary.  In *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 541 (9th Cir. 1989), the Ninth

10   Circuit affirmed dismissal under Rule 9(b) where the complaint against ten defendants made

11   allegations generally against "Defendants."  That is not the case here.  While the complaint does refer

12   at times to "Defendants" those general references are ultimately followed by defendant-specific

13   allegations.  And in *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 919 (C.D. Cal. 2011), the district

14   court dismissed a RICO claim against Toyota and four of its subsidiaries bearing the Toyota name

15   where the complaint referred only to "Toyota" or "Defendants."  The complaint makes plain which

16   entities were involved in which conduct and how the Projects were harmed.

17   **Second**, Ray claims the allegations that identify his fraudulent conduct fail to include the "time,

18   place, and specific content" of the misrepresentations or the parties to the misrepresentations.  (Dkt.

19   #64 at 20.)  This assertion is incorrect.  The complaint identifies the specific Projects to whom the

20   misrepresentations were made and states the representations were made "in writing via interstate wires

21   . . . prior to loan close."  (FAC ¶ 104; *see also*, *e.g.*, *id.* at ¶¶ 79-80.)  The complaint states when each

22   of these loans closed.  (*Id.*)  This information is sufficient for Ray to make out an adequate answer to

23   the allegations against him.  *Petrus v. New York Life Ins. Co.*, No. 14-CV-2268-BAS-JMA, 2016 WL

24   1255812, at *4 (S.D. Cal. Mar. 31, 2016) ("Corbett knows that what is at issue are his representations

25   to Plaintiff about the impact of the DOT Rider on the premium for the Policy.  Indeed, according to

26   the SAC, Corbett himself initiated discussion on the topic.  Pleading the exact dates of each of the

27   relevant conversations or exchanges would not assist Corbett in identifying the oral and written

28   representations at issue any more than pleading the general time frame.").  Similarly, Ray claims he

1  cannot identify sufficient information to answer the allegation that he promised the Projects prior to

2  the 2005 Bliss Project closing that he would use good faith to negotiate credit enhancement fees with

3  Ambac.  But Ray again ignores that the complaint alleges he first began taking undisclosed profits at

4  the Monterey Project, and then identifies those Projects which closed between the Monterey Project

5  in October 2003 and the Bliss Project in July 2005.  (FAC ¶¶ 19, 79.)

6         Contrary to Ray's suggestion, the complaint need not contain an exhaustively detailed list of

7  fraudulent transactions.  *See Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) ("It is not fatal to

8  the complaint that it does not describe in detail a single specific transaction (i.e. shipment) in which

9  Merisel transgressed as above, by customer, amount, and precise method.").   Nonetheless, the

10  complaint does detail numerous instances of fraud implicating Ray, as set forth above.  Thus, there is

11  no question that the detailed complaint identifies "the nature of the deception it alleges." *Chiron Corp.*

12  *v. Abbott Labs.*, 156 F.R.D. 219, 222 (N.D. Cal. 1994) ("In order to meet the requirements of Rule

13  9(b), Abbott must, at a minimum, specify the nature of the deception it alleges.").   Plaintiffs'

14  allegations are very clear in the deception alleged against Ray, which includes (but is not limited to):

15  (1) Ray and GMAC "set the interest to include undisclosed profits in the form of an inflated 'credit

16  spread'" (FAC ¶ 9); (2) Ray and Marfatia "rigged the rating system" for the Projects by implementing

17  an artificial ratings cap (FAC ¶¶ 12-13); (3) Ray and GMAC "rigged the GIC auction process" by

18  giving Ambac a "last look" on all bids and by charging separate, undisclosed fees to GIC bidders

19  (FAC ¶¶ 124–28); (4) Ray charged the Projects for inflated deal expenses (FAC ¶ 18); (5) Ray steered

20  Project business to Ambac without opening it up to competitive offers, despite representing otherwise

21  to the Projects (FAC ¶ 19); (6) Ray worked with Marfatia to implement the "stealth structure," which

22  permitted Ambac and GMAC to hide Ambac's role and the non-market based compensation it

23  received (*id.* ¶ 108.)  Such allegations sufficiently put Ray on notice of the deception alleged.  *U.S. ex*

24  *rel. McCoy v. California Med. Review, Inc.*, 723 F. Supp. 1363, 1372 (N.D. Cal. 1989) (denying

25  motion to dismiss where complaint contained a description of "the plan allegedly created by defendant

26  Snodgrass and approved and implemented by defendants Ross, Magna and Shea for falsely certifying

27  that discharges from the last quarter of fiscal 1986 had been reviewed").

