# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MONTEREY BAY MILITARY HOUSING, LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> AMBAC ASSURANCE CORPORATION, et al., <br><br> Defendants. | Case No. 17-cv-04992-BLF <br><br> **ORDER RE MOTIONS TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** <br><br> [Re: ECF 62, 63, 64, 66, 71] |

This action arises from alleged wide-scale fraud in the financing of military housing projects. In the mid-1990s, Congress authorized the Department of Defense to enter into agreements with private sector developers to construct and operate modernized housing for military families on bases throughout the United States. Those agreements resulted in the creation of "project entities" – partnerships or joint ventures between a private developer and the military – dedicated to one or more specified bases. Plaintiffs are eighteen such project entities that constructed housing on bases in fifteen different states.[1] Plaintiffs claim that they were defrauded by the lenders financing that construction, the company insuring the loans, and others, in violation of RICO[2] and state common laws.

---

[1] Plaintiffs are: Monterey Bay Military Housing, LLC; Monterey Bay Land, LLC; Fort Bliss/White Sands Missile Range Housing LP; Carlisle/Picatinny Family Housing LP; Stewart Hunter Housing LLC; Fort Leavenworth Frontier Heritage Communities, I, LLC; Fort Leavenworth Frontier Heritage Communities, II, LLC; Meade Communities LLC; Riley Communities LLC; Bragg Communities LLC; Fort Detrick/Walter Reed Army Medical Center LLC; Picerne Fort Polk Funding LLC; Rucker Communities LLC; Sill Housing, LLC; AETC Housing LP; AMC West Housing LP; Lackland Family Housing, LLC; and Vandenberg Housing LP.

[2] Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.

Before the Court are  motions to dismiss brought by five sets of defendants:   (1) Ambac Assurance Corporation ("Ambac"); (2) Chetan Marfatia ("Marfatia"); (3) Jefferies Mortgage Finance, Inc., Jefferies & Company, Inc., Jefferies LLC, and Jefferies Group LLC (collectively, "Jefferies")[3]; (4) Annandale Plantation, LLC (Colorado) and Annandale Plantation, LLC (South Carolina) (collectively, "Annandale"); and (5) Danny Ray ("Ray").  All Defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(2) for lack of personal jurisdiction and 12(b)(6) for failure to state a claim.

For the reasons discussed below, the motions to dismiss under Rule 12(b)(2) for lack of personal jurisdiction are GRANTED WITH LEAVE TO AMEND, except that Defendant Ambac's Rule 12(b)(2) motion is DENIED IN PART *only* with respect to claims asserted by the Monterey Bay Plaintiffs.  The motions to dismiss under Rule 12(b)(6) for failure to state a claim are GRANTED WITH LEAVE TO AMEND as to all Defendants and as to all claims

## I.    BACKGROUND[4]

In 1996, Congress enacted the Military Housing Privatization Initiative ("MHPI"), authorizing the Department of Defense to enter agreements with private sector developers to improve housing for military families.  First Am'd Compl. ("FAC") ¶ 1.  With respect to housing projects for the United States Army, the Army and the private developer were partners, with the Army contributing the land and additional equity and the private developer managing the project on a day-to-day basis.  FAC ¶ 2.  The Army received significant equity participation and had consent rights regarding major decisions.  *Id.*  With respect to housing projects for the United States Air Force, the Air Force contracted with the private developer, contributed the land, and provided a Government Direct Loan.  FAC ¶ 3.  The Air Force had the right to cash flows after

---

[3] Because Plaintiffs generally treat the four Jefferies defendants as a single entity for pleading purposes, the Court follows suit in this order.  The Jefferies defendants argue that the FAC is deficient because it lumps them together without providing fair notice of the allegations against each of them.  The Court's use of the collective term "Jefferies" does not reflect any substantive determination regarding that argument.

[4] The background facts are taken from the allegations of the operative first amended complaint, which are accepted as true for purposes of Defendants' Rule 12(b)(6) motions.  *See Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).

certain returns were paid to the private developer and was consulted on significant issues. *Id.*

Each project entity needed substantial long-term financing, often in the hundreds of millions of dollars. FAC ¶¶ 1, 7. Most of the project entity Plaintiffs obtained that financing from non-party GMAC Commercial Mortgage Corporation ("GMAC") or its successor, non-party Capmark, between 2002 and 2009.[5] FAC ¶¶ 4-28. Those project loans were insured by Defendant Ambac, which provided both credit enhancement and a surety bond in nearly all of the transactions involving GMAC prior to 2009. FAC ¶¶ 5, 75. The Managing Directors of GMAC/Capmark and Ambac – Defendants Ray and Marfatia, respectively – used their positions to defraud Plaintiffs of hundreds of millions of dollars in undisclosed fees and profits related to the loan transactions. FAC ¶¶ 4-5. Ray and Marfatia formed a RICO enterprise and engaged in a long-running pattern of racketeering, described as follows.

**Inflated Interest Rates on Project Loans:** Ray and GMAC held themselves out to Plaintiffs as "financial advisors." FAC ¶ 7. However, rather than using best efforts to provide the most competitive loan interest rate possible, Ray and GMAC built in "[a] minor and undetected inflation in the interest rate above market." FAC ¶¶ 9-10. Ray represented to Plaintiffs that the rate was set based on the risk premium required by investors. *Id.* In reality, and unbeknownst to Plaintiffs, Ray inflated the credit spread and thereby made millions of dollars in profits when GMAC syndicated the loans by selling bonds. *Id.* "To this day, the Monterey Project and subsequent Projects continue to suffer substantial harm in paying inflated interest rates on these long-term loans." FAC ¶ 10.

**Manipulation of Shadow Ratings from S&P:** Ray and Marfatia insisted on using "shadow" ratings – unofficial ratings given to a bond or an issuing party – rather than public ratings to determine the appropriate loan interest rates and the necessary amount of loan insurance/credit enhancement for each transaction. FAC ¶ 12. Ray and Marfatia "rigged the rating system" by instructing Standard & Poor's ("S&P") that none of the projects involving Ambac credit enhancement should receive a shadow rating higher than an "A." FAC ¶ 13. S&P

---

[5] GMAC was sold in a leveraged buyout in 2006 and it ultimately became Capmark. FAC ¶ 4 & n. 1.

accepted this artificial ratings cap, and at least for a period of time S&P did not give any of the projects a shadow rating above an "A" even though the projects received public ratings above an "A." *Id.* Ray and Marfatia used the shadow ratings as justification for inflated loan interest rates and inflated and unnecessary surety and bond insurance fees and premiums. FAC ¶ 14.

