Michael P. Esser (SBN 268634)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: michael.esser@kirkland.com

Jeffrey L. Willian, P.C. (*pro hac vice*)
Donna M. Welch, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: jwillian@kirkland.com
Email: dwelch@kirkland.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| MONTEREY BAY MILITARY HOUSING, LLC, MONTEREY BAY LAND, LLC, MEADE COMMUNITIES LLC, FORT BLISS/WHITE SANDS MISSILE RANGE HOUSING LP, RILEY COMMUNITIES LLC, FORT LEAVENWORTH FRONTIER HERITAGE COMMUNITIES, I, LLC, FORT LEAVENWORTH FRONTIER HERITAGE COMMUNITIES, II, LLC, CARLISLE/ PICATINNY FAMILY HOUSING LP, BRAGG COMMUNITIES LLC, FORT DETRICK/WALTER REED ARMY MEDICAL CENTER LLC, PICERNE-FORT POLK FUNDING, LLC, RUCKER COMMUNITIES LLC, STEWART HUNTER HOUSING LLC, SILL HOUSING, LLC, AETC HOUSING LP, AMC WEST HOUSING LP, LACKLAND FAMILY HOUSING, LLC, and VANDENBERG HOUSING LP, | Case No. 5:17-cv-04992 |
| | **SECOND AMENDED COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| vs. | |
| AMBAC ASSURANCE CORPORATION, JEFFERIES MORTGAGE FINANCE, INC., JEFFERIES & COMPANY, INC., JEFFERIES LLC, JEFFERIES GROUP LLC, DANNY RAY, and CHETAN MARFATIA, | |
| Defendants. | |

# **TABLE OF CONTENTS**

**Page**

**INTRODUCTION**.................................................................................................3

**PARTIES** ............................................................................................................17

**JURISDICTION AND VENUE**.........................................................................21

**DETAILED ALLEGATIONS** ...........................................................................29

    I.     For More Than a Decade, Defendants Used the MHPI Program to Enrich Themselves To the Detriment of the Plaintiff Projects...........................................29

          A.     To win the MHPI financings over other competitors, Ray held himself and GMAC out and acted as a fiduciary financial advisor and agent.......31

          B.     Jefferies joins the conspiracy, assuming GMAC's role as financial advisor, agent, and fiduciary....................................................................45

          C.     Ambac represented that it would act in the Army Projects' best interests in connection with the rating agencies.......................................................47

    II.    GMAC and Ambac Systematically Misrepresented and Omitted Critical Facts to the Financial Detriment of the Projects. ............................................................49

          A.     Ambac and GMAC misrepresented and omitted that they had formed a collusive relationship in order to benefit each other at the Projects' expense....................................................................................................49

          B.     GMAC, and later Jefferies, ensured that the Projects paid inflated interest rates on their loans in order to make undisclosed profits..............51

          C.     GMAC and Ambac conspired to charge the Projects inflated expenses. ..68

          D.     Ray and Marfatia acted within the scope of their employment for the benefit of Ambac, GMAC, and Jefferies in carrying out the scheme........68

    III.   In Late 2016 Jefferies and Ray Further Conspire, Including With Ambac, to Spoliate Evidence and Conceal the RICO Proceeds Through a Fraudulent Transfer. ....................................................................................................69

**PRAYER FOR RELIEF**.....................................................................................85

## INTRODUCTION

1.      Pursuant to the Military Housing Privatization Initiative of 1996 ("MHPI"), Congress authorized the Department of Defense (including the United States Army and Air Force) to enter into agreements with private developers to modernize housing for military families on bases around the country.  The purpose of the MHPI Program was to develop long-term, safe, economical, and comfortable housing for the men and women of the Armed Forces and their families.  Plaintiffs are MHPI project entities (referred to herein as the "Projects"), each dedicated to one or more of the specified military bases.

2.      For the Army MHPI Projects, the Army and a private developer are partners, with the private developer partner managing the Project on a day-to-day basis.  Specifically, the Army MHPI Project Plaintiffs each involve one of four private developers—Balfour Beatty Communities, LLC (f/k/a GMH Military Housing headquartered in Pennsylvania) ("BBC"), Corvias Group, LLC (f/k/a Picerne Military Housing headquartered in Rhode Island) ("Corvias"), Clark Realty Capital, L.L.C. (headquartered in Virginia) ("Clark"), and Michaels Military Housing, LLC (headquartered in New Jersey) ("Michaels")—who in turn entered into a partnership with the Army.  The Army contributed the housing (pursuant to a 50-year Ground Lease) and additional equity, and in return, receives significant equity participation.  In addition, the Army has consent rights to major decisions regarding the Projects, including the terms of the initial financing at issue and whether to pursue litigation such as this Second Amended Complaint.

3.      For the Air Force MHPI Projects, the Air Force contracted with the private developer, contributed the housing (pursuant to a 50-year Ground Lease), provided a Government Direct Loan to the Project (except at the Vandenberg Project), and has the right to cash flows from the Project.  BBC is the private developer on each of the Air Force MHPI Projects referenced herein, and manages the Projects on a day-to-day basis.  The Air Force also has rights to consent to significant aspects of the Project and is consulted on whether to pursue litigation such as this Second Amended Complaint.

4.      These MHPI Projects collectively needed billions of dollars of long-term financing to undertake this massive development and construction.  Defendant Danny Ray ("Ray"), a former

Managing Director of GMAC Commercial Mortgage Corporation ("GMAC")[1] and its successors, and Defendant Chetan Marfatia ("Marfatia"), a former Managing Director of Defendant Ambac Assurance Corporation ("Ambac"), used the MHPI Projects as an opportunity to enrich themselves by committing repeated frauds and authorizing and directing breaches of fiduciary duty.  In or about 2002, GMAC and Ambac, through their respective managing partners Ray and Marfatia, formed a RICO enterprise to illegally profit on the financing of such transactions.

5.      At Ray's urging, GMAC was hired as a trusted Financial Advisor, the position expressly sought by Ray in writing, beginning in 2002.  For each successive Project, Ray capitalized on that fiduciary role, touted the financing that he had obtained for other Projects, and told other developers that he would do the same for them.  Ray represented that he and GMAC would put the interests of the MHPI Projects first when it came to developing an appropriate financial structure to finance the needed military housing.  While GMAC also served as the eventual lender to the Projects, its role under Ray's direction was not limited to being a traditional lender.  Instead, through the period from 2002 to 2012, Ray presented himself as a key member of each of the Projects he pitched, both before and after closing on the Project loans.  He repeatedly promised both orally (to the developers and the Army) and in writing to financially advise, and negotiate in, the Project's best interest, including to "███████████████████████████████████████████████████████████████████████████████████████████" and "to provide financial structuring advice . . . throughout the CDMP approval period and transition period."  Ray used this trusted financial advisor role to mislead the Projects and reap substantial undisclosed and inflated fees and profits, separate and apart from the disclosed fees made by GMAC as lender.

6.      Ray also used his position as trusted partner to recommend his co-conspirators Marfatia and Ambac to serve as long-term "█████████" to the Projects.  Beginning with the 2002 Meade Project in Maryland, and on each successive deal until the Bliss Project in Texas, Ray chose Ambac

---

[1]   In 2006, GMAC was sold in a leveraged buyout and later formed into Capmark.  In late 2009, Capmark went into bankruptcy, and its military housing servicing business—led by Ray—was sold to Defendant Jefferies Mortgage Finance, Inc.  Key personnel, including Ray, who along with Ambac devised the financing structures at issue herein, moved from GMAC to each of these successor entities.  GMAC and Capmark are collectively referred to as "GMAC" herein.

(then AAA-rated) to insure or "███████████" the loan (or on occasion the bonds or certificates syndicated by GMAC), which allowed GMAC to syndicate the loan provided to the Projects by selling bonds (also known as certificates) as AAA-rated.   Throughout the period from 2002-2005, Ray/GMAC and Marfatia/Ambac represented to the Projects' developers and the Army and its advisor Jones Lang LaSalle ("JLL") that they operated at arm's length, while in reality, as reflected in internal Ambac documents that were reviewed and approved by Marfatia's bosses, they operated as a self-described "████████" Unknown to the Projects, GMAC provided Ambac with an "exclusive right" to provide bond insurance and Ambac was thus able to charge in its own words "above market pricing." As described herein, GMAC and Ambac built on this exclusive and undisclosed relationship to aid and abet the other for years—charging the Monterey Project and other Plaintiff Projects hundreds of millions of dollars in inflated and undisclosed fees and profits.

7. In carrying out this pattern of racketeering, Ray and Marfatia (and through them, GMAC, Jefferies in the post-2009 time period, and Ambac) made numerous written (via interstate wires and the U.S. mails) and verbal misrepresentations and omissions to the Projects. As detailed below, these and other representations were made to BBC (including Chris Williams, Lou DeRogatis, Denise Hubley, Katie Richardson, and Rick Taylor), Clark (including Fran Coen, Greg Day, and Tad Guleserian), Corvias (including John Picerne, Chris Bicho, and Michael DeLaRosa), and Michaels (including John O'Donnell and Annie Eustice), as well as to the Army's advisors at JLL (including Barry Scribner and Jennifer Hill). The four private developers and the Army continued to rely on these representations at Ray's urging in connection with their later Projects, because he assured them that his and GMAC's role as financial advisor and trusted agent remained the same over time and that he and GMAC and later Jefferies were on their team and working in their best interest.

8. Based on these express representations, all of the Plaintiff Projects trusted that Ray and Marfatia would tell them the truth, disclose all material facts regarding the financing transactions, not make any secret profits or fees, and operate in the Projects' best interests. As detailed herein, as the risk of detection increased, Defendants changed the scheme in order not only to mask it, but to increase their secret profits over time. The scheme essentially had the following elements, all of which constituted a long-running pattern of racketeering.

9. **Ray, GMAC, and later Jefferies charged the Projects inflated interest rates and undisclosed profits on the Project loans.** As Managing Director of GMAC, Ray represented to each of the Projects that he and GMAC would serve as "███████████" and, among other duties, negotiate key documents, advise on the optimal financial structure, and obtain the best market rates for the Projects. Once Ray was hired into this role, GMAC also eventually served as a nominal lender, originating a long-term loan, often in the hundreds of millions of dollars, to fund the necessary housing renovation and construction on the individual bases. GMAC received a disclosed "███████████" for these services but rarely carried any loan as, in nearly all cases, it was pre-sold through bond syndication prior to closing. Ray specifically represented to the developers associated with each Project and to the Army that GMAC would act under his direction as a fiduciary and that he would use his "█████████" to negotiate the most competitive market rate and efficient financial structure.

10. In 2009, when Ray's MHPI business was purchased by Jefferies & Company, Inc., and in subsequent years, when he became employed by Jefferies LLC (all under the umbrella of parent company Jefferies Group LLC and collectively "Jefferies"), Ray and Jefferies, at his direction, continued to act as a financial advisor, and to assure the developers and the Army that his role (which he described in writing as financial advisor) remained the same. The Projects thus continued to view Ray and his employer as their trusted financial advisor and agent through at least 2012. Defendant Jefferies Mortgage Finance, Inc., which also served as a lender on the Sill and Bliss Projects, did purport to disclaim a financial advisor or fiduciary relationship role to Plaintiffs Sill Housing LLC in 2010 and Fort Bliss/White Sands Missile Range Housing LP in 2012. But this disclaimer by its express terms applied only to Jefferies Mortgage in its role as lender. It did not apply to Ray, his team, or the other Jefferies Defendants who interacted with the Projects and employed Ray.

11. Beginning with the Meade Project, which closed in 2002, and the Bragg Project, which closed in 2003, Ray and GMAC began to use their position of trust and confidence to defraud, taking secret profits. The scheme was not fully formed, however, until late 2002/2003 in connection with the Monterey Project, when Ray and GMAC first set the interest rate above market to include undisclosed profits in the form of an inflated "credit spread" (the difference between a bond's coupon rate or yield and an underlying benchmark rate). Ray and Marfatia continued this new element of the fraud, through

a variety of changing artifices and misrepresentations, at subsequent Plaintiff Projects.  A minor and undetected inflation in the interest rate above market, given the long-term nature of the loan, reaped substantial excess and immediate profits for GMAC, Ray, and later Jefferies when they syndicated the loan by selling bonds.

12.     As reflected in a 2004 JLL presentation to the United States Government Accountability Office, an arm of Congress, Ray represented to the Projects, the Army, and JLL that the credit spread was set based on the "risk premium required by investors."  In reality, beginning with the Monterey Project, prior to closing Ray and his team inflated the credit spread above market to allow GMAC to make tens of millions of dollars of undisclosed profits on the sale of the bonds, which were sold or committed prior to the close of the Projects' loans.  Through the sale of these bonds, Ray was able to immediately monetize the inflated credit spread for GMAC's and his own personal profit.  In sworn testimony, Ray admitted that these bond profits, of which he personally received approximately 40%, were never disclosed to the Projects.  To this day, the Monterey Project and subsequent Projects continue to suffer substantial harm in paying inflated interest rates on these long-term loans.

13.     The scheme devised by Ray and GMAC was dependent, in part, on protecting the purchasers of the bonds and ensuring that they got precisely what they paid for and thus would be incented to buy bonds in subsequent Projects.  Thus, by design, the purchasers of the bonds (including Ambac) were not harmed by the scheme in any way; they received full and accurate disclosures regarding the Projects and the interest rate being charged to the Projects, and continue to receive the full benefit of their bargain in the form of interest payments that are made by the Projects.  The deception was only directed at the Projects themselves, who were misled about when the bonds were sold (or committed) and the supposed market basis that formed the credit spread.

14.     Defendants Ray and GMAC concealed the fraud by repeatedly assuring the Projects that they were not making a profit on the sale of the bonds to third-party investors.  Nor was there available market data that would have allowed the Projects to detect the inflated credit spread, which made the Projects even more dependent on Ray's role as financial advisor given his duty to disclose and not make secret fees or profits (in contrast to a traditional investment bank).

15.     Ambac and Marfatia in turn aided and abetted Ray and GMAC in charging this inflated interest rate to the Projects.  Ambac began to directly participate in the GMAC scheme to profit on the sale of the bonds by buying some of the MHPI bonds (either directly or indirectly) at a premium to par.  Indeed, Ambac did so at the Monterey Project, and, in return for aiding GMAC's scheme by putting money directly in Ray's pocket, Ray and GMAC used Ambac almost exclusively in subsequent Projects, allowing Ambac to avoid competition and charge inflated credit enhancement fees as well.

16.     **Ambac, GMAC, Marfatia, and Ray manipulated the "shadow" ratings to the detriment of the Projects.**  Prior to the July 2005 Fort Bliss transaction, Ray and Marfatia represented to the Projects that they needed a rating from third-party rating agencies on the underlying proposed transaction before Ambac could provide credit enhancement.  Unlike other competitors, Ray and Marfatia insisted that the Projects obtain "shadow ratings" rather than a public rating that would have been subject to public scrutiny.  GMAC and Ambac used the resulting shadow rating as a basis to justify in part setting the inflated interest rates and the need for, and amount of, credit enhancement.

17.     Marfatia and Ray also specifically represented that they would attempt to obtain the highest or most favorable shadow rating from the rating agencies based on the transaction pro forma—which would have been in the Projects' best interests.  Instead, Ambac and GMAC, through Ray and Marfatia, rigged the rating system.  In or around October 2003, in a face-to-face meeting with S&P, Marfatia and his boss Bob Shoback instructed S&P (Chris Moriarty, among others) that none of the MHPI Projects involving Ambac credit enhancement should receive a shadow rating higher than an "A."  This artificial ratings cap, which S&P accepted as a matter of their procedure, enabled GMAC and Ambac to help mask the inflated charges and the overall supposed need to credit enhance the GMAC loan and/or bonds.  Notably, many MHPI Projects not involving GMAC/Ambac or these developers received ratings above an "A" and therefore did not require credit enhancement.  In contrast, consistent with the above instruction by Ambac and GMAC to S&P, after 2003 and at least before S&P's ratings criteria changed in August 2006, no joint GMAC/Ambac Project received a shadow or public rating above an "A."  The Ambac/GMAC imposed rating cap, which appeared to suggest a greater risk to the financial viability of the Projects, allowed GMAC and Ambac to charge excessive fees, rates, and other charges.

18.     **GMAC and Ambac conspired to charge the Projects for unnecessary and inflated surety and bond insurance fees and premiums.**  To maximize the ill-gotten fees that it received from the Projects, GMAC and Ambac, through Ray and initially Marfatia, falsely represented to the Projects (except the Fort Sill Army Project and the Lackland II Air Force Project) and JLL that in addition to bond insurance on the full amount of the loan, the rating agencies required the Projects to purchase a surety bond or cash fund a debt service reserve account in the amount of one year's principal and interest in order to receive a AAA rating.  In truth, in or about 2002, at least S&P had made clear to Marfatia and Ray that it did not require a surety or cash funding of the debt service reserve on a credit enhanced transaction in order to rate the loan or bonds as AAA.

19.     Ray and Marfatia did not disclose this rating agency instruction to the Projects and actively concealed that, in fact, S&P did not require surety bonds and instead only required 12 months total of any type of bond insurance (or cash funded liquidity).  Thus, Ambac and GMAC falsely insisted that at least S&P required that the Projects buy not only bond insurance for the full amount of the loan (or at times, the bonds), but also buy insurance on insurance—a surety bond representing one year's worth of liquidity protection—for a hefty fee.  As stated in Ambac's internal documents and emails, Marfatia and his bosses knew that the sureties it sold to the Projects "████████████████████████ ████████████████████" but that Ambac had taken "the view" with the Projects that the securities "were issued mainly to placate the rating agencies."   In short, Ambac/Marfatia and GMAC/Ray knew the sureties sold to the Projects were an unnecessary but fee-producing part of the overall financing transactions.

20.     **GMAC and Ambac charged the Projects for inflated deal expenses.**  The Projects agreed to pay the actual deal expenses of GMAC and Ambac (sometimes subject to a cap), but GMAC and Ambac often charged the Projects inflated expenses that exceeded their actual expenses, often by as much as hundreds of thousands of dollars.  To ensure that Ray maximized his approximately 40% cut of all GMAC profits on the MHPI Projects, he included the fictional expenses in calculations used with GMAC to determine his share of the profits.  Ambac knew that GMAC was charging inflated expenses and did the same.  In fact, in October 2008, Marfatia acknowledged in an email to his direct report Peter Hoffman that Ambac and GMAC would often "fudge" the expenses in the MHPI deals.

21.     **Ray and Marfatia concealed their companies' "exclusive" relationship, allowing them to perpetuate the fraud and charge above market rates.**  Ray recognized that Ambac was crucial to receiving their out-sized and illicit profits in connection with the interest rate charged to the Projects, including taking undisclosed profits on the sale of Project bonds.  As a result, Ray went to extraordinary lengths to maximize the credit enhancement fees that Ambac could charge the Projects and, through direct misrepresentations to the Projects, protected Ambac from competition from other mono-line bond insurers, including MBIA.  As an example, in 2006 on the Riley transaction, Ray emailed Marfatia and said he had decided to secretly give Ambac an "extra 4.56 bps" on the deal because it was "extra and [he] didn't want to give it back" to the Project.  This is only one of many examples of Ray paying off his co-conspirator at the expense of the Projects.

22.     Prior to the 2005 Bliss Project, Ray promised the developers for each of the Projects and JLL that he would use good faith and best efforts to negotiate credit enhancement fees with Ambac.  For example, in an August 2003 loan commitment letter, Ray represented to Clark that he and GMAC, consistent with their role as agent and financial advisor, would use "best efforts to negotiate the most favorable rates" for multiple items, including credit enhancement.  In truth, as he admitted in testimony in 2017, Ray engaged in no meaningful negotiation with Ambac and claimed to have returned so frequently to Ambac because they were "comfortable" and he "saw no need to change."  The relationship between Ray and Marfatia was so close that, as documented in emails exchanged between them in October 2006, Marfatia at times even gave Ray authority to charge the Projects Ambac's credit enhancement fee within a range of discretion.  In return, Ray gave Ambac an "exclusive right" to provide this unnecessary and overpriced financial product, thereby insulating Ambac from competition.  As touted in internal Ambac documents endorsed by Marfatia's boss, this "exclusive relationship" between GMAC and Ambac allowed Ambac to charge the Projects "above market" rates.

23.     **Defendants modified the RICO scheme and their misrepresentations over time to avoid detection.**  In late 2004, the Army's consultant, JLL, suggested that GMAC competitively bid out credit enhancement.  Marfatia emailed his boss that there could be "no worse news."  In response, Ray, Marfatia, and Ambac out of necessity retooled the scheme to convince the Projects that no credit enhancement was going to be involved in forthcoming deals, and thus there was no need to open the

1  transaction to Ambac's competitors.  In reality, as reflected in 2005/2006 email correspondence

2  between GMAC and Ambac, Defendants privately developed what they termed a "stealth structure,"

3  to help conceal and maintain the lucrative fraud schemes.

4  24.     Defendants' "stealth structure" had several integrated deceptive components.  First, as part of

5  the stealth structure, Ray represented to the Projects that GMAC would close the loan and then later

6  attempt to syndicate the loan post-closing thereby taking market risk.  In reality, Ray and GMAC, as

7  Ambac knew, intended to and did set the Projects' loan interest rate above market and sell the bonds

8  prior to close at a premium to par, reaping millions of dollars in undisclosed profits.  Second, the

9  stealth structure allowed Ray, Marfatia, and Ambac to secretly build a monthly fee for Ambac credit

10  enhancement into the loan interest rate.  Yet, Ray and Ambac failed to disclose the involvement of

11  Ambac prior to closing and failed to disclose that the Ambac fee was the result of a collusive

12  relationship between GMAC and Ambac.  Third, through written responses to requests for proposals,

13  including a proposal dated March 2005 to the Bliss Project sent via interstate wires, GMAC convinced

14  the Projects to purchase a Liquidity Facility from GMAC in lieu of a surety bond, representing it was

15  substantially cheaper.  In truth, without disclosure to the Projects, at a separate, simultaneous closing

16  that excluded the Projects, GMAC immediately assigned the Liquidity Facility to Ambac, which

17  issued a surety bond in lieu of the Liquidity Facility at approximately half the price of the Liquidity

18  Facility.  In emails sent throughout 2005-2007, Ray and Marfatia then secretly negotiated on how to

19  split the Liquidity Facility fee between the two companies even though GMAC took no market risk.