28

Ray also ignores that the complaint identifies specific communications and emails with granular specificity.  For example, Plaintiffs allege that Ray made misrepresentations to the Corvias project management team and JLL in July/August 2010.  (FAC ¶ 116.)  When asked whether he and Jefferies were making a profit on the bonds at the expense of the Sill Project—*i.e.,* whether the interest rate on the loan was above market—Ray flatly lied and denied that Jefferies was making any hidden profits.  The fact that this was sufficient notice to Ray and Jefferies is best illustrated by the fact that Ray's co-Defendant Jefferies identified the specific email referenced and attached it to its briefing.  (Dkt. #63-12.)  To state the obvious, identifying specific emails and alleging that they make fraudulent misrepresentations more than satisfies Rule 9(b).

Moreover, Ray ignores that many of the claims against him are based on his ***failure*** to disclose relevant information to the Projects.  (FAC ¶ 109 (alleging Ray did not disclose existence of stealth structure); *id.* at ¶ 107 (alleging Ray did not disclose that he had pre-sold Monterey bonds at a substantial profit); *id.* at ¶ 95 (alleging Ray did not disclose that the ratings agencies were instructed to limit rating to an "A").)  In such a situation, where a fraud claim is based on a failure to disclose, the requirements of Rule 9(b) are relaxed in recognition of the fact that Plaintiffs will "not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim.  *Roberts v. Gainsforth*, No. CV 14-07595-AB (VBKx), 2015 WL 12765021, at *8 (C.D. Cal. Apr. 28, 2015) ("For that reason, a fraud by concealment claim can succeed without the same level of specificity required by a normal fraud claim." (internal citations and quotation marks omitted)).   Instead, the Plaintiffs must allege the "what, why, and how of defendant's fraudulent omission." *Id*.  Here, this standard is easily satisfied.  Plaintiffs have alleged the what (Ray's failure to disclose the various schemes he was running to reap undisclosed profits and fees at the Projects' expense), the why (because Ray, his employers, and Ambac, were benefiting to the detriment of the Projects) and the how (by representing that he was working in the best interests of the Projects) of Ray's fraudulent omissions.  (*E.g.*, FAC ¶¶ 180–186.)

## CONCLUSION

For the foregoing reasons, Defendant Ray's motion to dismiss should be denied in its entirety as this Court properly has personal jurisdiction over Ray given his specific contacts with the state of

California and his role as a mastermind of a multi-district nationwide RICO conspiracy.  Furthermore,

Plaintiffs' complaint sufficiently allege claims against Ray, none of which can be dismissed under the

applicable law.

DATED: December 15, 2017                KIRKLAND & ELLIS LLP


By: */s/ Donna M. Welch, P.C.*

    Michael P. Esser (SBN 268634)
    KIRKLAND & ELLIS LLP
    555 California Street
    San Francisco, CA 94104
    Telephone: (415) 439-1400
    Facsimile: (415) 439 1500
    Email:  michael.esser@kirkland.com

    Jeffrey L. Willian, P.C (*pro hac vice*)
    Donna M. Welch, P.C. (*pro hac vice*)
    KIRKLAND & ELLIS LLP
    300 N. LaSalle
    Chicago, IL 60654
    Telephone: (312) 862-2000
    Facsimile: (312) 862-2200
    Email:  jwillian@kirkland.com
    Email:  dwelch@kirkland.com

    Attorneys for Plaintiffs

1

## CERTIFICATE OF SERVICE

2

     I HEREBY CERTIFY that on December 15, 2017 a copy of the foregoing document is being

3

electronically filed with the Clerk of the United States District Court of the Northern District of

4

California by using the CM/ECF system, which will send notice of such filing to all counsel of

5

record.

6

7

8

9    DATED:  December 15, 2017          Respectfully submitted,

10                                KIRKLAND & ELLIS LLP

11                                By:   */s/ Donna M. Welch, P.C.*

12                                Michael P. Esser (SBN 268634)
KIRKLAND & ELLIS LLP

13                                555 California Street
San Francisco, CA 94104

14                                Telephone: (415) 439-1400
Facsimile: (415) 439-1500

15                                Email: michael.esser@kirkland.com

16                                Jeffrey L. Willian, P.C. (*pro hac vice*)
Donna M. Welch, P.C. (*pro hac vice*)

17                                KIRKLAND & ELLIS LLP
300 North LaSalle

18                                Chicago, IL 60654
Telephone: (312) 862-2000

19                                Facsimile: (312) 862-2200
Email: jwillian@kirkland.com

20                                Email: dwelch@kirkland.com

21                                Attorneys for Plaintiffs

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE                         Case No.  5:17-cv-04992-BLF