**Inflated and Unnecessary Credit Enhancement:** Ray and Marfatia secretly agreed that Ambac would provide all credit enhancement in connection with the project loans. FAC ¶¶ 19-20. Ray misrepresented to Plaintiffs that he was using best efforts to negotiate credit enhancement fees, and that Ambac's competitor MBIA would charge the same fees and terms as Ambac, despite the fact that MBIA offered substantially better pricing and terms than Ambac. FAC ¶ 19. This exclusive arrangement allowed Ambac to charge Plaintiffs "above market and unnecessary credit enhancement and surety fees." FAC ¶ 20.

**GIC Bidding Process:** A significant portion of the loan proceeds were not needed immediately, and sometimes not until years after closing. FAC ¶ 16. Ray recommended to Plaintiffs that unused portions of the loans be invested in Guaranteed Investment Contracts ("GICs"). *Id.* Ray conducted what was supposed to be a blind bid auction for each of the projects to identify the GIC provider with the highest return and best terms. *Id.* However, Ray gave Ambac a "last look" at all GIC bids, which "severely undermined the efficiency and integrity of the results of the blind auction process." FAC ¶ 17. Ray and GMAC also required the winning bidder to pay separate fees to GMAC which were not disclosed to Plaintiffs. *Id.* Plaintiffs allege that these practices led to lower returns on Plaintiffs' investments than otherwise could have been obtained. *Id.*

**Inflated Deal Expenses:** Plaintiffs agreed to pay GMAC and Ambac actual deal expenses, sometimes subject to a cap. FAC ¶ 18. GMAC and Ambac charged Plaintiffs inflated expenses that exceeded their actual expenses, by as much as hundreds of thousands of dollars. *Id.*

Capmark went into bankruptcy in 2009, and Defendant Jefferies purchased the military housing servicing business in an asset sale. FAC ¶ 4 & n.1; ¶ 23. Jefferies hired Ray as Managing Director and Head of Global Finance, and brought over Ray's team from GMAC/Capmark. FAC ¶ 23. Jefferies joined the RICO conspiracy at that time, and ultimately served as the lender on two

of the loans at issue in this lawsuit, one in 2010 and one in 2012. FAC ¶¶ 23, 52. Ray and

Jefferies made more than $5 million in undisclosed profits on the pre-sale of bonds in connection

with the 2010 project at Fort Sill. FAC ¶ 23. They likewise made secret profits on the 2012 Bliss

transaction. FAC ¶ 26. Ambac was not the insurer on those transactions.

Ray invested millions of dollars that he obtained through the RICO enterprise in

Annandale. FAC ¶ 135. Annandale had no agents or employees other than Ray. *Id.* Ray

instructed "his subordinates" – presumably those at Jefferies – to send emails regarding the Fort

Bliss Project to Annandale's email account, annandale.plantation@gmail.com. FAC ¶ 136. He

also emailed documents relating to the projects and the RICO enterprise from his Jefferies email

account to the Annandale email account for storage. *Id.*

Plaintiffs claim that they had no idea that they had been defrauded until several of them

were sued by Ambac. FAC ¶ 137. Plaintiffs' loan documents contained a provision stating that if

Ambac's credit rating fell below a certain level, Plaintiffs were required to provide a replacement

surety or cash fund a debt service reserve. *Id.* Ambac sought to enforce that provision by "filing

suit first against the Mead Project" entity in October 2015. FAC ¶ 141. It is not clear from the

FAC how many state court suits ultimately were filed by Ambac. A California state court issued

multiple orders compelling discovery from Ray and Jefferies, including production of Ray's early

GMAC documents and emails. FAC ¶ 143. Ray attempted to delete more than 9,100 responsive

documents from the Jefferies system. FAC ¶ 144. During that process in April 2016, Ray sent

documents related to the RICO scheme to the Annandale email account. FAC ¶ 146. In February

2017, the California state court granted a motion to compel Jefferies to produce access logs which

detailed the deletion of records from Jefferies' document system. FAC ¶ 144.

Plaintiffs filed this action in August 2017, approximately eight years after the last loan

transaction involving Ambac and five years after the last loan transaction involving Jefferies.

Compl., ECF 1. The operative first amended complaint ("FAC") asserts the following claims on

behalf of the eighteen Plaintiffs against Ambac, Marfatia, Jefferies, Annandale, and Ray: (1) Civil

RICO in violation of 18 U.S.C. § 1962(c) and conspiracy to commit Civil RICO in violation of 18

U.S.C. § 1962(d) (against all defendants); (2) breach of fiduciary duty (against Ambac, Marfatia,

Jefferies, and Ray); (3) aiding and abetting breach of fiduciary duty (against all defendants); (4) fraud by intentional misrepresentation (against Ambac, Marfatia, Jefferies, and Ray); (5) fraud by fraudulent concealment (against Ambac, Marfatia, Jefferies, and Ray); and (6) conspiracy to commit fraud (against all defendants). Subject matter jurisdiction is premised on federal question as to the RICO claim and supplemental jurisdiction as to the state law claims.

## II.    RULE 12(b)(2) – PERSONAL JURISDICTION

### A.    Legal Standard

A party may challenge the Court's personal jurisdiction over it by bringing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2). When a defendant raises a challenge to personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015). The plaintiff may meet that burden by submitting affidavits and discovery materials. *Id.* "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss." *Id.* (internal quotation marks and citation omitted). "[T]he plaintiff cannot simply rest on the bare allegations of its complaint," but when evaluating the plaintiff's showing, the court must accept uncontroverted allegations in the complaint as true and resolve factual disputes created by conflicting affidavits in the plaintiff's favor." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (internal quotation marks and citation omitted).