20  25.     In late 2009, Jefferies knowingly bought Ray's MHPI business to profit from the ongoing

21  scheme.  In the fall of 2009, Jefferies became interested in purchasing Ray's MHPI business and team

22  from Capmark, which was in financial distress.  In the due diligence process, Ray disclosed to Jefferies

23  the fraudulent nature of the MHPI financings.  In particular, Ray disclosed his role as financial advisor,

24  the secret "trading profits" on a hypothetical deal that were often 50% greater than the actual

25  origination fee, and the prospect for future MHPI business.  In fact, Jefferies internally recognized that

26  these MHPI transactions as constructed by Ray—involving the pre-sale of bonds and secret trading

27  profits generated by these sales—created essentially a riskless business.  The Jefferies business unit

28  that diligenced and eventually employed Ray's MHPI team, the Mortgage and Asset Backed Securities

Group (based in Connecticut), embraced Ray's bond-related scheme because it too accepted, practiced, and operated based on misleading bond trading practices. Indeed, after various criminal investigations that involved the very Jefferies executives who diligenced and approved of Ray's MHPI transactional practices, including the Sill MHPI transaction, in 2014 the United States Attorney for the District of Connecticut and other investigative agencies announced that "Jefferies' fixed income division repeatedly misled their own customers" and the upper Jefferies' management "encouraged the fraudulent conduct." In a non-prosecution agreement between Jefferies and the United States Attorney, Jefferies admitted, "Beginning in approximately 2009, on certain occasions, certain employees in Jefferies' Mortgage and Asset-Backed Securities Trading group fraudulently increased the profitability of certain RMBS trades for Jefferies in various ways," including through the use of "[e]lectronic communications with customers" and "[f]unds wired to and from Jefferies." Jefferies also admitted, "On certain occasions, certain members of Jefferies' management in the fixed income division became aware that Jefferies' employees were making misrepresentations to customers and did nothing to stop it." By 2012, however, there were no new MHPI transactions as discussed herein and, thus, Jefferies avoided government scrutiny of Ray's MHPI transactional business. In December 2009, knowing that Ray's fraudulent model fit well with Jefferies misleading bond practice, Jefferies approved and consummated the purchase of Ray's MHPI business from Capmark and willingly joined the conspiracy. With the knowledge and consent of those at Jefferies to whom Ray reported, including William Jennings (forced to leave Jefferies and suspended by FINRA for manipulative bond sale practices) and Johan Eveland (who left Jefferies after testifying at trial to manipulative bond sale practices), Ray continued his trusted role as financial advisor with the Projects and almost immediately began using Jefferies to perpetuate and continue the pattern of racketeering that he had previously directed. In early 2010, with respect to providing financing to Fort Sill, Ray and now Jefferies made over $5 million in secret trade profits on the pre-sale of the underlying bonds, through the use of an Original Issue Discount ("OID") on the loan.

26. As explained more fully herein, the OID allowed Ray to sell underlying MHPI bonds at a discount to par, yet still reap millions in undisclosed profits and convince the Project that Jefferies had sold the bonds after closing, thereby purportedly taking post-closing market and interest rate risk. In

reality, without disclosure to the Project, but with full disclosure and assurances to senior-ranking executives at Jefferies, Ray and Jefferies had presold the Sill bonds at a $5 million profit prior to closing based on the inflated credit spread that was masked in part by the OID, making the transaction essentially riskless for Jefferies.  As discussed above, the OID did not impact in any way the price paid by investors for the bonds, and did not result in any harm to investors.

27.     As the scheme to profit on the sale of bonds had evolved, Ray and GMAC used this OID scheme like the one at Sill to make secret profits on the bonds sold to many other MHPI Projects, including Plaintiff Army Projects Carlisle/Picatinny, Leavenworth, and Rucker, and on additional financing in 2007 at Bragg and the Air Force Projects, including AETC I, Vandenberg (located in California), AMC West (which provides housing for three Air Force bases, including Travis Air Force Base in California), and Lackland II.  At Ray's direction and as discussed in more detail herein, in 2006 and thereafter, Ray caused to be sent (via interstate wires) emails with false representations about the purpose and effect of the OIDs.

28.     By 2012, Ray and Jefferies knew that opportunities to commit such MHPI transactional frauds were diminishing.  By then, most of the housing on the Armed Forces' bases had been privatized and so what remained for Ray and Jefferies were additional financings at bases where Ray had initially committed fraud.  In 2011 and 2012, when the Bliss Project determined it needed an additional $140 million in debt to further increase the Armed Forces' housing scope at the Bliss Project—as approved by the Army—Ray and Jefferies saw this as one of the last opportunities to make outsized secret profits.  Pursuant to the 2012 Bliss $140 million financing, Ray and Jefferies reaped greater secret profits (on a percentage basis)—all locked in prior to closing on the secret pre-sale of bonds— than on any other of the referenced MHPI Project transactions.  As discussed below, Ray and Jefferies also used this as an opportunity to mislead the developers and JLL again through emails in the face of direct questions regarding the OID, including by misrepresenting its purpose and necessity for obtaining financing and protecting the lender.

29.     As part of the 2005 fraudulent Bliss transaction, Ray secured for GMAC a right of first refusal (a right now owned by Jefferies) to issue any additional debt needed by the Bliss Project.  Ray and Jefferies assured the Bliss Project that the 2012 loan from Jefferies Mortgage was at market rate.  In

truth, Ray and Jefferies had secret pre-commitments from investors to buy the debt at 8% above par—reflecting a significantly inflated interest rate on the loan.  In fact, as documented in November 2012 emails, the excess interest rate that Jefferies Mortgage charged the Bliss Project was so significant that Ray and Jefferies carved out a separate and undisclosed Interest Only strip at 0.576% and separately securitized it in the form of a bond.

30.     As Ambac's consent was required for this transaction, in November 2012, Ray communicated to Ambac via email (specifically, Gary Greendale ("Greendale")) that he had pre-sold the bonds prior to closing and needed prompt Ambac consent for the transaction.  Ambac, as a co-conspirator who had received an inflated credit enhancement fee on the 2005 Bliss transaction and also had approval rights over the issuance of additional debt, readily consented to the fraudulent transaction.  Thus, on the last fraudulent MHPI transaction, not only did Ray and Jefferies reap extraordinary undisclosed profits on the sale of the bonds, but Ambac consented to the transaction in its long-held role as co-conspirator.

31.     **Defendants conspired to conceal their fraudulent scheme from the Projects.**  Defendants have gone to extraordinary lengths to fraudulently conceal the above scheme and pattern of racketeering from the Projects.  As detailed herein, Defendants directly misled each of the Projects verbally and in writing.  Indeed, in 2010 and 2011, when BBC and Corvias, and the Army's consultant JLL questioned Ray and Marfatia directly about the financial structure of the Projects, including about the OID and whether GMAC/Jefferies were making a profit on the sale of bonds, Ray and his team directly misled in emails sent via interstate wires, and concealed key facts to ensure that they would not unravel the components of the scheme.  Ray and Jefferies confirmed that they were not taking profits on these MHPI deals and also assured the developers and JLL that they were doing these deals just as they had done all of the prior deals—that is, without taking undisclosed profits.  The developers and JLL were ultimately satisfied with these email assurances, made by their trusted financial advisor and agent in response to direct questioning.

32.     It was not until late 2016 that the Projects began to learn that they had been severely misled and harmed by Defendants based on facts unearthed during related litigation ("Debt Service Reserve

Litigation") between Ambac and the Projects.[2]  In 2016 and 2017, after they received subpoenas in the Debt Service Reserve Litigation, Jefferies and Ray misled a California state court about the existence of MHPI transactional documents.  Worse, Jefferies and Ray attempted to cover up through direct misrepresentations and false testimony that Ray had made efforts to destroy over 9,100 MHPI documents in the custody of Jefferies that bear on these issues within days and even hours after receiving a subpoena from the Monterey Plaintiffs.  In March 2016, after receiving a document subpoena from the Monterey Project for MHPI-related documents, Ray consulted with Jefferies in-house counsel Vicki Andreadis regarding the subpoena.  In response, Jefferies issued no "hold notice" as standard practice would have required.  Instead, within hours of this in-house consultation, on March 17, 2016, Ray went on Jefferies' database and, over the next several weeks, manually deleted over 9,100 MHPI-related documents.  Other evidence indicates the further potential for massive deletions of relevant documents by Jefferies and Ray.  Recognizing the potential detection of his long-running scheme to harm the MHPI Projects, approximately four hours after deleting the last of the 9,100 MHPI-subpoenaed documents on Jefferies' servers, on April 8, 2016, Ray and Jefferies announced to MHPI representatives via email that Ray had quit Jefferies and the MHPI business altogether.  By engaging in these deletions and making this retirement announcement, Ray and Jefferies hoped to cover their tracks and simultaneously lessen the MHPI Projects' interest in pursuing serious inquiry or action into the potential discovery of the long-running fraud perpetrated by Ray and Jefferies.

33.    When it learned of this destruction by Ray, abetted by Jefferies, the California state court observed this conduct was "highly disturbing" and issued an order (the "Forensic Order") for further and detailed forensic investigation and document and third-party conducted data review of Jefferies' systems and documents.  As of this filing, Jefferies has failed to comply with the California state

---

[2]    In late 2015, Ambac initiated multiple lawsuits against the MHPI Projects claiming a requirement to cash fund collectively over $200 million in debt service reserve accounts—money that would act as a major buffer to Ambac's insurance in the event of Project default.  After numerous adverse rulings on discovery and the merits, including granting multiple summary judgment motions for the Projects, Ambac conceded its claim lacked any merit and settled by dismissing such claims with prejudice for all 12 MHPI Projects, agreeing to limit Ambac's consent rights and making a cash settlement payment to the Projects.

court's Forensic Order due to Ambac's sudden concession of judgment in Monterey by waiving defenses that it had stood by throughout the case, and Jefferies and Ray have subsequently refused to confirm that they have preserved—and continue to preserve—documents subject to the Forensic Order.  Thus, Plaintiffs believe and allege that there likely has been a determined and successful effort by certain Defendants including Ray and Jefferies to destroy pertinent evidence.

34.      Thus, this likely destruction of documents has led to potential evidence gaps.  For example, 2009 Jefferies emails confirm that Ray and his team's past emails while at GMAC were transferred and stored at Jefferies.  Indeed, Jefferies actually purchased these prior communications as part of the purchase of the MHPI business from Capmark.  Yet, in conjunction with various misrepresentations to the California state court, Jefferies repeatedly claimed that it could not locate such documents even though they were unmistakably transferred to Jefferies.  The status of these documents remains unknown and subject to further discovery.

35.      **Defendants' actions constitute classic racketeering.**  The above fraudulent and long-running scheme, implemented through the use of the U.S. mails and interstate wires including emails, constituted a classic, long-running RICO enterprise that accomplished its fraudulent goals through a continuous pattern of racketeering activity.  The RICO enterprise included at least Ambac, Jefferies, GMAC (not sued in this action given their bankruptcy), Ray, and Marfatia.  As co-conspirators, Jefferies, Ambac, Ray, and Marfatia are jointly and severally liable for the acts of each other.  The damage that their RICO enterprise has caused the Projects is in the hundreds of millions of dollars and, as noted herein, the damage is ongoing and continues to this day.  Such damage is subject to trebling under RICO, and Defendants are liable for all reasonable attorney fees and subject to punitive damages.  In addition, as dishonest fiduciaries, Defendants must disgorge the significant profits and fees received in these transactions, both disclosed and undisclosed, including the fees that Jefferies received from the Projects for acting as Servicer.

36.      The Army (as the Designated Member and beneficial owner of each of the respective Army MHPI Project entity Plaintiffs) and Air Force (as beneficial owner of each of the respective Air Force MHPI Project entity Plaintiffs) have authorized the prosecution of, and funding to pursue, these claims.

1

## PARTIES

2  **Plaintiffs**

3  37.    Plaintiff Monterey Bay Military Housing, LLC is a Delaware limited liability company with

4  an address at 4401 Wilson Boulevard, Suite 600, Arlington, VA 22203.  Monterey Bay Military

5  Housing, LLC's principal place of business is at 328 Hatten Road, Seaside, CA 93955.

6  38.    Plaintiff Monterey Bay Land, LLC is a Delaware limited liability company with an address at

7  4401 Wilson Boulevard, Suite 600, Arlington, VA 22203.  This entity, along with Plaintiff Monterey

8  Bay Military Housing, LLC, operates the privatized military housing project located at the Presidio of

9  Monterey and Naval Post-Graduate School located in Monterey, California.

10  39.    Plaintiff Fort Bliss/White Sands Missile Range Housing LP is a Delaware limited partnership

11  with an address at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern,

12  PA 19355.  This entity operates the private military housing project located at Fort Bliss, Texas and

13  the White Sands Missile Range in New Mexico.

14  40.    Plaintiff Carlisle/Picatinny Family Housing LP is a Delaware limited partnership with an

15  address at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern, PA

16  19355.  This entity operates the privatized military housing project located at the Carlisle Barracks in

17  Pennsylvania and the Picatinny Arsenal in New Jersey.

18  41.    Plaintiff Stewart Hunter Housing LLC is a Delaware limited liability company with an address

19  at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern, PA 19355.  This

20  entity operates the privatized military housing project located at Fort Stewart and Hunt Army Airfield

21  in Georgia.

22  42.    Plaintiff Fort Leavenworth Frontier Heritage Communities, I, LLC is a Kansas limited liability

23  company with an address at 222 Hancock Avenue, Fort Leavenworth, KS 66027.

24  43.    Plaintiff Fort Leavenworth Frontier Communities, II, LLC is a Kansas limited liability

25  company with an address at 222 Hancock Avenue, Fort Leavenworth, KS 66027.  This entity, along

26  with Plaintiff Fort Leavenworth Frontier Heritage Communities, I, LLC operates the private military

27  housing project located at Fort Leavenworth, Kansas.

28

44.     Plaintiff Meade Communities LLC is a Delaware limited liability company with its principal place of business at 3080 Ernie Pyle Street, Fort Meade, Maryland 20755.

45.     Plaintiff Riley Communities LLC is a Kansas limited liability company with an address at 45 Barry Avenue, Fort Riley, KS 66442.  This entity operates the private military housing project located at Fort Riley, Kansas.

46.     Plaintiff Bragg Communities LLC is a Delaware limited liability company with an address at 160 Mine Lake Court, Suite 200, Raleigh, NC 27615.  This entity operates the private military housing project located at Fort Bragg, North Carolina.

47.     Plaintiff Fort Detrick/Walter Reed Army Medical Center LLC is a Delaware limited liability company with an address at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern, PA 19355.  This entity operates the privatized military housing project located at Fort Detrick, Maryland and the Walter Reed Army Medical Center in Maryland.

48.     Plaintiff Picerne Fort Polk Funding LLC is a Delaware limited liability company with an address at 1405 South County Trail, Suite 530, East Greenwich, RI 02818.  This entity operates the private military housing project located at Fort Polk, Louisiana pursuant to a sublease from Plaintiff Polk Communities LLC.

49.     Plaintiff Rucker Communities LLC is a Delaware limited liability company with an address at 2908 Andrews Avenue, Fort Rucker, AL 36362.  This entity operates the private military housing project located at Fort Rucker, Alabama.

50.     Plaintiff Sill Housing, LLC is a Delaware limited liability company with an address at 6949 Post Road, Suite 300, North Kingstown, RI 02852.  This entity operates the private military housing project located at Fort Sill, Oklahoma.

51.     Plaintiff AETC Housing LP is a Delaware limited partnership with an address at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern, PA 19355.  This entity operates as one privatized military housing project at four Air Force bases located at:  Altus Air Force Base in Altus, Oklahoma; Luke Air Force Base in Glendale, Arizona; Sheppard Air Force Base in Wichita Falls, Texas; and Tyndall Air Force Base in Panama City, Florida.

52.    Plaintiff AMC West Housing LP is a Delaware limited partnership with an address at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern, PA 19355.  This entity operates as one privatized military housing project at three Air Force bases located at: Fairchild Air Force Base, Spokane County, Washington, Tinker Air Force Base, Oklahoma County, Oklahoma, and Travis Air Force Base, Solano County, California.

53.    Plaintiff Lackland Family Housing, LLC is a Delaware limited liability company with an address at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern, PA 19355.  This entity operates the privatized military housing project located at Lackland Air Force Base, in Bexar County, Texas.

54.    Plaintiff Vandenberg Housing LP is a Delaware limited partnership with an address at c/o Balfour Beatty Communities, LLC, 1 Country View Road, Suite 100, Malvern, PA 19355.  This entity operates the privatized military housing project located at Vandenberg Air Force Base, in Santa Barbara County, California.

**Defendants**

55.    Defendant Ambac Assurance Corporation is an insurance company formed under the laws of the state of Wisconsin, with its principal place of business at One State Street Plaza, New York, New York 10004.  Ambac has conceded it is subject to personal jurisdiction in this Court.

56.    Defendant Jefferies Mortgage Finance, Inc. was a Delaware corporation with its principal place of business at 520 Madison Avenue, 16th Floor, New York, New York 10022.  Two days after a California state court issued an order granting the Monterey Plaintiffs' motion to compel Jefferies Mortgage to produce evidence that revealed its involvement with Ray in attempting to destroy the 9,100 documents, the Jefferies Defendants attempted to dissolve Jefferies Mortgage on February 8, 2017.  Jefferies Mortgage served as the lender for the 2010 Sill and 2012 Bliss transactions.  Jefferies Mortgage Finance, Inc. is subject to personal jurisdiction in this Court because, during all relevant times, Jefferies Mortgage Finance, Inc. conducted business in California and maintained a registered agent in California, and this suit arises out of Jefferies Mortgage Finance, Inc.'s contacts with California.

57.     Defendant Jefferies & Co., Inc. was a Delaware corporation with its principal place of business at 520 Madison Ave, 16th Floor, New York, New York 10022.  Jefferies & Co., Inc. merged and became Jefferies LLC in 2013.  Prior to its merger with Jefferies LLC, Jefferies & Co., Inc. employed Ray and his team and served as placement agent and financial advisor on the 2010 Sill and 2012 Bliss transactions.  Jefferies & Co. is subject to personal jurisdiction in this Court because, during all relevant times, Jefferies & Co. conducted business in California and maintained a registered agent in California, and because this suit arises out of Jefferies & Co.'s contacts with California.

58.     Defendant Jefferies Group LLC is a Delaware limited liability company with its principal place of business at 520 Madison Avenue, 16th Floor, New York, New York 10022.  It was Jefferies Mortgage's ultimate parent company at the time of Jefferies Mortgage's dissolution, and Jefferies Group LLC received a distribution of Jefferies Mortgage's assets following Jefferies Mortgage's dissolution.  Jefferies Group LLC is subject to personal jurisdiction in this State because it continues to conduct business and transact its affairs in the state of California and has a registered agent within the state of California, and because this suit arises out of Jefferies Group LLC's contacts with California.

59.     Defendant Jefferies LLC is a Delaware limited liability company with its principal place of business at 520 Madison Avenue, 16th Floor, New York, New York 10022.  After its merger with Jefferies & Co., Inc., Jefferies LLC employed Ray and his team.  Jefferies LLC is subject to personal jurisdiction in this State because it continues to conduct business and transact its affairs in the state of California and has a registered agent within the state of California, and because this suit arises out of Jefferies LLC's contacts with California.

60.     Defendant Ray is a natural person and resident of South Carolina residing at 732 Prince Street, Georgetown, South Carolina 29585.  Ray is subject to personal jurisdiction in this Court because Ray committed intentional acts purposefully directed at and causing harm to the Monterey, Vandenberg, and AMC West (which includes Travis Air Force Base) Projects in California.  This suit arises, in part, out of Ray's contacts with California.

61.     Defendant Marfatia is a natural person and resident of New York residing at 13 Horton Court, West Harrison, New York 10604.  Marfatia is subject to personal jurisdiction in this Court because he

committed intentional acts purposefully directed at and causing harm to the Monterey, Vandenberg, and AMC West (which includes Travis Air Force Base) Projects in California.  This suit arises, in part, out of Marfatia's contacts with California.

## JURISDICTION AND VENUE

**The Defendants Are Subject To Jurisdiction Under 18 U.S.C. § 1965(b).**

62.      18 U.S.C. § 1965(a) permits a district court to exercise jurisdiction over a defendant in a RICO action in "any district in which such person resides, is found, has an agent, or transacts his affairs." For other defendants, 18 U.S.C. § 1965(b) provides where "it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by marshal thereof."  As interpreted by the Ninth Circuit, the "ends of justice" test under § 1965(b) is satisfied where this court has jurisdiction over at least one defendant under § 1965(a) or a state long-arm statute and there is no other court that would have jurisdiction over all of the defendants.

63.      Here, the ends of justice test of § 1965(b) is satisfied because the Court has jurisdiction under § 1965(a) and the California long-arm statute over Defendants Ambac, Jefferies Mortgage, Jefferies & Company, Inc., Jefferies LLC, and Jefferies Group LLC (collectively "Jefferies"), Ray, and Marfatia. There is no other district in the country that would have jurisdiction over all Defendants as Ray is not subject to jurisdiction in New York.

**The Defendants Are Subject to Jurisdiction In California Under § 1965(a) and the Long-Arm Statute.**

64.      This Court has personal jurisdiction under § 1965(a) and the California long-arm statute over Defendant Ambac because it regularly conducts business in the state of California, has a registered agent within the state of California, transacts its affairs within the state of California, and has availed itself of the benefits of doing business in the state of California.  Moreover, Ambac has admitted that it is subject to personal jurisdiction in this Court with respect to at least one Plaintiff.  (Dkt. No. 86, 11/30/17 Hr'g Tr. at 9:11–12 ("[Counsel for Ambac]: Well, certainly for our client, we believe—we conceded there would be jurisdiction.").)  These facts are sufficient to establish personal jurisdiction

over Ambac pursuant to 18 U.S.C. § 1965(a) and the California long-arm statute.  Furthermore, the subject matter of this dispute arises, in part, out of Ambac's contacts within the state of California. Ambac committed intentional torts, including numerous instances of breach of fiduciary duty, fraud and violations of RICO, purposefully directed at and causing harm to the Monterey and Vandenberg Projects in California and to the AMC West Project, which provides housing to three Air Force bases, including Travis Air Force Base in California.

65.    As detailed above, while Defendants engaged in multiple misrepresentations and took hidden fees and profits with respect to the Meade and Bragg Projects, the fraud scheme was not fully formed until Defendants began to take hidden profits on the pre-sale of the bonds.  This first occurred at the Monterey Project in 2003 and was the fraud model used thereafter.  Without the trust gained through the financing of early Projects including the Monterey Project, Defendants would not have been able to carry out their fraudulent scheme against other Projects located both in and outside of California. Jurisdiction is therefore appropriate over Ambac pursuant to 18 U.S.C. § 1965(a), California Code of Civil Procedure section 410.10, and the Fifth and Fourteenth Amendments of the United States Constitution.