### B.    Discussion

All Defendants move to dismiss the FAC in whole or in part for lack of personal jurisdiction. Ambac concedes the existence of personal jurisdiction with respect to claims asserted by the Monterey Bay Plaintiffs, but it disputes personal jurisdiction with respect to claims asserted by the other Plaintiffs. *See* Ambac's Reply at 19, ECF 119. Marfatia, Jefferies, Annandale, and Ray challenge personal jurisdiction with respect to all claims asserted by all Plaintiffs.

In response, Plaintiffs argue that 18 U.S.C. § 1965(b) provides a basis for the Court's exercise of personal jurisdiction over all Defendants, and that California's long-arm statute provides a basis for the Court's exercise of specific personal jurisdiction over Ambac, Marfatia,

Jefferies, and Ray.[6]

### 1.    18 U.S.C. § 1965(b)

Under 18 U.S.C. § 1965(b), a district court may exercise personal jurisdiction over non-resident participants in an alleged RICO conspiracy, even if those parties otherwise would not be subject to the court's jurisdiction, if "the ends of justice" so require.  The "ends of justice" provision permits a court, consistent with the purpose of the RICO statute, to "enable plaintiffs to bring all members of a nationwide RICO conspiracy before a court in a single trial."  *Butcher's Union Local No. 498, United Food & Comm. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 538 (9th Cir. 1986).  This power is not unlimited, however.  In order for a court to exercise personal jurisdiction through the "ends of justice" provision, "the court must have personal jurisdiction over at least one of the participants in the alleged multi-district conspiracy and the plaintiff must show that there is no other district in which a court will have personal jurisdiction over all of the alleged coconspirators."  *Id.* at 539.  Moreover, the plaintiff must allege facts showing the existence of "a single nationwide RICO conspiracy" involving the defendants as to whom personal jurisdiction is asserted.  *Id.*

### a.    Single Nationwide Conspiracy

Taking those requirements in reverse order, Plaintiffs have not alleged facts showing the existence of a single nationwide conspiracy involving all named Defendants.  As discussed below in section 2.B., Plaintiffs' RICO claim suffers from a number of significant pleading defects.  Unless and until a viable RICO claim is stated, § 1965(b) cannot provide a basis for this Court's exercise of personal jurisdiction over Defendants.

---

[6] Plaintiffs also argue that the Court may exercise personal jurisdiction over all Defendants under 18 U.S.C. § 1965(a), which states that a RICO action may be brought in any district in which the defendant "resides, is found, has an agent, or transacts his affairs."  While some courts have found that § 1965(a) provides a basis for exercise of personal jurisdiction, others have treated it as a supplemental venue provision.  *Compare Wegner v. Wells Fargo Bank Nat'l Ass'n*, No. 17-CV-1429 JCM (PAL), 2018 WL 3114528, at *6 (D. Nev. June 25, 2018) (treating § 1965(a) as a basis for exercising personal jurisdiction) *with CBC Framing, Inc. v. Flores*, No. CV 08-00150 MMM (JCX), 2008 WL 11337545, at *3 (C.D. Cal. May 19, 2008) (treating § 1965(a) as "a supplemental venue provision").  Neither the Supreme Court nor the Ninth Circuit has addressed the issue, and this Court is inclined to construe § 1965(a) as a venue provision.  Given Plaintiffs' failure to state a RICO claim, however, the Court need not decide at this time whether § 1965(a) can provide an independent basis for the exercise of personal jurisdiction.

Moreover, even if Plaintiffs had alleged facts sufficient to show that the other Defendants conceived of and executed the fraudulent scheme described in the FAC, they have not alleged facts showing that Annandale agreed to or furthered that scheme. Plaintiffs do not allege facts showing that Annandale took part in directing the affairs of the alleged enterprise as required for liability under 18 U.S.C. § 1962(c), *see Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008), or that Annandale adopted the goal of furthering or facilitating the criminal endeavor as required for liability under 18 U.S.C. § 1962(d), *see Salinas v. United States*, 522 U.S. 52, 65 (1997). Indeed, Annandale is not alleged to have done, adopted or agreed to anything in furtherance of the alleged scheme to defraud Plaintiffs. To the contrary, Plaintiffs allege that *Ray used Annandale* to shelter his ill-gotten gains and receive incriminating emails and documents. FAC ¶¶ 66, 135-36, 146.

Plaintiffs allege that "[a]t all relevant times, Ray operated and acted as agent for the Annandale Plantation Defendants." FAC ¶ 135. Thus, Plaintiffs argue, Annandale properly is named as a RICO coconspirator. The problem with Plaintiffs' argument is that they allege that Ray wore several "hats" during the course of the events giving rise to this lawsuit. Ray is alleged to have acted on behalf of GMAC, Capmark, Jefferies, and Annandale, and on his own behalf, at various times. *See, e.g.*, FAC ¶¶ 4-10, 135-36. Under those circumstances, Plaintiffs must allege with specificity *which* of Ray's acts were taken on behalf of each Defendant.

Additionally, Plaintiffs must show that any conduct on behalf of Annandale was in furtherance of a single nationwide RICO conspiracy to defraud Plaintiffs. Defendants assert that at most Plaintiffs have suggested that Ray and Annandale entered into a separate conspiracy to shelter Ray's profits and hide incriminating evidence. Allegations suggesting that Defendants participated in two separate conspiracies, as opposed to a single nationwide conspiracy, are insufficient to implicate § 1965(b). *See Butcher's Union*, 788 F.2d at 539 (allegations showing the defendants' participation in multiple separate conspiracies were insufficient to "allege a single nationwide RICO conspiracy as required for nationwide service of process under the ends of justice provision of section 1965(b)").