66.    This Court has personal jurisdiction over Jefferies because the subject matter of this dispute arises, in part, out of Jefferies' contacts within the state of California.  Defendants Jefferies Mortgage, Jefferies & Company, Inc., Jefferies LLC, and Jefferies Group LLC (collectively "Jefferies"). Additionally, each of the Jefferies entities regularly conducted business and transacted their affairs in the state of California and had a registered agent in the state of California during all relevant time periods.  Further, Jefferies conducted business in California following its purchase of the MHPI loan servicing business in 2009, after which time Jefferies acted as the servicer for the Monterey Project. And once Ray became Managing Director of the Jefferies entities, continuing to hold himself out as the Projects' trusted financial advisor and agent, Defendants continued the same pattern of racketeering activity and continued to act, as alleged herein.  Moreover, Jefferies directed additional tortious acts, in furtherance of this conspiracy, towards California, including Jefferies' substantial deletion of documents during litigation between the Monterey Project and Jefferies in California state court.  Furthermore, the subject matter of this dispute arises in part out of Jefferies' contacts within

the state of California.  These facts, demonstrating Jefferies' purposeful availing of doing business in California, are sufficient to establish personal jurisdiction over each of the Jefferies entities pursuant to 18 U.S.C. § 1965(a) and the California long-arm statute.  Jurisdiction is therefore appropriate over Jefferies pursuant to 18 U.S.C. § 1965(a), California Code of Civil Procedure section 410.10, and the Fifth and Fourteenth Amendments of the United States Constitution.

67.     This Court has personal jurisdiction over Defendant Ray because the subject matter of this dispute arises, in part, out of Ray's contacts within the state of California.  Ray committed intentional torts, including numerous instances of breach of fiduciary duty, fraud and violations of RICO, purposefully directed at and causing harm to the Monterey, Vandenberg, and AMC West Project (which includes Travis Air Force Base) in California.  Additionally, in 2003, Ray traveled to California in connection with the scheme to defraud the Monterey Project.  As detailed above, while Defendants engaged in multiple misrepresentations and took hidden fees and profits with respect to the Meade and Bragg Projects, they added the centerpiece of the fraud—taking hidden profits on the pre-sale of the bonds—with the Monterey Project in 2003.  Furthermore, the subject matter of this dispute arises, in part, out of Ray's contacts within the state of California.  The Monterey fraud model was the basic model used thereafter to engage in the subsequent pattern of racketeering alleged herein.  Without the trust gained through the financing of early Projects including the Monterey Project, Defendants would not have been able to carry out their fraudulent scheme against other Projects located outside of California.  Jurisdiction is therefore appropriate over Defendant Ray pursuant to 18 U.S.C. § 1965(a), California Code of Civil Procedure section 410.10, and the Fifth and Fourteenth Amendments of the United States Constitution.

68.     This Court has personal jurisdiction over Defendant Marfatia because the subject matter of this dispute arises, in part, out of this party's contacts with the state of California.  Marfatia committed intentional torts, including numerous instances of breach of fiduciary duty, fraud and violations of RICO, purposefully directed at and causing harm to the Monterey, Vandenberg, and AMC West (which includes Travis Air Force Base) Projects in California.  Additionally, in 2003, Marfatia traveled to California in connection with the schemes to defraud the Projects and in an effort to further the scheme to defraud the Monterey Project.  As detailed above, while Defendants engaged in multiple

misrepresentations and took hidden fees and profits with respect to the Meade and Bragg Projects, they added the centerpiece of the fraud—beginning to take hidden profits on the pre-sale of the bonds—with the Monterey Project in 2003.  Furthermore, the subject matter of this dispute arises in part out of Marfatia's contacts within the state of California.  The Monterey fraud model was the basic pre-fraud model used thereafter.  Without the trust gained through the financing of early Projects including the Monterey Project, Defendants would not have been able to carry out their fraudulent scheme against other Projects located outside of California.  Jurisdiction is therefore appropriate over Defendant Marfatia pursuant to 18 U.S.C. § 1965(a), California Code of Civil Procedure section 410.10, and the Fifth and Fourteenth Amendments of the United States Constitution.

**Ray is Not Subject to Jurisdiction in New York.**

69.     Jurisdiction over the Defendants is appropriate under § 1965(b) because there is no Defendant, including Ray, who is subject to jurisdiction in New York.  Ray resides in and is domiciled in South Carolina. While Ray previously submitted an affidavit to this Court claiming without specifics that "on occasion" he would travel to and work from New York, this testimony does not establish jurisdiction over Ray in New York for purposes of this action, as has since been confirmed by jurisdictional discovery. Ray's prior affidavit itself did not state that he did any work on the MHPI Projects from New York.  Regardless, no affidavit from Ray, including this or any future affidavit Ray may offer to avoid this Court's jurisdiction can be relied upon absent objective confirmation given his past perjury and documented efforts to destroy evidence.  Not only has Ray made clear his willingness to illegally delete documents after receiving a duly-issued subpoena, but he also was willing to perjure himself about these deletions.  In his deposition, Ray first testified "I did not" delete any documents, but when confronted with Access Logs, admitted to deleting over 9,100 documents after receiving a subpoena requesting such documents.

70.     More specifically with respect to New York's lack of jurisdiction over Ray regarding the subject matter of this complaint, despite the production of hundreds of thousands of transactional documents and emails, not a single one reflects that Ray made a relevant communication to the Projects—much less a misrepresentation or omission—from New York.  In fact, among the many interactions between Ray and Plaintiffs, including on all facets of the transactions described herein,

1    not once did Plaintiffs meet with Ray in New York, close a transaction in New York, call Ray in New

2    York, or receive a communication from Ray in New York.  Thus, Plaintiffs do not believe, nor is there

3    any basis to allege, that Ray substantively worked on MHPI business related to the allegations in this

4    complaint from New York.

5    71.    Jurisdictional discovery, which Ray resisted, has further confirmed that New York does not

6    have jurisdiction over Ray related to this complaint.  In 2009, when Ray moved to Jefferies, he

7    repeatedly confirmed in writing that he and his MHPI business had only two offices—located in

8    Colorado and Chicago. For example, in October 2009, in connection with Jefferies' purchase of Ray's

9    MHPI unit, Ray provided Jefferies a listing of the individuals in his "███████████████" and his

10   "███████████" Jefferies then coordinated with Ray to have computers shipped to the

11   respective sites, including to "███████████" where Ray resided and would, when not in

12   Denver, manage his teams.  On December 11, 2009, Ray and Jefferies announced the purchase of

13   Ray's MHPI unit from Capmark, and expressed, both internally and externally, that Ray was "███

14   ███████" that the "█████████████████████████████

15   █████████████████████████████████████" Ray

16   then listed his direct and mobile phone numbers, each of which began with a 303 area code specific to

17   the location in and around Denver, Colorado.  Indeed, all team members listed either 303 or 720 area

18   codes (both associated with Denver, Colorado) for both their direct and mobile phone numbers.  Ray

19   never provided office information for him or his team in New York, nor did he ever provide New York

20   contact information for him or his team, no doubt because they were working as they had represented

21   they would do from Colorado and South Carolina.

22   72.    New York has stringent tax laws that require any person, particularly an employee of a

23   New York-based company such as Jefferies, to record and report income tax for the days that an

24   employee is physically in New York working.  *See* N.Y. Tax Law § 601 (imposing tax on nonresident

25   for taxable income obtained from "sources" in New York); N.Y. Tax Law § 631(b)(1)(B) (defining

26   income attributable to New York sources to include "a business, trade, profession or occupation

27   carried on in" New York); N.Y. Comp. Codes R. & Regs. tit. 20, § 132.4 ("The New York adjusted

28   gross income of a nonresident individual rendering personal services as an employee includes the

compensation for personal services entering into his Federal adjusted gross income, but only if, and to the extent that, his services were rendered within New York State. . . . If personal services are performed within New York State, whether or not as an employee, the compensation for such services includible in Federal adjusted gross income constitutes income from New York State sources."); N.Y. Comp. Codes R. & Regs. tit. 20, § 132.18 ("If a nonresident employee [] performs services for his employer both within and without New York State, his income derived from New York State sources includes that proportion of his total compensation for services rendered as an employee which the total number of working days employed within New York State bears to the total number of working days employed both within and without New York State."). Plaintiffs served discovery on Ray, requesting that he produce his "New York state tax filings from 2001 to present" and documents related to his "allocation of tax payments or tax liability attributed to working in New York State from January 1, 2001 to present." Ray resisted responding to this discovery, filing an unsuccessful motion for a protective order and an unsuccessful appeal of the order requiring him to answer the discovery requests. Ultimately, Ray was forced to admit that he had paid no taxes in New York during the years 2002-2012—the relevant time period that he worked on the MHPI transactions as alleged herein. Thus, the fact that Ray, a sophisticated and wealthy businessman, did not pay New York taxes during the period from 2002-2012 in which he performed work related to the MHPI Projects further confirms the contemporaneous documentation and observations of the Projects that Ray was not engaged in complaint-related activities in New York. Accordingly, Ray is not subject to New York's long-arm statute for the acts and omissions described in this lawsuit. The ends of justice test is therefore satisfied and jurisdiction exists in this district over all Defendants under § 1965(b).

**All Defendants Are Subject to California's Long-Arm Statute.**

73. Even if Ray were subject to jurisdiction in New York (and thus the ends of justice test is not satisfied), jurisdiction still exists in this district because each of the Defendants is subject to jurisdiction under the California long-arm statute.

74. The California long-arm statute supplies jurisdiction to the full extent permitted by the United States Constitution. Specific personal jurisdiction exists when: (1) the nonresident defendant has personally availed himself of the privilege of conducting activities in the form by some affirmative act

or conduct; (2) the claims at issue arise out of or result from the defendant's forum-related activities; and (3) exercise of jurisdiction is reasonable. In determining whether the defendant has personally availed himself, the court considers whether the defendant committed an intentional act, expressly aimed at the forum state, which caused harm that the defendant knew was likely to be suffered in the forum state. Here, the actions of Ambac, Jefferies, Ray, and Marfatia establish that this test is satisfied.

75.     As recounted above, Ambac is subject to specific jurisdiction in California as it directed substantial activity at California, through its involvement with the Monterey Project, and has in fact admitted that it is subject to personal jurisdiction in this suit, at least with respect to the claims by the Monterey Project.

76.     As recounted above, Jefferies is subject to specific jurisdiction in California as it directed numerous acts at California, including in acting as servicer for the Monterey Project after purchasing the MHPI Servicing business, through its substantial deletion of documents in the litigation between the Monterey Project and Ambac, and Jefferies' maintenance of an agent for service of process in California.

77.     As recounted above, Ray is subject to specific jurisdiction in California as he directed specific misrepresentations at several California-based Projects, most notably the Monterey Project, and traveled to California for the purpose of perpetrating the fraudulent scheme, which Ray knew would cause harm to the Projects located in California.

78.     As recounted above, Marfatia is subject to specific jurisdiction in California as Marfatia directed specific misrepresentations at several California-based Projects, most notably the Monterey Project, and traveled to California for the purpose of perpetrating the fraudulent scheme, which Marfatia knew would cause harm to the Projects located in California.

79.     For each of these Defendants, the exercise of jurisdiction in California is not unreasonable. Each of these Defendants engaged in at least one substantial transaction directed specifically at an MHPI Project located in California, and used the same fraudulent scheme developed in California against the other MHPI Project Plaintiffs. These Defendants could be expected to be haled into court in California given their business transactions directed at the state, and therefore exercising jurisdiction over these Defendants for these actions is reasonable.

**The Seminal Fraud Blueprint Was Developed in California.**

80.     The connections to California through the Monterey Project are particularly critical given the central nature of the fraud as against the Monterey Project.  It was only through the transactions with the Monterey Project that the Defendants truly established themselves as supposedly "trustworthy" advisors that would work in the best interests of each of the subsequent MHPI Projects.

81.     Moreover, the Monterey Transaction is where the Defendants established the "blueprint" for the fraud that they would use moving forward.  Absent the fraud perpetrated on the Monterey Project, and the important contacts with California that were present through the negotiation of the Monterey Project, the Defendants would not have been able to successfully perpetrate the fraud against the remaining MHPI Projects.

**Venue and Joinder of all Defendants Is Proper in the Northern District of California.**

82.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred and were felt in the Northern District of California.

83.     Additionally, all Defendants have engaged in a multidistrict pattern of racketeering activities and a conspiracy to engage in these racketeering activities.  Thus, venue also is proper pursuant to 18 U.S.C. § 1965(a).

84.     Joinder of all Plaintiffs is proper under Federal Rule of Civil Procedure 20(a)(1).  As alleged throughout, Defendants' fraud and pattern of racketeering activity arose out of the same series of privatized Army and Air Force housing transactions that have a similar factual background and a definite, logical relationship to one another.  Likewise, numerous issues of law and fact common to all Plaintiffs will arise in this action.  A significant waste of judicial and client resources would result, including a risk of inconsistent verdicts, if the Projects were forced to try each of their claims separately in different forums.

## DETAILED ALLEGATIONS

I.     **For More Than a Decade, Defendants Used the MHPI Program to Enrich Themselves To the Detriment of the Plaintiff Projects.**

85.     Congress established the MHPI in 1996 to help the military improve the conditions of the housing provided to members of the Armed Forces.  According to the United States Department of Defense's website, MHPI "was designed and developed to attract private sector financing, expertise and innovation to provide necessary housing faster and more efficiently than traditional Military Construction processes would allow."   The Office of the Secretary of Defense delegated implementation of MHPI to the Military Services and authorized them "to enter into agreements with private developers selected in a competitive process to own, maintain and operate family housing via a fifty-year lease."  At the end of the 50-year Ground Lease, the program contemplates that the housing will be returned to the Armed Services—thus any decrease in the Projects' value and scope as a result of Defendants' actions both harm the Projects and directly decreases the bargain received by the armed services.

86.     Each of the Army Project Plaintiffs is a participant in a public-private partnership between the United States Army and one of four private developers, established to operate, construct, develop, and maintain privatized housing on one of several Army bases located around the country.  The Army is an equity member/partner in each Army Project, is entitled to significant equity returns, and holds consent and approval rights over all significant aspects of the Project.  The managing member of each Army Plaintiff is a private development partner, which manages each Plaintiff's operations pursuant to its respective operating agreements or partnership agreements with the Army.  Each of the Air Force Project Plaintiffs is managed by private developer BBC, which contracted with the Air Force, and the Air Force contributed the land and provided a Government Direct Loan to the Projects (except at the Vandenberg Project), and has the right to cash flows after certain returns are paid to the private developer.

87.     Corvias Group, LLC (f/k/a Picerne Military Housing headquartered in Rhode Island),[3] through its affiliates, is the private partner with the Army in connection with the Fort Meade (Maryland) in 2002, Fort Bragg (North Carolina) in 2003, Fort Polk (Louisiana) in 2005, Fort Riley (Kansas) in 2006, Fort Rucker (Alabama) in 2006, and Fort Sill (Oklahoma) in 2010 Plaintiffs.  Chris Bicho, Michael DeLaRosa, and John Picerne are among the key principals for these Projects to whom misrepresentations were made.  Michaels Military Housing, LLC (headquartered in New Jersey), through its affiliates, is the private partner with the Army in connection with the Fort Leavenworth (Kansas) in 2006 Project Plaintiff.  Annie Eustice and John O'Donnell are among the key principals for these Projects to whom misrepresentations were made.   Clark Realty Capital, L.L.C. (headquartered in Virginia), through its affiliates, partnered with the Army in connection with the Monterey Project Plaintiff in 2003, located in, and with its principal place of business, in California. Fran Coen, Greg Day, and Tad Guleserian are among the key principals for these Projects to whom misrepresentations were made.

88.     Balfour Beatty Communities, LLC ("BBC") (f/k/a as GMH Military Housing headquartered in Pennsylvania), through its affiliates, is the private partner with the Army in connection with the Fort Stewart/Hunter Army Airfield (Georgia) in 2003, Fort Detrick/Walter Reed Army Medical Center Project (Maryland) in 2004, Fort Bliss/White Sands Missile Range (Texas) in 2005, and Carlisle Barracks/Picatinny Arsenal (Pennsylvania) Plaintiffs in 2006.

89.     BBC, through its affiliates, also contracted with the Air Force in connection with the AETC I (Oklahoma, Arizona, Texas and Florida) in 2007, Vandenberg (California) in 2007, AMC West (Washington, Oklahoma, and California), and Lackland II Air Force (Texas) Plaintiffs.   Lou DeRogatis, Denise Hubley, Katie Richardson, Rick Taylor, and Chris Williams are among the key principals for these Projects to whom misrepresentations were made.

90.     California is the location of three of the military bases at issue:  the Presidio of Monterey, Vandenberg Air Force Base, and Travis Air Force Base (a part of the AMC West Project).  No other

---

[3]   To avoid confusion, where this pleading refers to the entity known at the time known as Picerne Military Housing, Plaintiffs refer to it as "Corvias."

state is home to more military bases harmed by Defendants' long-running fraud scheme. New York is home to no MHPI military bases at issue or any of the subject developers.

91.    In order to construct and develop high quality housing for military families at each of the respective bases, each Project needed to determine the best way to finance hundreds of millions of dollars in construction and maintenance over the life span of the Project. Each Project—through senior members of the private developer team and through the Army and its advisor JLL— relied on Ray and his team to advise regarding the optimal financial structure and to negotiate the best interest rate and other terms for the Project.

92.    Once Ray and GMAC were hired as financial advisor and agent, GMAC served as lender to each Project. Specifically, each Project then took out a large loan (often in the amount of hundreds of millions of dollars) from GMAC or Jefferies—though under this scheme, neither party ever undertook any material balance sheet risk. A division of GMAC (and later Jefferies) also served as the loan servicer, the entity responsible for disbursing the Projects' revenue pursuant to the waterfall levels specified in the Servicing and Lockbox Agreements. But as the written representations made clear, GMAC and Ray's roles were not limited to lender and loan servicer.

### A.    To win the MHPI financings over other competitors, Ray held himself and GMAC out and acted as a fiduciary financial advisor and agent.

93.    Shortly after the enactment of the MHPI, several financial institutions (including Goldman Sachs and Morgan Stanley) began competing for loan origination work at the Projects. In order to set himself apart from the competition, ███████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ████████████████ The Meade Project hired the GMAC team and Ray, in part, based on the fact that, unlike his competitors, Ray and GMAC would and did assume the trusted role of Financial Advisor— a role that Ray expressly solicited in writing.

94.    In 2003, to ensure that JLL, the Army, and the developers understood that Ray and GMAC were different than their competitors and would serve as a financial advisor, he created and disseminated to the above a flow chart to this effect. This chart, authored by Ray, applied in substance

1    to all of the MHPI transactions handled by Ray and GMAC and specifies very clearly the "████

2    ████" and fiduciary roles of Ray, Ray's team, and GMAC.



95.     Thus, Ray and GMAC represented to the Projects, the Army, and JLL that the fiduciary services provided by GMAC were distinct and separate from the more traditional investment banker services they provided "as lender."   As Financial Advisor, Ray and GMAC agreed to act as the Projects' agent in providing 12 broad categories of services, including *Negotiation* of Surety Bonds and DSR Requirements, Rating Agency Coordination, Legal Counsel with respect to key documents, *Negotiating* Term Loans, and to run an "Open Book Auction" to determine the market credit spread. These written representations were never retracted, and the developers, the Army, and JLL thus continued to rely on the fulfillment of such duties and such financial advisor representations by Ray and his team.  In addition to this factual confirmation of Ray and GMAC's fiduciary role as financial advisor, it was and is recognized under the law that fiduciary duties attach when a financial institution goes beyond a traditional transactional arrangement and purports to act as a financial advisor.  *Negrete v. Fid. & Guar. Life Ins. Co.*, 444 F. Supp. 2d 998, 1004 (C.D. Cal. 2006) (holding plaintiff stated fiduciary duty claim by alleging otherwise non-fiduciary insurer also purported to act as financial advisor); *Estate of Migliaccio v. Midland Nat'l. Life Ins. Co.*, 436 F. Supp. 2d 1095, 1108 (C.D. Cal. 2006) (holding same).  As sophisticated entities and individuals, Defendants knew and understood the legal ramifications of acting as a financial advisor.

96.     As recounted below, in substance, Ray reported these same financial advisor fiduciary duty representations at each of the MHPI Projects.  Notably, given that the same personnel from the developers, JLL, and the Army generally worked on all of the MHPI transactions, Ray did not need to repeatedly enforce in chart form his and GMAC's established role as a financial advisor.

**Meade Project (Closing Date: 5/1/2002; Location: Maryland; Developer: Corvias)**

97.     Ray began to establish a foothold with the MHPI Projects and private developers through his efforts to procure business at the Meade Project developed by Picerne Military Housing (now Corvias Military Living).  As noted, Ray's bio submitted to the Projects stated he was applying for the positon of "████████████"  In a presentation dated April 2001, entitled "████████████████" Ray provided GMAC's "████████████" to Corvias representatives, who included John Picerne and Chris Bicho, regarding financing for the Meade Project.  The proposal set forth that GMAC, in

addition to serving as "███████████████████████████" would also "████████
████████████████████████████████" GMAC and Ray represented in
the proposal that GMAC would provide an "████████████████████████" and
"████████████████████████"

98.     As reflected in the financial advisory position that Ray applied and was selected for, he and
GMAC undertook the above duties as a financial advisor for the Meade Project.

99.     In addition to these written representations, Ray made substantially similar oral representations
to Corvias representatives, including John Picerne and Chris Bicho, prior to the May 2002 closing.

100.     Ray made the same written and oral representations to the Army's consultant JLL prior to the
May 2002 closing at the Meade Project.

101.     The private developer and the Army relied on these written and verbal representations in
closing the deal with Ray and GMAC and in continuing to treat Ray and GMAC as a trusted advisor
with whom they closed subsequent deals.

**Bragg Project (Closing Date: 8/1/2003; Location: North Carolina; Developer: Corvias)**

102.     Ray built on his success at the Meade Project by pursuing business at the Bragg Project, another
Corvias-Army partnership.  In the months leading up to the August 2003 closing, Ray represented
orally to Corvias representatives (including John Picerne, Chris Bicho, and Michael DeLaRosa), that
he and GMAC had assumed and would maintain a role as a financial advisor to the Bragg Project in
connection with which they would "provide financial structuring advice" to the Bragg Project and
would "continually analyze the best financial structure" for the Bragg Project.  In March 2003, Ray
also represented to these Corvias representatives an estimated credit spread for the transaction, which
he represented was based on an anticipated spread derived from a "'best value' debt investor
competition."  These representations were reflected in the Bragg Project's CDMP submission shared
with the Army and Congress in March 2003.

103.     Likewise, in an October 4, 2002 commitment letter to Corvias representative Chris Bicho, Ray
represented to the Fort Bragg Project that the credit spread on the transaction would be set "█████
██████████████" or otherwise "████████████████████████████
██████████" In an October 15, 2002 response to questions from Corvias regarding the GMAC bid,

Ray touted to Corvias representatives GMAC's relationship with Ambac as a creditor enhancer, claiming " ████████████████████ " Ray again reinforced in this early transaction his position of trust by upon belief making no secret profits on the sale of bonds. That would soon change, however, as Ray and Marfatia saw the opportunity to trade on this position of trust to make secret profits on the sale of bonds.