### b.     No Other District

Plaintiffs also have failed to meet their burden to show that there is no other district in which all coconspirators would be subject to personal jurisdiction. Setting aside the allegations against Annandale for the reasons discussed above, the FAC alleges facts indicating that the District Court for the Southern District of New York ("the SDNY Court") could exercise personal jurisdiction over Defendants Ambac, Marfatia, Jefferies, and Ray based on their contacts with the state of New York. *See* FAC ¶ 67 ("[T]he Southern District of New York would have jurisdiction over Defendants Ambac, Jefferies and Marfatia because they are residents of or have their principal place of business within the Southern District of New York."), ¶ 131 (alleging that Ray was "a senior employee and Managing Director" of New York based Jefferies). Moreover, Ray states in his declaration that although he resided in South Carolina during his employment with Jefferies, he commuted to both Jefferies' New York City headquarters and its Colorado office to perform his job. Ray Decl. ¶ 4, ECF 64-1. The most reasonable inference to be drawn from that statement is that Ray performed the work giving rise to Plaintiffs' claims against him at both Jefferies' New York City headquarters, where he states expressly that he maintained an office, and at Jefferies' Colorado office. *See id.* Ray also states that although he resided in Colorado during his employment with GMAC and Capmark, and worked primarily at their Colorado offices, he occasionally worked at their New York offices. Ray Decl. ¶¶ 2-3.

Plaintiffs argue that Ray's declaration does not affirmatively represent that he did any work relevant this case in New York. That argument misses the mark. *Plaintiffs* have the burden making a *prima facie* showing of personal jurisdiction. Plaintiffs have not presented any evidence, or even alleged, that Ray's work relevant to this lawsuit was not performed in New York. The SDNY Court could exercise personal jurisdiction over Ray based on a determination that he "deliberately has engaged in significant activities within" New York. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985). Plaintiffs point to their allegation that "no torts or fraud were directed at or felt by any Plaintiff in New York," but that conclusory allegation is unsupported by any facts and therefore is insufficient to demonstrate that Ray would not be subject to personal jurisdiction in the SDNY.

### c. Personal Jurisdiction Over at Least One Conspirator

Of the three requirements for the exercise of personal jurisdiction under § 1965(b), Plaintiffs have satisfied only the requirement that the Court have personal jurisdiction over at least one participant in the alleged conspiracy. Ambac has conceded that this Court has personal jurisdiction over it, albeit *only* with respect to claims asserted by the Monterey Bay Plaintiffs.[7] *See* Ambac's Reply at 19, ECF 119. However, because Plaintiffs have failed to allege facts showing the existence of a single nationwide RICO conspiracy, or to show that all coconspirators would not be subject to personal jurisdiction in the SDNY, Plaintiffs have failed to meet their burden to show that this Court may exercise personal jurisdiction over all Defendants pursuant to § 1965(b).

### 2. California's Long-Arm Statute

Where no applicable federal statute governs personal jurisdiction, "the law of the state in which the district court sits applies." *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003). "California's long-arm statute allows courts to exercise personal jurisdiction over defendants to the extent permitted by the Due Process Clause of the United States Constitution." *Id.* "[D]ue process requires that the defendant 'have certain minimum contacts' with the forum state 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Ranza*, 793 F.3d at 1068 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted)).

Plaintiffs argue that even absent application of 18 U.S.C. § 1965(b), the Court has personal jurisdiction over Defendants Ambac, Marfatia, Jefferies, and Ray under California's long-arm statute. Defendants contend that they lack sufficient minimum contacts with California to support the exercise of this Court's personal jurisdiction over them, with the exception of Ambac's

---

[7] Ambac's concession is limited to the claims asserted against it by the Monterey Bay Plaintiffs. As discussed below, Ambac and other Defendants raise a *Bristol-Myers Squibb* challenge to the Court's exercise of personal jurisdiction with respect to claims asserted by Plaintiffs that do not reside in, or have any significant connection to, California. *See Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1782 (2017).

concession of jurisdiction as to claims asserted by the Monterey Bay Plaintiffs. Defendants also contend that the Court may not exercise personal jurisdiction with respect to claims asserted by non-resident Plaintiffs which arise from conduct outside the state of California. *See Bristol-Myers Squibb Co. v. Superior Court,* 137 S. Ct. 1773, 1782 (2017).

Plaintiffs' assertion of Defendants' minimum contacts with California is based solely on Defendants' alleged participation in the RICO conspiracy and related misconduct. For example, Plaintiffs allege that Ambac is subject to this Court's personal jurisdiction because Ambac "committed intentional torts, including numerous instances of breach of fiduciary duty, fraud and violations of RICO, purposefully directed at and causing harm to the Monterey and Vandenberg Projects in California and to the AMC West Project, which provides housing to three Air Force bases, including Travis Air Force Base in California." FAC ¶ 61. Personal jurisdiction is asserted over the other Defendants based on similar allegations. FAC ¶¶ 62-66. As discussed below, the FAC does not plausibly allege that Defendants are liable under RICO or state law. Accordingly, with the exception of Ambac, which has conceded personal jurisdiction as to the claims asserted by the Monterey Bay Plaintiffs, all Defendants are entitled to dismissal under Rule 12(b)(2).

At the hearing on Defendants' motions, the Court expressed concern that *Bristol-Myers Squibb* may bar the bulk of Plaintiffs' claims, but it declined to take up the issue given that *Bristol-Myers Squibb* would not raise a complete bar to litigation in California and the FAC is deficient in numerous other respects. Defendants may argue the *Bristol-Myers Squibb* in a future motion, if appropriate.

The motions to dismiss under Rule 12(b)(2) for lack of personal jurisdiction are GRANTED WITH LEAVE TO AMEND, except that Defendant Ambac's Rule 12(b)(2) motion is DENIED IN PART *only* with respect to claims asserted by the Monterey Bay Plaintiffs. The Court reiterates that Defendants' challenge pursuant to *Bristol-Myers Squibb* has not been resolved and may be dispositive of the claims asserted by many of the Plaintiffs.

### III.   RULE 12(b)(6) – FAILURE TO STATE A CLAIM

#### A.   Legal Standard

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

claim upon which relief can be granted tests the legal sufficiency of a claim." *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (internal quotation marks and citation omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B. RICO (Claim 1)

"RICO focuses on 'racketeering activity,' which the statute defines as a number of specific criminal acts under federal and state laws." *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008). "Under § 1962(c), it is illegal for any person 'to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity,' where that enterprise affects interstate commerce." *Id.* (quoting 18 U.S.C. § 1962(c)). Under § 1962(d), "[i]t is also illegal for any person to conspire to do so." *Id.* "A 'pattern of racketeering activity' requires at least two predicate acts of racketeering activity . . . within a period of ten years." *Id.*

Section 1964(c) sets forth RICO's civil enforcement mechanism, providing that "[a]ny person injured in his business or property by reason of a violation of section 1962" may sue in federal district court to "recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). "To have standing under § 1964(c), a civil RICO plaintiff must show: (1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was 'by reason of' the RICO violation, which requires the plaintiff to establish proximate causation." *Canyon Cty.*, 519 F.3d at 972.