104.    In addition to these written representations, Ray made substantially similar oral representations to Corvias representatives, including John Picerne, Chris Bicho, and Michael DeLaRosa, prior to the August 2003 closing.

105.    Ray made the same written and oral representations to the Army's consultant JLL prior to the August 2003 closing at the Bragg Project.

106.    The private developer and the Army relied on these written and verbal representations in closing the deal with Ray and GMAC and in continuing to treat Ray and GMAC as a trusted advisor with whom they closed subsequent deals.

**Monterey Project (Closing Date: 10/1/2003; Location: California; Developer: Clark)**

107.    With the trust built with the Army and JLL, Ray took aim at Projects won by other private developers, including the Monterey Project managed by Clark.   In November 2002, in a written response to the Monterey Project's request for financing proposals, Ray represented to Clark representatives, including Fran Coen, Greg Day, and Tad Guleserian, that GMAC would act as a " ██████████ " to the Project.  As " ██████████ " to the Monterey Project, GMAC would, according to Ray, " ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████ "   Ray also represented that " ██████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████ " He further represented that " ██████ will be responsible for ensuring that all parties are given sufficient information/advice from which to make decisions on business and development matters as we move through the CDMP and documentation process."   Ray outlined a detailed " ████████████████ "

1   process "███████████████████████████████████████████████████

2   ████" which was to include an investor bid process and promised that "████████████████

3   ████████████████████████████████████████████"

108.   In an August 20, 2003 loan commitment letter to Clark representatives, including Fran Coen, Greg Day, and Tad Guleserian, Ray again reinforced this position of trust as an agent and financial advisor, representing that GMAC "agrees to use its best efforts to negotiate the most favorable rates for the following terms," which included the 30-year Treasury swap rate, credit enhancement, loan credit spread, and lockbox and servicing fee.   Ray further stated that GMAC "agrees Credit Enhancement and Loan Credit Spread listed above are not-to-exceed rates.   To the extent the actual rates on either of these line items individually is lower than the above stated not-to-exceed rates, the lower actual rates will be provided to Borrower."   In addition to these written representations, Ray made substantially similar oral representations to Clark representatives, including Fran Coen, Greg Day, and Tad Guleserian, prior to the October 2003 closing at the Monterey Project.   As detailed below, having earned the trust of the Army, JLL and certain MHPI Projects, Ray first used the Monterey Project to implement his scheme to include an above-market credit spread on the Monterey loan and then make secret profits by pre-selling the bonds based on the above market interest rate on the loan.

109.   Ray made the same written and oral representations to the Army's consultant JLL prior to the October 2003 closing at the Monterey Project.

110.   The private developer and the Army relied on these written and verbal representations in closing the deal with Ray and GMAC and in continuing to treat Ray and GMAC as a trusted advisor with whom they closed subsequent deals.

**Stewart Project (Closing Date: 11/1/2003; Location: Georgia; Developer: BBC)**

111.   Again with the earned trust of JLL and the Army in holding himself out as a trusted financial advisor, Ray sought the transactional business of Balfour Beatty Communities ("BBC") and the Stewart Project by once again touting his past and proposed role as Financial Advisor on the transaction.   In April 2003, in a written response to the Stewart Project's request for financing proposals, Ray represented to BBC representatives, who included Lou DeRogatis, Denise Hubley,

Bruce Robinson, and Rick Taylor, that GMAC would serve as a "██████████" with roles, including "██████████████████" "████████████████" "negotiation of loan terms," "analysis of capital structures," "negotiation of surety bond or debt-service reserve requirements."  Ray stated that, as Financial Advisor, "████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████"

112.    In a June 19, 2003 loan commitment letter sent to BBC, Ray represented to BBC representatives, that with respect to the interest rate on the transaction, "████████████████ ██████████████████████████████████████ ████████████████"

113.    In addition to these written representations, Ray made substantially similar oral representations to BBC representatives, including Chris Williams, Lou DeRogatis, Denise Hubley, Bruce Robinson, and Rick Taylor, prior to the November 2003 closing at the Stewart Project.

114.    Ray made the same written and oral representations to the Army's consultant JLL prior to the November 2003 closing at the Stewart Project.

115.    The private developer and the Army relied on these written and verbal representations in closing the deal with Ray and GMAC and in continuing to treat Ray and GMAC as a trusted advisor with whom they closed subsequent deals.

**Detrick Project (Closing Date: 7/1/2004; Location: Maryland; Developer: BBC)**

116.    Ray again traded upon his established role as trusted financial advisor with BBC at the Detrick Project.  In October 2003, in a written response to the Detrick Project's request for financing proposals, Ray represented to BBC representatives, including Lou DeRogatis, Denise Hubley, and Rick Taylor, that GMAC would "████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████" Ray also represented that "████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████" Ray further represented that during the CDMP process, GMAC will be

responsible for "██████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████" Ray

also outlined a detailed "████████████████" process "███████████████████████

██████████████████████████████████████████████████████

promised that "███████████████████████████████████████"

117.    In an April 26, 2004 loan commitment letter to BBC representative Austin Repetto, Ray

promised that "██████████████████████████████████████████

████████████████████████████" He further represented that 40 basis points of

the credit spread were allocated for AAA-rated credit enhancement.

118.    In addition to these written representations, Ray made substantially similar oral representations

to BBC representatives, including Chris Williams, Lou DeRogatis, Denise Hubley, and Rick Taylor,

prior to the July 2004 closing at the Detrick Project.

119.    Ray made the same written and oral representations to the Army's consultant JLL prior to the

July 2004 closing at the Detrick Project.

120.    The private developer and the Army relied on these written and verbal representations in

closing the deal with Ray and GMAC and in continuing to treat Ray and GMAC as a trusted advisor

with whom they closed subsequent deals.

**Polk Project (Closing Date: 9/15/2004; Location: Louisiana; Developer: Corvias)**

121.    Having gained the trust of Corvias through earlier financings, in a July 2003 written response

to the Polk Project's request for financing proposals, Ray reiterated to Corvias representatives, who

likely included John Picerne, Chris Bicho, and Michael DeLaRosa, GMAC's role as financial advisor

and agent:  GMAC would "█████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████" Ray also represented that

"███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████" Ray also described GMAC's "████████████████████████

████" as a detailed "████████████████" process "██████████████████████████

███████████████████████████████████" which includes an investor bid process and

promises that "██████████████████████████████████████████████████"

122.    In addition to these written representations, Ray made substantially similar oral representations to Corvias representatives, including John Picerne, Chris Bicho, and Michael DeLaRosa, prior to the September 2004 closing.

123.    Ray made the same written and oral representations to the Army's consultant JLL prior to the September 2004 closing at the Bragg Project.

124.    The private developer and the Army relied on these written and verbal representations in closing the deal with Ray and GMAC and in continuing to treat Ray and GMAC as a trusted advisor with whom they closed subsequent deals.

**Bliss Project (Closing Date: 7/1/2005; Location: Texas and New Mexico; Developer: BBC)**

125.    Ray again reemphasized GMAC's fiduciary role to BBC's representatives when arranging financing for the Bliss Project.  In a March 2005 written response to the Bliss Project's request for financing proposals, Ray stated to BBC representatives, including Lou DeRogatis, Denise Hubley, and Rick Taylor, that GMAC would be the "███████████████" and that GMAC's commitment was not contingent on agency ratings or credit enhancement.  Ray represented that GMAC would provide a number of "Additional Value-Added Services," including as a "██████████████" GMAC would and was "██████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████" and would "███████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████" Ray further stated that, with regard to potential financial structuring options, "████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████" and "███████████████████████

████████████████████████████████████████████████████"

126.    In fact, BBC developed spreadsheets that evaluated Ray and GMAC against their investment bank competitors.  These analyses reflect that a value-add to selecting Ray and GMAC over other competitors was that they will serve as a "Financial Advisor."  No other competitor offered to serve in this fiduciary role.

127.    In addition to these written representations, Ray made substantially similar oral representations to BBC representatives, including Chris Williams, Lou DeRogatis, Denise Hubley, and Rick Taylor, prior to the July 2005 closing at the Bliss Project.

128.    Ray made the same written and oral representations to the Army's consultant JLL prior to the July 2005 closing at the Bliss Project.

129.    The private developer and the Army relied on these written and verbal representations in closing the deal with Ray and GMAC and in continuing to treat Ray and GMAC as a trusted advisor with whom they closed subsequent deals.

**Leavenworth Project (Closing Date: 3/1/2006; Location: Kansas; Developer: Michaels)**

130.    Ray secured the trust as a financial advisor of still another developer, Michaels Military Housing, at the Leavenworth Project.  In March 2005, in response to the Leavenworth Project's request for financing proposals, Ray represented to Michaels representatives, who likely included John O'Donnell and Annie Eustice, that GMAC was the "Transaction Driver" due to its lending role, allowing it to "control the underwriting, document terms, pricing and timing rather than letting these be dictated by third parties."  Ray represented that GMAC would act as a financial advisor "responsible for structuring a financing that 1) meets the goals of the Borrower and Government, 2) ensures the long-term viability of the Project and 3) minimizes risk to the Government" and "advocat[ing] for as much flexibility for the Borrower and Project as is possible while also maintaining a structure that is capable of providing the lowest cost financing for the Project."

131.    In a March 1, 2006 loan commitment letter to Michaels representative John O'Donnell, Ray told Michaels that the interest rate on the transaction reflected a 30-year swap rate as a rate lock plus

credit spread and servicing, with no reference to credit enhancement.  Ray further represented that the commitment was not contingent on agency ratings or credit enhancement.

132.    In addition to these written representations, Ray made substantially similar oral representations to Michaels representatives, including John O'Donnell and Annie Eustice, prior to the March 2006 closing at the Leavenworth Project.

133.    Ray made the same written and oral representations to the Army's consultant JLL prior to the March 2006 closing at the Leavenworth Project.

134.    The private developer and the Army relied on these written and verbal representations in closing the deal with Ray and GMAC and in continuing to treat Ray and GMAC as a trusted advisor with whom they closed subsequent deals.

**Rucker Project (Closing Date: 4/1/2006; Location: Alabama; Developer: Corvias)**

135.    Trading on his role as financial advisor, Ray leveraged the trust of Corvias representatives yet again at the Rucker Project.  In GMAC's June 2005 written response to the Rucker Project's request for financing proposals, Ray built upon his previous misrepresentations to other Projects by representing to Corvias representatives, including John Picerne, Chris Bicho, and Michael DeLaRosa, that "█████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ██████████████████████████████" Ray further represented that GMAC would be "███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████" Ray further represented GMAC would act as "████████████████" and that in doing so would "███████████ ███████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████" Ray also represented that GMAC would serve as a "███████████████████████████" and referred to the benefit of GMAC playing that same role at the Meade Project.

136.    In a March 16, 2006 loan commitment letter to Corvias representative Rasim Moid, Ray repeated his representation from the June 2005 request for production responses that the transaction was not contingent on credit enhancement or agency ratings.

137.    In addition to these written representations, Ray made substantially similar oral representations to Corvias representatives, including John Picerne, Chris Bicho, and Michael DeLaRosa prior to the April 2006 closing.

138.    Ray made the same written and oral representations to the Army's consultant JLL prior to the April 2006 closing at the Rucker Project.

139.    The private developer and the Army relied on these written and verbal representations in closing the deal with Ray and GMAC and in continuing to treat Ray and GMAC as a trusted advisor with whom they closed subsequent deals.

**Riley Project (Closing Date: 7/1/2006; Location: Kansas; Developer: Corvias)**

140.    In September 2005, with yet another Corvias Project, the Riley Project, Ray reinforced his and GMAC's role as trusted financial advisor by representing in writing to Corvias representative Chris Bicho that "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"

141.    In a June 15, 2006 loan commitment letter to Corvias representative Rasim Moid, Ray represented once again that the transaction was not contingent on credit enhancement or agency ratings.  He further stated the interest rate on the transaction was based on the current 30-year swap rate and a maximum credit spread.

142.    In addition to these written representations, Ray made substantially similar oral representations to Corvias representatives, including John Picerne, Chris Bicho, and Michael DeLaRosa prior to the July 2006 closing at the Riley Project.

143.    Ray made the same written and oral representations to the Army's consultant JLL prior to the July 2006 closing at the Riley Project.

144.    The private developer and the Army relied on these written and verbal representations in closing the deal with Ray and GMAC and in continuing to treat Ray and GMAC as a trusted advisor with whom they closed subsequent deals.

**Carlisle Project (Closing Date: 7/21/2006; Location: Pennsylvania and New Jersey; Developer: BBC)**

145.    Through Ray, GMAC again exploited its role as past financial advisor to the BBC Projects at the Carlisle Project.  In a May 4, 2006 loan commitment letter to BBC representative Lou DeRogatis, Ray stated the interest rate on the transaction was based on the 30-year swap rate as of the pricing date and a credit spread to exceed .580%.

146.    In addition to these written representations, Ray made substantially similar oral representations to BBC representatives, including Chris Williams, Lou DeRogatis, Denise Hubley, Rick Taylor, prior to the July 2006 closing at the Carlisle Project.

147.    Ray made the same written and oral representations to the Army's consultant JLL prior to the July 2006 closing at the Carlisle Project.

148.    The private developer and the Army relied on these written and verbal representations in closing the deal with Ray and GMAC and in continuing to treat Ray and GMAC as a trusted advisor with whom they closed subsequent deals.

**Air Force Projects:**

**AETC Project (Closing Date: 2/6/2007; Location: Oklahoma, Arizona, Texas, and Florida; Developer: BBC)**

**AMC West Project (Closing Date: 7/21/2008; Location: Washington, Oklahoma, and California; Developer: BBC)**

**Lackland Project (Closing Date: 12/23/2008; Location: Texas; Developer: BBC)**

**Vandenberg Project (Closing Date: 11/1/2007; Location: California; Developer: BBC)**

149.    Due to the structure of the transactions for the Air Force Projects, the financing bid documents did not contain the same level of detail as in the Army bid documents.  However, by the time Ray bid for the first BBC Air Force Project in 2007, Ray had long established GMAC/Capmark's role as a trusted financial advisor and agent to BBC and to the Army.  As noted, starting with the Fort Stewart transaction, where they were provided a flow diagram of GMAC's and Ray's duties as a "Financial

Advisor," BBC relied on Ray's representations that GMAC and Ray would continue in that role for all MHPI transactions.  Ray's oral representations to BBC representatives, including Chris Williams, Lou DeRogatis, Denise Hubley, and Rick Taylor, that GMAC and he would serve as Financial Advisor did not distinguish between Air Force and Army Projects, nor did Ray, GMAC, or Capmark ever, in writing or orally, disclaim the financial advisor relationship, which had long been established, cultivated, and touted by Ray.

150.     Thus, based on the repeated representations made by Ray, BBC and the Air Force believed that GMAC and Ray were operating in the same capacity as trusted financial advisor and agent with respect to each of the BBC Air Force Projects, including AETC (which closed in November 2007), Vandenberg (which closed in November 2007), AMC West (which closed in July 2008), and Lackland (which closed in December 2008).

151.     The private developer and the Air Force relied on these written and verbal representations in closing the deal with Ray and GMAC and in continuing to treat Ray and GMAC as a trusted advisor with whom they closed subsequent deals.

**Sill Project (Closing Date: 6/1/2010; Location: Oklahoma; Developer: Corvias)**

152.     Ray filled out his portfolio of Projects with Corvias' Sill Project.  In January 2008, in a written response to the Sill Project's request for financing proposals, Ray represented to Corvias representatives, including John Picerne, John DiBari, David Rozen, and Ken Richard, that Capmark would act as a "financial advisor" which would be "responsible for structuring a financing that 1) meets the goals of the Borrower and Army, 2) qualifies for investment grade ratings, 3) ensures the long-term viability of the Project and 4) minimizes risk to the Borrower."  Ray also represented that in its role as financial advisor, Capmark would "advocate for as much flexibility for the Borrower and Project as is possible while also maintaining a structure that is capable of providing the lowest cost financing for the Project."

153.     In addition to these written representations, Ray made substantially similar oral representations to Corvias representatives, including John Picerne, John DiBari, David Rozen, and Ken Richard, prior to the June 2010 closing at the Sill Project, by which time Jefferies had purchased the military housing business from Capmark.

154.    Ray made the same written and oral representations to the Army's consultant JLL prior to the June 2010 closing at the Sill Project.

155.    The private developer and the Army relied on these written and verbal representations in closing the deal with Ray and GMAC and in continuing to treat Ray and GMAC as a trusted advisor with whom they closed subsequent deals.

156.    After Ambac's ratings downgrade in 2008, the Army Projects, the Army, and JLL continued to turn to Ray, GMAC and Jefferies as their financial advisors for consultation and advice regarding the impact of Ambac's ratings downgrade on the Projects.  For example, in 2009 and 2010, the Projects, the Army and JLL had several conference calls with Ray, seeking his input as their financial advisor on the impact of Ambac's downgrades and on related strategies to minimize any harm to the Projects.

**B.      Jefferies joins the conspiracy, assuming GMAC's role as financial advisor, agent, and fiduciary.**

157.    In or around the fall of 2009, as part of due diligence Jefferies performed leading up to its acquisition of Capmark's MHPI-related business and its hiring of Ray and Ray's team from GMAC/Capmark to continue their MHPI-related business, Jefferies communicated with Ray and learned of the manner in which Ray had manipulated the financings of past MHPI Projects to reap substantial, undisclosed profits from the Projects.  (*See infra* at ¶ 25.)

158.    With knowledge of the ongoing scheme, Jefferies elected to go forward with the acquisition and hired Ray and his team, in part, so Jefferies could benefit from this riskless business.

159.    Jefferies determined, however, that because Ray would continue his manipulation of MHPI Project financings while at Jefferies, Jefferies would try to insulate itself from liability by including a disclaimer that disavowed a fiduciary duty from Jefferies Mortgage, the lender, to the Projects on future transactions.  Thus, in connection with the 2010 Sill and 2012 Bliss transactions, Jefferies Mortgage enlisted Ray to induce the Sill and Fort Bliss Projects to sign letters of intent sent via email in which Jefferies Mortgage, the actual lender on these Projects, claimed to disavow a fiduciary duty to the Projects.

160.    To obtain this disclaimer, Ray held himself out as having always acted in the Projects' best interests as a financial advisor; however, both Jefferies and Ray continued to conceal the truth of his, and now Jefferies' role, in the ongoing fraudulent scheme to manipulate these financings.  The Projects viewed Ray's and other Jefferies' employees' previous experience and role as financial advisors with the Projects as selling points; but the Projects had no way of knowing that Jefferies Mortgage and Ray were concealing their past scheme as alleged herein.  The Projects would never have agreed to a disclaimer of duties or entered into the agreements had they known such information.  Through material omissions and misrepresentations, Jefferies Mortgage used Ray's and other Jefferies employees' relationships with the Projects—who still held themselves out as financial advisors to the Projects, actively advised the Projects, and made no disclaimer of a fiduciary duty—to fraudulently obtain this limited disclaimer.  Based on the confidential and trusted relationship with Plaintiffs, Ray and Jefferies both had a duty to disclose the prior fraud and breaches of fiduciary duties in obtaining such waivers, but failed to do so.  As such, the 2010 Sill and 2012 Bliss disclaimers by Jefferies Mortgage of a fiduciary duty and any financial advisor role are void as having been procured through Ray's and now Jefferies Mortgage's ongoing fraudulent conduct.

161.    Importantly, this fraudulently-obtained disclaimer only applied to Jefferies Mortgage.  By its terms, it did not apply to other Jefferies entities or employees, including the entity that employed Ray.

162.    In sum, in documents communicated via the interstate wires and mails over a period of time from 2001-2012, Ray and GMAC and later Ray and Jefferies (as alleged) together held themselves out as, and acted as financial advisors and agents to the Projects—misleading the Projects to believe that they were fiduciaries and agents who always acted in the Projects' best interests.  The Projects, the Army, and JLL collectively accepted and relied on Ray's representations that he, his team, and the entities for which he worked would serve as a financial advisor and perform specifically articulated fiduciary duties.  While Ray, GMAC, and Jefferies caused the Projects to rely on them as fiduciaries, Defendants regularly ignored such a sacrosanct duty in order to enrich themselves without disclosure at the long-term expense of these military housing Projects.

### C. Ambac represented that it would act in the Army Projects' best interests in connection with the rating agencies.

163.    As part of the initial and fraudulent financing structure devised by Ray, Marfatia, Ambac and GMAC, the Projects were required to pay often $100,000 or more to obtain underlying ratings from the rating agencies in connection with the planned financing.  In imposing this requirement on the Projects, Ambac and GMAC, through Marfatia (as he confirmed in sworn deposition testimony) and Ray, represented that they would operate in the Projects' best interest and obtain the highest rating possible from the rating agencies for the transaction, based on the Projects' pro forma financials.

164.    It was in each of the Projects' best interest to receive the highest rating possible in order to minimize the interest rate charged for the underlying loan and to minimize the need for, and cost of, any credit enhancement.  However, in their dealings with rating agencies, Ambac and GMAC operated as a RICO enterprise, tightly controlling the flow of communication to address any rating agency questions or concerns, and manipulating the rating process.

165.    For example, in their efforts to further the conspiracy, Marfatia and Ambac instructed the rating agencies via email that they could not directly communicate with the Projects' representatives without the presence of Ambac or GMAC, and demanded that any questions be funneled directly through Ambac or GMAC.  On several occasions, including, by way of example, in October 2003 in connection with the Monterey Project, when the rating agencies inadvertently communicated directly to the Projects, they were chastised by Marfatia and told to cease such direct communications with the Projects—"I am disturbed to hear that Ambac's AAA rating letter was sent [by S&P] to Clark Construction directly. . . .The underlying shadow is also a private rating and is only for Ambac."  None of these instructions—designed to perpetuate the pattern of racketeering by avoiding detection—were disclosed to the Projects.  With the Projects effectively fenced off from the rating agencies, Ambac and GMAC were able to exercise significant influence over the rating process, causing Marfatia to boast in an October 2005 email, "[w]hen Ambac and GMAC do a deal, I am the only person who talks with S&P and Moody's and I can convince them to do things based on my underwriting."  Marfatia made similar email boasts to his boss, Bob Shoback, describing how he had "gotten" the agencies to take certain action.

166.    On each of the Projects discussed in paragraphs 167 to 172 below, which closed prior to the development of the "stealth structure," Ambac, at the direction of Marfatia, represented that Ambac would operate as their fiduciary and agent in dealing with the rating agencies.  The MHPI Projects, the Army, and JLL reasonably relied on these representations.

167.    In the months leading up to the May 2002 closing at the Meade Project, Marfatia made oral representations to Corvias and the Army's consultant JLL that he and Ambac would act in the Meade Project's best interests to obtain the highest possible rating from the rating agencies, which were providing shadow ratings.  The highest possible rating was in the Meade Project's best interests because it would minimize the interest rate charged for the underlying loan and minimize the need for, and cost of, any credit enhancement for the financing of the Meade Project.