Claim 1 asserts that Defendants engaged in a pattern of racketeering activity under § 1962(c) and conspired to do so under § 1962(d). FAC § 161. Claim 1 also alleges that "Plaintiffs suffered injury to their business and property by reason of Defendants' conspiracy and pattern of racketeering activity" as required under § 1964(c). *Id.* Collectively, Defendants request dismissal of Claim 1 on several grounds, including that it: (a) is barred by the Private Securities

Litigation Reform Act ("PSLRA"); (b) is time-barred; and (c) does not allege facts sufficient to state a claim for relief. The Court addresses those arguments in turn. The Court notes that although there is substantial overlap between the motions to dismiss, not every defendant argues every ground for dismissal. However, all asserted grounds are potentially dispositive of the RICO claim. Therefore, as a practical matter, where the Court finds an argument to be meritorious, the Court dismisses the RICO claim against all Defendants. The Court perceives no prejudice to Plaintiffs in this approach, as they had an opportunity to respond fully to all of the arguments raised by Defendants.

### 1. PSLRA Bar

"The Private Securities Litigation Reform Act of 1995, Pub.L. 104–67, § 107, 109 Stat. 737, 758 (Dec. 22, 1995), amended RICO so that 'no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.'" *Howard v. Am. Online Inc.*, 208 F.3d 741, 749 (9th Cir. 2000) (quoting 18 U.S.C. § 1964(c)).[8] The PSLRA bar applies even where the RICO plaintiff himself could not bring a securities fraud claim, as long as such claim could be brought by *some* plaintiff with proper standing. *Id.* (applying PSLRA bar where "Plaintiffs do not dispute that their securities fraud claims could be brought by a plaintiff with proper standing").

Despite the plain language of the statute limiting the PSLRA bar to "conduct that would have been actionable" as securities fraud, Defendants assert that the bar applies whether or not any person or entity could have brought a securities fraud claim. Defendants have not cited, and the Court has not discovered, any case applying the PSLRA bar absent a determination that the conduct underlying the RICO claim would have been actionable as securities fraud. To the contrary, the cases make clear that "the PSLRA does not bar reliance on all predicate acts pertaining to securities, only reliance on those acts that would have been actionable by some party." *Kayne v. Ho*, No. LA CV09-06816 JAK (CWx), 2012 WL 12878753, at *10 (C.D. Cal.

---

[8] "The so-called 'RICO Amendment' contains one limited exception." *Perkumpulan Inv'r Crisis Ctr. Dressel-WBG v. Wong*, No. C09-1786-JCC, 2014 WL 1047946, at *7 n.5 (W.D. Wash. Mar. 14, 2014). "A private plaintiff may rely on securities-fraud conduct in a civil suit if the defendant was criminally convicted of the securities fraud." *Id.* That exception is not applicable here.

Sept. 6, 2012).

Defendants' reliance on *Perkumpulan Inv'r Crisis Ctr. Dressel-WBG v. Wong*, No. C09-1786-JCC, 2014 WL 1047946 (W.D. Wash. Mar. 14, 2014), is misplaced. In *Perkumpulan*, the district court applied the PSLRA bar even though it appeared that a securities fraud claim based on the alleged conduct was unlikely to be successful. *Perkumpulan*, 2014 WL 1047946, at *12. The court held that the relevant question was not whether a securities fraud claim ultimately would prove meritorious, but "whether the conduct alleged is of the type generally actionable under the securities laws – that is, whether it is conduct that involved fraud in connection with the purchase or sale of securities." *Id.* The district court devoted several paragraphs to determining whether the conduct at issue was actionable as securities fraud, looking to "section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 to provide the basic guideposts of such an analysis." *Id.* at *8-12. This Court follows the same approach.

Defendants Ambac and Ray contend that the PSLRA bars Plaintiffs' RICO claim. The Court therefore must determine whether the RICO claim is based on "conduct that would have been actionable," either by Plaintiffs or others, "as fraud in the purchase or sale of securities." *Howard*, 208 F.3d at 749 (quoting 18 U.S.C. § 1964(c)). Fraud in the purchase or sale of securities is governed by § 10(b) of the Securities and Exchange Act, which makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, which implements that statute, describes conduct that falls within § 10(b). 17 C.F.R. § 240.10b-5.

In discussing the scope of § 10(b) and Rule 10b-5, the Supreme Court has held that those provisions protect only actual purchasers or sellers of securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731 (1975); *see also Binder v. Gillespie*, 184 F.3d 1059, 1066 (1999) (citing *Blue Chip Stamps* for proposition that "[o]nly a purchaser or seller of securities has standing to bring an action under section 10(b) and Rule 10b–5"). The fraud need not relate to the value of securities or call into question the lawfulness of a securities transaction to fall within the scope of § 10(b) and thus the PSLRA bar. *See SEC v. Zandford*, 535 U.S. 813, 820 (2002) (allegations that

broker sold securities from customer account and misappropriated resulting proceeds was sufficient to state § 10(b) claim even though securities sales themselves were not unlawful); *Swartz v. KPMG LLP*, 476 F.3d 756, 761 (9th Cir. 2007) (RICO claim based on defendants' sale of sham tax shelter to plaintiff was barred by PSLRA where plaintiff's otherwise lawful sale of Microsoft stock was "lynchpin" of defendants' fraudulent scheme). However, the Supreme Court has observed that "every securities case in which this Court has found a fraud to be 'in connection with' a purchase or sale of a security has involved victims who took, who tried to take, who divested themselves of, who tried to divest themselves of, or who maintained *an ownership interest* in financial instruments that fall within the relevant statutory definition." *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1066 (2014).

With that guidance in mind, the Court turns to Defendants' assertion that the PSLRA bar applies here based on both the "bond fraud" and "GIC" aspects of the alleged RICO scheme.