168.    Ambac and Marfatia's representations at the Meade Project dovetailed with their efforts at the Bragg Project, also developed by Corvias.  In the months leading up to the August 2003 closing at the Bragg Project, Marfatia made oral representations to Corvias and  JLL that he and Ambac would act in the Bragg Project's best interests to obtain the highest possible rating from the rating agencies, which were providing shadow ratings.  The highest possible rating was in the Bragg Project's best interests because it would minimize the interest rate charged for the underlying loan and minimize the need for, and cost of, any credit enhancement for the financing of the Bragg Project.

169.    Beginning in 2002, Ambac, through Marfatia, communicated with Clark regarding credit enhancement services in connection with GMAC's financing of the Monterey Project.  In the months leading up to the October 2003 closing at the Monterey Project, Marfatia made oral representations to Clark and JLL that he and Ambac would act in the Monterey Project's best interests to obtain the highest possible rating from the rating agencies, which providing shadow ratings.  The highest possible rating was in the Monterey Project's best interests because it would minimize the interest rate charged for the underlying loan and minimize the need for, and cost of, any credit enhancement for the financing of the Monterey Project.

170.    Beginning in 2003, Ambac, through Marfatia, made similar representations to BBC regarding credit enhancement services in connection with GMAC's financing of military housing projects.  In the months leading up to the November 2003 closing at the Stewart Project, Marfatia made oral

representations to BBC and JLL that he and Ambac would act in the Stewart Project's best interests to obtain the highest possible rating from the rating agencies, which were providing shadow ratings. The highest possible rating was in the Stewart Project's best interests because it would minimize the interest rate charged for the underlying loan and minimize the need for, and cost of, any credit enhancement for the financing of the Monterey Project.

171.    In the months leading up to the July 2004 closing at the Detrick Project, Marfatia continued to make oral representations to BBC and JLL that he and Ambac would act in the Detrick Project's best interests to obtain the highest possible rating from the rating agencies, which were providing shadow ratings.  The highest possible rating was in the Detrick Project's best interests because it would minimize the interest rate charged for the underlying loan and minimize the need for, and cost of, any credit enhancement for the financing of the Detrick Project.

172.    In 2004, Marfatia continued to represent to Corvias and JLL that he and Ambac would act in the Polk Project's best interests to obtain the highest possible rating from the rating agencies, which were providing shadow ratings.  The highest possible rating was in the Polk Project's best interests because it would minimize the interest rate charged for the underlying loan and minimize the need for, and cost of, any credit enhancement for the financing of the Bragg Project.

## II.    GMAC and Ambac Systematically Misrepresented and Omitted Critical Facts to the Financial Detriment of the Projects.

### A.    Ambac and GMAC misrepresented and omitted that they had formed a collusive relationship in order to benefit each other at the Projects' expense.

173.    GMAC and Ray convinced the private developers and JLL (Barry Scribner and Jen Hill, among others)—and, through them, each of the specific Projects—that they operated at arm's length with Ambac.  For example, in an August 2003 loan commitment letter, Ray expressed to representatives of Clark (including Fran Coen) that GMAC would "use its best efforts to negotiate the most favorable rates" for multiple items, including credit enhancement.   Similar representations were made to representatives of the other Projects as well, shortly before Ambac was "selected" as credit enhancer.

174.    In April 2003, in GMAC's written response to the Stewart Project's request for financing proposals, Ray touted GMAC's then-recent experience at the Meade and Bragg Projects and

represented to BBC representatives that GMAC, in its role as "███████████" would "███████████████████████████" on behalf of the Stewart Project.

175.     Ray made substantially similar oral representations to Corvias (including John Picerne and Chris Bicho), BBC (including Lou DeRogatis, Denise Hubley, Bruce Robinson, and Rick Taylor), and Michaels representatives (including John O'Donnell and Annie Eustice), and to JLL (including Scribner and Hill), prior to the closing of their respective preliminary MHPI Projects at Meade, Stewart, and Leavenworth.  Indeed, Ray repeatedly represented during the time period from 2002-2005 that GMAC would negotiate the most favorable terms possible with potential credit enhancers, including Ambac and MBIA, and he touted GMAC's credibility with credit enhancers and rating agencies as a reason GMAC could negotiate such favorable terms.  At no time did Ray disclaim these false representations.   Instead, he built and induced reliance on them by continuing to make substantially similar false representations in pitching transactions for the remaining credit enhanced Projects at Bragg, Polk, Rucker, Riley, Sill, Detrick, Bliss, Carlisle, AETC I, AMC I, Lackland II, and Vandenberg.

176.     Ray and his co-conspirators, however, ensured there was no "selection" process or negotiation of credit enhancer rates.  To further the collusive enterprise, GMAC, Ray, Marfatia, and Ambac had predetermined that Ambac would provide credit enhancement at rates designed to benefit Ambac and, in turn, the rest of the enterprise, at the expense of the Projects.  Internal Ambac documents and emails in connection with the performance reviews of Marfatia highlight this undisclosed collusive relationship with between Ambac and GMAC, referring to it as a "joint venture" and an "exclusive" relationship that yielded Ambac "above market rates."  In fact, Ambac paid bonuses to Marfatia in constructing and executing this fraud that benefitted Ambac as a whole.

177.     In carrying out their scheme, co-conspirators Ray and Marfatia often traveled and socialized together.  They also repeatedly took business discussions off-line to avoid a paper trail and, in later years, communicated and sent materials to each other via Blackberry Pins, which allowed them to communicate regarding their conspiracy in an untraceable manner.  If Ray and Marfatia had been operating in a forthright and arm's-length manner, consistent with their duties and as represented to the Projects, there would have been no need to engage in these extensive efforts to conceal their

1   communications and later destroy documents as Ray did.  To this day, these untraceable business

2   communications between Ray and Marfatia, by design, are unrecoverable.

3        **B.   GMAC, and later Jefferies, ensured that the Projects paid inflated interest rates
            on their loans in order to make undisclosed profits.**

4   178.    A central part of Defendants' scheme allowed GMAC, and later Jefferies, to make undisclosed

5   and outsized profits at the expense of the Projects, on the sale of the bonds or certificates that were

6   syndicated from the Projects' loans.  In general, GMAC and later Jefferies would originate a Project

7   loan and misrepresent to the private developer and JLL (and through them the Project) that they had

8   set the credit spread (the interest rate spread above the then applicable reference rate, such as the

9   30-year swap rate), and, therefore, the coupon interest rate on the loan, at market as required by

10  investors or the market.  Ray, GMAC, and Jefferies were able to carry out this scheme by trading on

11  their role as trusted financial advisor that they would not take secret fees or profits.

12  179.    Often a few days or weeks before a loan would close, Ray would lock-in the interest rate on

13  the loan, and in many instances charge the Projects a fee for this process, claiming that GMAC, and

14  later Jefferies, were bearing risk by guaranteeing the stated interest rate on the loan.  Contrary to their

15  representation, GMAC or Jefferies, would set the Project loan interest rate above the expected yield

16  of the marketplace.  With the inflated interest rates on the loans locked in, GMAC, and later Jefferies,

17  would then sell bonds or certificates on the loans prior to closing and at a premium to par, given the

18  above market interest rate on the underlying loans, immediately reaping profits while simultaneously

19  assuring it would bear no risk on the loans it was going to issue.  The fact that GMAC, and later

20  Jefferies, could flip the loans through the sale of bonds or certificates above the equivalent par value,

21  within weeks or sometimes the very same day it issued a rate lock to the Projects (and collected a

22  rate-lock fee from the Projects), meant it had set the interest rate on the loans above market.

23  180.    Unlike publicly reported treasury bond interest rates, the "market" rate for new issue bonds for

24  the MHPI Projects was not transparent to the Plaintiffs.  In order to determine the appropriate rate

25  stack for their new issue bonds corresponding to a true market rate, the Projects had specifically

26  retained a financial advisor to act as their agent in determining and negotiating a market interest rate.

27  The Projects used Ray for this purpose.  However, unbeknownst to them, Ray's intent was to enrich

himself rather than fulfill his fiduciary duties.  In addition, the MHPI Projects had no visibility or transparency into when the investors committed to purchase the bonds or the amounts investors paid for the bonds, both of which are necessary to understand the true market interest rate.  In addition, without this information, it was not possible for the Projects to understand the actual risk (or lack thereof) that GMAC and later Jefferies were exposed to.  While one component was certainly known (the loan and bond interest rate), without knowing the answer to the other two components (date of purchase commitment and bond price), Plaintiffs had no way of knowing that Ray and his employers had charged MHPI borrowers a substantial premium, attributable to the above-market interest rate.

181.    While no misrepresentations were made to the purchasers of the bonds themselves, and no purchaser was harmed, the result of GMAC's, and later Jefferies', scheme was to saddle the Projects with loans at above-market interest rates that the Projects have paid and will continue to pay for decades to come on a monthly basis from the soldiers' rent payments.

182.    As shown below, Defendants' scheme to profit from the sale of the bonds morphed over the years in response to changing market conditions and the desire to maximize secret profits and to ensure the scheme would continue undetected.  In nearly all of the early Projects (Meade, Bragg, Stewart, Detrick, and Polk), Ray stated in writing via interstate wires the interest rate would be set by an "open book" process where the loan interest rate would be set as dictated by the bids for the bonds.  With the bids from the bond investors in hand, GMAC and Ray claimed they would then set the market interest rate based on what the investors were "willing to pay" for the bonds.

183.    Ray represented to the Projects, through the private developers and JLL, that this process would make certain that the credit spread was a true market rate and that the Projects would receive the full benefit of competition.  Thus, in reasonable reliance on Ray and GMAC, JLL reported in 2004 to the General Accounting Office (the non-partisan agency that acts as the investigative arm of Congress), that this credit spread represented the "risk premium required by investors."  In truth, the credit spread set by Ray and GMAC included not only the risk premium required by investors, but also an additional premium to generate undisclosed and substantial profits for Ray and GMAC when it syndicated the loan as of the close.

184.     On the first Projects (the 2002 Meade Project and the 2003 Bragg Project), Ray and GMAC apparently followed this outlined process, and it was used to generate a market interest rate for the Project.  Thus, subject to further confirmation, it appears that both the Meade and the Bragg 2003 bonds were sold at par, reflecting a market credit spread on the loan.  To be sure, Ray and GMAC took undisclosed profits from these Projects in other ways as discussed herein, but also used these Projects to begin to build the fiduciary trust and confidence of the Projects, the Army and JLL.

**The Interest Rate Fraud Is Developed At California's Monterey Project.**

185.     Within weeks of the Bragg Project closing in August 1, 2003, and having obtained the trust of the Army and JLL, at the Monterey Project (which closed on October 1, 2003), Ray and GMAC rolled out the likely most lucrative element of the fraud in California.  Beginning with the Monterey Project, Ray and GMAC began to manipulate the interest rate setting process for subsequent Projects to generate millions of dollars in secret profits.  Ray represented that he would employ this auction process to ensure the Projects received the full benefit of the bond sales in the form of a true market rate.  In reality, he misrepresented the market risk and/or the credit spread generated by the sale of bonds allowing GMAC, and later Jefferies, to sell the bonds prior to loan closing at a premium to par and, at times, to justify unnecessary and inflated rate lock fees and thus to reap millions in undisclosed profits.

186.     Thereafter, Ray and GMAC represented to the Projects, JLL and the Army that they would use their best efforts to obtain the most favorable rates for the interest rate, including specifically for the interest rate components of the investor credit spread and credit enhancement.  These representations were false.  For example, in an August 2003 loan commitment letter, Ray and GMAC represented to Monterey Bay Military Housing, the developer of the Monterey Project, the Project on which this bond fraud scheme started, in an August 20, 2003 loan commitment letter, that to the extent "the actual" Loan Credit Spread "is lower than the above stated not-to-exceed rates, the lower actual rates will be provided to Borrower."  In response to direct questions posed by Clark, Ray represented in writing in November 2002 that the credit spread on the loan for the Monterey Project (which closed on October 1, 2003) "████████████████████████████████████████████" In September 2003, GMAC and Ray purported to set the credit spread and interest rate on the Monterey

loan at market.  On September 15, 2003, Ray and GMAC induced Clark to authorize payment via interstate wires of a $950,000 rate-lock fee to GMAC to guarantee this purported market interest rate through closing.  This fee was paid in consideration for GMAC appearing to bear the risk of market fluctuation on the interest rate between then and the time of the bond sale, which Ray represented to Clark was a significant risk that justified the rate-lock fee charged.  Ray also represented to Clark that he and GMAC were acting as the Monterey Project's financial advisor and would pass on any available savings on the Monterey loan to the Monterey Project.

187.    Just one day after the Monterey Project paid the rate-lock fee, however, GMAC sold bonds on the Monterey loan to Fannie Mae, Ambac, and NY Life, followed by sales to Mutual of Omaha and others, over the following days, above the par value of the loan. By selling bonds on the Monterey Project's loan just one day after it agreed to guarantee the Monterey Project's interest rate on the loan, GMAC was able to unload any risk of market fluctuation, for which it had just induced the Monterey Project to pay $950,000.  Additionally, by selling the bonds on the Monterey loan above the par value of the loan it had just issued, GMAC was able to reap millions of dollars of immediate profits. Contrary to its representation to Clark, none of these profits, which could have represented savings for the borrower on the interest rate on its 40-plus year loan, were disclosed or passed along to the Monterey Project.  Ray and GMAC capitalized on their success at the Monterey Project to secure new business, continuing to build in undisclosed bond sale profits in successive Project transactions.

188.    GMAC and later Jefferies, through Ray, employed the scheme developed at the Monterey Project with respect to subsequent Projects sponsored by the other developers.  In a June 19, 2003 loan commitment letter addressed to BBC's partner, GMH Military Housing, Ray represented that the interest rate on the loan for the Stewart Project (which closed on November 1, 2003) would be "████ ███████████████████████████████████████" and that "████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████" A few months later, in September 2003, GMAC and Ray purported to set the interest rate on the Stewart loan at market.  On September 25, 2003, Ray and GMAC induced BBC to authorize payment of a $1 million rate-lock fee to GMAC to guarantee this purported market interest rate through closing. This fee was paid in consideration for GMAC appearing to bear the risk of market fluctuation on the

interest rate between then and the time of the bond sale.  As reflected in documents obtained in the Debt Service Reserve Litigation, the very same day the Stewart Project paid the rate-lock fee, however, GMAC sold bonds on the Stewart loan to Ambac, Freddie Mac, Fannie Mae, and NY Life above the par value of the loan. By selling bonds on the Stewart Project's loan the very same day it agreed to guarantee the Stewart Project's interest rate on the loan, GMAC was able to unload any risk of market fluctuation, for which it had just induced the Stewart Project to pay $1 million.  Additionally, by selling the bonds on the Stewart loan above the par value of the loan it had just issued, GMAC was able to reap millions of dollars of immediate profits. Contrary to its representation to BBC, none of these profits, which could have represented savings for the borrower on its loan, were disclosed or "█████ █████" to the Stewart Project.

189.    GMAC, through Ray, made similar misrepresentations to BBC regarding the Detrick Project. In a December 2003 loan commitment letter, again addressed to BBC's partner, GMH Military Housing, Ray represented that the interest rate on the loan for the Detrick Project (which closed on July 1, 2004) would be "based on then current 30-Year Swap Rate" and that "GMAC commits to an open book process related to the Investor Credit spread pricing and agrees to pass along any savings achieved to the Borrower[.]" GMAC agreed to lock in the interest rate for the loan, which was purportedly a market interest rate, on June 25, 2004. As reflected in documents obtained in the Debt Service Reserve Litigation, that same day GMAC sold bonds on the Detrick loan to Freddie Mac, Great West Life, and NY Life at 102.098% the par value of the loan.  Once again, by selling the bonds on the Detrick loan above par value of the loan it had just issued, six days prior to closing, GMAC was able to reap more than a million dollars of immediate profits while simultaneously assuring it took no risk on the loan it had issued. Contrary to GMAC and Ray's repeated representations to BBC, none of these profits, which could have represented savings for the borrower on its loan, were disclosed or "pass[ed] along" to the Detrick Project.

190.    Similar verbal misrepresentations—including that GMAC and later Jefferies were setting the Project loans at market rates, were bearing actual risk on the loans, and were passing any available savings on to the Projects—were made by Ray to BBC. BBC continued to rely on Ray's further verbal assurances of the above-mentioned misrepresentations on the successive Projects that BBC sponsored,

including the Bliss Project, the Carlisle Project, the AETC I Project, the Vandenberg Project, the AMC West Project, and the Lackland Project.  For each of the preceding BBC Projects, GMAC, and later Jefferies, failed to set the interest rate on the Project loan at market, and profited from either or both the pre-closing sale of bonds on the loans and collection of rate-lock fees while bearing no actual risk of market fluctuation.

191.    For example, at the Bliss Project (July 1, 2005), as reflected in documents obtained in the Debt Service Reserve Litigation, GMAC sold bonds on the Bliss loan to Fannie Mae, Metropolitan Life, Guggenheim, and Mutual of Omaha fourteen days before closing above the stated par value of the loan it had locked-in just one day earlier, and GMAC sold bonds on the Bliss loan to Freddie Mac and Farm Bureau ten days before closing above the stated par value of the loan it had locked in just five days earlier.  GMAC made millions of dollars in undisclosed profits on the pre-closing sale of bonds on the Bliss Project loan, none of which were passed on as savings to the Bliss Project.

**The Scheme Is Expanded To Include the OID Artifice.**

192.    The scheme was modified in 2006 to include the use of an OID to further mask the outsized and undisclosed profits taken by Ray, GMAC, and later Jefferies.  In or around 2006, Ray and GMAC began to request that the Projects accept what Ray termed an Original Issue Discount ("OID") on the loan.  In general, an OID occurs when a financial instrument sells for a price less than its stated redemption price at maturity.  Specifically, for the AETC I, Vandenberg, AMC West, and Lackland II Air Force Projects and for the Leavenworth, Rucker, Carlisle/Picatinny, and Sill Army Projects (including additional financings at Bragg and Stewart/Hunter in 2007 and 2008, respectively), Ray insisted on the use of an OID.

193.    Ray affirmatively misled the Projects regarding the need for, and purpose of, an OID.  In practice, GMAC and Ray purported to generate the loan interest rate at par pre-closing (which should be market), then took an OID to reduce the interest rate, but also decrease the actual loan proceeds received by the Project by an equivalent amount.  Ray, and those who worked for him, represented verbally and by email sent via interstate wires that the OID was financially neutral to the Projects, but that it helped GMAC/Jefferies sell the bonds post-closing at a discount to par.  Ray claimed prospective bond buyers were increasingly unwilling to pay fair value above par, which would occur

if interest rates moved lower after the closing of the transaction.  In an email dated September 2006, Ray represented to Lou DeRogatis at BBC that the "only" purpose of the OID was to ensure GMAC could sell the bonds post-closing at a discount to par and that the Projects would not suffer any financial harm.

194.    The Projects relied on these false representations to their detriment.  In fact, Ray used the OID as a tool to conceal that he was selling the bonds prior to closing at a substantial and secret profit.  By suggesting that he sought to sell the bonds after close at a discount to premium by using the OID, Ray caused the Projects to believe that GMAC and later Jefferies were taking genuine market risk.  In reality, before setting the OID, Ray knowingly set the credit spread at an above market level as before, having pre-sold the bonds prior to the loan closing, therefore taking no real market risk post close.  At times, Ray's scheme was so successful that he made undisclosed profits pre-close both by selling the bonds at a premium above par and by taking an OID profit.

195.    Ray's use of the OID allowed him to monetize and conceal his frauds on the borrowers, but it did not adversely affect any noteholder or investor.  Because Ray had fraudulently inflated the borrower's interest rates above market, the eventual bondholders were in a net-neutral position after the OIDs were applied.  It was solely the Projects who bore the harm of inflated interest rates and/or inflated principal balances attributable to the OIDs.

196.    The Leavenworth Project was the first instance in which GMAC used an OID to conceal and monetize their profit.  Even though the bonds were sold well in advance of the closing, such that there was no economic purpose for an OID, Ray and GMAC charged a 0.7%-1.0% OID on the Leavenworth bonds.  As reflected in documents obtained in the Debt Service Reserve Litigation, this lowered the premium above par at which the bonds sold, and allowed Ray and GMAC to make millions of dollars in profits on the pre-closing sale of bonds on the Leavenworth loan, none of which was disclosed or passed on as savings to the Leavenworth Project.

197.    Ray misrepresented to Michaels that GMAC was setting the Project loans at market rates, was bearing actual risk on the loans, and was passing any available savings on to the Projects.  Michaels relied on these verbal misrepresentations at the Leavenworth Project where, consistent with the scheme described above, GMAC failed to set the interest rate on the Project loan at true market rates,

and thus profited from the pre-closing sale of bonds.  As reflected in documents obtained in the Debt Service Reserve Litigation, GMAC sold bonds on the Leavenworth loan to, among others, Freddie Mac, Great West Life, Farm Bureau, Phoenix Life, and FSA on February 23-24, 2006, six to seven days before closing, at a price above the stated par value of the loan.

198.    Likewise at the Carlisle Project (which closed on July 21, 2006), as reflected in documents obtained in the Debt Service Reserve Litigation, GMAC sold bonds on the Carlisle loan to Farm Bureau and Phoenix Life on July 19, 2006, two days before closing, at a price above the stated par value of the loan it had locked-in that same day.  Then, as reflected in documents including the July 2006 loan commitment letter, without any legitimate purpose or justification, GMAC applied a 1% OID, locking in more than one million dollars in profits on the Carlisle loan, most of which was on the pre-closing sale of bonds and not disclosed or passed on as savings to the Carlisle Project on its loan.

199.    Subsequently, Defendants made similar intentional misrepresentations to conceal the improper profit at the Carlisle Project.  In September 2006, for example, the BBC project management team had discussions with GMAC and Ray regarding an OID taken on the Carlisle/Picatinny Project near the time of the Project's closing and an OID that GMAC requested on the pending AETC I Project.  One of Ray's chief lieutenants (Craig Sands), with Ray's knowledge, misrepresented in writing using interstate wires that in using the OID "all GMAC was doing" was swapping out interest and replacing it with principal.  That was not accurate in that GMAC was using the OID to lock in and mask the taking of secret profits prior to the close of the loan transaction.  GMAC also represented in writing that the Carlisle/Picatinny interest rate was at "market rate," when it knew this was false—Ray's team again sold the bonds prior to close at a significant profit, meaning the loan interest rate was by definition above market.

200.    At AETC I (which closed on February 6, 2007), as reflected in documents obtained in the Debt Service Reserve Litigation, GMAC sold bonds on the AETC I loan to, among others, Farm Bureau and Genworth Financial within five days of closing, at a price above the stated par value of the loan. GMAC again made millions of dollars in profits on the pre-closing sale of bonds on the AETC I loan, none of which was disclosed or passed on as savings to the AETC I Project.