### a. Bond Fraud

Plaintiffs allege that "a central part of Defendants' scheme allowed GMAC, and later Jefferies, to make undisclosed and outsized profits on the sale of the bonds or certificates that were syndicated from the Projects' loans." FAC ¶ 102. When originating a project loan, GMAC and Jefferies allegedly misrepresented that they had "set the credit spread (the interest rate spread above the then applicable 30-year swap rate) and therefore the coupon interest rate on the loan at market as required by investors or the market, and then would sell bonds or certificates based on the purported market rate of the loan." *Id.* Plaintiffs paid the interest and principal on each loan from soldiers' rent payments, which monies were used to meet the required bond payments. *Id.* Plaintiffs allege that "[i]n reality, Ray and GMAC had pre-sold the bonds in nearly all cases at a profit prior to closing of the transaction, necessarily meaning that Ray and GMAC had set the Projects' interest rate above investor demand and therefore the market and in contravention of their direct representations." *Id.* ¶ 103. "By syndicating the loans through the sale of bonds prior to close, GMAC and Jefferies immediately monetized the interest rate spread above market to reap and make outsized profits." *Id.* Plaintiffs refer to this conduct as the "bond fraud scheme." *Id.* ¶ 107. They characterize the pre-sale of the bonds as "a major (and perhaps most damaging)

15

component of the fraud" against Plaintiffs. *Id.* ¶ 62.

This conduct does not fall within the scope of § 10(b) and Rule 10b-5. The alleged conduct would not have been actionable by Plaintiffs as securities fraud, as Plaintiffs did not buy, sell, or assert an ownership interest in, the bonds. *See Chadbourne*, 134 S. Ct. at 1066. None of the cases cited by Defendants compels a different result, as all of them involved a victim with an ownership interest in the security. *See, e.g., Zandford*, 535 U.S. at 820 (SEC stated § 10(b) claim where broker sold victims' securities and misappropriated proceeds); *Swartz*, 476 F.3d at 761 (9th Cir. 2007) (applying PSLRA bar to RICO claims where plaintiff's otherwise lawful purchase and sale of Microsoft stock was the "lynchpin" of defendants' alleged fraudulent scheme); *Perkumpulan*, 2014 WL 1047946, at *9 (applying PSLRA bar to RICO claims where defendants' allegedly fraudulent statements induced plaintiffs to invest in a Ponzi scheme).

At the hearing, Defendants suggested that the conduct would have been actionable by the bond holders as securities fraud, under the theory that the fraudulent scheme depleted revenue that was to be the security and source of repayment for the bonds. However, the FAC contains no allegations suggesting that Defendants made any misrepresentations to the bond holders or that the bond holders were injured by Defendants' conduct. If anything, the FAC suggests that the bond holders may have benefitted from inflated or unnecessary credit enhancement provided by Plaintiffs as a result of Defendants' misrepresentations. See FAC ¶¶ 12-15, 99-100.

Accordingly, Defendants have failed to show a PSLRA bar to the "bond fraud" aspect of the alleged scheme.

### b. GICs

"The Securities Acts define 'security' as, among other things, an 'investment contract.'" *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) (citing 15 U.S.C. §§ 77b(a)(1), 78c(a)(10)). While the Acts do not define "investment contract," the Supreme Court has defined the term to mean "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). "The definition of an investment contract is a flexible rather than a static principle, one that is capable of adaption to meet the countless and

variable schemes devised by those who seek the use of the money of others on the promise of profits." *Perkumpulan*, 2014 WL 1047946, at \*8 (internal quotation marks and citation omitted). The Ninth Circuit has "distilled *Howey*'s definition into a three-part test requiring (1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." *Rubera*, 350 F.3d at 1090.

Plaintiffs allege that Ray and GMAC recommended GICs as the most appropriate investment vehicle for loan proceeds that Plaintiffs did not need right away, but that Defendants engaged in fraudulent misconduct during the GIC auction process. FAC ¶¶ 124-28. Ray and GMAC purported to conduct blind auctions to obtain the best GIC products with the highest interest rates, but in fact they rigged the auctions by giving Ambac a "last look" which allowed Ambac to bid in an unfair manner. *Id.* ¶ 127. GMAC also required that bidders pay it a separate fee, which was undisclosed to Plaintiffs, to be considered eligible for award of a GIC. *Id.* ¶ 126. Plaintiffs claim that this fee requirement "likely caused some if not all of the GIC providers to further lower their GIC interest bids," with the result that Plaintiffs "received less in interest rate returns than if no fee had been demanded." *Id.* ¶ 127.

Defendants' alleged conduct appears to fall within the scope of § 10(b) and Rule 10b-5. Based on the facts alleged in the FAC, the GICs appear to be securities under the *Rubera* test, and Plaintiffs claim injury based on Defendants' alleged misrepresentations in connection with the GIC sales. Plaintiffs argue that the GICs in this case are not securities, citing *Marine Bank v. Weaver*, 455 U.S. 551 (1982), for the proposition that a GIC does not qualify as a security if no prospectus issues, the GIC is negotiated one-on-one, and the GIC is not intended to be traded. However, in *Marine Bank* the Supreme Court held only that the "unique agreement" before it, which did not involve a prospectus and was negotiated one-on-one by the parties, was not an investment contract. *Id.* at 560. The Supreme Court did not hold that an investment contract which is negotiated one-on-one and does not involve a prospectus can never qualify as a security.

Plaintiffs contend that because the parties dispute whether the GICs properly are characterized as securities, the issue presents a factual question which should not be resolved in the context of a motion to dismiss. However, "the ultimate issue of whether or not a particular set

of facts . . . constitutes an investment contract is a question of law." *United States v. Carman*, 577 F.2d 556, 562 (9th Cir. 1978). As a result, a district court may determine whether a particular contract properly is characterized as a security based on allegations in the complaint, which are accepted as true for purposes of a Rule 12(b)(6) motion to dismiss. *See Sell v. Zions First Nation Bank*, No. CV 05 0684 PHX SRB, 2006 WL 322469, at *7 (D. Ariz. Feb. 9, 2006). Accepting Plaintiffs' allegations as true, it appears that the GICs are securities and thus that Defendants' alleged misrepresentations in connection with the sales of the GICs would have been actionable as securities fraud.