201.     At the Vandenberg Project (which closed on November 1, 2007), as reflected in documents obtained in the Debt Service Reserve Litigation, GMAC sold bonds on the Vandenberg loan to Freddie Mac and Fannie Mae at a price above the stated par value of the loan.  They then applied a 2% OID. GMAC made millions of dollars in profits on the pre-closing sale of bonds on the Vandenberg loan, none of which was disclosed or passed on as savings to the Vandenberg Project.

202.     At the AMC West Project (which closed on July 21, 2008), as reflected in documents obtained in the Debt Service Reserve Litigation, GMAC sold bonds on the AMC West loan to, among others, Farm Bureau on July 10, 2008, eleven days before closing, at a price above the stated par value of the loan it had locked-in that same day.  To disguise the above market rate, Ray and GMAC applied a 2.25% OID.  This allowed them to make millions of dollars in profits on the pre-closing sale of bonds on the AMC West loan, none of which was disclosed or passed on as savings to the AMC West Project.

203.     At the Lackland Project (which closed on December 23, 2008), as reflected in documents obtained in the Debt Service Reserve Litigation, GMAC sold bonds on the Lackland loan to Freddie Mac and Guggenheim at a price above the stated par value of the loan.  GMAC made millions of dollars in profits on the pre-closing sale of bonds on the Lackland loan, none of which was disclosed or passed on as savings to the Lackland Project.

204.     Jefferies continued the scheme at the Bliss Project when issuing follow-on financing on November 21, 2012.  Within one week of closing, as reflected in documents obtained in the Debt Service Reserve Litigation, GMAC sold bonds on the Fort Bliss 2012 follow-on financing to, among others, Unum Life and American Equity at a price above the stated par value rate of the loan.  Jefferies neither disclosed nor passed on any of the profits it made from the sale of bonds or the follow-on financing to the Bliss Project.

**Fraudulent Charging of Rate Lock Fees.**

205.     As noted previously, GMAC first rolled out its purported open book process of generating market interest rate for the Project loans at the Meade and Bragg Projects, developed by the Army and Corvias.  In an October 3, 2002 letter to Chris Bicho of Corvias, Ray represented that GMAC was "██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

██████ " In an October 2002 loan commitment letter for Fort Bragg, Ray represented that the credit spread on the loan for the Bragg Project (which closed on August 1, 2003) "████████████████████████████████████████████████████████ " On May 8, 2003, Ray and GMAC induced Corvias to authorize payment of a $3.5 million rate-lock fee to GMAC to guarantee this purported market interest rate through closing.  This fee was paid in consideration for GMAC appearing to bear the risk of market fluctuation on the interest rate between then and the time of the bond sale, which Ray represented to Corvias was a significant risk that justified the rate-lock fee charged.  Ray also represented to Corvias that he and GMAC were acting as the Bragg Project's financial advisor and would pass on any available savings on the Bragg loan to the Bragg Project.

206.    The very same day the Bragg Project paid the rate-lock fee, however, as reflected in documents obtained in the Debt Service Reserve Litigation, GMAC sold bonds on the Bragg loan to Fannie Mae, Phoenix Life, and Mutual of Omaha, followed by sales to NY Life and Freddie Mac over the following days.  By selling bonds on the Bragg Project's loan the very same day it agreed to guarantee the Bragg Project's interest rate on the loan, GMAC was able to unload any risk of market fluctuation, for which it had just induced the Bragg Project to pay $3.5 million.  Contrary to its representation to Corvias, none of these profits, which could have represented savings for the borrower on its loan, were disclosed or passed along to the Bragg Project.

207.    GMAC, through Ray, made similar misrepresentations to Corvias shortly after the Bragg Project closed at the Polk Project.  In a July 31, 2003 letter to Chris Bicho, Ray once again  represented that GMAC was "████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████ " In an ██████████████████████████████ represented that the credit spread on the loan for the Polk Project (which closed on September 15, 2004) "████ ██████████████████████████████████████ " A few months later, in June 2004, GMAC and Ray purported to set the credit spread and interest rate on the Polk loan at market.  On June 8, 2004, Ray and GMAC induced Corvias to authorize payment of a $1.7 million rate-lock fee to GMAC to guarantee this purported market interest rate through closing.  This fee was paid in reliance on GMAC's representation that it was bearing the risk of market fluctuation on the interest rate

between then and the time of the bond sale, which Ray represented to Corvias was a significant risk that justified the rate-lock fee charged.  Ray also made representations to Corvias that he and GMAC were acting as the Polk Project's financial advisor and would pass on any available savings on the Polk loan to the Polk Project.

208.    The very same day the Polk Project paid the rate-lock fee, however, GMAC sold bonds on the Polk loan to Freddie Mac, Farm Bureau, Phoenix Life, Mutual of Omaha, and Fannie Mae, above the par value of the loan.  By selling bonds on the Polk Project's loan the very same day it agreed to guarantee the Polk Project's interest rate on the loan, GMAC was able to unload any risk of market fluctuation, for which it had just induced the Polk Project to pay $1.7 million.  Additionally, by selling the bonds on the Polk loan above the par value of the loan it had just issued, GMAC was able to reap millions of dollars of immediate profits.  Contrary to its representation to Corvias, none of these profits, which could have represented savings for the borrower on its loan, were disclosed or passed along to the Polk Project.

209.    Similar misrepresentations—including that GMAC and later Jefferies were setting the Project loans at market rates, were bearing actual risk on the loans, and were passing any available savings on to the Projects—were made by Ray to Corvias.  Corvias continued to rely on Ray's further verbal assurances of the above-mentioned misrepresentations on the successive Projects that Corvias sponsored, including the Rucker Project, the Riley Project, and the Sill Project.  For each of the Rucker Project, the Riley Project, and the Sill Project, GMAC, and later Jefferies, failed to set the interest rate on the Project loan at market, and profited from either or both the pre-closing sale of bonds on the loans and collection of rate-lock fees while bearing no actual risk of market fluctuation.

210.    At the Rucker Project (which closed on April 3, 2006), as reflected in documents obtained in the Debt Service Reserve Litigation, GMAC sold bonds on the Rucker loan to Freddie Mac, Farm Bureau, FSA, and RBC three to four days before closing, at a price above the stated par value of the loan it had locked-in two weeks earlier.  GMAC then charged a 1% OID, even though interest rates had not moved enough during this time to justify one.  Through the inflated interest rate and related OID, GMAC made millions of dollars in profits on the pre-closing sale of bonds on the Rucker loan, none of which was disclosed or passed on as savings to the Rucker Project.

211.     At the Riley Project (which closed on July 3, 2006), as reflected in documents obtained in the Debt Service Reserve Litigation, GMAC sold bonds on the Riley loan to Freddie Mac, Farm Bureau, Phoenix Life, FSA, and RBC, among others, on June 29, 2006, four days before closing, at a price above the equivalent par value of the loan it had locked-in two weeks earlier.  GMAC again made millions of dollars in profits on the pre-closing sale of bonds on the Riley loan, none of which was disclosed or passed on as savings to the Riley Project.

212.     At the Sill Project (which closed on June 1, 2010), as reflected in documents obtained in the Debt Service Reserve Litigation, Ray and now Jefferies sold bonds to Mutual of Omaha, Unum Life, and American Equity, among others, on May 26, 2010, six days before closing, at a price above the stated par value of the loan it had locked-in that same day.

**Ray and Jefferies Misrepresented the OID to Further the Scheme.**

213.     Ray and Jefferies affirmatively concealed this, and the prior scheme, from Corvias and the Army, JLL, and the other developers.  The OID deception is well summarized in the following email exchange: Ray's long-time associate, Craig Sands, stated in a May 26, 2010 email to, among others, Ray as well as David Rozen and Ken Richard of Corvias, that the OID taken on the Sill Project "is consistent with how we've structured the rate lock on all projects for the last several years."  Thirty minutes earlier, with no one outside Jefferies copied, as reflected in documents obtained in the Debt Service Reserve Litigation, Sands emailed Ray and others at Jefferies, informing them that Jefferies was earning millions of dollars in profits on the pre-closing sale of bonds on the Sill loan, none of which was disclosed or passed on as savings to the Sill Project.  Both the Corvias project management team and the Army's advisor, JLL, inquired specifically about how Ray, now on behalf of his new firm Jefferies, was pricing and marketing the bonds and whether Jefferies was making a profit on the bonds at the expense of the Sill Project.  In an August 2010 email, Ray denied to Corvias (Ken Richard) that Jefferies was making hidden profits on the sale of the Fort Sill bonds.  Ray reiterated these misrepresentations to Corvias, claiming in this email that Jefferies was taking significant market risk in connection with selling the bonds after the closing of the Project's loan by referring to Jefferies taking "premium dollar price risk that we could potentially face if Treasuries continued to rally."  Ray's statement was false, because as in other prior deals as alleged herein and as revealed in

the Debt Service Reserve Litigation documents, Ray, and this time Jefferies, had sold the bonds prior to the loan closing at an out-sized and undisclosed profit. Ray confirmed a pattern and practice of racketeering by further stating in this email that the financing of the Sill Project had been handled "exactly how we financed" previous Corvias MHPI Projects (Meade, Bragg, Polk, Rucker, Riley)—in other words conceding via interstate wires that all such Projects had been similarly the subject of his racketeering conduct.

214.    GMAC and Jefferies did not make misrepresentations, on the other hand, to the third-party investors who purchased the bonds. Those purchasers (including Ambac) received full and accurate disclosures and the specific income stream represented. The Project loan interest rates were fixed and known, and the bonds were sold to sophisticated institutional investors with a prospectus that accurately disclosed the Project financials and details. Indeed, the bonds have all performed as represented to the third-party investors, with not a single default. This was integral to the scheme; to continue to make outsized and undisclosed profits, Ray needed to ensure that the bond purchasers would continue to buy bonds in subsequent Projects and never claim they had been misled.

**Defendants Further Concealed the Fraud With Their "Stealth Structure."**

215.    In 2005, the Army made an important change to the MHPI bidding process. Starting with the Bliss Project, the Army through JLL requested that the Project credit enhancement be competitively bid.

216.    This posed a serious threat to Defendants' enterprise. First, it would lessen Ambac's ability to charge inflated credit enhancement fees. Second, it created risk that a competitive bidding process would result in selection of a different company, one that would not cooperate in Defendants' enterprise including exposing the Ray scheme to take profits from the bond sale.

217.    In response, and in an effort to conceal the fact that Ambac and GMAC had an "exclusive relationship" and that credit enhancement was thus not being competitively bid and negotiated by Ray as he had represented, Defendants created a self-termed "stealth" structure, in which there would be no competitive bidding process, and Ambac would be placed as the Project's credit enhancer without the knowledge of the developer or the Army.

218.    Under the stealth structure, Ambac's role as credit enhancer and its credit enhancement fees were not disclosed to either the borrower or the Army.  Instead, the Loan Agreement for each stealth Project clearly indicated that there would be no credit enhancement at closing, and that any future credit enhancement obtained by the lender would be "at the lender's expense."

219.    Internal GMAC emails obtained in the Debt Service Reserve Litigation, reflect that Ray, in collusion with Ambac, failed to competitively bid credit enhancement at the stealth Projects despite continuing to hold himself out as a financial advisor and agent of the Projects.  For example, in June 2005, Ray was contacted by an employee of MBIA, Mr. Chafizadeh, seeking more business. Ray, in response, falsely explained that he had not accepted any competitive bids for Bliss credit enhancement, because he "just felt like I owed Ambac the next one."  This MBIA representative made clear that MBIA could beat Ambac substantially on price and terms.  As Ray admitted, none of this was communicated by him or his team to the Projects, JLL or the Army and instead he was able to continue the scheme with Ambac through the stealth structure.

220.    As reflected in documents obtained in the Debt Service Reserve Litigation, at each stealth Project, Ambac secretly provided (and was secretly paid for) two separate types of credit enhancement. First, Ambac entered into an undisclosed Credit Enhancement Agreement, for which it was paid an undisclosed monthly premium for insuring the principal balance of the loan.  As reflected in numerous Ray emails, this Credit Enhancement Agreement was expressly concealed from the Borrower and the Army, describing such an arrangement as "hush, hush."

221.    In addition to the Credit Enhancement Agreement, Ambac also insured one year's worth of annual debt service at each stealth Project.  To accomplish this, Jefferies/GMAC entered into a liquidity facility guarantee with each stealth Project.  This facility guaranteed one year's debt service.

222.    However, unbeknownst to the borrowers and the Army, Jefferies/GMAC never actually bore any risk under the liquidity facility guarantees, because immediately at closing these liquidity facility guarantees were assigned to Ambac.  As negotiated in 2005 emails between Ray and Marfatia, Ambac and Jefferies/GMAC split the fees for these policies, as Ambac only charged a 1% premium for the assigned liquidity facility.  This 1% premium reflected the actual market premium for the policy, and the 1% retained by Jefferies/GMAC was a pure kickback for which they bore no actual market risk.

223.    This self-described stealth structure allowed Defendants to further conceal the scheme and to avoid the competitive bidding process, provided GMAC with an unearned profit in the form of the liquidity facility fee split, and ensured that no third-party credit enhancer would be placed at the MHPI Projects.  The stealth structure thus had many fraudulent purposes and was repeatedly referenced in GMAC/Ambac emails.

224.    In fact, at the stealth Projects, the credit enhancement documents were listed on a secret, Ambac-only closing index communicated via email and were not provided to either the borrower or the Army.

225.    On June 21, 2005, Michael Johnson of Kutak Rock (counsel for Jefferies) wrote to Marfatia and others, explaining that the documents disclosing Ambac's role in the Bliss Project were in an "addendum to the closing index. . . that are not included in the main part of the closing index.  This addendum is not being shared with the Army or the Borrower."

226.    After the Bliss closing, as reflected in documents obtained in the Debt Service Reserve Litigation, Ambac and Jefferies went on to use the stealth structure at the Leavenworth Project.  There, Marfatia flatly asked Craig Sands at GMAC in an email "if the borrower knows we are insuring the loan."  Sands confirmed in an email response that "they do not."  This was consistent with the email instructions Marfatia received from Ray.

227.    That same day, representatives for the Leavenworth Project at Michaels (Mr. Young) contacted Shawn Willette at Kutak Rock to inform him via email that they "were not anticipating that [the Project's] obligations were being insured and [had] not budgeted the payments of any premiums therefor."   Despite knowing that Ambac was secretly providing credit enhancement at the Leavenworth Project and charging a fee for it, Ambac emailed back to the Project's representatives, falsely stating that "there is no premium for this policy."

228.    Defendants also used the stealth structure at the Carlisle/Picatinny Project.   On March 23, 2006, Bruce Robinson with the Michaels Organization wrote to Ray in an email, discussing possibly using credit enhancement at the Carlisle/Picatinny Project.  Robinson emphasized the need to competitively bid credit enhancement for the Project to avoid further "pushback" from JLL.

229.    Ray forwarded Robinson's email to Marfatia, without copying Robinson.  He noted that Goldman Sachs ("GS") was actively competing with Ambac to provide credit enhancement at military projects.  According to Ray, the best solution to this competition, Ray said, was "to say we aren't using credit enhancement."  Ultimately, that is exactly what Defendants did, using the stealth structure to place Ambac as the Carlisle/Picatinny credit enhancer without disclosing it to the Borrower or the Army and without competitively bidding the Project.  This allowed Ambac to extract an undisclosed credit enhancement fee that was secretly baked into the insurance stack.

230.    The stealth structure was so important to Ambac's success that Marfatia was lavishly praised for it in his 2006 annual review.  In his Ambac "Performance Evaluation" communicated via email at Ambac, Marfatia's boss noted that it faced "extreme competition from other enhancers such as MBIA, XL and newcomer CIFG. . ." in placing credit enhancement at MHPI Projects.  Marfatia was praised by his boss for "immers[ing] himself in fighting this competition by persuading GMAC to change to a stealth secondary market execution on military housing transactions."  "This proved successful as Marfatia's relationships were the key to Ambac being awarded eleven transactions in 2005."

231.    Internal Ambac emails (again all obtained in the Debt Service Reserve Litigation) show that even site visits were cloaked in stealth in order to deceive the borrowers and the Army as to Ambac's role.  In November 2006, Marfatia specifically directed another Ambac employee that he must "go stealth as before" on a site visit, going even so far as to suggest that an Ambac employee should "go [on a site visit] and pretend he works for Capmark."  Craig Sands, in order to prevent the borrower and the Army from learning about Ambac's role during a Ft. Lee site visit, instructed a senior Ambac employee to attend the site visit "in stealth mode."

232.    The stealth structure was used at, at least, the Bliss, Leavenworth, Carlisle, Riley, Rucker, AETC, AMC West, and Vandenberg Projects.  At each of these stealth Projects, the Loan Agreement stated that any credit enhancement would be at lender's expense.  In addition, at each stealth Project, the documents disclosing Ambac's role and fees were kept off the closing index delivered to Borrower, and only listed on a secret stealth index delivered to Ambac.

**Jefferies Buys the MHPI Business and Continues the Fraud With Ray.**

233.    By 2012, Ray and Jefferies had not only fine-tuned their fraud scheme, but knew that opportunities to commit such MHPI transactional frauds were diminishing.  By then, most of the housing in the Armed Forces bases had been privatized, and so what largely remained for Ray and Jefferies, were additional financings at bases where Ray had initially committed fraud.  Thus, in 2011 and 2012, when the Bliss Project determined it needed an additional $140 million (approximately) in debt to further increase the Armed Forces housing scope at Bliss—as approved by the Army—Ray and Jefferies saw this as one of the last opportunities to make secret profits.  Thus, as planned and executed, on the 2012 Bliss financing, Ray and Jefferies reaped greater secret profits (on a percentage basis)—secured prior to closing—than on any of the other referenced MHPI Project transactions.

234.    As part of the 2005 fraudulent Bliss transaction, Ray secured for GMAC a right of first refusal (a right now owned by Jefferies) to issue any additional debt needed by the Bliss Project.  In exercising their fraudulently obtained right, Ray and Jefferies assured the Bliss Project that the loan from Jefferies Mortgage was at market rate.  In truth, Ray and Jefferies had secret pre-commitments from investors to buy the debt at a staggering 8% above par—reflecting a highly inflated interest rate on the loan.  In fact, the excess interest rate that Jefferies Mortgage charged the Bliss Project was so significant that Ray and Jefferies Mortgage carved out a separate Interest Only strip at 0.576% and securitized it in the form of a bond.

235.    Ambac's consent was required for this transaction.  In November 2012, Ray communicated to Ambac via email (specifically, Greendale) that again he had pre-sold the bonds prior to closing and needed prompt Ambac consent.  Ambac, as a co-conspirator who had received an inflated credit enhancement fee on the 2005 Bliss transaction and also had approval rights over the issuance of additional debt, readily consented to the fraudulent transaction.  Thus, on the last fraudulent MHPI transaction, not only did Ray and Jefferies reap extraordinary undisclosed profits on the pre-sale of the bonds, but Ambac consented to the transaction in its long-held role as co-conspirator.

236.    As alleged herein and as a result of Defendants' misrepresentations and omissions, GMAC and, later, Jefferies saddled the Projects with an interest rate that was above market for the life of these loans and also were required to pay excess amounts in insurance premiums on the underlying loan

amounts.  Had the Projects known that GMAC and Jefferies were making these undisclosed profits from securitizing the loans pre-closing, they would have had the option either to demand a lower interest rate or to seek more competitive rates from these or other lenders.  Likewise, the Projects in which Ambac is involved (including all but the Fort Sill Army Project and the Lackland II Air Force Project) would have used this information to negotiate better insurance premiums if needed, and either better surety fees or a deal where no surety or bond insurance was required.

### C.     GMAC and Ambac conspired to charge the Projects inflated expenses.

237.     GMAC and Jefferies also charged the Projects other unjustified and undisclosed fees, which were disguised and misrepresented in the closing instructions.  For example, GMAC charged several of the Projects a $75,000 fee for undescribed "expenses."  After closing, GMAC then secretly wired this money to Ambac as part of their scheme.

238.     GMAC and Jefferies also negotiated a cap on their expenses with the Projects, representing that they would not charge more than a certain amount for expenses actually incurred.  Instead, they charged the amount of the negotiated cap, and then made an undisclosed profit, by charging these Projects hundreds of thousands of dollars more than it had actually incurred in expenses.  Ray earned 40% of all profits on the expense charges.  Collectively, GMAC and Ambac charged several million dollars more in transactional expenses than actually incurred.

239.     As Marfatia admitted to Craig Sands (Ray's chief lieutenant) in a 2008 email exchange, "[w]e used to fudge all additional and ongoing expenses" but the current ability to do that given increased financial oversight has "gone the way of the do-do bird."

### D.     Ray and Marfatia acted within the scope of their employment for the benefit of Ambac, GMAC, and Jefferies in carrying out the scheme.

240.     During all relevant time periods, Ray was a senior employee and Managing Director of GMAC and later of the Jefferies entities as alleged herein.

241.     Marfatia was acting in the scope of his employment and, in part, for the benefit of his employer Ambac when he worked to arrange the financing for the Projects and, in the process, executed the aforementioned schemes to defraud.

242.    Ray's and Marfatia's superiors, including the various credit committees of their employers, approved of Ray's and Marfatia's acts and conduct as alleged herein that generate the revenue and profits for their respective companies.

243.    GMAC, Jefferies and Ambac benefited from the aforementioned schemes to defraud through receipt of hundreds of millions of dollars in fees and profits taken from the Projects.   Jefferies and Ambac are thus liable for the tortious and fraudulent conduct of Ray and Marfatia.

**III.    In Late 2016 Jefferies and Ray Further Conspire, Including With Ambac, to Spoliate Evidence and Conceal the RICO Proceeds Through a Fraudulent Transfer.**

244.    The long-running scheme only began to come to light in late 2016 in the context of the Debt Service Reserve Litigation that Ambac had threatened and initiated against several MHPI Projects.   In connection with their fraudulent scheme, Ambac and GMAC demanded a provision in the Projects' loan documents that purportedly provided that if Ambac's credit rating fell below a certain credit rating, which it did in the fall of 2008, the Projects had a contractual obligation to provide a replacement surety or cash fund a debt service reserve.   But for the fraud, this contractual provision would not have existed between the parties.   From 2008 until 2015, Ambac took no steps to legally enforce the ill-gotten provision, but instead looked for other ways to create leverage with the Projects (for example, by attempting to negotiate additional rights, including enhanced consent rights) based on the purported obligation to cash fund or replace the surety.

245.    But for the underlying litigation that ensued as a result of Ambac's desire to force cash funding to increase the value of its own MHPI bond holdings, the long-running scheme by Ambac and GMAC likely would never have come to light.   After the Debt Service Reserve Litigation was filed, Ambac fought discovery relating to its MHPI Projects' bond purchases but it was forced by court orders to provide such discovery.   As a result, in late 2016 and early 2017, the above multi-faceted scheme began to surface.