"Courts have consistently concluded that where a plaintiff alleges a "single scheme" and any predicate act is barred under the PSLRA, the entire RICO claim is precluded." *Perkumpulan*, 2014 WL 1047946, at *7. Accordingly, if any of the predicate acts alleged in the FAC are grounded in the GIC transactions, the RICO claim is subject to dismissal as barred by the PSLRA. Because the predicate acts are alleged entirely in general terms, it is difficult to determine whether any of them are based on the GICs. However, the Court concludes that the alleged predicate act of "[u]sing the U.S. mails and/or interstate wires to mislead regarding the matters alleged herein" does implicate the GICs, and therefore that the RICO claim is subject to dismissal.

Defendants contend that dismissal pursuant to the PSLRA should be without leave to amend on the basis that once Plaintiffs have alleged a single conspiracy involving a predicate act which implicates the PSLRA, Plaintiffs may not sanitize their RICO claim by omitting such predicate act. Plaintiffs contend that they can amend their pleading to demonstrate that the GICs are not securities, and thus that the GIC aspect of the RICO scheme does not trigger the PSLRA bar. Alternatively, Plaintiffs argue that they can state a claim under RICO based solely on the bond fraud, and that nothing in the case law precludes them from doing so. The Court finds that the parties have not devoted sufficient briefing to the latter issue, and therefore declines to address it at this time. Defendants may reassert the argument in the event that Plaintiffs seek to sanitize their RICO claim by omitting previously alleged predicate acts.

Accordingly, the motions to dismiss Claim 1 based on the PSLRA bar are GRANTED WITH LEAVE TO AMEND.

### 2. Statute of Limitations

Defendants assert that Plaintiffs' RICO claim is barred by the applicable four-year statute of limitations. *See Pincay v. Andrews*, 238 F.3d 1106, 1108 (9th Cir. 2001) ("The statute of limitations for civil RICO actions is four years."). Under the "injury discovery" rule followed in the Ninth Circuit, "the civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies his cause of action." *Id.* at 1109 (internal quotation marks and citation omitted). "Thus, the 'injury discovery' rule creates a disjunctive two-prong test of actual or constructive notice, under which the statute begins running under either prong." *Id.* "The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud." *Id.* at 1110 (internal quotation marks and citation omitted).

"Equitable tolling doctrines, including fraudulent concealment, apply in civil RICO cases." *Grimmett v. Brown*, 75 F.3d 506, 514 (9th Cir. 1996). "The doctrine is properly invoked only if a plaintiff establishes affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." *Pincay*, 238 F.3d at 1110 (internal quotation marks and citation omitted).

Plaintiffs' claims are based on conduct which began in 2002. FAC ¶ 9 ("Beginning with the Meade Project, which closed in 2002, and the Bragg Project, which closed in August 2003, Ray and GMAC began to use their position of trust and confidence to defraud, taking significant secret fees and profits."). Fifteen of the sixteen projects giving rise to this suit closed by 2008, and the last project, Fort Sill, closed in 2010. FAC ¶¶ 79-80. Defendants Ray and Jefferies allegedly arranged additional financing for the Fort Bliss project in 2012. FAC ¶ 26. However, Plaintiffs did not file suit until August 2017 – seven years after the last project closed and more than four years after the last financing transaction was completed. *See* Compl., ECF 1.

Plaintiffs allege that they did not discover Defendants' fraudulent conduct until 2016 and 2017, when the relevant facts were unearthed in the course of a related litigation between Ambac and Plaintiffs. FAC ¶ 29. Given the nature of the RICO claim, it is unclear why Plaintiffs could not have discovered the alleged fraud years earlier in the exercise of reasonable diligence. For

example, Plaintiffs allege that a major component of the RICO scheme was the "bond fraud," which was executed in part by misrepresenting to Plaintiffs that interest rates would be set at market when in fact the interest rates were set above market. FAC ¶¶ 22, 62, 107. However, market interest rates are transparent and thus could have been confirmed by Plaintiffs at any time. Plaintiffs allege that Defendants Ray and Marfatia lied when questioned about transactional issues, including whether GMAC and Jefferies were making a profit on the sale of bonds. FAC ¶ 29. The fact that Plaintiffs felt the need to question Defendants about those issues suggests that they suspected wrongdoing. Moreover, Plaintiffs allege that in 2005 the Army's real estate consultant, Jones Lang LaSalle, "began to observe that GMAC seemed partial to using Ambac for credit enhancement on its MHPI deals." FAC ¶ 21. The Fort Bliss Project responded by insisting that GMAC competitively bid out credit enhancement. *Id.* However, Plaintiffs do not allege that they undertook any investigation with respect to market rates or credit enhancement at that time or thereafter.

Plaintiffs argue that Defendants Ray, GMAC, and Jefferies were their fiduciaries and thus that Plaintiffs were entitled to rely on Defendants' representations and to expect full disclosure of all material facts. "In the context of loan participation agreements among sophisticated lending institutions . . . fiduciary relationships should not be inferred absent unequivocal contractual language." *First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Tr. Co.*, 919 F.2d 510, 514 (9th Cir. 1990). Plaintiffs neither attach such contracts to the FAC, nor allege the contents of such contracts with sufficient specificity to show that a fiduciary relationship was established. Plaintiffs instead allege in general terms that Ray and GMAC held themselves out to Plaintiffs as "trusted financial advisers" that "owed the Projects a fiduciary duty." *See, e.g.,* FAC ¶¶ 7-8. Those representations allegedly were made "[t]hrough written material sent to the Army Projects . . . and in verbal discussions." FAC ¶ 76. As the Court indicated at the hearing, such general allegations are insufficient to plead a fiduciary relationship. Plaintiffs thus cannot rely on the existence of such fiduciary relationships to explain their delay in bringing suit.

Having considered all of the allegations in the FAC and the relevant case law, the Court concludes that Plaintiffs have not alleged facts sufficient to show that they could not have

discovered Defendants' alleged fraud – and thus their alleged injury – until 2016 or 2017 as they claim.

Accordingly, the motions to dismiss Claim 1 based on statute of limitations are GRANTED WITH LEAVE TO AMEND.