246.    Ray and Jefferies, who were no doubt aware that Ambac had ultimately filed suit against the Meade Project in October 2015, and who had gone to great lengths to conceal their hidden profits from the Projects as detailed above, were subpoenaed for documents.   However, recognizing that Jefferies had purchased the GMAC MHPI assets, including its books and records and documentation of the

above schemes, Jefferies and Ray went to extraordinary lengths to avoid discovery.  In response to motions brought by the Monterey Plaintiffs in California state court, Jefferies and Ray made numerous false representations to the Court and to Plaintiffs—including claiming "they had no responsive documents."   Nonetheless, the California state court granted five discovery orders compelling discovery from Jefferies, including producing Ray's early GMAC documents and emails.

247.   Within hours after Ray and Jefferies had received subpoenas for the transactional documents in the underlying litigation, Ray, while a Managing Director of Jefferies and with Jefferies' knowledge after consulting with Jefferies in-house counsel who issued no document preservation notice, began to delete thousands of responsive MHPI documents on the Jefferies document system—including files related to the subject matter of the above-described schemes.  In a matter of a few days, Ray attempted to delete over 9,100 electronic documents from the Jefferies' electronic data system server after he and Jefferies were subpoenaed.  No one at Jefferies attempted to stop Ray from this unlawful act. Jefferies and Ray subsequently misled Plaintiffs and the California Court in attempting to hide this massive act of intentional document spoliation by claiming they personally investigated and ensured through a viewing of Jefferies access logs that no such deletions had occurred.  These statements by Jefferies were knowingly false.  Two days after the California Court issued its February 6, 2017 order granting the Monterey Plaintiffs' motion to compel Jefferies to produce the access logs, which detailed Ray's minute-by-minute deletion of records from Jefferies' document system, on February 8, 2017, the Jefferies Defendants attempted to dissolve Jefferies Mortgage—the Jefferies party before the California state court.

248.   As part of discovery during the Debt Service Reserve Litigation, Ray also was personally served with a subpoena for documents within his personal possession and control.  As stated above, for years, including after Ray was served with the subpoena, Ray sent MHPI Project-related documents, some of which were responsive to the subpoena requests, to his personal email address, annandale.plantation@gmail.com.   Despite this, Ray's outside counsel, who at the same time represented Jefferies, represented in writing that Ray had no documents responsive to the subpoena served upon him in that litigation.  Ray further confirmed the same in a sworn declaration sent via

interstate wires later served in connection with a motion to compel discovery from Jefferies.  Such statements were demonstrably false at the time they were made.

249.    Days after being confronted with evidence regarding his attempts to delete thousands of electronic documents and basic facts regarding the RICO enterprise described herein, Ray engaged in further efforts to conceal his ill-gotten RICO proceeds.  On March 10, 2017 (eight days after he was deposed, and the day after Jefferies' outside counsel stated in writing that they no longer represented Ray), Ray executed four deed transfers of real estate from his name to his wife's name, including the transfer of Ray's Pawleys Island, South Carolina beach house.  These real estate interests were worth millions of dollars and Ray transferred them all to his wife in consideration of "Five ($5.00) Dollars and Love and Affection."

250.    The March 10, 2017 deed transfers were attempts by Ray to conceal assets obtained via the RICO enterprise and an attempt to judgment-proof himself against a lawsuit, after he had been confronted with evidence of his intentional destruction of documents.  In recording and executing these deed transfers, Ray used or caused to be used interstate wires and/or the U.S. mail.

### Count I:  Violation of 18 U.S.C. §§ 1962(c)

### (Civil RICO)

### (Against All Defendants)

251.    Plaintiffs reallege, as if fully set forth herein, the allegations set forth in the preceding paragraphs.

252.    Plaintiffs are all "persons," who have sustained injury to their business or property by reason of Defendants' conduct within the meaning of 18 U.S.C. § 1964(c).

253.    Defendants Ambac, Ray, Marfatia, and Jefferies are "persons" within the meaning of 18 U.S.C. § 1961.

254.    Defendants are "culpable persons" within the meaning of 18 U.S.C. § 1962(c).

255.    Defendants, along with GMAC, associated together as an "enterprise" within the meaning of 18 U.S.C. § 1961(4).  Each of the Defendants participated in this enterprise in its various permutations in order to engage in a pattern of racketeering activity designed to mislead Plaintiffs and to thereby ensure that Plaintiffs would continue to pay Ambac's and GMAC's premiums, profits and fees (both

disclosed, inflated and undisclosed) in connection with the financing at each of the military housing Projects.  This enterprise consisted originally of Ambac, Marfatia, GMAC, and Ray (and, over time, Jefferies).

256.    As Ray and other individuals moved to and worked at other organizations, including Jefferies, Ambac and Marfatia worked with Ray and thus associated in fact with Ray, GMAC, and Jefferies to continue to conceal and effectuate this pattern of racketeering activity.

257.    Defendants engaged and participated in a pattern of racketeering activity as set forth in 18 U.S.C. § 1961(1).  Specifically, as alleged herein, each of the Defendants engaged in at least two incidents of mail fraud in violation of 18 U.S.C. § 1341 and/or wire fraud in violation of 18 U.S.C. § 1343.  More specifically, various elements of the RICO scheme were carried out, recorded, and communicated through the use of interstate wires and the U.S. mails.

258.    Defendants, along with other members of the enterprise, intentionally devised and participated in a scheme to intentionally defraud Plaintiffs out of money.

259.    Each mailing and/or use of interstate wires by any one of the Defendants in connection with the scheme to defraud represents a separate violation of 18 U.S.C. § 1341 and § 1343 and includes at least the following:

    a)    Using the U.S. mails and/or interstate wires to deceive the Plaintiff Projects and Army/Air Force into believing that Ray and GMAC would act as a financial advisor and Agent on behalf of the Projects and negotiate with Ambac on behalf of the Projects;

    b)    Using the U.S. mails and/or interstate wires to deceive the Projects and Army/Air Force into believing that GMAC and Ambac would act in the interests of the Projects to ensure that the Projects received the highest possible ratings;

    c)    Using the U.S. mails and/or interstate wires to deceive the Projects and Army/Air Force into believing that the insurance portion of any financing transaction was competitively bid out;

    d)    Using the U.S. mails and/or interstate wires (including for the transmission of email) to deceive the Projects and Army/Air Force into believing that the rating agencies required a surety bond and that the fee for the surety bond was the product of arm's-length negotiations;

    e)    Using interstate wires to communicate with S&P, Moody's, and potentially other rating agencies, including about the "shadow ratings" for the military housing projects;

f)      Using interstate wires to communicate among themselves regarding the scope and later concealment of their scheme to defraud;

g)      Using the U.S. mails and/or interstate wires to charge and receive inflated fees from the Projects and from the bond investors;

h)      Using the interstate wires to mislead regarding the destruction of documents;

i)      Using the U.S. mails and/or interstate wires to conceal, and later fraudulently transfer, ill-gotten proceeds from the RICO enterprise; and

j)      Using the U.S. mails and/or interstate wires to mislead regarding the matters alleged herein.

260.    While many more predicate acts are detailed in paragraphs 85 to 251 above, it is clear that each named Defendant engaged in the following predicate acts resulting in harm to Plaintiffs, required to state a claim under the RICO statute.

261.    With respect to Ray's predicate acts and the resulting harm to each Plaintiff, Plaintiffs incorporate by reference the allegations herein and to avoid any doubt allege the following predicate acts against each Defendant:

- **Meade Project:** On or about April 3, 2001, Ray caused to be sent to Corvias representatives a presentation holding himself out as a financial advisor.  On June 29, 2001, Ray caused to be sent to Corvias representatives a commitment letter detailing the financing transaction for the Meade Project.  Ray caused these communications to be sent using either email or the U.S. mails.  These communications caused harm to the Meade Project by inducing Corvias to place its trust in Ray as a financial advisor, in furtherance of the fraudulent scheme, and binding the Project to a structure that was not the best it could obtain.

- **Bragg Project:** On October 4, 2002, Ray caused to be sent to Corvias representative Chris Bicho a commitment letter detailing the financing transaction for the Bragg Project.  On October 15, 2002, Ray caused to be sent to Corvias representatives responses to their Bragg Project debt competition questions touting credit enhancement by Ambac.  Ray caused these communications to be sent using either email or the U.S. mails.  These communications caused harm to the Bragg Project by inducing Corvias to place its trust in Ray as a financial advisor, in furtherance of the fraudulent scheme, and to purchase an unnecessary surety at an inflated price, and binding the Project to a structure that was not the best it could obtain.

- **Monterey Project:** On or about November 6, 2002, Ray caused responses to the request for proposals for the Monterey Project financing to be sent to Clark representatives.  On August 20, 2003, Ray caused to be sent to Clark representatives a commitment letter detailing the financing transaction for the Monterey Project.  Ray caused these communications to be sent using either email or the U.S. mails.  These communications caused harm to the Monterey Project by inducing Clark to place its trust in Ray as a financial advisor, in furtherance of the fraudulent scheme, and to purchase an unnecessary surety at an inflated price, and binding the Project to a structure that was not the best it could obtain.

- **Stewart Project:** On or about April 8, 2003, Ray caused to be sent to BBC representatives a response to their request for proposals for the Stewart Project financing.  On June 19, 2003, Ray caused to be sent to BBC representatives a commitment letter detailing the financing transaction for the Stewart Project.  Ray caused these communications to be sent using either email or the U.S.

mails.  These communications caused harm to the Stewart Project by inducing BBC to place its trust in Ray as a financial advisor, in furtherance of the fraudulent scheme, and to purchase an unnecessary surety at an inflated price, and binding the Project to a structure that was not the best it could obtain.

- **Detrick Project:** On or about October 7, 2003, Ray caused to be sent to BBC representatives a response to their request for proposals for the Detrick Project financing.  On April 26, 2004, Ray caused to be sent to Austin Repetto of BBC's partner GMH Military Housing a commitment letter detailing the financing transaction for the Detrick Project. Ray caused these communications to be sent using either email or the U.S. mails.  These communications caused harm to the Detrick Project by inducing BBC to place its trust in Ray as a financial advisor, in furtherance of the fraudulent scheme, and to purchase an unnecessary surety at an inflated price, and binding the Project to a structure that was not the best it could obtain.

- **Polk Project:**  On or about July 31, 2003, Ray caused to be sent to Corvias representatives a response to their request for proposals for the Polk Project financing.  On June 9, 2004, Ray caused to be sent to Corvias representatives a commitment letter detailing the financing transaction for the Polk Project.  Ray caused these communications to be sent using either email or the U.S. mails.  These communications caused harm to the Polk Project by inducing Corvias to place its trust in Ray as a financial advisor, in furtherance of the fraudulent scheme, and to purchase an unnecessary surety at an inflated price, and binding the Project to a structure that was not the best it could obtain.

- **Bliss Project:**  On or about March 3, 2005, Ray caused to be sent to BBC representatives a response to their request for proposals for the Bliss Project financing.  On June 16, 2005, Ray caused to be sent to a representative of MBIA an email declining MBIA's credit enhancement services for the Bliss Project financing.  Ray caused these communications to be sent using either email or the U.S. mails.  These communications caused harm to the Bliss Project by inducing BBC to place its trust in Ray as a financial advisor, in furtherance of the fraudulent scheme, and to pay for undisclosed credit enhancement, which had not been put out for competitive bid as required.

- **Leavenworth Project:**  On or about March 15, 2005, Ray caused to be sent to Michaels representatives responses to questions concerning GMAC's financing proposal for the Leavenworth Project.  On March 1, 2006, Ray caused to be sent to Michaels representative John O'Donnell a commitment letter detailing the financing transaction for the Leavenworth Project.  Ray caused these communications to be sent using either email or the U.S. mails.  These communications caused harm to the Leavenworth Project by inducing Michaels to place its trust in Ray as a financial advisor, in furtherance of the fraudulent scheme, and to pay for undisclosed credit enhancement, which had not been put out for competitive bid as required, and binding the Project to a structure that was not the best it could obtain.

- **Rucker Project:**  On or about June 21, 2005, Ray caused to be sent to Corvias representative Rasim Moid a response to their request for proposals for the Rucker Project financing.  On March 16, 2006, Ray caused to be sent to Corvias representatives a commitment letter detailing the financing transaction for the Rucker Project. Ray caused these communications to be sent using either email or the U.S. mails.  These communications caused harm to the Rucker Project by inducing Corvias to place its trust in Ray as a financial advisor, in furtherance of the fraudulent scheme, and to pay for undisclosed credit enhancement, which had not been put out for competitive bid as required, and binding the Project to a structure that was not the best it could obtain.

- **Riley Project:**  On September 16, 2005, Ray caused to be sent to Corvias representative Chris Bicho a response to their request for proposals for the Riley Project financing.  On June 15, 2006, Ray caused to be sent to Corvias representative Rasim Moid a commitment letter detailing the financing transaction for the Riley Project.  Ray caused these communications to be sent using either email or the U.S. mails.  These communications caused harm to the Riley Project by inducing Corvias to place its trust in Ray as a financial advisor, in furtherance of the fraudulent

scheme, and to pay for undisclosed credit enhancement, which had not been put out for competitive bid as required, and binding the Project to a structure that was not the best it could obtain.

- **Carlisle Project:** On May 4, 2006, Ray caused to be sent to BBC representative Lou DeRogatis a commitment letter detailing the financing transaction for the Carlisle Project.  On July 19, 2006, Ray caused to be sent to BBC representatives another commitment letter updating details regarding the financing transaction for the Carlisle Project.  Ray caused these communications to be sent using either email or the U.S. mails.  These communications caused harm to the Carlisle Project by inducing BBC to pay for undisclosed credit enhancement, which had not been put out for competitive bid as required, and binding the Project to a structure that was not the best it could obtain.

- **AETC I, AMC West, Lackland, and Vandenberg Projects:** All of the above communications directed to BBC were used for the purpose of inducing the BBC Air Force Projects to retain Ray as a financial advisor and to rely on his representations regarding the financial structure for those Projects, including that credit enhancement was being competitively bid and that interest rates were at market.  These same predicate acts thus also caused direct harm to each of the BBC Air Force Projects, which have been saddled with high interest rates and sub-optimal financing structures.

- **Sill Project:** On or around January 8, 2008, Ray caused to be sent to Corvias representatives a response to their request for proposals for the Sill Project financing.  On August 6, 2010, Ray caused to be sent to Corvias representatives an email regarding the use of an OID at the Sill Project.  Ray caused these communications to be sent using either email or the U.S. mails.  These communications caused harm to the Sill Project by inducing Corvias to pay for undisclosed credit enhancement which had not been put out for competitive bid as required, binding the Project to a structure that was not the best it could obtain, and inducing Corvias to submit to an inflated and unnecessary OID charge.

- **All Plaintiffs:**  Ray committed at least two, and in fact dozens of, predicate acts with regard to each of the Plaintiffs, insofar as each of the relevant loan agreements, servicing agreements, credit enhancement agreements, and related transactions negotiated and arranged by Ray required the payment of funds by wire transfer or through the mail.  Accordingly, Ray caused the use of wires or the U.S. mails.  Such acts caused harm to the Projects in that each payment by the Projects incorporated improperly inflated fees and rates and permitted the fraud to remain financially viable and profitable; moreover, the payment of loan proceeds to the Projects by wire transfer was strictly necessary to trigger the Projects' payment obligations and encouraged the Projects' developers to work with the conspirators on other Projects.

262.   With respect to Jefferies' predicate acts and the resulting harm to each Plaintiff, Plaintiffs incorporate by reference the allegations herein and to avoid any doubt allege the following predicate acts against each Defendant:

- **All Plaintiffs:** On a monthly basis since Jefferies acquired the GMAC/Capmark military housing servicing business in 2009 through the present, Jefferies has used interstate wires to draw fees from each of the MHPI Projects in its servicing portfolio, including all of the Plaintiffs. Jefferies' role as servicer has harmed the Projects in at least two distinct ways.  First, it ensured that an objective third party would not have reason to examine the terms of the Projects' loans, threatening the discovery of the ongoing scheme.  Second, it effectuated the continued payments of inflated interest and fees by the Projects caused by the ongoing fraud.

- **Sill Project and All Corvias Projects:** On May 26, 2010, Jefferies sent to representatives of Corvias, the Army, and the Army's advisor JLL an email explaining the necessity of a 5% OID at the Sill Project, stating "this approach is consistent with how we've structured the rate lock on all

projects for the last several years." On August 6, 2010, Jefferies, through Ray, sent to Corvias representatives an email regarding the use of an OID at the Sill Project. Jefferies sent these communications using interstate wires. The communication caused harm to the Sill Project by inducing Corvias to submit to an unnecessary and inflated OID charge. These communications induced not only the Sill Project, but all of the Corvias Projects, including the Meade, Bragg, Polk, Riley, and Rucker Projects, to continue to rely on assurances from Ray and Jefferies and furthered the conspiracy by continuing to conceal the fraud.

- **Bliss Project and All BBC Projects:** On November 20, 2012, Jefferies, through Ray, sent to its counsel an email regarding an Interest Only Strip in the 2012 Bliss Project follow-on financing. Jefferies sent this communication using interstate wires. The communication caused harm to the Bliss Project by inducing not only the Bliss Project, but all of the BBC Projects, including the Stewart, Detrick, Carlisle, AETC, AMC West, Lackland, and Vandenberg Projects, to continue to rely on assurances from Ray and Jefferies and furthered the conspiracy by continuing to conceal the fraud.

263.    With respect to Ambac's predicate acts and the resulting harm to each Plaintiff, Plaintiffs incorporate by reference the allegations herein and to avoid any doubt allege the following predicate acts against each Defendant:

- **Meade Project:** On April 25, 2002, Marfatia sent an email to his Ambac colleagues regarding his efforts on behalf of Ambac to influence shadow ratings for military housing deals. On June 3, 2004, Ambac, through Marfatia, sent an email to a representative for Moody's discussing future and previous shadow ratings provided for certain military housing deals. These communications, sent by interstate wires, caused harm to the Meade Project, as well as, at a minimum, the Bragg, Monterey, and Stewart Projects for which Marfatia also obtained shadow ratings, by inducing the Projects to purchase unnecessary credit enhancement based on artificially depressed ratings.

- **Bragg Project:** On April 25, 2002, Marfatia sent an email to his Ambac colleagues regarding his efforts on behalf of Ambac to influence shadow ratings for military housing deals. On June 3, 2004, Ambac, through Marfatia, sent an email to a representative for Moody's discussing future and previous shadow ratings provided for certain military housing deals. These communications, sent by interstate wires, caused harm to the Meade Project, as well as, at a minimum, the Bragg, Monterey, and Stewart Projects for which Marfatia also obtained shadow ratings, by inducing the Projects to purchase unnecessary credit enhancement based on artificially depressed ratings.

- **Monterey Project:** On April 25, 2002, Marfatia sent an email to his Ambac colleagues regarding his efforts on behalf of Ambac to influence shadow ratings for military housing deals. On June 3, 2004, Ambac, through Marfatia, sent an email to a representative for Moody's discussing future and previous shadow ratings provided for certain military housing deals. These communications, sent by interstate wires, caused harm to the Meade Project, as well as, at a minimum, the Bragg, Monterey, and Stewart Projects for which Marfatia also obtained shadow ratings, by inducing the Projects to purchase unnecessary credit enhancement based on artificially depressed ratings.

- **Stewart Project:** On April 25, 2002, Marfatia sent an email to his Ambac colleagues regarding his efforts on behalf of Ambac to influence shadow ratings for military housing deals. On June 3, 2004, Ambac, through Marfatia, sent an email to a representative for Moody's discussing future and previous shadow ratings provided for certain military housing deals. These communications, sent by interstate wires, caused harm to the Meade Project, as well as, at a minimum, the Bragg, Monterey, and Stewart Projects for which Marfatia also obtained shadow

ratings, by inducing the Projects to purchase unnecessary credit enhancement based on artificially depressed ratings.

- **Detrick Project:** On December 7, 2006, Ambac, through Marfatia and Peter Hoffman, sent at least two emails to a representative of Standard & Poor's attempting to influence the post-closing shadow ratings for the Detrick Project and the Monterey Project. This communication, sent by interstate wires, caused harm to the Detrick Project, at a minimum, by allowing Ambac to benefit from an improvement to the previous shadow ratings, which Ambac had artificially depressed, and thereby perpetuating Ambac's taking of inflated fees.

- **Polk Project:** On August 26, 2004, Ambac, through Marfatia, sent an email to a representative of Moody's requesting a pre-closing shadow rating for the Polk Project. On September 8, 2004, Marfatia sent an email to his Ambac colleagues regarding ratings requested from Moody's for the Polk Project. These communications, sent by interstate wires, caused harm to the Polk Project by facilitating Ambac's effort to cap ratings artificially to justify credit enhancement for the financing and to extract unnecessary and inflated fees from the Polk Project.

- **Bliss Project:** On May 24, 2005, Ambac, through Marfatia, sent an email to Ray regarding the "secret rating deal" on the Bliss Project. On June 7, 2005, Ambac, through Marfatia, sent an email to Ray's team member Rob McIntire stating his assumption that Ambac's involvement "wrapping" the deal is "on the hush hush." These communications, sent by interstate wires, caused harm to the Bliss Project and the Carlisle, Leavenworth, Riley, and Rucker Projects which followed by permitting the use of the "stealth structure" fraud scheme to impose undisclosed and inflated fees on the Projects.

- **Leavenworth Project:** On May 24, 2005, Ambac, through Marfatia, sent an email to Ray regarding the "secret rating deal" on the Bliss Project. This communication, sent by interstate wires, caused harm to the Bliss Project and the Carlisle, Leavenworth, Riley, and Rucker Projects, which followed by permitting the use of the "stealth structure" fraud scheme to impose undisclosed and inflated fees on the Projects. On February 27, 2006, Ambac, through Marfatia, sent an email to Ray acceding to Ray's request to avoid sharing information with Michaels regarding the Leavenworth Project. This communication, sent by interstate wires, caused harm to the Leavenworth Project by concealing the use of Ambac for credit enhancement and subjecting the Leavenworth Project to inflated and unnecessary fees.

- **Rucker Project:** On May 24, 2005, Ambac, through Marfatia, sent an email to Ray regarding the "secret rating deal" on the Bliss Project. On June 7, 2005, Ambac, through Marfatia, sent an email to Ray's team member Rob McIntire stating his assumption that Ambac's involvement "wrapping" the deal is "on the hush hush." These communications, sent by interstate wires, caused harm to the Bliss Project and the Carlisle, Leavenworth, Riley, and Rucker Projects, which followed by permitting the use of the "stealth structure" fraud scheme to impose undisclosed and inflated fees on the Projects.