### 3. Adequacy of Factual Allegations

Finally, Defendants argue that Plaintiffs have failed to allege the elements of their RICO claim with the heightened particularity required by Federal Rule of Civil Procedure 9(b). Rule 9(b) clearly applies to Plaintiffs' RICO claim. *See Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 541 (9th Cir. 1989) ("We have applied the particularity requirements of rule 9(b) to RICO claims."). "Rule 9(b) requires that the pleader state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Id.*

The Court discussed Plaintiffs' failure to satisfy those requirements at length during the hearing. For example, the Court noted that the predicate acts of mail and wire fraud are alleged in only the most general of terms, with no specificity regarding the identity of the parties who made the alleged misrepresentations using the mail or interstate wires, the content of such misrepresentations, or the time and place of such misrepresentations. *See* FAC ¶ 157. By way of illustration, one of the alleged predicate acts is: "Using interstate wires to communicate with S&P and potentially other ratings agencies, including about the 'shadow ratings' for the military housing projects." FAC ¶ 157(e). No facts are alleged as to which Defendant communicated with S&P, when the communication occurred, or what was communicated. At the hearing, Plaintiffs' counsel acknowledged the general nature of the predicate act allegations. Counsel explained that although Plaintiffs possess documents containing the details missing from the FAC, those documents were obtained pursuant to a protective order in another case which prevents Plaintiffs from including such details in their pleading in this case. After further colloquy with all counsel, the Court stated that it expected the parties to enter into an appropriate protective order in this case or otherwise resolve the issue so that Plaintiffs may plead their RICO claim adequately. Counsel indicated that they could resolve the issue.

Given the discussion on the record, the Court indicated that it would issue only a high level

ruling with respect to the adequacy of the RICO claim. The Court is satisfied that Plaintiffs have sufficient guidance to amend their RICO claim once the protective order issue is resolved. When drafting those amendments, Plaintiffs should allege facts showing what predicate acts each Defendant committed and how those acts injured each Plaintiff. *See Canyon Cty.*, 519 F.3d at 972 (reciting elements of primary RICO claim under 18 U.S.C. § 1962(c)). As discussed at the hearing, it is the Court's view that two predicate acts must be alleged by each Plaintiff as to each Defendant. Plaintiffs also should separate their claims asserted under §§ 1962(c) and (d), making clear which Defendants are alleged to be liable for primary RICO violations and which are alleged to be liable for conspiracy to commit such violations.

The motions to dismiss Claim 1 for failure to satisfy Rule 9(b) are GRANTED WITH LEAVE TO AMEND.

### C.    State Law Claims (Claims 2-6)

In addition to their sole federal claim under RICO, Plaintiffs assert state law claims for breach of fiduciary duty (Claim 2), aiding and abetting breach of fiduciary duty (Claim 3), intentional misrepresentation (Claim 4), fraudulent concealment (Claim 5), and conspiracy to commit fraud (Claim 6).

Absent a viable federal claim, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. "A district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (quoting 28 U.S.C. § 1367(c)(3) ). "'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Here, the case is still at the pleading stage. Under these circumstances, the Court perceives no reason to exercise supplemental jurisdiction over Plaintiffs' state law claims at this time, and it will dismiss the state law claims on that basis.

The Court also concludes that the state law claims suffer from a number of defects. Most

fundamentally, Plaintiffs do not allege which state laws apply. Defendants cannot be expected to defend claims absent identification of the governing laws. For purposes of the present motions, the Court assumes that California law applies. Under California law, all of the state claims are subject to three-year and four-year limitations periods. *See Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1479 (2014) ("The statute of limitations for breach of fiduciary duty is three years or four years, depending on whether the breach is fraudulent or nonfraudulent."); Cal. Civ. Proc. Code § 338(d) (three-year period for "[a]n action for relief on the ground of fraud or mistake"). As discussed above, Plaintiffs' claims are based on conduct that began in 2002, and they have not alleged facts sufficient to show that the limitations periods did not run before they filed suit. Under California law, "under the delayed discovery rule, a cause of action will not accrue until the plaintiff discovers or should have discovered, through the exercise of reasonable diligence, all the facts essential to the cause of action." *Prudential Home Mortg. Co. v. Superior Court*, 66 Cal. App. 4th 1236, 1246 (1998). "A defendant can be equitably estopped from asserting a statute of limitations defense if the plaintiff's "delay in commencing action is induced by the conduct of the defendant." *Atwater Elementary Sch. Dist. v. Cal. Dep't of Gen. Servs.*, 41 Cal. 4th 227, 232-33 (2007) (internal quotation marks and citations omitted). As discussed above in the context of the RICO claim, Plaintiffs have not alleged facts showing that they could not have discovered the alleged fraudulent scheme years earlier through the exercise of reasonable diligence.

With respect to the fiduciary duty claims, Plaintiffs have not alleged facts sufficient to show the existence of a fiduciary relationship. At the hearing, Plaintiffs' counsel represented that Plaintiffs could amend their complaint to plead the existence of fiduciary relationships. Finally, with respect to the fraud claims, Plaintiffs have not identified "the who, what, when, where, and how of the misconduct charged," as required under Rule 9(b). *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks and citation omitted).

Accordingly, the motions to dismiss Claims 2-6 for failure to state a claim are GRANTED WITH LEAVE TO AMEND.

**IV.    ORDER**

    (1)    The motions to dismiss under Rule 12(b)(2) for lack of personal jurisdiction are GRANTED WITH LEAVE TO AMEND, except that Defendant Ambac's Rule 12(b)(2) motion is DENIED IN PART *only* with respect to claims asserted by the Monterey Bay Plaintiffs.  As noted above, Defendants' challenge pursuant to *Bristol-Myers Squibb* has not been resolved and may be raised in a future motion, if appropriate.

    (2)    The motions to dismiss under Rule 12(b)(6) for failure to state a claim are GRANTED WITH LEAVE TO AMEND as to all Defendants and as to all claims;

    (3)    Any amended pleading shall be filed on or before September 17, 2018; and

    (4)    Leave to amend is limited to the deficiencies identified in this order – Plaintiffs may not add additional parties or claims without express leave of the Court.

Dated:  July 17, 2018

_____
BETH LABSON FREEMAN
United States District Judge