- **Riley Project:** On May 24, 2005, Ambac, through Marfatia, sent an email to Ray regarding the "secret rating deal" on the Bliss Project. On June 7, 2005, Ambac, through Marfatia, sent an email to Ray's team member Rob McIntire stating his assumption that Ambac's involvement "wrapping" the deal is "on the hush hush." These communications, sent by interstate wires, caused harm to the Bliss Project and the Carlisle, Leavenworth, Riley, and Rucker Projects which followed by permitting the use of the "stealth structure" fraud scheme to impose undisclosed and inflated fees on the Projects.

- **Carlisle Project:** On May 24, 2005, Ambac, through Marfatia, sent an email to Ray regarding the "secret rating deal" on the Bliss Project. On June 7, 2005, Ambac, through Marfatia, sent an email to Ray's team member Rob McIntire stating his assumption that Ambac's involvement "wrapping" the deal is "on the hush hush." These communications, sent by interstate wires, caused harm to the Bliss Project and the Carlisle, Leavenworth, Riley, and Rucker Projects which followed by

permitting the use of the "stealth structure" fraud scheme to impose undisclosed and inflated fees on the Projects.

- **AETC I, AMC West, Lackland, and Vandenberg Projects:** All of the above communications directed to BBC were used for the purpose of inducing the BBC Air Force Projects to retain Ray as a financial advisor and to rely on his representations regarding the financial structure for those Projects, including that credit enhancement was being competitively bid and that interest rates were at market. These same predicate acts thus caused direct harm to each of the BBC Air Force Projects, which have been saddled with high interest rates and sub-optimal financing structures.

- **All Plaintiffs:** Ambac committed at least two, and in fact dozens of, predicate acts with regard to each of the Plaintiffs, insofar as each of the relevant loan agreements, servicing agreements, credit enhancement agreements, and related transactions for Plaintiffs who received credit enhancement from Ambac required the payment of funds by wire transfer or through the mail. Accordingly, Ambac caused the use of wires or the U.S. mails. Such acts caused harm to the Projects in that each payment by the Projects incorporated improperly inflated fees and rates and permitted the fraud to remain financially viable and profitable; moreover, the payment of loan proceeds to the Projects by wire transfer was strictly necessary to trigger the Projects' payment obligations and encouraged the Projects' developers to work with the conspirators on other Projects.

264.    With respect to Marfatia's predicate acts and the resulting harm to each Plaintiff, Plaintiffs incorporate by reference the allegations herein and to avoid any doubt allege the following predicate acts against each Defendant:

- **Meade Project:** On April 25, 2002, Marfatia sent an email to his Ambac colleagues regarding his efforts to influence shadow ratings for military housing deals. On October 2, 2003, Marfatia sent an email to S&P representatives regarding the sharing of shadow ratings with the Monterey Project. These communications, sent by interstate wires, caused harm to, at a minimum, the Meade, Bragg, Monterey, Stewart, Detrick, and Polk Projects for which Marfatia also obtained shadow ratings, by inducing the Projects to purchase unnecessary credit enhancement based on artificially depressed ratings, by depriving the Projects of access to information which could help them assess the value of credit enhancement, and by strengthening Marfatia's ability to influence and control the issuance of shadow ratings.

- **Bragg Project:** On April 25, 2002, Marfatia sent an email to his Ambac colleagues regarding his efforts to influence shadow ratings for military housing deals. On October 2, 2003, Marfatia sent an email to S&P representatives regarding the sharing of shadow ratings with the Monterey Project. These communications, sent by interstate wires, caused harm to, at a minimum, the Meade, Bragg, Monterey, Stewart, Detrick, and Polk Projects for which Marfatia also obtained shadow ratings, by inducing the Projects to purchase unnecessary credit enhancement based on artificially depressed ratings, by depriving the Projects of access to information which could help them assess the value of credit enhancement, and by strengthening Marfatia's ability to influence and control the issuance of shadow ratings.

- **Monterey Project:** On April 25, 2002, Marfatia sent an email to his Ambac colleagues regarding his efforts to influence shadow ratings for military housing deals. On October 2, 2003, Marfatia sent an email to S&P representatives regarding the sharing of shadow ratings with the Monterey Project. These communications, sent by interstate wires, caused harm to, at a minimum, the Meade, Bragg, Monterey, Stewart, Detrick, and Polk Projects for which Marfatia also obtained shadow ratings, by inducing the Projects to purchase unnecessary credit enhancement based on artificially depressed ratings, by depriving the Projects of access to information which could help them assess the value of credit enhancement, and by strengthening Marfatia's ability to influence and control the issuance of shadow ratings.

- **Stewart Project:** On April 25, 2002, Marfatia sent an email to his Ambac colleagues regarding his efforts to influence shadow ratings for military housing deals.  On October 2, 2003, Marfatia sent an email to S&P representatives regarding the sharing of shadow ratings with the Monterey Project.  These communications, sent by interstate wires, caused harm to, at a minimum, the Meade, Bragg, Monterey, Stewart, Detrick, and Polk Projects for which Marfatia also obtained shadow ratings, by inducing the Projects to purchase unnecessary credit enhancement based on artificially depressed ratings, by depriving the Projects of access to information which could help them assess the value of credit enhancement, and by strengthening Marfatia's ability to influence and control the issuance of shadow ratings.

- **Detrick Project:** On October 2, 2003, Marfatia sent an email to S&P representatives regarding the sharing of shadow ratings with the Monterey Project.  This communication, sent by interstate wires, caused harm to, at a minimum, the Meade, Bragg, Monterey, Stewart, Detrick, and Polk Projects for which Marfatia also obtained shadow ratings, by inducing the Projects to purchase unnecessary credit enhancement based on artificially depressed ratings, by depriving the Projects of access to information which could help them assess the value of credit enhancement, and by strengthening Marfatia's ability to influence and control the issuance of shadow ratings.  On December 7, 2007, Marfatia sent an email to a representative of Standard & Poor's attempting to influence the post-closing shadow ratings for the Detrick Project and the Monterey Project.  This communication, sent by interstate wires, caused harm to the Detrick Project, at a minimum, by allowing Ambac to benefit from an improvement to the previous shadow ratings, which Ambac had artificially depressed and thereby perpetuating Ambac's taking of inflated fees.

- **Polk Project:**  On August 26, 2004, Marfatia sent an email to a representative of Moody's requesting a pre-closing shadow rating for the Polk Project.  On September 8, 2004, Marfatia sent an email to his Ambac colleagues regarding ratings requested from Moody's for the Polk Project.  These communications, sent by interstate wires, caused harm to the Polk Project by facilitating Ambac's effort to cap ratings artificially to justify credit enhancement for the financing and to extract unnecessary and inflated fees from the Polk Project.

- **Bliss Project:** On May 24, 2005, Marfatia, sent an email to Ray regarding the "secret rating deal" on the Bliss Project.  On June 7, 2005, Marfatia sent an email to Ray's team member, Rob McIntire, stating his assumption that Ambac's involvement "wrapping" the deal is "on the hush hush."  These communications, sent by interstate wires, caused harm to the Bliss Project and the Carlisle, Leavenworth, Riley, and Rucker Projects which followed by permitting the use of the "stealth structure" fraud scheme to impose undisclosed and inflated fees on the Projects.

- **Leavenworth Project:** On May 24, 2005, Marfatia, sent an email to Ray regarding the "secret rating deal" on the Bliss Project.  This communication, sent by interstate wires, caused harm to the Bliss Project and the Carlisle, Leavenworth, Riley, and Rucker Projects which followed by permitting the use of the "stealth structure" fraud scheme to impose undisclosed and inflated fees on the Projects.  On February 27, 2006, Marfatia sent an email to Ray acceding to Ray's request to avoid sharing information with Michaels regarding the Leavenworth Project.  This communication, sent by interstate wires, caused harm to the Leavenworth Project by concealing the use of Ambac for credit enhancement and subjecting the Leavenworth Project to inflated and unnecessary fees.

- **Rucker Project:** On May 24, 2005, Marfatia, sent an email to Ray regarding the "secret rating deal" on the Bliss Project.  On June 7, 2005, Marfatia sent an email to Ray's team member Rob McIntire stating his assumption that Ambac's involvement "wrapping" the deal is "on the hush hush."  These communications, sent by interstate wires, caused harm to the Bliss Project and the Carlisle, Leavenworth, Riley, and Rucker Projects which followed by permitting the use of the "stealth structure" fraud scheme to impose undisclosed and inflated fees on the Projects.

- **Riley Project:** On May 24, 2005, Marfatia, sent an email to Ray regarding the "secret rating deal" on the Bliss Project.  On June 7, 2005, Marfatia sent an email to Ray's team member Rob McIntire

stating his assumption that Ambac's involvement "wrapping" the deal is "on the hush hush." These communications, sent by interstate wires, caused harm to the Bliss Project and the Carlisle, Leavenworth, Riley, and Rucker Projects which followed by permitting the use of the "stealth structure" fraud scheme to impose undisclosed and inflated fees on the Projects.

- **Carlisle Project:** On May 24, 2005, Marfatia, sent an email to Ray regarding the "secret rating deal" on the Bliss Project.  On June 7, 2005, Marfatia sent an email to Ray's team member Rob McIntire stating his assumption that Ambac's involvement "wrapping" the deal is "on the hush hush."  These communications, sent by interstate wires, caused harm to the Bliss Project and the Carlisle, Leavenworth, Riley, and Rucker Projects which followed by permitting the use of the "stealth structure" fraud scheme to impose undisclosed and inflated fees on the Projects.

- **AETC I, AMC West, Lackland, and Vandenberg Projects:** All of the above communications directed to BBC were used for the purpose of inducing the BBC Air Force Projects to retain Ray as a financial advisor and to rely on his representations regarding the financial structure for those Projects, including that credit enhancement was being competitively bid and that interest rates were at market.  These same predicate acts thus caused direct harm to each of the BBC Air Force Projects, which have been saddled with high interest rates and sub-optimal financing structures.

- **All Plaintiffs:** Marfatia committed at least two, and in fact dozens of, predicate acts with regard to each of the Plaintiffs, insofar as each of the relevant loan agreements, servicing agreements, credit enhancement agreements, and related transactions for Plaintiffs who received credit enhancement from Ambac required the payment of funds by wire transfer or through the mail. Accordingly, Ambac caused the use of wires or the U.S. mails.  Such acts caused harm to the Projects in that each payment by the Projects incorporated improperly inflated fees and rates and permitted the fraud to remain financially viable and profitable; moreover, the payment of loan proceeds to the Projects by wire transfer was strictly necessary to trigger the Projects' payment obligations and encouraged the Projects' developers to work with the conspirators on other Projects.

265.     These predicate acts were committed over a number of years, beginning as early as 2002, and continuing through at least 2012, but were actively concealed and thus not discovered by Plaintiffs until late 2016 and early 2017.

266.     The acts set forth above constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).  Accordingly, each of the Defendants have violated 18 U.S.C. § 1962(c).

267.     Plaintiffs suffered injury to their business and property by reason of Defendants' pattern of racketeering activity.

### Count II:  Violation of 18 U.S.C. §§ 1962(d)

### (Conspiracy to Commit Civil RICO)

### (Against All Defendants)

268.     Plaintiffs reallege, as if fully set forth herein, the allegations set forth in the preceding paragraphs.

269.    Plaintiffs are all "persons," who have sustained injury to their business or property by reason of Defendants' conduct within the meaning of 18 U.S.C. § 1964(c).

270.    Defendants Ambac, Ray, Marfatia, and Jefferies are "persons" within the meaning of 18 U.S.C. § 1961.

271.    Defendants engaged in violations of 18 U.S.C. § 1962(c), the predicate acts for which are set forth in Count I above and expressly incorporated herein.

272.    Defendants have violated 18 U.S.C. § 1962(d) by conspiring and agreeing to violate 18 U.S.C. § 1962(c), as set forth in Count I above, by knowingly agreeing to adopt the goal of further facilitating the operation of the aforementioned enterprise through a pattern of racketeering and by agreeing to the commission of multiple predicate acts.

273.    Plaintiffs suffered injury to their business and property by reason of Defendants' conspiracy and pattern of racketeering activity.

### Count III:  Breach of Fiduciary Duty

### (Against All Defendants)

274.    Plaintiffs reallege, as if fully set forth herein, the allegations set forth in the preceding paragraphs.

275.    Plaintiffs bring this claim under California law.

276.    As alleged herein and for the purposes stated, Ray authorized and directed GMAC and later Jefferies to hold themselves out as fiduciaries to Plaintiffs and committed to working in Plaintiffs' best interests in connection with the financing of the Projects.  In addition, Marfatia authorized and directed Ambac to hold itself out as a fiduciary in connection with obtaining ratings for the Plaintiff Projects prior to the Bliss Project in 2005 and later Projects where Defendants sought to hide Ambac's involvement in those transactions from the Projects.

277.    Based upon the representations of Ambac, GMAC, Ray, and Marfatia, and later Jefferies, Plaintiffs placed confidence, trust, and reasonable reliance in GMAC, Jefferies and Ambac to secure the most advantageous financing terms on behalf of each of the Plaintiffs.

278.    Each of these Defendants breached their fiduciary duties to Plaintiffs by, among other things, concealing and misrepresenting the relationship between Ambac, GMAC, Ray, and Marfatia in

connection with the financing of the Projects; charging undisclosed fees in connection with the financing of the Projects; making undisclosed profits in connection with the financing of the Projects; not operating in the best interests of the Projects; and, other harms as more fully alleged herein.

279.    Defendants' breaches of their respective fiduciary duties proximately caused damage to Plaintiffs in the form of higher interest rates, payment of unnecessary and inflated fees, and payment of undisclosed fees in connection with the financing of the Projects, and additional damages as alleged herein and subject to discovery.

## **Count IV:  Aiding and Abetting Breach of Fiduciary Duty**

## **(Against All Defendants)**

280.    Plaintiffs reallege, as if fully set forth herein, the allegations set forth in the preceding paragraphs.

281.    Plaintiffs bring this claim under California law.

282.    Defendants each knew that one another's conduct, as alleged above, constituted breaches of their respective fiduciary duties by concealing and misrepresenting the relationship between Ambac, GMAC, Ray, and Marfatia in connection with the financing of the Projects; charging undisclosed and excessive fees in connection with the financing of the Projects; making undisclosed profits in connection with the financing of the Projects; not operating in the best interest of the Projects; and other harms as more fully alleged herein.

283.    Defendants each had knowledge that one another's conduct breached their respective fiduciary duties to Plaintiffs.

284.    Defendants each provided substantial assistance and encouragement to one another so as to breach their respective fiduciary duties to Plaintiffs.

285.    Such substantive assistance and encouragement caused substantial damage to the Projects.

## **Count V:  Fraud by Intentional Misrepresentation**

## **(Against Defendants Ambac, Jefferies, Ray and Marfatia)**

286.    Plaintiffs reallege, as if fully set forth herein, the allegations set forth in the preceding paragraphs.

287.    Plaintiffs bring this claim under California law.

288.    As alleged above, Ambac, GMAC, Ray, and Marfatia intentionally misrepresented to Plaintiffs and the Army/JLL that financial guarantee insurance and a fully funded 12-month debt service reserve or surety bond were required by the rating agencies.

289.    Ambac, GMAC, Ray, and Marfatia each intentionally concealed, among other things, that they were working to obtain shadow ratings from third-party rating agencies that justified the need for insurance and 12-month surety bonds, and that justified the excessive premiums and fees being charged by Ambac.

290.    Ambac, GMAC, Ray, and Marfatia each intentionally concealed, among other things, that they were splitting fees paid by the Projects, including fees for a debt service reserve or surety bond.  They further concealed that GMAC was splitting other fees (including fees misrepresented to be for reimbursement of expenses to GMAC) with Ambac.

291.    Beginning in approximately 2005, Ambac, GMAC, Ray, and Marfatia intentionally misrepresented to the Projects that GMAC was providing a Liquidity Facility to the Projects, when, in fact, GMAC was immediately assigning the Liquidity Facility to Ambac and receiving a full release and taking no real market risk.  Ambac, GMAC, Ray, and Marfatia each intentionally concealed this immediate assignment from the MHPI Projects and the Army/JLL in order to charge excessive fees to the Projects and to hide Ambac's involvement prior to closing.

292.    GMAC, Jefferies, and Ray also misrepresented, among other things as alleged more fully herein, to the Projects and the Army/JLL that the interest rates they charged to the Projects on the underlying loans were "market" and were "the best rates," that the credit spread represented what the investors required to purchase the bonds, and that the only purpose for the OIDs was to ensure the sale of bonds post-closing at a below-par-amount.  Ambac was aware of these misrepresentations and of the outsized profits GMAC was making on the securitization of the loans and the sale of bonds (including to Ambac), which were concealed from Plaintiffs and the Army/JLL.

293.    Plaintiffs reasonably relied on Defendants' intentional misrepresentations and intentional concealment and, as a result, were damaged as a result of this fraud, including by paying inflated and undisclosed premiums, fees and expenses.

## Count VI:  Fraud by Fraudulent Concealment

### (Against Defendants Ambac, Jefferies, Ray and Marfatia)

294.    Plaintiffs reallege, as if fully set forth herein, the allegations set forth in the preceding paragraphs.

295.    Plaintiffs bring this claim under California law.

296.    As alleged above, Ambac, GMAC, Jefferies, Ray, and Marfatia served as fiduciaries to Plaintiffs and committed to work in the best interests of Plaintiffs.  This fiduciary relationship required a duty of full disclosure by Ambac, GMAC, Ray, Jefferies, and Marfatia.

297.    Ambac, GMAC, Ray, and Marfatia failed to disclose, among other things, to Plaintiffs and the Army that financial guarantee insurance and a fully funded 12-month debt service reserve or surety bond were not required by the rating agencies.

298.    Ambac, GMAC, Ray and Marfatia likewise failed to disclose that they were splitting fees, including fees for a debt service reserve/surety.  They further failed to disclose that GMAC was splitting other fees (including fees misrepresented to be for reimbursement of expenses to GMAC) with Ambac.

299.    Beginning in approximately 2005, Ambac, GMAC, Ray, and Marfatia also failed to disclose to Plaintiffs that, among other things, GMAC was providing a Liquidity Facility to the Projects, when, in fact, GMAC was immediately assigning the Liquidity Facility to Ambac and receiving a full release. Ambac, GMAC, Ray, and Marfatia failed to disclose this immediate assignment in order to charge excessive fees to the Projects and to hide Ambac's involvement prior to closing.

300.    GMAC, Jefferies, and Ray also failed to disclose to Plaintiffs that, among other things as alleged more fully herein, the interest rates they charged to the Projects on the underlying loans were not "market," were not "the best rates" that its trading desk could offer, were not what was required by investors, that the OIDs were merely to allow GMAC to sell the bonds post-closing at a discount to par, that they were not negotiating Plaintiffs' credit enhancement premiums in the Projects' best interests, and that they were not charging only legitimate deal expenses to the Projects.  Ambac was aware of these misrepresentations and of the outsized and undisclosed profits GMAC was making on

the securitization of the loans and the sale of bonds (including to Ambac), which were concealed from Plaintiffs.

301.    Plaintiffs were not aware of these concealed facts at the time of the transactions.

302.    Plaintiffs reasonably relied on Defendants to provide full disclosure of all material facts and, as a result, were damaged as a result of these frauds, including by paying inflated premiums, fees, and expenses.

### Count VII:  Conspiracy to Commit Fraud

### (Against All Defendants)

303.    Plaintiffs reallege, as if fully set forth herein, the allegations set forth in the preceding paragraphs.

304.    Plaintiffs bring this claim under California law.

305.    Ambac and Marfatia, and their co-conspirators GMAC, Jefferies, and Ray arrived at a mutual understanding of how they would cooperate to accomplish carrying out and concealing the above-described frauds.

306.    Ambac and its co-conspirators acted in concert and made these representations and failed to disclose material facts with knowledge of their falsity.

307.    Plaintiffs were damaged as a result of the wrongful acts and conspiracy.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendants and seek the following relief:

a)      Relieving Plaintiffs, in whole or in part, from a continuing obligation to make payments to Ambac or its bond insurers;

b)      Declaring any purported disclaimer by Jefferies Mortgage of its fiduciary duty to the Sill and Bliss Projects null and void;

c)      Disgorgement of all profits and fees, both disclosed and undisclosed;

d)      An award of compensatory damages, the amount of which is to be determined at trial;

e)      Punitive damages;

f)      Trebled damages pursuant to 18 U.S.C. § 1964(c);

g)      Attorney's fees pursuant to 18 U.S.C. § 1964(c);

h)      Prejudgment interest at the legal rate on the foregoing sums; and

i)      Such other relief deemed appropriate and just by the Court.


DATED: July 22, 2019                          Respectfully submitted,

                                              KIRKLAND & ELLIS LLP


                                              By:     */s/ Donna M. Welch*
                                              Michael P. Esser (SBN 268634)
                                              KIRKLAND & ELLIS LLP
                                              555 California Street
                                              San Francisco, CA 94104
                                              Telephone: (415) 439-1400
                                              Facsimile: (415) 439-1500
                                              Email: michael.esser@kirkland.com

                                              Jeffrey L. Willian, P.C. (*pro hac vice*)
                                              Donna M. Welch, P.C. (*pro hac vice*)
                                              KIRKLAND & ELLIS LLP
                                              300 North LaSalle
                                              Chicago, IL 60654
                                              Telephone: (312) 862-2000
                                              Facsimile: (312) 862-2200
                                              Email: jwillian@kirkland.com
                                              Email: dwelch@kirkland.com

                                              Attorneys for Plaintiffs

1

**CERTIFICATE OF SERVICE**

2   I HEREBY CERTIFY that on July 22, 2019, a copy of the foregoing document is being

3   electronically filed with the Clerk of the United States District Court for the Northern District of

4   California by using the CM/ECF system which will send notice of such filing to all counsel of

5   record.

6         I HEREBY CERTIFY that on July 22, 2019, a copy of the foregoing document is being

7   electronically mailed to counsel below:

8

9       Martin Healy
    JLL

10      1801 K. Street NW, Suite 1000
    Washington, DC 20006

11      Telephone: (202) 719-5723
    Facsimile: (312) 416-9693

12      Email: martin.healy@am.jll.com

13

14                      KIRKLAND & ELLIS LLP

15

16                      By:    */s/ Donna M. Welch*
                    Michael P. Esser (SBN 268634)

17                      KIRKLAND & ELLIS LLP
                    555 California Street

18                      San Francisco, CA 94104
                    Telephone: (415) 439-1400

19                      Facsimile: (415) 439-1500
                    Email: michael.esser@kirkland.com

20                      Jeffrey L. Willian, P.C. (*pro hac vice*)

21                      Donna M. Welch, P.C. (*pro hac vice*)
                    KIRKLAND & ELLIS LLP

22                      300 North LaSalle
                    Chicago, IL 60654

23                      Telephone: (312) 862-2000
                    Facsimile: (312) 862-2200

24                      Email: jwillian@kirkland.com
                    Email: dwelch@kirkland.com

25                      Attorneys for Plaintiffs

26

27

28